NOV 24 2022 PM 2:22
FILED-USDC-CT-NEW HAVEN

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

22 mj 530
22 mj 531
22 mj 532
22 mj 533
22 mj 534
22 mj 535
22 mj 536
22 mj 537
22 mj 538
3:22 mj 539
22 mj 540
22 mj 541
22 mj 542
22 mj 543
22 mj 544

IN RE APPLICATIONS FOR ARREST      :
WARRANTS AND SERACH                :
WARRANTS                           :
                                   :
                                   :

# **MASTER AFFIDAVIT**

1

Table of Contents

I.     INTRODUCTION ..................................................................................................5

II.    SUMMARY OF THE INVESTIGATION ..........................................................14

III.   TRAINING AND EXPERIENCE .....................................................................19

IV.    BASIS AND SCOPE OF INFORMATION .......................................................29

V.     COOPERATING SOURCES ..............................................................................30

   Cooperating Source 1 ...............................................................................................31

     Pertinent Information/Evidence Provided by CS1 ..............................................32

   Cooperating Source 2 ...............................................................................................33

     Pertinent Information/Evidence Provided by CS2 ..............................................34

   Cooperating Source 3 ...............................................................................................35

     Pertinent Information/Evidence Provided by CS3 ..............................................36

   Cooperating Source 4 ...............................................................................................38

     Pertinent Information/Evidence Provided by CS4 ..............................................38

   Cooperating Source 5 ...............................................................................................38

     Pertinent Information/Evidence Provided by CS5 ..............................................39

   Cooperating Source 6 ...............................................................................................41

   Cooperating Source 7 ...............................................................................................42

VI.    TARGET TELEPHONES .................................................................................43

VII.   CONTROLLED PURCHASES ........................................................................44

VIII.  WIRETAP AUTHORIZATIONS .....................................................................45

IX.    SELECTED SUMMARIES OF INTERCEPTED COMMUNICATIONS............46

   Target Telephone 1 ("TT1") .....................................................................................46

     Sampling of Communications with Christopher Cammilletti................................47

     Sampling of Communications with John Steferak, a.k.a. "Jack" .........................50

     Francisco Gonzalez's Cocaine Prices and Processing Preferences (Session 2726)............51

     Francisco Gonzalez Prefers to Sell Cocaine in Quantities of an Ounce or More................54

     Communications Over Target Telephone 1 Pertaining to Javier Gonzalez ........................55

   Target Telephone 2 ("TT2") .....................................................................................59

   Target Telephone 3 ("TT3") .....................................................................................66

     A sampling of the communications is set forth below in chronological order. .................67

   Target Telephone 4 ("TT4")......................................................................................108

A sampling of the communications is set forth below in chronological order. ...............................109

X.    **ADDITIONAL INFORMATION REGARDING THE SUBJECT PREMISES**......................133

Additional Information Pertaining to Subject Premises 1 ("SP1") ........................................133

Additional Information Pertaining to Subject Premises 2 ........................................................138

Francisco GONZALEZ's Pattern of Distribution to CAMMILLETTI.................................141

Francisco GONZALEZ's Pattern of Distribution to STEFERAK ..................................144

December 27, 2021:  STEFERAKS' Arrest...........................................................147

STEFERAK's Continuing Pattern of Drug Transactions at Subject Premises 2 ...................147

Recent Surveillance at Subject Premises 2 .........................................................148

Additional Information Pertaining to Subject Premises 3 ("SP3") ........................................151

February 15, 2022:  Drugs Within Subject Premises 3 (Including a Video) ......................156

February 23, 2022:  Cash Drug Proceeds at Subject Premises 3 (Seizure of $88,000)......................159

March 7, 2022:  Cash Drug Proceeds at Subject Premises 3 ..........................................164

March 21, 2022:  Cash Drug Proceeds at Subject Premises 3 ($30,000) .........................................169

March 28, 2022:  Cash Drugs Proceeds at Subject Premises 3 ($55,000).........................................172

April 26, 2022:  Drugs Within Subject Premises 3 .....................................................175

May 12, 2022:  Drugs Within Subject Premises 3 ......................................................177

The Duran-Barrera 50 Gram Heroin Transaction on May 12, 2022 ..............................177

The Santiago 300-Gram Cocaine Transaction on May 12, 2022 ......................................180

Additional Information Pertaining to Subject Premises 4 ........................................................183

Additional Information Pertaining to Subject Premises 5 ("SP5") ........................................183

February 11, 2022:  Jose Duprey Retrieves Drugs from SP5 ...........................................186

February 23, 2022:  Kilogram Wrappers Pulled from the Trash Outside SP5 ..................188

March 15, 2022:  Duprey's Daughter Retrieves Drugs from SP5 .....................................194

April 13, 2022:  Robert AMATRUDA and Jose DUPREY Retrieve Drugs from SP5.............................199

May 12, 2022:  DUPREY Retrieved Heroin from within SP5 for DURAN-BARRERA.........................203

Additional Information Pertaining to Subject Premises 6 ("SP6") ........................................205

March 12, 2022:  RAMOS requesting 200 Grams of Cocaine.........................................207

April 13, 2022:  DUPREY and RAMOS exchange $3,000................................................207

April 14, 2022:  Surveillance of Jose RAMOS at SP6...................................................207

April 18, 2022:  RAMOS' $20,100 Drug Debt...........................................................209

April 21, 2022:  RAMOS Orders 150 Grams of Cocaine................................................209

April 22, 2022:  Drug Proceeds and Drugs at SP6........................................................209

Additional Information Pertaining to Subject Premises 7 ("SP7") ........................................213

March 14, 2022:  DURAN-BARRERA Surveilled to SP7 ........................................................215

March 31, 2022:  DURAN-BARRERA Arrested in Possession of 200 Grams of Heroin ....................217

April 20, 2022:  Surveillance of DURAN-BARRERA at SP7 ................................................219

DURAN-BARRERA's Continued Involvement in Drug Trafficking ....................................219

Additional Information Pertaining to Subject Premises 8 ("SP8") ........................................220

April 28, 2022 and April 29, 2022:  Surveillance of GEBEAU at SP8 ................................226

Additional Information Pertaining to Subject Premises 9 ................................................230

March 15, 2022: Drugs Transported to Subject Premises 9 ................................................231

April 25, 2022:  Cocaine Obtained from Subject Premises 9 ................................................234

Additional Information Pertaining to Subject Premises 10 ................................................237

Additional Information Pertaining to Subject Premises 11 ................................................241

2019 Arrest of Jonathan SANTIAGO by the Waterbury Police Department ....................................242

May 4, 2022:  200 Grams of Suspected Cocaine Within SP11 ................................................243

May 17, 2022:  Surveillance of SANTIAGO and Drugs Within SP11 ................................................246

Additional Information Pertaining to Subject Premises 12 ................................................248

April 2, 2022:  AMATRUDA in Possession of Four Kilograms of Cocaine ................................250

May 9, 2022, and May 10, 2022:  Cocaine Stored within Subject Premises 12 ................................251

XIII.      EXECUTION OF THE WARRANTS ................................................257

XIV.       SEALING ................................................258

## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

STATE OF CONNECTICUT                    ss:  Bridgeport, Connecticut

COUNTY OF NEW HAVEN

### MASTER AFFIDAVIT

I, Scott Vitelli, being duly sworn, do depose and say:

## I.     INTRODUCTION

1.     I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, and am empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18, United States Code.

2.     I am employed as a police officer with the West Haven Police Department ("WHPD"), located in West Haven, Connecticut.   I have been employed by the WHPD for approximately 11 years, three of which were spent in the WHPD Street Crime Unit, a group charged specifically with investigating narcotics trafficking offenses.

3.     I am currently assigned to the Drug Enforcement Administration ("DEA"), New Haven District Office ("NHDO"), as a Task Force Officer ("TFO").  I have been assigned to the DEA as a TFO since October of 2017.   In my capacity as a TFO with the DEA, I am a participating member of the Organized Crime Drug Enforcement Task Force ("Task Force"), which is comprised of personnel from federal, state, and local law enforcement agencies.

4.     As part of my duties, I am conducting an investigation, together with other law enforcement officers, into suspected criminal activity, including drug trafficking and related offenses,

5

in and around Waterbury, Connecticut, by Jose DUPREY and his suspected coconspirators, and Javier GONZALEZ and his suspected coconspirators, including suspected coconspirators yet unknown or not yet fully identified.

5.    I am a co-case agent directing the investigation that is the subject of this affidavit.

6.    The investigation has employed several different investigative techniques, including, but not limited to:

      a.   the gathering of intelligence from reliable cooperating sources;

      b.   the examination of records, including call detail records and motor vehicle records;

      c.   the use of pen registers and trap-and-trace devices;

      d.   the obtaining of precise location information;

      e.   physical surveillance and the use of pole cameras;

      f.   controlled purchases of drugs; and,

      g.   court-authorized wiretaps on cellular telephones utilized by DUPREY, Javier GONZALEZ, and Javier GONZALEZ's brother, Francisco GONZALEZ.

7.    Based upon information known to me as a result of my participation in this investigation, as well as information, which I have determined to be accurate and reliable, provided to me by other law enforcement officers, including my co-case agents in this investigation, I am familiar with the information discussed herein.  Where the contents of documents, or communications with others, are reported herein, they are set forth in substance and part, unless otherwise indicated.

8.    This affidavit is being submitted in support of applications for warrants to arrest numerous individuals, identified more fully herein as the "**Violators**."   This affidavit is also being

submitted in support of applications for warrants to search multiple locations, described more fully below and throughout this affidavit as the "**Subject Premises**."

9. As discussed more fully below, there is probable cause to believe, and I do believe, that the **Violators** listed herein have committed drug trafficking offenses in violation of Title 21 U.S.C. Sections 841, 846, and 843, to wit, possession with intent to distribute, and distribution of, controlled substances, including heroin, fentanyl, cocaine, cocaine base, oxycodone, conspiracy to do the same, and use of a telephone in furtherance of a drug trafficking offense, and, with respect to Javier Gonzalez and Francisco Gonzalez, bulk cash smuggling and conspiracy to commit bulk cash smuggling, in violation of Sections 31 U.S.C. Section 5332 and 18 U.S.C. Section 371, and that fruits, instrumentalities, and evidence of these violations set forth on the Attachments A to the warrants sought herein, including but not limited to quantities of said controlled substances, or residue of these substances, drug paraphernalia, drug packaging materials, cash deriving from the sale of drugs, and/or documents and records relating to the aforementioned offenses, including records stored in electronic form, as well as telephones utilized in furtherance of these offenses, will be found within the **Subject Premises** listed herein.

10. The following **Violators** have been identified in this case, using various investigative methods, including but not limited to, the gathering of information from confidential sources, physical surveillance, at times in conjunction with contemporaneous wiretap intercepts, pole camera footage, review of records, including telephone service provider records, motor vehicle records, utility records, and/or prison records, voice identification, and the content and context of intercepted communications.  In addition, using one or more of these investigative methods, investigators have confirmed that the conspirators listed

below have used the telephone numbers listed next to their names.  In some instances, if a conspirator, after having been identified as the user of a particular phone, dropped his or her phone, and/or began using one or more other phones, voice comparisons and the content and context of intercepted calls were used to associate new phones numbers with the conspirator, as was, in some instances, physical and/or pole camera surveillance conducted in conjunction with contemporaneous intercepts.

   a.  JAVIER GONZALEZ, a.k.a. "Jay" and "The Crazy One":  (860) 483-2274 (Target Telephone 2).

   b.  FRANCISCO GONZALEZ, a.k.a. "Sisco":  (203) 509-1982 (Target Telephone 1).

   c.  CHRISTOPHER CAMMILLETTI: (860) 877-1439.

   d.  JOHN STEFERAK, a.k.a. "Jack": (203) 306-7125.

   e.  JOSE DUPREY, a.k.a. "Red" and "Colorado": (203) 228-0565, which was changed to (860) 483-1069 (Target Telephone 3) and (347) 456-8272 (Target Telephone 4).

   f.  WANDA LORA: (203) 709-8326 and (203) 802-2948 (which is the business telephone number for "Blooming Eyes by Lora," Subject Premises 5).

   g.  EDWIN HERNANDEZ, a.k.a. "Lolo": (470) 838-5167.

   h.  ROBERT AMATRUDA, a.k.a. "Bubba" and "Spanky": (203) 850-9625 and (203) 519-3296.

   i.  VICTOR DURAN-BARRERA, a.k.a. "Mexico": (475) 449-0830.

   j.  GARRY GEBEAU: (475) 470-4553 and (413) 291-6166.

   k.  JONATHAN SANTIAGO: (475) 559-9691 and (203) 592-5107.

l.  THOMAS SANTOS, a.k.a. "White Boy": (475) 295-7948 and (475) 559-6199.  Santos is also known, based upon parole records, to have used telephone number (475) 559-1401 but was not intercepted using this number.

m.  JOSE RAMOS: (516) 669-4881.

n.  ARMANDO VARELA-PLAZA: (347) 556-6369.

o.  BIANCA RODRIGUEZ-CANCEL: (718) 753-5096.

p.  MICHELE CRUZ: (347) 361-2697.

11.    The Subject Premises for which search warrants are sought are as follows:

a.  **Subject Premises 1 ("SP1"),** 119 Enoch Street in Waterbury, Connecticut, is more particularly described as a newly constructed, two-story, singly-family home that appears dark gray in color with gray brick in the area of the front entrance.  The front entrance has white double doors with oval shaped windows. The residence has an attached two-car garage, with two, white garage doors. The number "119" is mounted on a placard located to the left of the front double doors.  This residence is the home of Javier GONZALEZ, where there is probable causes to believe he stores drugs, drug proceeds, and drug records and other evidence of the offenses listed herein and listed on Attachment A for this Subject Premises.

b.  **Subject Premises 2 ("SP2"),** 131 Geddes Terrace, Waterbury, Connecticut, is more particularly described as a two-story, single-family residence that is green and tan in color. The front door to the residence faces Geddes Terrace and the number "131" is clearly displayed to the left of the front door.  This residence is the home of Francisco GONZALEZ, where there is probable causes to

believe he stores drugs, drug proceeds, and drug records and other evidence of the offenses listed herein and listed on Attachment A for this Subject Premises.

c. **Subject Premises 3 ("SP3")**, 87 Seymour Street, Floor 1, in Waterbury, Connecticut, is more particularly described as a two-level, two-family residence that is light blueish-gray in color with shutters that are light tan in color, and a front door that is maroon in color and covered by a small awning. The front entrance of the residence faces Seymour Street. This residence is the home of Jose DUPREY and Wanda LORA, where there is probable causes to believe DUPREY stores drugs, drug proceeds, and drug records and other evidence of the offenses listed herein and listed on Attachment A for this Subject Premises.

d. **Subject Premises 4 ("SP4")**, Discount Car Rental, 767 Wolcott Street, Waterbury, Connecticut, is the business where Duprey is employed. It is also a principal location from which Duprey has routinely distributed drugs throughout this investigation. **Notwithstanding this, a search warrant for this location is no longer being sought**. This is so because, after a careful review of intercepted communication in which Duprey has participated and a careful review of surveillance reports prepared throughout this investigation, investigators believe Duprey stores his drug proceeds and records in Subject Premises 3 and bulk quantities of his drugs within Subject Premise 5, as explained more fully below in subsequent subsections of this affidavit pertaining to those Subject Premises.

e. **Subject Premises 5 ("SP5")** is located at 2030 Straits Turnpike, Suite 3 in Middlebury, Connecticut. Suite 3 is one several small business suites inside the

10

structure located 2030 Straits Turnpike.  The door to Suite 3 is clearly marked with a sign that reads "Suite 3."  The sign also reads "Skintique," "All About Tranquility Massage Therapy," "Blooming Eyes by Laura," and "by appointments only 203-802-2948."  The business park structure is circular in shape and white and blue in color, with a large sign on its front lawn which clearly displays the number "2030."  As indicated above, Duprey is believed to store bulk quantities of drugs, including heroin and cocaine, and other items listed on Attachment A for this Subject Premises, within Subject Premises 5.

f.   **Subject Premises 6 ("SP6"),** 163 Fanning Street, Waterbury, CT, is believed to be the residence of Jose RAMOS and the location at which there is probable cause to believe drugs, drug proceeds and drug records, as well as other evidence of the offenses set forth in this affidavit and listed on Attachment A for this Subject Premises are located.  SP6 is more particularly described as a single-family residence that is white in color and has black shutters.  The residence has the number "163" clearly displayed on the residence to the right of the front door.

g.   **Subject Premises 7 ("SP7"),** 214 Denver Avenue, 2nd Floor, Bridgeport, CT, more particularly described as a multi-family residence with a green-and-white painted exterior, white-trimmed windows, and black shingles. There are two separate doors on the front of the structure, both of which are white. The two doors are immediately adjacent to each other.  The right door is labeled "214" and is believed to be a common door used to access a first-floor unit, as well as SP7, which is the second-floor unit. (The left door is labeled "212" and is

11

believed to access the first and second floors units of 212 Denver Avenue, a separate and distinct premises.)  Subject Premises 7 is the home of Victor DURAN-BARRERA, where there is probable causes to believe he stores drugs, drug proceeds, and drug records and other evidence of the offenses listed herein and listed on Attachment A for this Subject Premises.

h.  **Subject Premises 8 ("SP8")**, 4 Chester Street, Ansonia, CT, more particularly described as a single-family residence that is white in color with a black rod iron railing.  The residence has the number "4" clearly displayed on the left side of the front door.  This residence is the home of Garry GEBEAU, where there is probable causes to believe he stores drugs, drug proceeds, and drug records and other evidence of the offenses listed herein and listed on Attachment A for this Subject Premises.

i.  **Subject Premises 9 ("SP9")**, 345 Woodtick Road, Wolcott, Connecticut, more particularly described as a two-bay garage with a small office attached on the right side.  The garage is light gray in color with maroon bay doors and the office is also light gray in color with maroon trim on the windows and doors.  Currently, there are no numbers affixed to the garage.  Robert AMATRUDA works at the service station located at this address and is believed to store bulk quantities of drugs within Subject Premises 9 as well as items listed on Attachment A for this Subject Premises.

j.  **Subject Premises 10 ("SP10")**, 30 Hart Circle, Unit 12, in Waterbury, Connecticut, is the home of Thomas SANTOS, and is believed to be the location where he stores drugs, drug proceeds, drug records and other items listed on

attachment A for this Subject Premises. It is more particularly described as a three-level, apartment/condominium building with numerous individual units within. The ground floor of the building consists of 10 garages on the east side of the building. The second floor of the building is the main floor that contains entrances to individual units. The third floor of the building appears to only be accessible by going through the main entrances to the building on the second floor. The exterior of the building primarily contains yellowish-colored siding and reddish-brown colored brick with brown trim. Unit 12 is accessed via a stairwell attached to the wall closest to Hart Circle, which leads to the second floor. At the top of the stairwell, a door is located on the left-hand side, and it is the only door the stairwell leads to. To the left-hand side of that door is a series of four doorbells labeled 9, 10, 11, and 12. Once that door is opened, Units 9 and 10 are located straight ahead. Unit 11 is located up a stairwell to the left-hand side of the main door and Unit 12 is located up a stairwell to the right-hand side of the main door. The number "30" is displayed on the outside wall of the stairwell closest to Hart Circle, which leads to Units 9-12.

k. **Subject Premises 11 ("SP11"),** 169 Stonefield Drive, apartment 7, Waterbury, Connecticut, more particularly described as a multi-unit apartment building with the front doors at ground level. The building is described as having the bottom portion constructed of brick and the top portion having tan siding. The exterior front door to SP11 is maroon in color and is clearly marked "169 7" on the right side of the door, above the black mailbox mounted to the brick. Subject Premises 11 is the home of Jonathan SANTIAGO and is believed to be

a location used by SANTIAGO to store narcotics purchased from Jose DUPREY as well as drug proceeds at other items listed on Attachment A for this Subject Premises.

l. **Subject Premises 12 ("SP12"),** 96 North Pond Street, Bristol, CT 06010, is the home of Robert AMATRUDO and is believed to be a location where he stores drugs, drug proceeds, and drug records, as well as other items listed on Attachment A for this Subject Premises.  It is more particularly described as a two-story, two-family residence that is white in color with dark colored shutters. The residence is located on the corner of North Pond Street and Cypress Street. The front door to the residence faces North Pond Street and the number, "96" is clearly displayed on the left side of the front door as you look at the house from the street.

12.     Because the information and evidence gathered during this investigation is voluminous, I have not included each and every fact known to me concerning this investigation.  Instead, I have set forth those facts which I believe are necessary to establish the existence of probable cause to support the requested warrants.

## II.    SUMMARY OF THE INVESTIGATION

13.     The DEA NHDO has conducted a long-term investigation of suspected drug trafficking in and around the city of Waterbury, Connecticut, by Javier GONZALEZ and his suspected coconspirators and Jose DUPREY and his suspected coconspirators.

14.     The investigation employed various investigative techniques, including but not limited to, the gathering of intelligence from several confidential informants, the examination of records, including but not limited to call detail records, motor vehicle records and/or utility

records, the gathering of precise location information on multiple cellular telephones, the use of pole cameras, the use of court-authorized wiretaps on multiple cellular telephones utilized by the subjects of the investigation, and physical surveillance, at times done in conjunction with contemporaneous wiretap intercepts.

15. During the course of the investigation, investigators have identified several **Violators** and ascertained the following regarding these individuals.

16. **Javier GONZALEZ** has been involved in the distribution of controlled substances for several years and is believed to be a kilogram-level drug trafficker.  Javier GONZALEZ was intercepted utilizing Target Telephone 2 during this investigation.  Wiretap intercepts indicate that he supplies drugs to his brother, Francisco GONZALEZ, who redistributes the drugs.  Wiretap intercepts also indicate that Javier GONZALEZ is supplied with drugs from source who is located in Mexico.  Intercepts also revealed that on or about February 24, 2022, Javier GONZALEZ and Francisco GONZALEZ, with the assistance of Francisco GONZALEZ's paramour, Vanessa Battice, smuggled approximately $26,000 in cash into Mexico for the purpose of paying Javier GONZALEZ's Mexican drug supplier.  Source information indicates that Javier GONZALEZ and Jose DUPREY previously worked together in the drug trade.  Wiretap intercepts and pole camera footage confirm that Javier GONZALEZ and DUPREY continue to be in contact with one another and continue to associate, but the precise nature of their current association has not been confirmed.  Two explicit intercepts over Target Telephone 4 on April 21, 2022, sessions 5248 and 5249, however, establishes probable cause to believe that Javier Gonzalez is supplying Duprey's daughter with redistribution quantities of oxycodone, with full knowledge of how much

profit Duprey's daughter will make selling the oxycodone.  In 2019, CS1 made a controlled purchase of heroin from Javier Gonzalez.

17.   **Francisco GONZALEZ** is believed to be supplied with drugs by his brother, Javier GONZALEZ.  Francisco GONZALEZ has been intercepted participating in numerous, explicit wiretap intercepts over Target Telephone 1, which plainly pertained to his distribution of heroin, cocaine, cocaine base, and oxycodone.  Several of Francisco GONZALEZ's drug customer appear to be users.   But at least two of Francisco GONZALEZ's drug customers--Christopher CAMMILLETTI and John STEFERAK--are also redistributors, as explained more fully herein.

18.   **Christopher CAMMILLETTI** is believed to be a drug user and a drug distributor.  This has been borne out by numerous, explicit intercepts over Target Telephone 1, which plainly pertained to CAMMILLETTI's distribution of heroin, cocaine, and cocaine base.

19.   **John STEFERAK**, a.k.a. "Jack," is believed to be a drug distributor (and likely a user) who sells heroin and oxycodone and is supplied with heroin and oxycodone by Francisco Gonzalez.  This has been borne out by numerous, explicit intercepts over Target Telephone 1, which plainly pertained to STEFERAK's distribution of heroin and oxycodone. (Steferak, when ordering oxycodone, expressly referred to this drug as "blue or blues," terms used commonly in the drug trade in connection with 30 mg oxycodone pills, which are blue in color.)  On December 27, 2021, in session 3736 over TT1, STEFERAK spoke to Francisco GONZALEZ and said, "I'm a get 6 and 2 . . . can you put all the six together and then the two," believed to be an indication that STEFERAK wanted heroin packaged in two separate bags, one containing six grams and another containing two grams. GONZALEZ said, "Okay.  Six and two . . . Alright, man."  Surveillance was conducted of

16

a subsequent meeting between STEFERAK and Francisco GONZALEZ at **Subject Premises 2**, during which Francisco Gonzalez is believed to have supplied Steferak with heroin, packaged in two separate quantities, in two separate bags, per Steferak's request. Following the meeting at **Subject Premises 2**, the vehicle STEFERAK was operating was stopped and two packages of heroin were seized from STEFERAK, one estimated to contain approximately two grams of heroin and the second estimated to contain approximately six grams of heroin.

20.    **Jose DUPREY** is believed to receive kilogram quantities of cocaine, heroin, and possibly fentanyl, from a Mexican supplier.  DUPREY is believed to redistribute wholesale quantities of these controlled substances in and around Waterbury, Connecticut, at times from his residence at 87 Seymour Steet, Floor 1, in Waterbury (**Subject Premises 3**) and at times from Discount Car Rental (**Subject Premises 4**), the business where he is employed.  He has been intercepted participating in numerous explicit intercepts over Target Telephone 3 and Target Telephone 4, which plainly pertained to drug trafficking. In connection with explicit intercepts, DUPREY has been observed by physical surveillance on several occasions engaging in suspected drug trafficking activities with his suspected coconspirators.  DURPEY's suspected drug trafficking activities have also been recorded in part, on occasion, by pole cameras utilized in this case in the vicinity of Discount Car Rental (**Subject Premises 4**); 87 Seymour Street in Waterbury, DUPREY's residence (**Subject Premises 3**); and, 2030 Straits Turnpike in Middlebury, the location of "Blooming Eyes by Lora," (**Subject Premises 5**), an eyelash salon operated by Wanda Lora and believed to be utilized by DUPREY to secrete bulk quantities of drugs.

21.  **Wanda LORA** a.k.a. "Wanda Lopez," is Jose Duprey's paramour and resides with him at Subject Premises 3.  The investigation has revealed that she Lora has knowledge of Duprey's drug trafficking activities and permits him to use her business, Blooming Eyes by Lora, Subject Premises 5, to store bulk quantities of drug proceeds, and her residence, Subject Premises 3, to store large quantities of drug proceeds.  She has also actively participated in the conspiracy by retrieving drug proceeds from within Subject Premises 3 and delivering the money to a location where Duprey and a money-courier for Duprey's drug supplier were meeting for the money exchange.  (Wanda Lora's driver's license is the name Wanda Lora and lists her address as 87 Seymour Street in Waterbury.  A law enforcement data base associates the names Wanda Lora and Wanda Lopez, with the same date of birth, at 87 Seymour Street in Waterbury, Connecticut.)

22.  **Edwin HERNANDEZ** is believed, based upon numerous, explicit intercepts, to be a high-level member of the organization with which Duprey is affiliated who coordinates kilogram-weight shipments of drugs and coordinates the delivery of payments by Duprey to the organization.  He is currently incarcerated in federal prison in Atlanta, Georgia.

23.  **Robert AMATRUDA** is believed to be a cocaine distributor who, at times, is also believed to have supplied Duprey with large quantities of cocaine.

24.  **Victor DURAN-BARRERA**, **Garry GEBEAU**, **Jonathan SANTIAGO**, **Thomas SANTOS**, **Jose RAMOS**, and **Michelle CRUZ** are all redistributors of one or more controlled substances (heroin, cocaine, cocaine base, and/or fentanyl), and are all supplied with drugs by Joe DUPREY.  Law enforcement seized 200 grams of heroin from DURAN-BARRERA on March 31, 2022, which had been supplied to him by DUPREY.

18

25.    **Armando VARELA-PLAZA** and **Bianco RODRIGUEZ-CANCEL** are money couriers for the organization of which DUPREY is a part and have picked up large quantities of cash drug proceeds from DUPREY during the investigation.  On February 23, 2022, in connection with explicit intercepts, law enforcement seized $88,000 that VARELA-PLAZA had picked up from DUPREY at Subject Premises 3.

## III.    TRAINING AND EXPERIENCE

26.    As indicated above, I have been a police officer for approximately 11 years, the last five of which have been spent serving as a Task Force Officer assigned to the DEA.

27.    I have received instruction relative to conducting drug investigations while attending the DEA Basic Narcotics Training Class, the Connecticut Police Academy (POSTC) in Meriden, Connecticut, and in connection with numerous in-service training classes.

28.    During the course of my career, I have participated in numerous criminal investigations, including investigations involving suspected narcotics trafficking by individuals and organizations, gang activity, violent crime, and money laundering.  The numerous investigations in which I have participated have resulted in state and federal convictions of numerous individuals for narcotics trafficking offenses and/or other criminal offenses.

29.    My participation in these investigations has included debriefing cooperating sources and drug distributors, as well as other local, state and federal law enforcement officers, regarding the manner and means employed by narcotics traffickers, including the manner in which narcotics traffickers obtain, store, manufacture, transport, package and distribute their illegal drugs, finance their distribution operations, and conceal, transport, and launder the corresponding drug proceeds.

30.     I have coordinated controlled purchases of controlled substances utilizing confidential sources and undercover law enforcement agents and officers.  I have been the affiant in numerous applications for federal search and seizure warrants, the execution of which resulted in the seizure of controlled substances.  I have been the affiant on numerous applications for criminal complaints and arrest warrants, the execution of which resulted in the arrest of persons engaged in unlawful activity.  I have executed, and coordinated the execution of, numerous search and seizure and arrest warrants.  I have conducted and coordinated electronic and physical surveillance of individuals involved in the illegal distribution of controlled substances.  I have analyzed records documenting the illegal purchase of and sale of controlled substances.  I have testified in court in criminal cases and my testimony has contributed to the conviction of numerous individuals.

31.     I have participated in multiple Title III wiretap investigations and have served as the case agent and/or co-case agent in connection with two federal Title III wiretap investigations (including this one).

32.     Based upon my experience and training, I am familiar with the practices employed by narcotics traffickers to secrete their drugs, drug proceeds, and records relating to drug trafficking in an effort to avoid detection.  I know that drug traffickers, particularly drug traffickers who operate a reasonably high level, often maintain and/or utilize multiple premises, each with a specific purpose, to facilitate their drug trafficking organization's operational interests as well as to protect their interests from their competition and elude law enforcement.

33.     I know that drug traffickers, particularly those who distribute a high volume of drugs and those who distribute drugs on a daily basis or with frequency, often store cash drug

proceeds and records relating to their drug trafficking and drug proceeds, including but not limited to records regarding the disposition, transportation, or transfer of drug proceeds, as well as records regarding drug debts or records pertaining to the identity of coconspirators, within their residences or other structures over which they can exercise complete dominion and control and which they can attempt to secure with surveillance cameras or other security measure.

34.    I am also familiar with the manner and means by which narcotics traffickers communicate, as well as the devices commonly utilized by them, and those methods employed by narcotics traffickers in an effort to avoid detection by law enforcement.

35.    I know that narcotics traffickers often use cellular telephones, and often speak to one another using coded, cryptic or slang words and phrases, in the belief that, by doing so, they can thwart the efforts of law enforcement to identify them and their activities and to seize their drugs and/or assets.

36.    I am familiar with the slang and coded conversation employed in the narcotics trade, and I know the wholesale and retail value and pricing associated with various controlled substances, including heroin, cocaine, cocaine base, oxycodone, and marijuana, and the manner in which these controlled substances are commonly packaged for wholesale and retail, i.e. "street-level," distribution.

37.    For example, I know that heroin is commonly referred to as "dope," "diesel," "the boy," "the dark one," "the horse," or simply "H" or by the name of the stamp on the bags of heroin a seller is distributing at a particular point in time.  Heroin is distributed at the street level in "bundles" or individual bags. "A "bundle" consists of ten, single-dosage unit bags of heroin that are bundled or tied together, with each bag containing between .02 and .03

grams of heroin.  Single-dosage unit bags are often "stamped" with a brand name that is familiar to a particular distributor's customer base.  The term "brick" and "house" refers to five "bundles" of heroin (i.e., 50 single dosage unit bags) sold together as one unit, which is a redistribution quantity.  Another term often associated with heroin distribution is "boxes."  A box of heroin contains 500 single-dosage-unit bags/folds, or 10 bricks/50 bundles.  (The boxes are sold packed with 600 bags/folds, but once filled with heroin, hold 500 bags/folds).  A bundle ranges from approximately $40 to $60 for street-level distribution, and a brick, which is a redistribution quantity, goes for between approximately $170 to $200.  The wholesale price for bulk quantities of pre-packaged heroin is approximately $125 per brick, and for loose heroin is between approximately $55 and $65 per gram. The per-gram price is higher for retail quantities of loose heroin.

38.  Cocaine base ("crack") is referred to as "balls" "base" or "hard," or by phrases including the word "hard" ("hard body," for example).  Crack is made by converting powder cocaine through a heating process, which drug distributors often refer to simply as "cooking" or "cooking it up," or, when the process is complete, by referring to the product as having been "done" or "done up."  Crack is commonly sold in eight-balls.  An eight-ball, which is approximately 3.5 grams, and is a redistribution quantity, goes for between approximately $180 and $220.  Ounces of crack sell for approximately $1,200.

39.  Cocaine is often referred to as "the girl" or "the white girl" or "soft" or "powder" or by other phrases incorporating the word "white."  It is sold at the street level in small quantities of a gram or less.  The wholesale price for bulk quantities of loose cocaine varies broadly depending upon quality and source, and is usually between approximately $27 and $40 per gram.

40.    Oxycodone is commonly sold in pills of 30mg strength that are blue in color and are commonly referred to as "blues" or phrases incorporating the word blue. Oxycodone pills are also sometimes referred to as "candies" or similar terms.

41.    I know that drug traffickers frequently have access to several cellular telephones, and that they periodically use newly acquired cellular telephones and sometimes re-activate a cellular telephone that has not been used for a period of time. I also know that narcotics traffickers sometimes use cellular telephones subscribed to by other persons and pre-paid cellular telephones that require the purchaser to provide little or no identifying information to purchase, activate and utilize, which is done in an effort to avoid detection and thwart the efforts of law enforcement.

42.    Based on my training and experience, and consultation with, and information from, other law enforcement sources, including sources with expertise pertaining to the features and functionality of cellular telephones and computers, I know the following information tends to exist on wireless telephones, including wireless telephones utilized by those engaged in narcotics trafficking activities:

     a.   the telephone call number and other identifiers (ESN number, IMSI, IMEI, MEID, and SIM card number) associated with said device/s;

     b.   call logs/histories, numbers, digits, stored messages (voice and/or text), letters, symbols, data, information, and images and videos stored in the memory of said device/s;

     c.   descriptions of time, date, locations, items, or events showing or tending to show the commission of, or connecting or tending to connect a person to, the above-described offenses;

    d.   records which tend to demonstrate ownership and use of the phone, and identification bearing the name or photograph of any person, telephone-books, address books, date books, calendars, personal files, and photographs of persons contained in the phone;

    e.   information showing or tending to show the identity of the maker or user of the data and information contained in the phone, such as passwords, sign-on codes, and program design;

    f.   GPS coordinates, waypoints, destinations, addresses, and location search parameters associated with GPS navigation software;

    g.   saved searches, locations, and route history in the memory of said device/s; and,

    h.   internet browsing history, to include, internet searches in the memory of said device/s.

43.    As indicated above, during my tenure as an DEA Task Force Officer, I have investigated and participated in numerous operations which involved drug trafficking violations. Search warrants relating to these investigations have covered vehicles utilized by drug traffickers and their coconspirators, residences of drug traffickers and their coconspirators, premises and residences used by narcotics traffickers as "mills," where drugs are processed and packaged for re-distribution, "stash houses" used as storage locations for controlled substances, locations used as points of distribution for controlled substances, safe deposit boxes, and businesses and offices used by drug dealers as fronts to legitimize their unlawful drug trafficking.

44.    Materials searched for and/or recovered in these locations have included various controlled substances and residue of controlled substances; drug paraphernalia;  books and records

reflecting drug sales, the transfer or transportation of drugs and amounts of monies owed for drugs; records reflecting the names, addresses, and telephone numbers of coconspirators; sales receipts, travel records and other records reflecting the expenditure of monies that are proceeds from unlawful drug distribution; currency and money wrappers; records of bank transactions made to conceal and launder drug trafficking proceeds; cellular telephones, computers and computer disks; and various valuable assets that were purchased with the proceeds of unlawful drug trafficking. Items obtained by search warrants of this nature constituted evidence of drug violations and related offenses.

45. Based on my training, experience, and participation in this and other drug trafficking investigations, I also know that:

    a. drug traffickers commonly conceal within their residences, controlled substances, diluents, drug paraphernalia, including packaging and processing materials, cash proceeds and items of value derived from drug trafficking, wireless telephones used in furtherance of drug trafficking, firearms, financial records and documents relating to the distribution of controlled substances, including ledgers, and records and documents concerning transactions relating to transferring, storing, secreting, and spending money derived from drug trafficking, including receipts;

    b. drug traffickers often place assets in names other than their own to avoid detection of these assets by law enforcement;

    c. drug traffickers often place assets in the names of businesses and corporate entities as nominee title holders in order to avoid detection of these assets by law enforcement;

d.  even though these assets are placed in the names of other persons or entities, the drug traffickers actually own and continue to use these assets and exercise dominion and control over them;

e.  drug traffickers must maintain and have quick access to large amounts of United States currency, foreign currency, or other liquid assets in order to maintain and finance their ongoing drug businesses;

f.  drug traffickers maintain in their residences computerized or written books, records, receipts, diaries, ledgers, calendars, personal telephone/address books, airline tickets, airline schedules and airline receipts, cashiers' checks, money orders, telephones with memory capabilities, telephone answering machines and telephone answering tapes, and other papers relating to the transportation, ordering, sale and distribution, of controlled substances and the outstanding debts and collections from controlled substances that have been distributed;

g.  drug traffickers commonly provide narcotics on consignment to their customers, who subsequently pay for the drugs after reselling the drugs. Therefore, the above-mentioned books, records, receipts, notes, ledgers, et cetera, will be secured by the drug traffickers within their residences for their ready access to them for the purpose of determining drug debts and collecting monies derived from the sale of drugs;

h.  drug traffickers commonly conceal contraband, proceeds of drug transactions, records of these transactions, and records reflecting names, nicknames, addresses and telephone numbers of current and past drug associates within their residences;

26

i.   drug traffickers commonly use their homes to store records and/or receipts reflecting the collection of drug debts and the distribution of controlled substances, as well as records and receipts reflecting the expenditure of drug proceeds for personal and business assets;

j.   drug traffickers will attempt to legitimize the profits from illegal drug transactions by using domestic banks and their attendant services such as safe deposit boxes, securities, cashiers' checks, money drafts, letters of credit, brokerage houses, real estate and business fronts;

k.   persons involved in drug trafficking who are aware of a criminal investigation into their financial drug activities, will conceal, liquidate, and transfer easily movable drug derived assets in order to prevent law enforcement agencies from seizing and forfeiting their assets;

l.   drug traffickers often have photographs, slides, or videos of themselves, their co-conspirators and the property and assets purchased with drug proceeds. These photographs and videos are normally in the drug trafficker's possession or residence, and are often stored on a cellular telephone;

m. The State of Connecticut is generally viewed as a consumer state in regards to narcotic activity. It is common for drug traffickers to travel to major distribution centers such as New York, Massachusetts, or Florida to purchase their narcotics for distribution. It is known that after purchasing these narcotics, drug traffickers will transport these narcotics or cause them to be transported to those areas in which they will be distributed to their customers. Drug traffickers' methods include, but are not limited to, the use of shipping

companies, such as UPS or FedEx, commercial airlines, private motor vehicles, tractor trailer units, public transportation, motor vehicles with concealed compartments, and government and contract mail carriers. The residences of drug traffickers often contain records of drug related travel or shipping records. These records may include shipping receipts, airline ticket receipts, credit card receipts, rental car receipts and luggage tags reflecting points of travel;

n.  drug traffickers commonly have firearms and other weapons in their possession, in their cars, on their person, at their residence including, but not limited to, handguns, rifles, shotguns, automatic weapons, and knives. These firearms and weapons are most often kept to protect and secure drug traffickers' drugs, drug proceeds, and property;

o.  it is a common practice for drug traffickers to store their drug proceeds, drug inventory, diluents, and drug related paraphernalia in their residences, including within safes or lock-boxes or other closed containers within their residences, or their cars, and it is also common for drug trafficker to store these items in the residences or cars of their trusted associates or "stash houses," owned or rented in a name other than their own; and,

p.  when controlled substances, including but not limited to heroin, fentanyl, cocaine, and cocaine base, are stored within a premises or an automobile, residue of the controlled substance can remain in the storage location for months after the drugs themselves have been removed, and there exists a process pursuant to which investigators can collect as evidence residue of

suspected controlled substances, and the residue can be laboratory tested to confirm, or rule out, the presence of a controlled substance in the residue;

q. drug traffickers often have, possess, maintain and control the items listed in the Attachments to the search warrants sought in this affidavit, in their homes, garages, out-buildings, cars, and other premises to which they have access and/or over which they can exercise dominion and control.

## IV. BASIS AND SCOPE OF INFORMATION

46. I have personally participated in the investigation of the offenses that are the subject of this affidavit. The statements contained in this affidavit are based, in part, upon my personal knowledge and, in part, upon information and belief. The sources of information and belief are, among other things:

a. my training and experience;

b. information, and oral and written reports, regarding this and other investigations which your affiant has received, directly or indirectly, from law enforcement authorities, including, but not limited to, Special Agents of the DEA, sworn members of the Task Force, other federal authorities, and detectives and officers of area police departments;

c. physical surveillance conducted by law enforcement agents which has been reported to your affiant either directly or indirectly;

d. pen register data and/or telephone call detail records, as well as telephone subscriber information;

e. content of consensually recorded or monitored calls and/or conversations;

f. review of vehicle registration records and/or court records;

29

g.  debriefings of one or more cooperating sources, reported to your affiant directly or indirectly;

h.  interceptions of wire and electronic communications occurring over cellular telephones utilized by Francisco GONZALEZ (Target Telephone 1), Javier GONZALEZ (Target Telephone 2), and Jose DUPREY (Target Telephone 3 and Target Telephone 4),  as authorized by the district court in this case;

i.  location information associated with the Target Telephones;

j.  footage from pole cameras installed in the vicinity of Francisco Gonzalez's residence ("SP2"), Jose Duprey's residence ("SP3"), Discount Car Rental ("SP4"), Blooming Eyes by Laura ("SP5"), and a service station located on Woodtick Road in Wolcott.

k.  other information that your affiant has reviewed and determined to be accurate and reliable.

## V.   COOPERATING SOURCES

47.   Investigators received information from multiple Cooperating Sources regarding targets of this investigation. The term "cooperating source" ("CS") is used herein to described three discrete categories of individuals:  Cooperating Witnesses, Confidential Informants, and Sources of Information.   Cooperating Witnesses are sources who have indicated a willingness to testify in court proceedings.  Confidential Informants are sources who are currently cooperating with law enforcement, or have done so in the past, but who have *not* agreed to testify.  Sources of Information are sources who are *not* necessarily cooperating with law enforcement, and who have *not* agreed to testify, but who have provided

information to law enforcement, sometimes in the context of a post-arrest statement, and sometimes in other contexts.

48.     Unless otherwise stated, any information obtained from a Cooperating Source ("CS") in this case has been related to your affiant by the source, by members of the NHDO and/or by other law enforcement officers who have debriefed the source.   Moreover, unless otherwise stated, all source information set forth herein is based upon personal observations by the source and/or statements directed to or overheard by the source, from the Violators named herein, their criminal associates, or persons with personal knowledge of the incidents described herein.

49.     A description of, and background information about, the Cooperating Sources debriefed in connection with this investigation is set forth below and is followed by a narrative summary of the information each CS provided to law enforcement.

**Cooperating Source 1**

50.     Cooperating Source 1 ("CS1") was a Confidential Informant who had *not* agreed to testify. CS1 was informant for the WHPD for several months in 2019.   CS1 was not a paid informant, but, rather, cooperated with law enforcement in exchange for consideration in connection with pending criminal charges, for which CS1 is now serving a sentence of imprisonment.   In or about 2019, CS1 provided information about Javier GONZALEZ, who is believed to head a drug trafficking organization under investigation in this case. CS1 also provided information about CS2, who is described more fully below.  Information provided to agents by CS1 regarding CS2 and Javier GONZALEZ has been, at least in part, corroborated by controlled purchases and corresponding DEA surveillance, by DMV records, and by information subsequently provided by CS2 and CS3.   Accordingly, the

information CS1 has provided in this case about Javier GONZALEZ and CS2 is believed to be truthful, accurate and reliable.  CS1, however, was previously a DEA cooperating witness who was deactivated by the DEA in July of 2005, because CS1 was deemed to be unreliable after failing to comply with DEA protocols in connection with a controlled purchase.  CS1's criminal history includes convictions for Sale of a Narcotic Substance, Possession of a Controlled Substance, Interfering, Larceny, Robbery, Use of a Motor Vehicle without Permission, and a Probation Violation.

### Pertinent Information/Evidence Provided by CS1

51.    According to CS1, Javier GONZALEZ, known to CS1 as "Jay," is a Waterbury-based narcotics trafficker, who is quite cautious, and who engages in drug transactions only with a select group of known and trusted associates.

52.    In or about August of 2019, CS1, at the direction of and under the supervision of law enforcement, made a controlled purchase of approximately 50 grams of heroin from CS2 and Javier GONZALEZ.  CS1 contacted an individual (who later became CS2) to arrange the transaction, and, thereafter, traveled with CS2 to Waterbury, Connecticut, where CS1 and CS2 met with Javier GONZALEZ, who supplied the heroin.  Surveillance was established in the area of the anticipated meet prior to the transaction. Surveillance observed Javier GONZALEZ travel from his residence to a garage/storage facility containing multiple units/bays, located at 54 Englewood Avenue in Waterbury, where Javier Gonzalez appeared to enter one of the units and remain there for a short period of time.  Javier GONZALEZ was then observed traveling back his residence.  A short time later, Javier GONZALEZ met with CS1 and CS2 and provided them with heroin.  In connection with the aforementioned surveillance, law enforcement officers observed Javier

32

GONZALEZ operating a vehicle which Department of Motor Vehicles records confirmed was registered to Javier GONZALEZ, and agents were able to positively identify Javier GONZALEZ based upon a Department of Motor Vehicles photograph of Javier GONZALEZ.   The controlled purchase was audio recorded and video recorded.   A representative sample of the heroin CS1 purchased from CS2 and Javier Gonzalez was field tested and yielded a positive result for the presumptive presence of heroin.  The heroin weighed approximately 53 grams.   Subsequent investigation confirmed that the storage facility/garage containing multiple units/bays located at 54 Englewood Avenue in Waterbury was owned by Javier GONZALEZ's brother, Francisco GONZALEZ, who is the user of <u>Target Telephone 1</u>.

**<u>Cooperating Source 2</u>**

53.      Cooperating Source 2 ("CS2") is a DEA cooperating witness who has agreed to testify.  CS2 has been a DEA CS since approximately March of 2021.  CS2 is cooperating with the DEA with hopes of receiving case consideration in connection with narcotics trafficking offenses for which CS2 has not yet been charged.  CS2 provided information to agents regarding Javier GONZALEZ's drug trafficking activities, and this information has been, at least in part, corroborated by the controlled purchase made by CS1 in August of 2019 and corresponding DEA surveillance, by DMV records, by toll records, and by information subsequently provided by CS3.  Accordingly, the information CS2 has provided in this case about Javier GONZALEZ is believed to be truthful, accurate and reliable.  CS2 was a heroin trafficker prior to the time he/she began cooperating with law enforcement in this case.  The DEA made several controlled purchases of heroin from CS2 and seized a bulk

quantity of heroin and approximately $40,000 in cash from CS2's residence.   CS2's criminal history includes convictions for Escape, Larceny, Assault and Attempted Murder.

**Pertinent Information/Evidence Provided by CS2**

54. CS2 has known Javier GONZALEZ for several years.

55. According to CS2, Javier GONZALEZ is a heroin supplier who, in roughly 2018/2019, supplied CS2 with gram-weight quantities of heroin, which CS2 redistributed.

56. Javier GONZALEZ "fronted" heroin to CS2, i.e., provided CS2 with heroin on consignment.

57. Javier GONZALEZ, according to CS2, utilizes telephone number (860) 483-2274, <u>Target Telephone 2</u>.

58. There was, according to CS2, never a time when Javier GONZALEZ did not have a supply of heroin on hand when CS2 sought to obtain heroin from him.

59. On one occasion in 2019, CS2 observed Javier GONZALEZ to be in possession of what CS2 believed to be approximately two kilograms of heroin and one kilogram of cocaine.

60. At some point, CS2 stopped obtaining heroin from Javier GONZALEZ, because CS2 found a heroin supplier who provided heroin to CS2 at a better price.

61. CS2 estimated that, during the time period Javier GONZALEZ was supplying CS2 with heroin, CS2 obtained at least two kilograms of heroin from Javier GONZALEZ, which CS2 redistributed.

62. CS2 informed investigators that Javier GONZALEZ resided on Enoch Street in Waterbury.

63. CS2, like CS1, indicated that Javier GONZALEZ is cautious and utilized several stash locations in and around the Waterbury area to secrete his drugs, and changes these stash locations.

34

64. CS2, at the direction of law enforcement, remained in contact with Javier GONZALEZ for a period of time in an attempt to further his/her ability to cooperate with law enforcement. But following the seizure of drugs and cash by law enforcement from CS2's residence, Javier GONZALEZ has been unwilling to supply CS2 with drugs and CS2 is no longer in contact with Javier GONZALEZ at the direction of law enforcement.

**Cooperating Source 3**

65. Cooperating Source 3 ("CS3") was a DEA cooperating witness who had agreed to testify. CS3 cooperated with law enforcement in this case from approximately August of 2021 through approximately November of 2021, when, shortly after the wiretap on Target Telephone 1 was initiated, CS3 was deactivated after intercepts indicated that CS3 was involved in the drug trade. CS3 was a paid CS. CS3, prior to being deactivated, provided information to agents regarding the drug trafficking activities of Francisco GONZALEZ, Javier GONZALEZ, and their suspected coconspirators. The information provided by CS3 has been, at least in part, corroborated by the controlled purchase made by CS1 in August of 2019 and corresponding DEA surveillance, by DMV records, by toll records, and by information provided by CS2. In addition, the information provided by CS3 has been corroborated by four controlled purchases of heroin CS3 made from Francisco GONZALEZ, which are detailed elsewhere in this affidavit, and, most recently, by explicit intercepts over Target Telephone 1 from November of 2021 through January of 2022. Accordingly, the information CS3 provided in this case is believed to be truthful, accurate and reliable. CS3 has a history of drug use and his/her criminal history includes convictions for narcotics offenses, Interfering/Resisting Arrest, and Reckless Endangerment. CS3 is not a convicted felon.

35

**Pertinent Information/Evidence Provided by CS3**

66.    According to CS3, Francisco GONZALEZ, aka "Sisco," resides at 131 Geddes Terrace in Waterbury, Connecticut.

67.    Francisco GONZALEZ distributes heroin, which is believed to be supplied to him by his brother, Javier GONZALEZ, who resides at 119 Enoch Street, Waterbury, Connecticut, and who CS3 believes distributes large quantities of heroin and marijuana.

68.    Francisco GONZALEZ utilizes Target Telephone 1 in furtherance of his heroin trafficking activities and distributes gram-weight quantities of heroin as well as pre-packaged heroin.

69.    CS3 informed investigators that Javier GONZALEZ, in addition to supplying heroin to Francisco GONZALEZ, is also believed to supply heroin to another individual, who CS3 identified and whose name is known to your affiant, who is responsible for operating multiple "mills" in the Waterbury area at which heroin is packaged for redistribution.  The CS does not know the location of the mills but knows an individual who has worked in at least one of the mills bagging heroin.

70.    CS3 has known Francisco GONZALEZ and Javier GONZALEZ to be involved in the distribution of drugs for more than a decade, and CS3 has been purchasing drugs from Francisco GONZALEZ for several years.  During this period of time, CS3 has purchased heroin, cocaine and cocaine base from Francisco GONZALEZ at Francisco GONZALEZ's home, located at 131 Geddes Terrace in Waterbury, and other locations, at Francisco GONZALEZ's direction.

71.    CS3 indicated that Francisco GONZALEZ also supplies heroin to John STEFERAK, a.k.a "Jack," who CS3 knows to be a drug user who also distributes heroin.  Francisco GONZALEZ has supplied heroin to STEFERAK for several years.

72.     Vanessa BATTICE, according to CS3, is Francisco GONZALEZ's girlfriend.  She resides with Francisco GONZALEZ and, at a minimum, has knowledge of his heroin trafficking activities.  She has been present when Francisco GONZALEZ supplied CS3 with heroin.  CS3 knows BATTICE to distribute small quantities of marijuana but does not know whether BATTICE also distributes heroin or what her role, if any, is in the target drug trafficking organization.   (Your affiant believes intercepts over Target Telephone 1 confirmed BATTICE's knowledge of Francisco GONZALEZ's drug trafficking business, but intercepts did not confirm her role in GONZALEZ's drug-trafficking activities.)

73.     Though CS3 believes that Javier GONZALEZ is the source of Francisco GONZALEZ's heroin, CS3 does not know where Javier GONZALEZ stores his drugs.

74.     CS3 does not know the location or locations from which Francisco GONZALEZ obtains the gram-weight quantities of heroin and pre-packaged heroin he is believed to be supplied with by Javier GONZALEZ, or the frequency or manner/method by which Francisco GONZALEZ is resupplied.

75.     CS3 does not know where Francisco GONZALEZ stores proceeds from his drug trafficking.

76.     CS3 does not know whether Francisco GONZALEZ launders proceeds of his drug trafficking, and if, in fact, Francisco GONZALEZ does so, CS3 does not know which entities and/or financial institutions Francisco GONZALEZ utilizes to do so.

77.     CS3 made four controlled purchases of heroin from Francisco GONZALEZ over Target Telephone 1, at the direction of, and under the supervision of, investigators in this case.

78.     CS3 is not able to purchase drugs directly from Javier GONZALEZ, and, more importantly, as indicated above, the DEA has discontinued CS3's cooperation with law enforcement.

**Cooperating Source 4**

79.    Cooperating Source 4 ("CS4"), in my estimation, most closely fits within the definition of a Source of Information. CS4 initially provided information to law enforcement in another state, in connection with an unrelated money-laundering investigation, which is being conducted by another law enforcement agency. CS4's true identity is not known to your affiant at this time. CS4's motivation for providing information to law enforcement in connection with the above-referenced money-laundering case is not known to your affiant at this time. CS4's criminal history is not known to your affiant. CS4's reliability is not capable of being favorably assessed by your affiant at this time, and CS4 is not currently cooperating with the DEA in this investigation, will not be utilized as a cooperating source by the DEA in this investigation going forward, and will not testify should charges arise from the DEA's investigation in this case.

### Pertinent Information/Evidence Provided by CS4

80.    CS4 informed law enforcement that on two occasions he/she picked up approximately $90,000 from a Hispanic male in Waterbury, Connecticut, whom CS4 subsequently identified from a photograph as Javier GONZALEZ, for the purpose of laundering the money.

**Cooperating Source 5**

81.    Cooperating Source 5 (CS5) is a Waterbury Police Department Source of Information (SOI) who has not agreed to testify. CS5 has been cooperating since approximately October of 2021. CS5 is a paid CS. CS5 provided information to agents regarding the drug trafficking activities of Jose DUPREY, Javier GONZALEZ, Edmelyn DUPREY,

Moises GARCIA, and Robert AMATRUDO.    CS5 is not a convicted felon.   CS5's

information has been corroborated, at least in part, by the DEA's independent investigation

and is believed to be reliable.

## Pertinent Information/Evidence Provided by CS5

82.    According to CS5, Jose DUPREY is affiliated with a drug trafficking organization which

has kilogram quantities of drugs, believed to be heroin, smuggled into Connecticut in motor

vehicles. When the vehicles arrive in Connecticut, they are brought to an unknown auto

repair shop where the drugs are removed from the vehicles.  DUPREY works with a partner

who owns and operates the auto repair shop. According to CS5, this partner goes by the

street names "Spanky" and "Baba."  (CS5 was subsequently shown a DMV photograph of

Robert AMATRUDO and positively identified AMATRUDO as the individual CS5 knows

by the alias "Spanky.")  Once the drugs are removed from the vehicles, they are retrieved

by DUPREY's daughter, Edmelyn DUPREY, who then brings the drugs to her home,

located at 40 Elliot Street in Meriden, Connecticut. Edmelyn DUPREY is one of Jose

DUPREY's most trusted associates and is believed to often make drug deliveries/sales on

behalf of Jose DUPREY. Edmelyn DUPREY utilizes two telephone numbers: (513) 981-

1064 and (775) 683-7002, according to CS5.  According to CS5, Jose DUPREY is also

believed to use an eyelash salon in Middlebury, operated by his girlfriend, Wanda LOPEZ,

to store drugs and drug proceeds.  (Subsequent investigation by the DEA revealed a

business matching this description in Middlebury--Blooming Eyes by Laura, located at

2030 Straits Turnpike in Middlebury.  The phone number for this business is associated

with Wanda Lopez, who is also known as Wanda Lora, Duprey's paramour.  (A pole

camera was installed at this location on or about January 19, 2022.  Jose DUPREY has

been observed in footage at this location since the installation of the pole camera on multiple occasions. On or about February 23, 2022, pole camera footage revealed that Jose Duprey had exited this building, deposited an item in a trash receptacle, and departed the area. Moments later, law enforcement responded to the area and recovered packaging consistent with kilogram packaging in the trash receptacle. The packaging contained a white residue consistent in appearance with cocaine. The residue was field tested and yielded a positive result for the presumptive presence of cocaine.) According to CS5, Jose DUPREY rarely handles drugs himself. Instead, he organizes distribution through a network of subordinates. (This information from CS5 has proven to be inconsistent with wiretap intercepts, which at time were contemporaneous surveillance and/or pole camera footage.) Jose DUPREY works at Discount Car Rental, a rental car business located on Wolcott Street in Waterbury. Jose DUPREY is known to conduct meetings at the car rental shop regarding drug trafficking. DUPREY lives on Seymour Street in Waterbury and owns two Mercedes luxury sedans. According to CS5, DUPREY is believed to have drug debts with a Mexican cartel in excess of $1 Million. (This appears to have been corroborated by an intercept over Target telephone 3 in which DUPREY and Edwin HERNANDEZ are believed to have explicitly discussed a seven-figure drug debt.) CS5 was shown a Waterbury booking photograph of Javier GONZALEZ. CS5 immediately recognized Javier GONZALEZ and said he goes by the name "Javion." CS5 stated that GONZALEZ and DUPREY previously worked together in the drug trade but CS5 does not know their current working relationship. (That Javier GONZALEZ and DUPREY are associated has been confirmed by intercepts over Target Telephone 2, Target Telephone 3, and Target Telephone 4 and footage from a pole camera installed in the area of Discount Car Rental

40

in Waterbury, Duprey's place of employ, which reveals that Javier GONZALEZ frequents Discount Car Rental.)  CS5 was also shown a Waterbury booking photograph of Moises GARCIA.  CS5 recognized GARCIA as "Moyo" and stated that GARCIA also worked for DUPREY in the drug trade but was unsure of GARCIA's specific role.  (GARCIA is not known to have been intercepted communicating with DUPREY over Target Telephone 3 or Target Telephone 4, but several suspected coconspirator who have been in contact with Target Telephone 3 and Target Telephone 4 remain unidentified UMs.)  CS5 provided two phone numbers for Jose DUPREY: (347) 456-8272 (Target Telephone 4) and (475) 775-0308.

**Cooperating Source 6**

83.   Cooperating Source 6 ("CS6") has been cooperating with law enforcement for approximately three years and is hoping to receive consideration in a pending criminal case in exchange for his/her cooperation.  CS6 is a DEA cooperating witness who has agreed to testify and has cooperated with the DEA in several investigations.  Information provided by CS6 has been deemed by law enforcement to be reliable and has been corroborated, at least in part, by independent investigation by the DEA and has resulted in the seizure of kilogram quantities of narcotics and significant amounts of suspected narcotics proceeds. CS6, at the direction of and under the supervision of the DEA, has made controlled purchases of drugs directly from Jose DUPREY, as detailed below in this affidavit.  CS6's criminal history includes a felony narcotics conviction.

**Cooperating Source 7**

84. Cooperating Source 7 ("CS7") was previously convicted of a federal drug offense and sentenced to a term of imprisonment. Following his/her term of imprisonment, CS7 expressed an interest in working with the DEA as a paid source. CS7 provided information to the DEA but did not make controlled purchases or otherwise cooperate proactively. CS7 is not currently cooperating with the DEA in this investigation (or any other), will not be utilized as a cooperating source by the DEA in this investigation going forward, and will not testify should charges arise from the DEA's investigation in this case. During the course of providing information to the DEA previously, in or about March of 2021, CS7 provided details about Jose DUPREY and Javier GONZALEZ.

85. CS7 informed investigators that he/she met DUPREY in 2020, approximately, at DUPREY's rental car business, Discount Rental in Waterbury, CT. CS7 stated DUPREY sells heroin and fentanyl out of the business. According to CS7, DUPREY's source of supply is in Mexico. CS7 stated once every few months, a car will be driven from Mexico to Waterbury with DURPEY's supply of narcotics. CS7 stated DUPREY will then take the car to a privately owned garage in the Waterbury area where the car will be disassembled for the narcotics to be removed and replaced with cash. CS7 stated this process takes a few days. CS7 provided a phone number for DUPREY of 203-721-4985 and the Discount Car Rental business phone number of 203-528-4226.

86. CS7 stated that Javier GONZALEZ and DUPREY used to work together in the narcotics business. According to CS7, in approximately late 2020, Javier GONZALEZ got a supply of heroin from Mexico that was of poor quality. GONZALEZ was unable to sell the heroin and therefore entered into debt with the Mexican source for $450,000. CS7 stated because

of this, Javier GONZALEZ traveled to Mexico recently to acquire a new source of supply. (A subsequent check of a law enforcement database revealed that Javier GONZALEZ, in fact, traveled to Mexico on March 3, 2021 and returned to the United States on March 7, 2021.)   CS7 stated DURPEY still utilizes the Mexican source of supply to whom GONZALEZ owes money. CS7 stated GONZALEZ visits the Rental Car business on a regular basis and currently drives a large black truck with chrome trim. CS7 stated GONZALEZ talks freely regarding selling narcotics and has brought samples of heroin to the Rental Car business. CS7 provided a phone number for GONZALEZ of (860) 483-2274 (Target Telephone 2).   (Footage from a pole camera installed in the vicinity of Discount Car Rental confirmed that Javier GONZALEZ frequented this business on several occasions during this investigation.)

## VI.   TARGET TELEPHONES

87.   The district court authorized the interception of communications over four different cellular telephones during the wiretap phase of this investigation.   Details pertaining to these telephones, and the corresponding wiretap authorizations, are set forth below.

88.   **Target Telephone 1** is a cellular telephone assigned telephone number (203) 509-1982, and accessed through International Mobile Subscriber Identity ("IMSI") 311480645001855, which is subscribed to "Francisco Gonzalez" of 131 Geddes Terrace, Waterbury, Connecticut, and serviced by Verizon Wireless, a wireless telephone service provider. It is utilized by Francisco Gonzalez.

89.   **Target Telephone 2** is a cellular telephone assigned telephone number (860) 483-2274 ("**Target Telephone 2**"), which is subscribed to Javier GONZALEZ, 119 ENOCH ST WATERBURY, CT 06705 USA and serviced by T-Mobile (hereafter "T-Mobile" or the

"Service Provider"), a wireless telephone service provider.   It is utilized by Javier Gonzalez.

90.     **Target Telephone 3** is a cellular telephone assigned telephone number (860) 483-1069 and accessed through International Mobile Subscriber Identity ("IMSI") 311480670485285, which has no listed subscriber and is serviced by Verizon Wireless, a wireless telephone service provider. It is utilized by Jose Duprey.  Target Telephone 3 was previously assigned telephone number (203) 228-0565.  On or about March 20, 2022, Jose Duprey changed the telephone number assigned to this device to (860) 483-1069, but Duprey did not change the above-referenced IMSI number.  Accordingly, communications over Target Telephone 3 continued to be intercepted consistent with the Court's March 10, 2022 Order and the continuation language contained therein. Target Telephone 3 remains active through the time of this writing.

91.     **Target Telephone 4** is a cellular telephone assigned telephone number (347) 456-8272, and accessed through International Mobile Subscriber Identity ("IMSI") 310240245593825, which is subscribed to by Vesse Yepez at 87 Seymour St., Waterbury, CT and is serviced by SPRINT/T-MOBILE, a wireless telephone service provider.  It is utilized by Jose Duprey.  Target Telephone 4 remains active through the time of this writing.  Also, 87 Seymour St., Waterbury, CT, is Jose DUPREY's known current address.

**VII.     CONTROLLED PURCHASES**

92.     Javier Gonzalez.  In or about August of 2019, CS1, at the direction of and under the supervision of law enforcement, made a controlled purchase of approximately 50 grams of heroin from and individual (who later became CS2) and Javier GONZALEZ.   CS1

contacted CS2 to arrange the transaction, and, thereafter, traveled with CS2 to Waterbury, Connecticut, where CS1 and CS2 met with Javier GONZALEZ, who supplied the heroin.

93.   <u>Francisco Gonzalez.</u>   CS3 made four controlled purchases of heroin from Francisco Gonzalez during this investigation:  September 22, 2021 (five grams); September 30, 2021 (five grams); October 7, 2021 (five grams); and October 27, 2021 (five grams).

94.   <u>Jose Duprey.</u>  CS6 made three controlled purchases from Jose Duprey:  December 16, 2021 (approximately 5 grams of heroin and 3 grams of fentanyl including packaging, inside Discount Car Rental, Subject Premises 4, for $800); December 22, 2021 (approximately 27 grams of heroin including packaging, inside Subject Premises 4, for $1,625); February 16, 2022 (approximately 25 grams of heroin for $1,625 inside Subject Premises 4).

## VIII. WIRETAP AUTHORIZATIONS

95.   As indicated previously herein, the district court authorized the interception of communications over four Target Telephones in this case.  These phones, and the users of these phones, are identified more particularly in a preceding section of this affidavit.   The wiretap phase of the investigation began on or about November, 2020 [2021 or] and was ongoing (with respect to Target Telephones 3 and 4) at the time this affidavit was prepared. Communications were intercepted over TT1 from approximately November 17, 2021 through January 13, 2022.   Communications were intercepted over TT2 from approximately February 9, 2022 through March 10, 2022.   Communications were intercepted over TT3 from approximately February 9, 2022 through the time of this writing. Communications were intercepted over TT4 from approximately March 10, 2022 through the time of this writing.

45

IX.     **SELECTED SUMMARIES OF INTERCEPTED COMMUNICATIONS**

96.     A sampling of communications intercepted during the wiretap phase of this investigation is set forth below. The sampling is based upon the initial transcription summaries/line sheets prepared by wiretap monitors, several of which are based on intercepted communications that were translated from Spanish to English. Several of the summaries include a belief statement from the affiant, which is based upon the training, experience, and knowledge of the affiant and agents working on this case, including knowledge gained through this investigation. Both the transcriptions and the belief statements have been done using best efforts and are subject to revision.

97.     Several pertinent communications in which the Violators participated or were referenced are set forth below under the respective subsection headings for **Target Telephone 1**, **Target Telephone 2**, **Target Telephone 3**, and **Target Telephone 4**. Other pertinent communications in which the listed Violators participated or were referenced are set forth in the subsections pertaining to the **Subject Premises** for which search warrants are being sought.

**Target Telephone 1 ("TT1")**

98.     Communications were intercepted over Target Telephone 1 from approximately November 7, 2021 through January 13, 2022 and plainly establish that Francisco Gonzalez utilizes Target Telephone 1 to facilitate the distribution of controlled substances, including heroin, cocaine, cocaine base, and oxycodone in the area of Waterbury, Connecticut.

99.     Francisco Gonzalez is believed, based upon source information and other investigative information, including communications intercepted over Target Telephone 1, to be supplied with drugs by his brother, Javier Gonzalez.

46

100.    Francisco Gonzalez distributes drugs to several customers who appear to be drugs users, and to at least two men—Christopher Cammilletti and John Steferak, a.k.a. "Jack," who are redistributors (and likely users, too).

101.    Francisco Gonzalez and/or his suspected customers/coconspirators have used coded terminology common to the drug trade, like "ball," believed to be a reference to an eighth of an ounce (3.5 grams), i.e., an eight-ball, of cocaine or cocaine base, and "blues," believed to be a reference to 30 mg oxycodone tablets, which are blue in color.

102.    In some instances, Francisco Gonzalez and/or his customers/coconspirators have spoken in even more explicit terms about drugs, using the word "grams," which is believed to be a reference to grams of heroin.

103.    Included below is a sampling of intercepted communications in which Francisco Gonzalez has participated.

### Sampling of Communications with Christopher Cammilletti

104.    On November 18, 2021, in session 86, Christopher Cammilletti spoke to Francisco Gonzalez.  Cammilletti, asked to be supplied with "a gram," believed to be a reference to a gram of heroin, and "a ball or half a ball," on consignment, believed to be a reference to an eight-ball of cocaine base.

105.    On November 27, 2021, in session 803 over Target Telephone 1, Cammilletti told Francisco Gonzalez, "my boy wants another one of those half grams," believed to mean that one of Cammilletti's customers wanted a half-gram of loose heroin.

106.    Francisco Gonzalez was often wary of law enforcement and cautious.  For example, in session 517 intercepted over Target telephone 1 on November 22, 2021, Francisco Gonzalez, having previously arranged to supply Christopher Cammilletti and Jack Steferak

with drugs, told Cammilletti, "You'll be waiting there with Jack.  Jack is coming, too . . . Alright, just, uh, pull in the driveway instead of making it suspicious alright."

107.    Several explicit intercepts have confirmed that Christopher Cammilletti is redistributing at least a portion of the drugs supplied to him by Gonzalez.  For example, in session 2846 on December 16, 2021, Cammilletti spoke to Gonzalez and said, "Hey um, I just didn't want to text this, but Janet wants half a ball," believed to meant that Cammilletti was indicating that a female to whom Cammilletti distributes drugs, "Janet," wanted a half an eight-ball (which is 3.5 grams) of drugs, or approximately 1.75 grams of drugs.

108.    In session 2910 on December 17, 2021, Cammilletti told Gonzalez: "Um, 14!  And then I need to drop... [Voices Overlap] some of that off and then I'll come..., we come back with some money for you," believed to mean Cammilletti, in this case, indicated he wanted Gonzalez to supply him with "14" grams of drugs and had to "drop" a supply of drugs "off" to one of his customers, after which he would "come back with some money" for Gonzalez for the sale, which is believed to indicate that Francisco Gonzalez provides drugs to Cammilletti on consignment.

109.    In session 3009 on December 19, 2021, Camilletti spoke to Gonzalez and ordered a "gram" of "hard," i.e. cocaine base, for one of his female customers, believed to be Janet. Gonzalez, upon learning that Cammilletti was in the hospital, instructed Cammilletti to send his customer directly to Gonzalez's residence, 131 Geddes Terrace in Waterbury (**Subject Premises 2**) to consummate the transaction, saying "Tell her to just come over." The term "hard" is commonly used in the drug trade used to refer to cocaine base.

110.    In addition, in other calls, Cammilletti instructed Francisco Gonzalez to charge Cammilletti's customers more than Gonzalez charges Cammilletti, and to subtract the

difference from the drug debt Cammilletti owed Francisco Gonzalez.  Two of Camilletti's customers are UF1155, aka "Donna," who utilizes telephone number (203) 982-1155, and UF8471, aka "Janet," who utilizes telephone number (203) 206-8471.

111.   On December 21, 2021, in session 3181, UF1155, aka "Donna" spoke to Gonzalez.  She referred to him as "Sisco" and asked, "is it okay if I stop over," believed to mean Donna wanted to obtain drugs from Gonzalez at his residence, **Subject Premises 2**.  Gonzalez responded, "yeah.  Come on over man," i.e. I believe he was available to meet Donna and supply her with drugs at his residence, **Subject Premises 2**.

112.   On December 21, 2021, in session 3187, UF8471, aka "Janet," texted Gonzalez the word "Half," which I believe was a reference to a quantity of drugs.  In session 3189, Cammilletti spoke to Gonzalez and discussed UF8471's order.  Gonzalez said, "when she said half I thought it was half a ball," i.e. half an eight-ball, an eight-ball being 3.5 grams.  Cammilletti said, "No, no, no.  Half a gram, I think.  Or maybe.  I don't know.  But she gonna, but if she gonna give you a half ball she gonna make sure she give you 130."  Gonzalez, based on other explicit intercepts, is known to sell eight-balls for $200, so half an eight-ball would ordinarily cost $100, but it is believed, in session 3187, Cammilletti directed Gonzalez to charge UF8471 (Janet) "$130."  Cammilletti later said, "So just take the extra off what I owe you," which is believed to mean that Cammilletti wanted Gonzalez to overcharge UF8471 and subtract the difference from Cammilletti's drug debt for drugs that Francisco Gonzalez had previously fronted to Cammilletti, i.e. provided to Cammilletti on consignment.

**Sampling of Communications with John Steferak, a.k.a. "Jack"**

113.    On November 18, 2021, in session 82 intercepted over Target Telephone 1, Jack Steferak, spoke to Francisco Gonzalez.  Gonzalez asked Steferak, "What we talking?"  Steferak responded, "It's gonna be two and one and a half," believed to be a reference to heroin, packaged in two different quantities, 2 grams and 1.5 grams.  (This belief is based in part upon numerous other intercepts that were similar in nature and in part on the arrest of Steferak on December 27, 2021, in possession of heroin packaged in two separate quantities, consistent with an intercept that preceded the arrest in which Steferak had requested such packaging.)  Steferak, in session 82, later added, "and I'll figure out how many of those blues, I won't know until I'm there. I gotta . . . see how much I have left," believed to be a reference to oxycodone pills.

114.    On December 27, 2021, in session 3736, Jack Steferak spoke to Francisco Gonzalez and said, "I'm a get 6 and 2," believed to mean that Steferak ordered drugs in a quantity of "2" units and  a quantity of "6" units.  Francisco Gonzalez responded "Okay, I got you," believed to meant that Francisco Gonzalez understood Steferak's drug order and agreed to supply him with the requested quantity of drugs in two separate units.  Steferak later said "Can you put all the six together and then the two," believed to be a request by Steferak for the heroin to be separated into two separate packages.  Francisco Gonzalez confirmed he would do so, saying "Okay. Six and two right? . . . Okay. Alright, man."

115.    Thereafter, following a meet between Francisco Gonzalez and Steferak at **Subject Premises 2**, the Connecticut State Police stopped the vehicle being operated by Steferak on Route 34 in Derby, Connecticut.  A small bag containing an off-white, powder-like substance, in a quantity estimated to be approximately two grams, was seized from

Steferak. It was field tested and yielded a positive reaction for the presumptive presence of heroin. Another bag containing a tan powder-like substance, in a quantity estimated to be approximately six grams, was also seized from Steferak. It was field tested and yielded a positive reaction for the presumptive presence of heroin. Officers also seized Steferak's cell phone and two bags containing numerous white, oval pills from Steferak, which field-tested positive for the presumptive presence of fentanyl.

116.   On December 28, 2021, in session 3802, Steferak (based upon voice identification and the content of the communication, which included Francisco Gonzalez referring to the caller as "Jack") called Francisco Gonzalez from telephone number (203) 306-9530 and told Gonzalez, "I got arrested last night in Derby . . . I had a tail light out and I didn't use a blinker in the turning lane . . . They fucking ran a dog around. It hit and then they got me with Xanax and dope." It is believed that in this call Steferak informed Francisco Gonzalez that he had been arrested by police in Derby in possession of the heroin Gonzalez provided to STEFEAK at Subject Premises 2, as well as other drugs (fentanyl, which were in the shape and form of Xanax pills). It is not believed that Francisco Gonzalez provided Steferak with the fake Xanax pills.

**Francisco Gonzalez's Cocaine Prices and Processing Preferences (Session 2726)**

117.   On December 15, 2021, in session 2726, Francisco Gonzalez spoke to a male identified only as "Boogie," (believed a relative) who was using telephone number (203) 909-0200. During the call, Francisco GONZALEZ plainly revealed his pricing structure for cocaine and his preferred cutting agent to be used in processing cocaine.

118.   In the first part of session 2726, Francisco Gonzalez confirmed that he charges "45" per gram for "soft," i.e. cocaine powder.   Boogie attempted to middle a drug deal for a friend, saying, "I could possibly bust a play," and expressed concern to Gonzalez about drugs being mixed with fentanyl.   More specifically, Boogie said, "I don't want them to get like something that they're not looking for," believed to mean Boogie was concerned about cocaine mixed with fentanyl.   Boogie added, "I just know that you would never do that . . . I just didn't want to ask nobody but you. 'Cause I trust you," believed to mean Boogie trusted Francisco GONZALEZ not to mix fentanyl into the cocaine he was selling. Francisco GONZALEZ later said, "Okay. So, what are we talking anyway?," believed to mean Francisco GONZLAEZ wanted to clarify Boogie's drug order.   Boogie responded, "What's up?   Yeah, soft," believed to mean Boogie wanted to obtain cocaine powder to provide to his friend.   Boogie added, "I'm saying I could make a buck off of it," believed to mean Boogie wanted to make some money, possibly $100 on the deal.   Gonzalez said, "Oh, okay.   So what do they want?"   Boogie asked, "What are you doing grams for like, 45?" i.e., Boogie inquired whether Francisco GONZALEZ was charging $45 for a gram of cocaine.   Gonzalez said, "Yes," confirming he sells cocaine for $45 per gram.

119.   Session 2726 continued, and Francisco Gonzalez explained his prices for "eight-balls" of cocaine and the cutting agents he used in processing cocaine.   The call proceeded as follows, in pertinent part.   Boogie said, "Okay.   I figured, cause eight-balls are like 140, 150, 160. [Voices Overlap]," i.e. Boogie believes eight-balls of cocaine sell for between $140 and $160.   Francisco Gonzalez responded, "Nah, they, eight-balls are not that much. They're 200," i.e. Gonzalez confirmed he sells 3.5 grams of cocaine (an eighth of an ounce, or an "eight-ball") for $200.   Boogie said, "Oh, oh shit!   Well, I don't know.   I'll take a

gram I guess. It's not like. I feel awkward doing this. But I don't want this person to get fucking hurt, man," believed to mean Boogie wanted to purchase a gram of cocaine and does not want his friend to purchase cocaine from an unknown source and thereby risk getting cocaine laced with fentanyl. Gonzalez is not believed to have consummated the transaction with Boogie, because the quantity Boogie requested, was too small. Gonzalez said, "today I'm gonna say no. Alright, cause I'm gonna. I got too much shit right now to stop doing what I'm doing just for that, i.e. I believe indicated Gonzalez was too busy to provide Boogie with a gram of cocaine.

120.   Later in session 2726, Gonzalez discussed his protocols—his preferred cutting agents—and indicated that he prefers to use lidocaine or natural supplements as cuttings agents. The conversation continued in pertinent part as follows. Boogie said, "I have a question. [Clears Throat] So I can educate this person. Um, what you uh. What is the usual cutting substances that these people used that are killing people [Voices Overlap]," believed to mean Boogie inquired what cutting agent most frequently caused users to overdose and die. Gonzalez responded, "Fentanyl," believed to mean Gonzalez indicated fentanyl was the cutting agent that was causing overdose deaths. Boogie later asked, "What do you use?," believed to mean that Boogie asked Francisco Gonzalez which cutting agent he used when he processes cocaine. Gonzalez responded, "Um, I use a variety of stuff. I try to go with uh, non-synthetic. Cause I don't like synthetic. I like natural . . . Yeah, so like lidocaine . . . It's just a numbing agent. You know I'm saying? Anything you ever, um, use, you should look up. You know I'm saying? So it won't hurt people. [Voices Overlap] . . . You know, cause most of the stuff I use are dietary supplements." Boogie said, "So you use caffeine too, right?" Gonzalez responded, "Yeah, you can. Well, that's not how we use

53

that and [U/I]. [Audio Fades] That's crazy. Cause that clogs up your arteries. So what if you snort caffeine, it's gonna harden up your veins and you don't want that to happen."

### Francisco Gonzalez Prefers to Sell Cocaine in Quantities of an Ounce or More

121.   In session 2789, on December 16, 2021, UF2884 texted Gonzalez: "I been trying to call you for the other stuff but you never answer," believed to mean that UF2884, who, based upon the investigation to date is a drug user and not a coconspirator, wanted to purchase drugs from Francisco Gonzalez but he was not responding.  In session 2790 UF 2884 again texted Gonzalez: "so I got the hint."

122.   In session 2791 on December 16, 2021, Francisco Gonzalez responded and texted UF2884: "I don't like nobody really knew [sic] that's why I don't want to deal with that it's too small for me you know what I'm saying twenty's 40 that's not my style."  It is believed in this text message, Francisco Gonzalez indicated that he does not like to sell drugs to "new" people i.e. people he doesn't know well, and doesn't like to sell small quantities, like "twenty's," i.e. $20 dollar quantities, or "40," i.e. $40 dollar quantities.

123.   In session 2792, Francisco Gonzalez texted UF2884 again and added: "I only do it for Chris because I knew him for ever since he was a kid but that's it I don't want to do it for nobody else it's a pain in the ass." It is believed in this text message, Francisco Gonzalez indicated he sells relatively small quantities to "Chris" Cammilletti because he has known him for several years, i.e. "for ever," but does not want to sell small quantities to other people.  In sessions 2797, 2798, and 2799, respectively, UF2884 texted Gonzalez:  "i want gs and better," which is believed to have been a reference to gram-weight quantities; "not small,"

54

which is believed to mean UF2884 did not want small quantities; and "half bs and stuff," which is believed to mean UF2884 wanted half eight-ball quantities, too.

124.    Francisco Gonzalez responded to UF2884 in session 2800: "I like ounce or up," which is believed to have been an indication that Francisco Gonzalez prefers to sell cocaine in quantities of an ounce or more.

### Communications Over Target Telephone 1 Pertaining to Javier Gonzalez

125.    Javier Gonzalez is believed to be a cautious, experienced, large-scale narcotics trafficker. This belief is based, in part, upon source information set forth elsewhere in this affidavit, upon a controlled purchase of heroin made by CS-1 in or about August of 2019, and upon communications intercepted over Target Telephone 1 from approximately November 17, 2021 through January 13, 2022, as explained more fully below.  (Communications intercepted over Target Telephones 2, 3, and 4, some of which are summarized in subsequent sections of this affidavit, also support this belief.)

126.    Javier Gonzalez and his brother Francisco Gonzalez appear to work together (or, at a minimum, to assist one another) in the business of renovating and renting properties, and roofing, which Francisco Gonzalez appears to be involved in.  And some of the calls intercepted over Target Telephone 1 appeared to pertain to this work.

127.    Other communications intercepted over Target Telephone 1 in which Javier Gonzalez participated, however, though guarded, as anticipated, are believed to have pertained to his involvement in narcotics trafficking with Francisco Gonzalez, the user of Target Telephone 1.

128.    For example, on November 27, 2021, in session 756, Francisco Gonzalez spoke to Javier Gonzalez and said, "I was just gonna stop by so I could pick up that, that, that, that thingy

thingy."   Javier Gonzalez, who appeared to understand exactly what Francisco Gonzalez meant, responded, "Alright, I'll call you as soon I get to the house, so you could come over."   I believe that in this call when Francisco Gonzalez said, "I was just gonna stop by so I could pick up that, that, that, that thingy thingy," he was indicating that he wanted to pick up a supply of drugs from Javier Gonzalez.   I further believe that when Francisco Gonzalez hesitated by saying "I was just gonna stop by so I could pick up that, that, that," he was exercising the degree of caution that I believe Javier Gonzalez demands.   I further believe that when Javier Gonzalez said "Alright, I'll call you as soon I get to the house, so you could come over," he was indicating that he would soon be available to supply Francisco Gonzalez with drugs at **Subject Premises 1**, Javier Gonzalez's residence located at 119 Enoch Street in Waterbury.

129.   Similarly, on December 11, 2021, in session 2218, at approximately 2:24 p.m., Francisco Gonzalez spoke to Javier Gonzalez.   During the calls, Francisco Gonzalez asked Javier Gonzalez, "Where you at?"   Javier Gonzalez responded, "I'm home," believed to mean that Javier Gonzalez was at **Subject Premises 1**.   Francisco Gonzales said, "Alright.   I'm coming . . . I'm gonna pass by and pick up that thing," which I believe meant that Francisco Gonzalez was going to meet with Javier Gonzalez at **Subject Premises 1** to obtain a re-supply of drugs, likely powder cocaine, for reasons explained below.   Javier Gonzalez said, "Alright."   I believe in this call, Javier Gonzalez, once again, appeared to understand precisely what Francisco Gonzalez meant when he said "I'm gonna pass by and pick up that thing," and responded "Alright," which I believe meant that Javier Gonzalez would meet with Francisco Gonzalez to resupply him with drugs at **Subject Premises 1**.

130.     Approximately one minute after session 2218 was intercepted, Francisco Gonzalez spoke

         to Christopher Cammilletti, in session 2220.  Cammilletti said "probably just a gram," and

         also said "alright, you never, you never did uh, any of that soft, huh?" I believe Cammilletti

         inquired whether Francisco Gonzalez had arranged to obtain a resupply of powder cocaine

         when he asked about "that soft," which is a term commonly used in the drug trade to refer

         to powder cocaine.  Francisco Gonzalez replied "yeah, yeah," indicating, I believe, that he

         would have powder cocaine, likely because, I believe, he had just arranged to pick up

         powder cocaine from Javier Gonzalez, in session 2218.  Cammilletti responded, "You did.

         Okay, alright.  Let me uh, let me talk to her and then that, that might, that gram might

         change."  I believe Cammilletti indicated he would talk to one of his female customers to

         inform her that Francisco Gonzalez had arranged to obtain powder cocaine, and, as a result,

         Cammilletti's order for "a gram . . . might change."

131.     Approximately 20 minutes after the call between Francisco Gonzalez and Javier Gonzalez

         in session 2218 was intercepted, surveillance observed Francisco Gonzalez's black, four-

         door, pick-up truck parked in the driveway of Javier GOZNALEZ's residence, **Subject

         Premises 1**.

132.     Surveillance, thereafter, also observed Francisco Gonzalez exit from Javier Gonzalez's

         residence, **Subject Premises 1**, carrying a box, which Francisco Gonzalez loaded into the

         back seat of his pick-up truck.

133.     Footage from a pole camera installed near Francisco Gonzalez's residence, **Subject

         Premises 2**, revealed that, moments later on December 11, 2021, Francisco Gonzalez

         arrived back at his residence located at 131 Geddes Terrace in his pick-up truck and met

         with Cammilletti who had been waiting at the residence for Francisco Gonzalez to return.

134.     The pole camera footage also revealed that, approximately 90 minutes later, Francisco Gonzalez appeared to retrieve from his pick-up truck the box he had loaded into the truck earlier in the day at Javier Gonzalez's residence, and which, I believe, contained a bulk quantity of cocaine that Javier Gonzalez had supplied to Francisco Gonzalez.

135.     During approximately 60 days of intercepts over Target Telephone 1, dozens of explicit communications, which plainly pertained to drug trafficking, were intercepted and revealed that Francisco Gonzalez distributed cocaine, cocaine base, heroin on a regular basis, and oxycodone.  During this 60-day period, however, no calls, other than those set forth above between Francisco Gonzalez and Javier Gonzalez, appeared to relate to Francisco Gonzalez being re-supplied with bulk quantities of drugs.  I believe, therefore, that the above intercepts between Francisco Gonzalez and Javier Gonzalez confirm source information and other investigative information indicating that Javier Gonzalez is a supplier of bulk quantities of drugs and is supplying Francisco Gonzalez with drugs.

136.     Francisco Gonzalez and Javier Gonzalez also appear to be using the messaging application known as WhatsApp to communicate in an effort to conceal their drug trafficking communications.  (Investigators were unable to intercept WhatsApp communications during this investigation.)  On December 9, 2021, in session 2019, for example, Javier Gonzalez told Francisco Gonzalez: "I'm a call you on WhatsApp real quick," which I believe indicated that Javier Gonzalez wanted to have an explicit conversation related to drug trafficking with Francisco Gonzalez and was more comfortable doing so using WhatsApp.

137.     Finally, one call intercepted over Target Telephone 1 indicated that Javier Gonzalez is a higher-level drug trafficker than Francisco Gonzalez.  On December 28, 2021, in session

3859, Francisco Gonzalez spoke to "Boogie," believed to be his relative. During the call, Francisco Gonzalez said, "I want to make like half a million dollars this year," which I believe was an indication that Francisco Gonzalez wanted to make $500,000. Boogie responded "Okay, Jay," which I believe indicated Boogie was teasing Francisco Gonzalez and indicating that, by making such a statement, Francisco Gonzalez was talking the way Javier Gonzalez would talk. Francisco Gonzalez responded, "Nah, nah, Jay, he want to make more than a million . . . But I'm not in Jay's game like that," by which I believe Francisco Gonzalez indicated that Javier Gonzalez is a higher-level narcotics trafficker that he is.

138.   In addition to the foregoing communications intercepted over <u>Target Telephone 1</u> between November of 2021 and January of 2022, Javier Gonzalez was also intercepted on his own phone, <u>Target Telephone 2</u> (which appears to have been a phone he used for personal matters and drug trafficking), from approximately February 9, 2022, through March 10, 2022. Finally, Javier Gonzalez was intercepted over <u>Target Telephone 3</u> (from approximately February 9, 2022 through the time of this writing) and <u>Target Telephone 4</u> (from approximately March 10, 2022 through the time of this writing) communicating with Jose Duprey. Some of these intercepts pertaining to Javier Gonzalez are set forth below in the sections corresponding to each, respective Target Telephone.

**<u>Target Telephone 2 ("TT2")</u>**

139.   Javier Gonzalez was often guarded in his communications with suspected coconspirators on Target Telephone 2 during the wiretap phase of the investigation. Target Telephone 2, moreover, appears to be primarily a "personal" phone rather than a "drug" phone. Notwithstanding this, intercepts over Target Telephone 2 (and, subsequently, Target

59

Telephone 3 and 4) shed light on Javier Gonzalez's suspected involvement in drug trafficking, his association with a suspected source of supply in Mexico, and his involvement in bulk cash smuggling into Mexico.

140.    A sampling of pertinent calls intercepted over Target Telephone 2 is set forth below in chronological order.

141.    On February 10, 2022, in session 106, Javier Gonzalez spoke to Vanessa Battice, who is his brother Francisco Gonzalez's paramour.  During the call, Javier Gonzalez spoke to Battice about an upcoming trip to Mexico that Javier Gonzalez had planned for all of them. (Subsequent intercepts indicated that the purpose of the trip was for Javier to make a bulk cash payment to his suspected source of supply in Mexico.)  Javier Gonzalez also told Battice that Francisco Gonzalez is "a cheap bastard.  He got money buried somewhere . . . I know what I gave him already.  He saves.  I know he don't spend shit."  Battice later said "me and Sisco don't discuss that type of stuff."  It is believed that, in this call, Javier Gonzalez indicated to Battice that he (Javier) knew Francisco Gonzalez had made substantial profits distributing drugs that Javier Gonzalez had supplied to him ("I know what I gave him already").

142.    On February 10, 2022, in session 111, Javier Gonzalez spoke to a male, believed to be a relative, named "Boogie," and told him "we're going to Mexico . . . the 24th, we're going down there for five days . . . I wanna see if I could buy a house down there . . . Sisco's coming with me . . . Vanessa's coming too."

143.    On February 11, 2022, in session 154, Javier Gonzalez told a male using telephone number (888) 111-2663, "You can do anything . . . look at me I went from not doing anything to

becoming a fucking drug addict to look where I am at now . . . anybody can do it with that money that is coming buddy . . . we can make a lot of shit happen."

144.    On February 11, 2022, in session 175, Javier Gonzalez told an unidentified female that "he has a lot of properties in Waterbury."

145.    On February 11, 2022, in session 275, Javier Gonzalez indicated he was going to "Mexico" for five days on February "24th." He said "In Mexico, I just tell my man what I want when I wanna do it and he makes it happen. You understand what I'm saying . . . he is hard-core people . . . I don't pay for fucking nothing. He pays for it," which is believed to be a reference to Javier Gonzalez's Mexican-based source of supply.

146.    On February 12, 2022, in session 319, Gonzalez told a female using telephone number (203) 526-3177, "[i]f you start coming around I could help you better  . . . make some money."

147.    On February 12, 2022, in session 359, Javier Gonzalez spoke to a male using telephone number (203) 666-9676 and said "I just finished doing what I'm doing . . . everybody still there  . . . any police there . . . yeah, 'cause I, I, . . . with some jewelry," which is believed, perhaps, to have been reference to a gun. UM3177 indicated there were "no police" and also said "You are good. I'm strapped too," indicating, perhaps, that UM7166 also had a gun. I know that drug traffickers, particularly those who generate the kind of profits Javier Gonzalez is believed to generate from drug trafficking, often carry firearms to protect themselves and their drugs and drug proceeds.

148.    On February 13, 2022, in session 403, a female using telephone number (203) 526-3177 told Javier Gonzalez "I have 50 for some weed." Gonzalez later said, "I'm not at the house right now because I'm out here collecting some rent . . . Let me go to the house," believed

to mean Gonzalez had drugs stored within his residence, **Subject Premises 1**.  In the next session, session 404, Javier Gonzalez told UF3177 "I'm a go grab that shit from you right now," believed to mean Javier Gonzalez was going to retrieve the money from UF3177 for the drugs he had stored within Subject Premises 1.

149.   On February 14, 2022, in session 557, Javier Gonzalez told a male using telephone number (203) 850-4671, "I have 1.5 million in buildings . . . I could grab 100,000, 200,000 like it ain't nothing," believed to mean that Javier Gonzalez has acquired properties with his drug proceeds and has access to large sums of money.

150.   On February 18, 2022, in session 1092, Javier Gonzalez spoke to a male using (203) 768-5698, identified only as Duran.  During the call, Jose Duprey was in Gonzalez's presence. Gonzalez asked Duran, "Hey listen,, um, do you got time to come over here and talk to um, do you remember Colorado?," to which Duran responded, "Latin King Colorado?" Gonzalez said "yeah, and later indicated that Colorado "runs a rental place," believed to be a reference to Discount Car Rental operated by Jose Duprey.  Gonzalez then put Duprey on the phone and Duprey and Duran seemed to discuss what Duran, who drives a flatbed truck, would charge Duprey to pick up cars when needed.

151.   On February 20, 2022, in session 1232, Gonzales spoke to a male using telephone number (475) 377-0288.  During the call, UM0288 complained to Gonzalez about a fight he had gotten into and complained about some people whom UM0288 believed to be "rats" and that's why he "doesn't fuck with them anymore."  UM0288 also informed Gonzalez that he had informed a male named "Ford" that Ford "will never sell coke in the city ever again," believed to be a refence to the distribution of cocaine ("coke").

152.   On February 21, 2022, in session 1318, Javier Gonzalez spoke to his brother, Francisco Gonzalez.  During the call, Javier Gonzalez said "I wanted you to see if you could . . . remember, check that thing for me, remember?"  Francisco said, "Check what thing?"  Javier Gonzalez said, "The thing that you forbid thing, you know."  Francisco Gonzalez said, "Oh, okay, what, you got it?"  Javier Gonzalez said "Yeah . . . I could bring it to you . . . just let me know when you gonna do it up."  Francisco Gonzalez said, "do it up, you mean?"  Javier Gonzalez said," yeah, a little bit."  Francisco Gonzalez said, "okay, alright man," which was perhaps an indication that Francisco Gonzalez would process a small, test batch of cocaine into cocaine base, which Javier Gonzalez is believed to have been addicted to and to which his reference to "that thing you forbid" is believed to have pertained.

153.   On February 22, 2022, in session 1453, Javier Gonzalez spoke to Francisco Gonzalez.  During the call, Francisco asked Javier if he could postpone the trip to Mexico for a week or so, because, apparently, Francisco had tested positive for COVID-19.  Javier Gonzalez explained, "I can't cancel it . . . them dudes over there already made, uh, plans to come see me . . . where they live in Me, where they live over there, they have to take a plane, too, to meet me there . . . 'cause it takes time, you know, I may need a day or two days to drive through from where they are at," which is believed to mean that Javier Gonzalez's source of supply in Mexico had made arrangements to meet with Javier Gonzalez during his trip to Mexico to collect money from him.

154.   On February 23, 2022, in session 1616, Javier Gonzalez informed Francisco Gonzalez that he needed his help smuggling a bulk quantity of cash into Mexico (bulk cash smuggling), for the suspected purpose of making a cash payment to his Mexico-based drug supplier.

63

155.    Specifically, on February 23, 2022, in session 1616, Javier Gonzalez informed Francisco Gonzalez that he wanted Francisco Gonzalez to carry "8," i.e. $8,000 and his paramour, Vanessa Battice, to carry "9," i.e. $9,000 in cash on their trip to Mexico.  Francisco Gonzalez asked, "Why," and Javier Gonzalez responded, "You know why . . . I gotta bring the mone . . . I gotta bring some money with me," believed to mean that Javier Gonzalez informed Francisco Gonzalez that he needed to smuggle a bulk quantity of cash into Mexico so he could make a payment to his drug supplier there.  Francisco Gonzalez said, "I don't know, that's suspect, huh . . . Alright man.  I just don't feel comfortable doing that, but is alright."  Javier Gonzalez later told Francisco Gonzalez during the call that a person "can't carry over 10,000" when traveling to Mexico.  Francisco Gonzalez later said, "I'm just scared, just carrying that much money, man."  It is believed that in this call, Javier Gonzalez explained that he needed to bring a bulk quantity of cash to his source of supply in Mexico and wanted Francisco Gonzalez and Vanessa Battice to help him transport the bulk cash, i.e., smuggle the bulk quantity of cash, estimated to be approximately $26,000 into Mexico.

156.    Later the same day (February 23, 2022), in session 1641 over TT2, Javier Gonzalez and Francisco Gonzalez discussed meeting early the following morning, February 24, 2022, to travel to "Bradley" International Airport.

157.    On February 24, 2022, in session 1688 on TT2, Javier Gonzalez informed a female caller, "I can't really hear you right now cause I'm in the airplane I'm getting off the plane I'm in Cancun."

158.    U.S. Customs and Border Protection records indicate that Javier Gonzalez, his girlfriend, whose name is known to you affiant, Francisco Gonzalez, and his girlfriend Vanessa

64

Battice, all flew from Bradley International Airport in Connecticut to Cancun, Mexico, on February 24, 2022.

159.   On February 24, 2022, after arriving in Mexico, Javier Gonzalez spoke to Francisco Gonzalez in session 1741.  During the call, Javier said, "I've been trying to call you, bro. Where you at."  Francisco responded that he was at "the restaurant" and said "I thought you were leaving," believed to mean that Francisco thought Javier had left the hotel to go meet with his Mexican source-of-supply.  Javier responded, "Yeah, but I can't leave without that money," believed to mean that Javier Gonzalez intended to meet with his Mexico-based drug supplier, but could not do so without the bulk sum of cash that Francisco Gonzalez had helped Javier Gonzalez smuggle into Mexico.  Francisco responded, "Oh, shit . . . [i] in my room," believed to mean that Francisco had the money he smuggled into Mexico stored within his hotel room.  Javier Gonzalez said, "Alright. Don't worry about it, man. I'll get it tomorrow, man."

160.   On March 3, 2022, in session 2219, Javier Gonzalez informs UM0897 that his customers did not want the pills that UM0897 had supplied to him.  Javier Gonzalez asked, "Them things that you... They have something else with it. You know that right?"  UM0897 responded, "What do you mean?"  Javier Gonzalez replied, "It's got codeine in it.. . . They're not... They're not the official ones. It's got aspirin in it. . . Yeah, yeah those are codeines nobody want them shits. . . So I'm a drop 'em off to Julio tomorrow alright?"  It is believed that in this call, Javier Gonzalez was complaining about the quality of pills, likely oxycodone, he received from UM0897 and that he was intending to return them the following day to a male named "Julio," because Javier Gonzalez's would not buy the

suspected counterfeit oxycodone pills ("They are not the official ones . . . nobody wants them shits").

161.　　On March 10, 2022, in session 2697 on Target Telephone 2, Javier Gonzalez spoke to UM4915, who was using telephone number (52) (998) 874-4815. During the call, it is believed that Javier Gonzalez indicated that his Mexican supplier had eight kilograms of heroin available for distribution. UM4915 said, "Tell me. Your uncle, what part of Mexico does your uncle live in?," believed to mean that UM4915 inquired what area of Mexico Javier Gonzalez's source of supply lived in. Javier Gonzalez said, "Um, I don't know how to say the part [of Mexico] but I will, I will send him the number, um, your number to him and I will tell him to call you." UM4915 said, "Okay. And does he also have horses or does he like them?," believed to mean that UM4915 inquired whether Gonzalez's Mexican source of supply had heroin available for distribution, because the phrase "the horse" is commonly used in the drug trade to refer to heroin. Gonzalez replied, "Yes. He has, I think he has like eight (8) horses," believed to be a reference to 8 kilograms of heroin. UM4915 said, "Alright then. What horse? What kind,?" believed to be an inquiry into the type of heroin. Gonzalez said, "I don't know, but when he calls you, you both can talk." UM4915 said, "One has to find a good horse to run it here and make something on these people," believed to mean that UM4915 indicated that he needed to be supplied with good quality heroin at a good price so he could make a profit selling it. Gonzalez said, "That's alright. I'll call him now and will tell him to call you."

**Target Telephone 3 ("TT3")**

162.　　Intercepts over Target Telephone 3, utilized by Jose Duprey, have confirmed Duprey's involvement in a high-level drug trafficking organization. The intercepts over Target

66

Telephone 3 have often been explicit with respect to the appearance, color, and texture of suspected controlled substances and with respect to numbers, which are believed to correspond to drug debts.

163.   Several of Duprey's coconspirators were intercepted over Target Telephone 3 in communications that are believed to have pertained to drug trafficking, including Edwin Hernandez, Garry Gebeau, Jonathan Santiago, Thomas Santos, Jose Ramos, and Bianca Rodriguez-Cancel.

**A sampling of the communications is set forth below in chronological order.**

164.   On February 10, 2022, in session 19, Jose Duprey spoke to a male who was using telephone number (203) 594-8432.  During the call, UM8432 told Duprey "it's the color that has given me problems.  And I haven't been able to find what we talked about to take the color out," believed to be a reference to the color of narcotics, likely heroin, that Duprey previously provided to UM4832, because heroin is often tan or light brown in color. Duprey responded, "Uh huh, that little color, what was the little color?  The little goldish?" UM8432 said, "That one.  Yes.  That one is the one that's a little burned. Because the other one too, I think it is . . . it has been working well up to now." Duprey said, "Uh-huh.  There is one out there that is like . . . It's like Quick.  It's like the chocolate Quick, you heard . . . when you come . . . I will give you a little of, of each one."  UM8432 said "Oh, oh, that's fine.  Oh, yes, that's' fine.  When I drop in on you, I will call you a day before to see how I will . . . And that way I'll tell you what I'll take."

165.   On February 10, 2022, in session 22, Duprey had a lengthy conversation (22 minutes) with Edwin Hernandez, who was using telephone number (470) 838-5167. Hernandez is believed, based upon numerous subsequent intercepts, to be a high-level member of the

organization with which Duprey is affiliated who coordinates kilogram-weight shipments of drugs and coordinates the delivery of payments. During the session 22, Hernandez asked Duprey, "Do you have the notes there?" Duprey responded, "Let me look in this little phone, wait." Hernandez said, "Look for it please." The two then engaged in a lengthy discussion that involved tallying what is believed to be a drug debt. At one point, Hernandez said, "we will add the 13 of parceras, correct," to which Duprey responded "Uh-huh." Hernandez then said, "13 times 27," which is believed to be a reference to 13 kilograms of cocaine, or "parceras," at a price of $27,000 per kilogram, which is consistent with the price of cocaine when multiple kilograms are purchased in bulk. At the conclusion of the extensive discussion about the amount of the suspected debt and how the two arrived at a final number, Hernandez informed Duprey that "there is a total left of one, six, zero, three, five-hundred," or $1,603,500. Duprey responded, "Mm-hmm." Hernandez later said, "And how is it going with the parceras, with the paisanas?" Duprey responded, "The parceras are going good. They are already . . . they are already gaining ground . . . Yeah, because you know that this, this, the habit of the people." Hernandez responded, "Yes, exactly, yes . . . that's good, all set, well then yes. So, we are active there?" Duprey responded, "Yeah, yeah. We already did that little number, that was the only thing left."

166.    During session 22, Duprey also told Hernandez that he had once agreed to buy heroin from an individual and the individual attempted to supply Duprey with fentanyl instead of heroin. Duprey said "I told him, 'Well, go ahead, tell him to send them to me. I have an address where they will arrive' and . . . listen, when I open the damn book, you know what they were? . . . five patches of the F ones . . . I said, 'Listen, that is a thing that you do not want to touch in there, if a person that is clean touches that, they could die' . . . I told him,

68

'So I am going to tell you sincerely, I am not going in there with that little game, you heard' . . .I told him 'No, no, no, no . . . tell him, that no, next time speak clearly and little oranges are little oranges and this is something else,'" i.e. Duprey refused to accept the "five patches of the F ones," believed to be five kilograms of suspected fentanyl, and wanted "little oranges," believed to be a reference to heroin, which is often tan in color.

167.   On February 15, 2022, in session 121, Duprey again spoke to Hernandez, who was using telephone number (470) 838-5167.  The two are believed to have discussed the quality of drugs being distributed by the organization and are believed to have referred to the different color wrappers on the kilograms received.  Hernandez said," Alright, and how you been with the parceras, bro?"  Duprey said, "That parceras are going up . . . listen, that black, that black on one side came out good and other it came out bad . . . the little cousin did the mix right?"  UM6267 said "Yes."  Duprey said, "Yes but people said it didn't do anything to them, some people was good for some people bad for others," believed to mean that the product received mixed reviews from drug users.  Duprey later said "Yeah, I don't know about that combination, we'll have to open another one to see what's up with different of that . . . because if not the pizza guy will have to change the purples," believed to mean that if the drugs wrapped in a purple wrapper do not receive positive feedback from customers, the supplier will have to exchange them.  Duprey later said, "Well I don't know because I have one there but today I am working on a mix right  . . .  of that good dust Ferrari . . . I will check today with that one," believed to be a reference, possibly, to heroin mixed with fentanyl ("good dust Ferrari").  Finally, Duprey said, "the wall is full, I can't, nothing else at the wall now, I'm putting in boxes and putting them to the side," believed

to be a reference to bulk quantities of cash drug proceeds secreted in a wall. Hernandez responded by laughing and saying "yes we have to take it down a notch."

168.    On February 15, 2022, in session 128, Duprey spoke to Hernandez and had another lengthy conversation (ten minutes) during which Duprey said "I was here doing the mix . . . and that gets like gum you heard . . . sticky and all . . . I almost couldn't take it out of the Osterizer (blender) . . . so let him know, because as much as you mill it . . . it goes back to sticking . . .. I cannot put it in a strainer because it is going to stay all stuck there," believed to be a reference to drugs, likely heroin, not processing properly. Additional details regarding this call are set forth in the section of this affidavit pertaining to Subject Premises 3.

169.    On February 16, 2022, in session 144, Garry Gebeau, using telephone number (475) 470-4553 texted Duprey "3 of soft. 1 piece please," believed to be a reference to cocaine, because I know based on my training and experience that the term "soft" is a term commonly used in the drug trade to refer to cocaine. (Gebeau also expressly used the term "soft fish," which, too, was believed in context to be a reference to cocaine, in sessions 174, 523, 530, and 849 intercepted over Target Telephone 3.)

170.    On February 16, 2022, in session 149 UM3264, who was using telephone number (720) 655-3254. During the call, UM3264 said, "Did you bring a piece of the white, the white girl?," believed to be a reference to cocaine, because "white girl" is a term commonly used in the drug trade to refer to cocaine. Duprey responded, "Yeah. I'll bring you some so you could see it."

171.    On February 19, 2022, in session 264, Duprey spoke to Jose Ramos, who was using telephone number (516) 669-4881. During the call, Duprey asked, "Have you checked the

young guy?" Ramos said, "No, so far they said you know, I checked with only one but."
Duprey said, "that is really good, right?" Ramos said, "Man, damn with two, they told me,
you know, right . . . that's above the astronauts," believed to mean that the quality of the
drugs, likely cocaine, that Ramos received from Duprey was good.

172.    On February 21, 2022, in session 307, Duprey spoke to Thomas Santos who was using
telephone number (475) 295-7948.  During the call, Santos said, "I got my guy here . .
.before he takes off, I'm trying to get everything done today, uh, so the only one left is
what just the blue one?" Duprey later said "I got that. I got some blue ones.  I got some
other ones that are more clear blue.  They gave me, I haven't opened that one yet." This is
believed to be a reference to whole kilograms of cocaine, wrapped in blue packaging, which
Duprey had not yet "opened."  Santos said," Because if anything pops I need to take um
the whole beef of the month so at the end of the day, whatever you got whole I'm just
gonna grab that," believed to mean that Santos wanted a whole kilogram of cocaine
("whole beef of the month") for his customer.  Duprey later said, "one is ash-like color, I
could get all those three cars today . . . like an hour and a half," believed to mean Duprey
could have three kilograms ("three cars") of cocaine.  Santos said "Perfect."

173.    On February 21, 2022, in session 311, Duprey spoke to Jonathan Santiago, who was using
telephone number (475) 559-9691.  During the call, Santiago asked Duprey, "Hey, I wanted
to see what up with the gray shit?"  Duprey responded "I'm in the shop right now . . . just
come by, I got it right there . . . I just went and picked it up this morning," which is believed
to mean that Duprey has a quantity of drugs (believed to be heroin) at his rental car
business, Discount Car Rental (**Subject Premises 4**), which is located at 767 Wolcott St.
in Waterbury.

174.    On February 22, 2022, in session 322, Jose Duprey spoke to Hernandez, who was using telephone number (470) 838-5167. During the call, Hernandez told Duprey, "If you pick up more, just give him the 80 . . . Just give him 80 and whatever we pick up from now until Friday, we'll give it to the guy so that way he's happy as well.  You understand?," which is believed to be an instruction for Duprey to give the supplier's courier $80,000.  Duprey responded, "Yes, yes, yes. That's alright. That's alright."  Hernandez said, "Exactly. Just give him 80 and they can entertain themselves there . . . ."  Later in the conversation, the two appeared to discuss the cocaine market and current prices. Duprey said, "I told them, 'when this gets better, he can negotiate the price, but for now . . . the price can't be negotiated.'  But I said, 'if they buy five from me at once . . . then we can make a deal and leave it at 25 . . . I said, 'But it has to be all at once,'" which is believed to mean that Duprey was willing to sell a bulk quantity of five kilograms of cocaine for $25,000 per kilogram.

175.    Following the interception of session 322 over Target Telephone 3 on February 22, 2022 between Duprey and Hernandez, which indicated that Duprey would be transferring "80," i.e. $80,000 in suspected drug proceeds, other intercepts, including session 384 on February 23, 2022, also indicated that Duprey would be transferring "80."  Ultimately, however, Hernandez informed Duprey in session 391 intercepted on February 23, 2022 over Target Telephone 3, that "Listen, the thing is that I didn't understand him well, because the man was on the road, but it's 88," which I believe meant that Hernandez was informing Duprey that Duprey would have to transfer $88,000 rather than $80,000, in the arranged money drop.  Duprey responded, "Oh, so let me check.  Hold on, because I have to get to that place.  I haven't even gone over there to get it yet," which I believe meant that Duprey had to travel to his residence at 87 Seymour Street (Subject Premises 3), the location where he

72

secretes his drug proceeds to "check" whether he had enough drug proceeds to deliver $88,000 in the arranged money drop.

176.   In session 404 over Target Telephone 3 on February 23, 2022, Duprey informed Hernandez, "All good.  88," which I believe meant that Duprey had transferred $88,000. Hernandez asked, "Already passed it," to which Duprey responded, "Yes," which, once again, I believe meant that Duprey had transferred $88,000.

177.   On March 2, 2022, in Session 619, Gary Gebeau, texted Duprey, "5 fish shiny and5 f. and change this 6 left for dark," which is believed to be an order for five grams of cocaine, "fish shiny," five grams of fentanyl, "f," and six grams of heroin, "dark," which Gebeau wanted in exchange for the six grams of heroin previously provided to him.  On the same day, in Session 640, Gebeau texted Duprey, "u gave me 5 fish (175$) and 5 f (235$)...$ 410 total, i gave u 350 so owe u 60 from today rite," which is believed to be a message from Gebeau confirming how much his debt is to Duprey.  On the same day, in Session 652, Gebeau texted Duprey, "That dark is nice it's all nice but that dark is real nice," which is believed to be Gebeau providing feedback to Duprey that the heroin is of particularly good quality.

178.   On March 3, 3022, in session 703 over Target Telephone 3, Duprey spoke to Santiago, who was using telephone number (203) 592-5107.  Santiago said, "Hey Red.  I was gonna tell you, he owes me 11,000.  I gotta give you 10, right.," to which Duprey responded "Yeah, yeah."  Santiago said "I'm a take, I'm a take out a couple thousand from the money I got saved at the house.  My, like my profit.  I'm a take a couple, I'm a take a couple thousand now. That way, I can, I can owe you less.  You know what I'm saying? . . . While he get rid of this.  You know what I'm saying?"  Duprey responded "Yeah, Yeah."  It is believed

73

in session 703, Santiago informed Duprey that he was going to pay Duprey at least "a couple thousand" dollars of a drug debt Santiago owed to Duprey for drugs that Duprey had previously provided to Santiago on consignment and as a partial payment on a new supply of drugs. It is further believed that when Santiago said "while he get rid of his," he was making reference to the time it would take for one of Santiago's distributors to sell the drugs that Santiago had provided to this customer.

179.   On March 3, 2022, in session 708 over Target Telephone 3, Duprey spoke to Santiago, who was using telephone number (203) 592-5107, and told Santiago "Yeah, I'm on my way to go get that for you," which I believed meant that Duprey was "on his way" to **Subject Premises 5** (Blooming Eyes by Lora), which Duprey utilizes as a stash location, to pick up a supply of drugs ("that") for Santiago.

180.   On March 3, 2022, in session 712, Jose Duprey spoke to Jonathan Santiago. Santiago asked Duprey, "What you left half (½)," which is believed to be a question as to why Duprey only left half of the drugs that Santiago had expected. Duprey said, "Yeah, it's four (4) 50 in there," believed to mean 450 grams of cocaine. Santiago states, "Listen, if I bring you another five (5) and it bring it close to what I owe you," which is believed to be a question asking if he pays more money towards his debt, would Duprey supply him with more drugs. Duprey responded, "Let me know. Yeah." Santiago then clarifies, "A'right, bet. So if I get... I'm might get you like another five (5). If I could get you the other five (5), you give me the other half (½)?" Duprey answers, "Yeah! I just gotta open the other one that my boy have," believed to mean that Duprey would "open" a new kilogram of cocaine and give Santiago 500 grams ("half" a kilogram). Eighteen minutes later, Santiago texted Duprey, in session 715, "Hey bro I got more bread for u out of my own money can

I bring it to you and grab the other 550," and in Session 716 Santiago continues, "Because ima drop this off to my other 2 boys and I'm not going to have anymore for myself to move around."  It is believed that Santiago was inquiring whether Duprey would provide him with 550 grams of cocaine if Santiago made another partial payment of $5,000 toward the debt he owed Duprey for cocaine Duprey previously supplied to Santiago on consignment. It is further believed that Santiago wanted the additional 550 grams of cocaine, because he had already sold 450 grams of cocaine to his two customers and, therefore, needed to be resupplied with cocaine.

181.    On March 4, 2022, in session 727 Duprey spoke to Jose Ramos.  In that conversation, Ramos stated, "that green one that was, they told me that it was," to which Duprey responded, "It was on fire, right?"  Ramos answered, "That's what they told me, that's what they told me [Stammers] the both of them, because you put, you gave me a good portion," which is believed to be Ramos reporting that the bulk quantity of cocaine ("good portion") that Duprey supplied to him in green wrapping was of particularly good quality, as reported to him by two separate end users.

182.    On March 4, 2022, in session 748, Duprey spoke with Hernandez.  In that conversation, Hernandez tells Duprey, "That those papers got fucked. So that's why I need to know what you have now to be picked either tomorrow or Sunday. That way they can facilitate more "parceras" to the man. . . . So he's trying to pick up... He told me; 'I'm trying to pick up more papers? Does your friend already have?' I told him; 'I'll ask him later on.' So, tomorrow is Saturday," which is believed to mean that a man asked Hernandez if Hernandez could supply him with more "parceras," which is believed to be a code word used in this context for kilograms of drugs.  Hernandez continued, "He told me; But he

75

doesn't want... He doesn't want... [Pause] to be in a Ferrari right now? I told him; He is telling me, 'no.'" Hernandez stated, "He sent you a Ferrari that you told me people liked. Do you remember," to which Duprey responded, "Yes, uh-huh. That's the same one. The little powder one. That's the little powder that I have there." Hernandez responds, "He doesn't have it in little powder form, he has it in "blocks". But then he was telling me... He told; "Look, whatever is left there... Because there isn't going to be any showing up with that until June, July. That's why I want him to have them, it's better. Because if he uses them. He can make room for them." That's why I'm telling you that it doesn't matter. We could grab them." Later in the conversation, Hernandez says, "So, Uh... about the cake, that of the Ferrari . . . So I told him that 'it was a little like this... that it was, according to what we talked, a little that it was slow, bah, bah, bah...' So then, he told me: 'Tell him to give it at 41, for him to lower 3 more pesos to that' I say: 'Alright. good, all set.'"

183.   On March 9, 2022, in session 927, Gebeau texted Duprey "Good morning. Let's do 10 h dark and 15 of fish. I have some extra $ for u. Thx," which is believed to mean that Gebeau wanted to purchase a quantity of heroin, likely 10 grams, ("10 h dark") and a quantity of cocaine, likely 15 grams ("15 of fish"), because Gebeau has referenced in other intercepts the term "soft fish," and soft is a coded term commonly used in the drug trade to refer to cocaine. Later that day, in session 941, Gebeau spoke to Duprey and said, "You got the dark too, right?" Duprey said, "Yeah, the dark one . . . They like the dark one, huh? For some reason." Gebeau said, "Oh yeah, man. They fucking love it." It is believed that in session 941, Gebeau confirmed he wanted to purchase heroin ("the dark one") because his customers wanted the dark colored heroin ("They fucking love it").

184.    On March 9, 2022, in session 960, Duprey spoke to UM7204, who was using telephone number (203) 577-7204.  During the call, Duprey asked UM7204, "What we you looking for, for that blue kid?," believed to be drugs contained in blue packaging.  UM7204 responded, "Ah, no. Yes."  Duprey said "Okay, What was it you were or what were you looking for. How much does that fucker weigh?," believed to be an inquiry by Duprey into what quantity of drugs UM7204 wanted to obtain.  UM7204 said, "Like 5, around there. More or less," believed to mean likely 500 grams of cocaine contained within blue packaging.

185.    On March 10, 2022, in session 965 over Target Telephone 3, Duprey spoke to Hernandez, who was using telephone number (470) 838-5167. Hernandez asked Duprey, "Did you speak with that, with that girl . . . what number are you going to give her . . . what number do you have . . . ?," believed to mean that Hernandez wanted to know how much money in drug proceeds Duprey was going to provide to a female associated with the organization as payment for drugs previously provided to Duprey.  Duprey said, "There is about 30, as a matter of fact almost 40 . . . I will finish today," believed to mean that Duprey has collected almost $40,000 from his drug customers.  Hernandez said, "Giver her 30 for me, so we can ask the other for something next week," believed to mean that Hernandez instructed Duprey to make a payment of $30,000 for drugs previously provided to Duprey, so Hernandez and Duprey could request another shipment of drugs the following week.

186.    On March 11, 2022, in session 978 over Target Telephone 3 ((203) 228-0565), Duprey identified himself as "Jose Duprey," and stated that his telephone number was (347) 456-8272, the telephone number for Target Telephone 4.  He also identified his address as "87 Seymour Street, Waterbury, Connecticut, 06708."

187.    On March 12, 2022, Ramos, calling from telephone number (516) 669-4881, spoke to Duprey.  This telephone number is subscribed to by Jose Ramos.  During the call, Duprey asked Ramos, "Are we still on for the, on the 200 blue ones," believed to be a reference to a bulk quantity of cocaine, contained in blue wrapping, based upon the content and context of several calls between Duprey and Ramos indicating that Ramos purchases bulk quantities of cocaine, at time whole kilograms, and refers to the cocaine by the color of its packaging. Ramos later responded, "Yes.  Well, tomorrow [UI] I can take them all for you," believed to mean that Ramos would take delivery of the quantity of cocaine from Duprey.

188.    On March 12, 2022, in session 981 on Target Telephone 3, Duprey spoke to Hernandez, who was using telephone number (470) 838-5167.  During the call, Duprey and Hernandez discussed the weather.  Duprey said, "There where you are, it's really good in Atlanta, huh?" Hernandez said, "Exactly.  Yes.  Uh-huh.  It's mild here . . . because remember that here in Atlanta it is close to Miami, Florida.  It's all coastline." Hernandez later said, "We're in lockdown. [UI] even the food."  Duprey said, "Yeah.  You're on lockdown? Why again now?"  Hernandez said "Who knows."  Later in the call the parties discuss how law are changing and Hernandez indicated he has served enough time.  Based upon this call, and other investigative information, Edwin Hernandez, was believed to be incarcerated in prison in Atlanta (and this was later confirmed when telephone number (470) 838-5167 was seized from him by prison officials on or about March 16, 2022).

189.    On March 13, 2022, in session 987 over Target Telephone 3, Duprey spoke to Hernandez, who was using telephone number (470) 838-5167.  During the call, Duprey asked Hernandez about the "parceritas," believed to be a reference to kilograms of drugs, likely

cocaine (based upon session 22 intercepted over Target Telephone 2 on February 10, 2022, in which Duprey and Hernandez discussed "parceras" and indicated the price was "27," believed to mean $27,000, which is consistent with the wholesale price for cocaine). Duprey said, "And the 'parceritas' there. Let's see what happens with the 'parceritas' there. For them to come down around there," believed to mean Duprey wanted a delivery of kilograms of drugs, likely cocaine.  Hernandez said, "Yes. Yes. I'm on that," believed to mean he was arranging a delivery of kilograms to Duprey.  Duprey said, "Because everybody now.  Everyone had a taste of that one already. Everybody got hooked, the time is now," believed to mean Duprey's customer base liked the quality of the drugs, likely cocaine, Duprey was distributing and became addicted ("hooked"), so it was a good time to distribute more drugs ("the time is now").

190.   On March 14, 2022, in session 995 over Target Telephone 3, Ramos, calling from telephone number (516) 669-4881, spoke to Duprey.  Duprey said, "This one said that the white car is done. So pass by there," believed to mean, possibly, that one of the organization's customers had informed Duprey that his or her supply of cocaine ("the white car") had been distributed, and Duprey wanted Ramos to deliver a resupply of cocaine to this individual.

191.   On March 14, 2022, in session 996 over Target Telephone 3, Duprey spoke to UM1469, who was using telephone number (203) 519-1469.  UM1469 said, "My brother may need something, right around [U/I] on the white girl," believed to be a reference to cocaine. Duprey responded, "On the White girl?"  UM1469 said, "Uh-hum." Duprey said, "On the white girl, I could give it to you for 29," believed to be a reference to a price of $29 per gram for cocaine, consistent with the price for bulk, wholesale quantities of cocaine.

UM1469 said, "Okay [U/I]."  Duprey said, "No touch or nothing. You hear?," believed to mean that the cocaine had not been cut with any diluent.  UM1469 later said, "A'ight. What about the other thing? [U/I]," believed to mean that UM1469 also inquired about the availability of bulk, wholesale quantities of heroin ("the other thing").  Duprey said, "The, the other one, we still got some good shit, we got the brown shit, whatever you want of that," believed to mean that Duprey had a bulk quantity of heroin available for sale ("the brown shit"), because heroin is sometimes brown or tan in color, and sometimes lighter, almost white.  UM1469 said, "Yeah, what's the price on it, though?" believed to mean that UM1469 inquired about the price for heroin.  Duprey said, "That one I could just give it to you both. Either one are for 50. Either one," believed to mean that Duprey had light colored heroin and dark colored heroin, both of which he would supply in bulk to UM1469 for $50 per gram, which is consistent with the per-gram price for bulk, wholesale quantities of heroin. UM1469 said "Okay . . . I gotta call him," believed to mean UM1469 had to speak with one of his associates about the prices for cocaine and heroin being offered by Duprey. In session 997, UM1469 texted Duprey, "Hit you up tonight or tomorrow  need probably 100," believed to mean UM1469 wanted 100 grams, perhaps of both heroin and cocaine.

192.     On March 14, 2022, in session 1002, Duprey spoke to UM1469, who was using telephone number (203) 519-1469.  UM1469 said, "Yeah. He need that."  Duprey said, "He need that. What the 100?"  UM1469 said "Yep."  Duprey said, "Alright, alright. You want the white girl, no.. the softy?," believed to be a reference to cocaine, which is commonly referred to as the "white girl" or "soft" in the drug trade.  UM1469 said, "Yeah, white girl... white girl. You said, 29, right?," believed to be a confirmation that UM1469 wanted 100 grams of

cocaine for his associate at a price of $29 per gram.  Duprey said, "Alright, alright. Yeah,"
believed to be a confirmation that the per-gram price for cocaine was $29.

193.   On March 16, 2022, in session 1045 over Target Telephone 3, Garry Gebeau, using number
(413) 291-6166, spoke to Duprey.  During the call, Duprey said, "I got the 15," believed to
be a reference to 15 grams.  Gebeau, after waring Duprey that Gebeau's girlfriend was
suspicious of Gebeau's activities and had examined Gebeau's phone records, later said,
"That green shit they don't like.  It gotta be the white shit . . . the white, uh, fent.  The white
F.  You know that right," believed to mean that Gebeau wanted to be supplied with
fentanyl.  Duprey responded, "Uh-huh . . . I have the good one now, some good for you."

194.   On March 16, 2022, in session 1051 over Target Telephone 3, Garry Gebeau texted Duprey
"Save some dark H but without the black edges. Working late text u in am.  Sorry," believed
to mean that Gebeau wanted to purchase a quantity of heroin ("dark H") from Duprey the
following day.

195.   On March 16, 2022, in session 1054 over Target Telephone 3, Garry Gebeau, using number
(413) 291-6166, spoke to Duprey.  Gebeau said, "that stuff you gave me last week. I just
opened it. The 10. 'Cause I brought it to my boy's house. Remember the 10? The brown?
The dark brown? . . . Well, you remember how it was real dark on the edges? Some of it
was real dark. . . That shit... that dark shit? I thought... I thought 'Oh, man. Maybe that shit
will be stronger when they put,' . . . My boy just showed me. When you put the dark, dark
shit on the edges, it fuck... it gets all shitty and you can't put it in the needle. So that dark
dark shit around the edges fucks it all up. I'm telling you. So I took all the dark stuff and I
took it off the edges and I put it to the side," believed to mean that a previous supply of
dark colored heroin provided to Gebeau was, in part ("on the edges"), of poor quality and

could not be injected using a "needle."  Gebeau later said, "I like the dark brown but the...

on the edges of the dark brown it's black almost. You know what I'm talking about? . . . I

just have to swap that out," believed to mean Gebeau wanted to return a portion of the

heroin Duprey provided to him.  Duprey said, "Yeah, yeah, yeah."  Gebeau later said, "I

need more H and I need the F too," believed to mean Gebeau wanted to be resupplied with

both heroin ("H") and fentanyl ("F").  Gebeau later said "I want the white powder fentanyl

. . . that's the strong stuff . . . yeah, they love that."

196.    On March 16, 2022, in session 1057 over Target Telephone 3, Duprey spoke to a UM0016,

calling from a Mexican telephone number (52) (777) 539-0016.  During the call, UM0016

inquired about the "15 that arrived . . . of the "paisanas," believed to be a reference to 15

kilograms of drugs. The two then discussed the size of the vehicle that had transported the

15 kilograms, and Duprey informed UM0016 that the shipment had arrived in "a Nissan,

something like that . .  . It was a normal car.  A small normal car . . . Like a Subaru,

something like that."  UM0016 later said, "The thing is that with them…they charge a lot

and like that is not worth bringing up the 'paisanas'," believed to mean the person

transporting the kilograms for UM0016 was charging a high price.  Duprey said "Oh."

UM0016 said "Because it's very expensive with them to bringing it up. So, we want to

bring it up ourselves, us. We have who can bring it, but we don't know how they were

bringing it," believed to mean UM0016 wanted to know how the previous transporter was

concealing the kilograms in the transport vehicle.  Duprey said, "Okay, to bring up the

'paisanas," believed to mean Duprey understood that UM0016 wanted to find someone to

deliver the kilograms to Duprey for a lower price.  Duprey later said, "You have to check

it out because it was like in the seats more or less, I think it was . . . Yeah.. .. because the

recliner had it too," believed to mean the 15 kilograms previously delivered to Duprey were concealed in the seats of the transport vehicle.

197.    On March 20, 2022, in sessions 1184, 1186, 1187, 1188, 1189, and 1190, Duprey interacted via text messages with his service provider and change the telephone number assigned to his device.  He did not change the IMSI number, and, therefore, intercepts continued pursuant to the Court's March 10, 2022 order. (The new telephone number for Target Telephone 3 became (860) 483-1069.)

198.    On March 21, 2022, in session 1192, UM5856, calling from telephone number (347) 754-5856, spoke to Duprey and arranged to pick up $30,000.  UM5856 said, "I will go directly there. I think I should be there at around 9:00." Duprey said, "Ah, well what you do when you're arriving here is... When you are already close to here, you give me a call." UM5856 said "We're going to the same address? From last time? Around the same area? Or send me one," believed to mean UM5856 inquired whether he would pick up money from Duprey at the same place he picked it up previously, or whether Duprey would send him a new address for the pick up." Duprey said, "Where was it that you went? Uh-huh. I will send you one," believed to mean Duprey would send UM5856 a new address for the money pick up." UM5856 said, "All right then. So, you send me one, buddy. To see... What?" Duprey said, "So that you arrive well," believed to mean that UM5856 would be sent to a safe location for the pick up.  UM5856 said, "It's 3-0 right? . . . Okay. They told me that it's 3-0," believed to mean the money pick up would involve $30,000.  Duprey said, "Uh-huh. I will send you one. So that you arrive [UI] comfortably," believed to mean that Duprey confirmed the amount, $30,000, and agreed to send UM5856 an address for the money pick up that would be a safe location for the transfer.  Later that evening, in session 1203,

83

UM5856 texted Duprey "Send me the address, buddy. So I can head over there, please." In session 1204, Duprey texted UM5865 "Cvs west main st waterbury ct," the address where the money pick up would take place. In session 1253, UM5856 spoke to Duprey and said, "I'm over here, at the CVS."

199. On March 21, 2022, in session 1195, over Target Telephone 3, Duprey spoke to Thomas Santos, who was calling from telephone number (475) 559-6199. (Santos, based upon voice identification, has previously called from telephone number (475) 295-7948 and had been identified by the alias "White Boy.") During this call, Santos, aka White Boy, informed Duprey that he had "broke" his "i phone." Duprey told Santos, "You remember [Stammers] in the stuff that you give me that I put it right away in the jacket, no?" Santos said, "Yup." Duprey said, "Yeah. So, when I went to count it, I was counting like... Thousand, thousand, thousand, thousand, no?" Santos said, "Right." Duprey said, "But in one of the stacks, it was only like, like 400 something and then the other stack was the other one... Like, I was like 'Yo. Nah it can't be. I count.' I told even my girl. I said 'Yo, can you count that one again? Because I think I'm buggin," believed to mean that Santos shorted Duprey on money he owed Duprey, and one of the "stacks" of money that was supposed to be a thousand dollars was only approximately $400. Santos said, "I don't understand. Because I counted it. So, I don't understand how the fuck... I don't understand that . . . I always double count it before I put it away, so I know my shit was accurate." Duprey later said, "It was not in the bigger 22. It was in the 8... in the 8," believed to mean that Santos's payment to Duprey was in two parts, one for $22,000 and for $8,000, and the shortage was found in the $8,000 payment.

200.    On March 21, 2022, in session 1199, over Target telephone 3, Duprey spoke to UM1469. During the call, UM1469 said, "I need another 100 [Short Pause] of the other." This is believed to have been a request for 100 grams of heroin ("the other") based upon a previous explicit intercept in which UM1469 is believed to have ordered cocaine and heroin and, in the context of that previous intercept, UM1469 referred to heroin using this terminology. Duprey responded, "Alright."

201.    On March 22, 2022, in session 1280 over Target Telephone 3, Duprey spoke to Garry Gebeau and said, "What up? You see? I changed my number," believed to mean Duprey confirmed that he has changed the telephone number associated with his device, Target Telephone 3. In session 1281, Gebeau spoke to Duprey again and asked "Listen, do you still got dark? You got some of that dark or nah?," believed to be a reference to heroin. Duprey said, "Yeah. I still got dark. Yeah." Gebeau said, "Yo, put some of that to the side. At least 10," believed to mean Gebeau wanted at least 10 grams of heroin.

202.    On March 23, 2022, in session 1284 over Target Telephone 3, Duprey spoke to Santos, aka "White Boy." During the call, Santos said, "I'm wondering if the fucking, um... the white bobo came back yet?," believed to be an inquiry about whether Duprey had received a new shipment of drugs, likely cocaine ("white bobo"). Duprey said, "No that haven't. Uh, that haven't come through yet. I just waiting for it. For see they give me the call whenever they give me a call," believed to mean that Duprey had not received a new shipment of cocaine. Santos said, "Yeah. 'Cause Pops, I'm on like... I'm on my fucking... [Voices Overlap.]" Duprey said, "That, that's the shit. I'm on [Stammers]... On that shit I'm like... Like almost 'E'. Shit." Believed to mean Duprey was out of the drugs Santos was asking for ("I'm like . . .Like almost 'E'"). Santos said, "Yeah. This car about to break down on me. This car is

breaking down on me. This shit is, is, is bad," believed to mean Santos was nearly out of drugs.

203.    On March 23, 2022, in session 1285 over Target Telephone 3, Duprey spoke to Gebeau. Gebeau ordered "5 and 5 on the 'H'. Separate," believed to be a request for ten grams of heroin, packaged in two separate bags, each containing five grams.  Gebeau later said, "This is a new kid and I hope . . . I hope everything goes good with him . . . hopefully he'll do more," believed to mean Gebeau had found a new heroin customer.

204.    On March 24, 2022, in session 1286, Gebeau texted Duprey: "10h. Put 5h and 5h in separated bags. And 5 f. Thanks.. When," believed to mean Gebeau wanted 10 grams of heroin ("10h") separated into two bags, each containing five grams, and five grams of fentanyl ("5 f").

205.    On March 24, 2022, in session 1306, Gebeau spoke to Duprey and warned him of undercover police vehicles in the area.  Gebeau said, "Yo, I just wanna to tell you, it was a false alarm but when I left you, I was way down the street and behind me two cars, you know how the undercover, they got the red light and the blue light in the window, like one on each side . . . Yo, so I'm like ... Oh my god this motherfucker being watched, so I, I had this shit alr, when you gave it to me, I wrap it up again twice, cause the bag was so big, like I made another knot on it, so... [U/I] fucking [Audio Glitch] when on this corner, I was nervous, right. He was behind me for a minute, but he was two cars behind me, you know what I'm saying? . . . So what I did was, yo I took a right and I threw it out the window [U/I] was like a dead street. I threw it out the window, 'boom,' [U/I] see anything and then I went up the street, but the dude kept going. God I shit my pants. It was a false alarm dude.

I would tell you, if something. I thought something was hot. It was a false alarm for sure because he kept going but I turn around and grab my shit again."

206.    On March 27, 2022, in session 1372 over Target Telephone 3, UM4169, who was utilizing telephone number (203) 519-1469, texted DUPREY: "You around my boy need another 100," believed to be a reference to 100 grams ("100") of cocaine or heroin, based upon other explicit intercepts in which UM1469 has participated.  Moments later, in session 1374 over Target Telephone 3, Duprey spoke to UM1469.  During the conversation, UM1469 said, "What up? My, my brother need another 100 about an hour. So he say he gotta go get the money together," believed to mean UM1469 had a customer who need 100 grams ("100") of cocaine or heroin and was assembling money for the payment ("get the money together").  Duprey responded, "Yeah, let me check what I got left. Because I think I run out on that shit. On that shit waiting for someone . . . .," believed to mean Duprey may have run out of the type of drug ("run out on that shit") UM1469 wanted to purchase 100 grams of.

207.    On March 27, 2022, in session 1375, Duprey spoke to UM0016, who was calling from a Mexican telephone number, (52) (777) 539-0016.  The call lasted approximately seven minutes.  During the call, as explained more fully below, it is believed that UM0016 instructed Duprey to make a $55,000 drug payment.  The two are also believed to have discussed a shipment of drugs to be sent to Duprey, and they used the terms "the bizcochos," "the normal ones," "the black ones," "the parceritas," the "paisanas," "regulars," and "the brownish," all of which are believed to be references to types of drugs, in an effort to clarify precisely which drug was being sent to Duprey.  At the beginning of the call, UM0016 told Duprey, "I was given, your number was given to me by that friend's

cousin . . . of Lolo's." Lolo is believed to be a reference to Edwin Hernandez, who has been intercepted talking to Duprey in numerous, explicit calls that plainly pertained to drug trafficking. Hernandez is believed to be incarcerated in Atlanta, and on or about March 16, 2022, prison officials are believed to have seized the contraband cellular telephone Hernandez had been utilizing to communicate with Duprey. Duprey responded, "Uh-huh. Lolo is sick," believed to mean that Lolo had not recently been in communication with Duprey. UM0016 responded, "Well yes. He passed me the number and I said, 'I'm going to speak directly to him.' Because to be there with a middleman and all that," believed to mean that UM0016 wanted to speak directly to Duprey and did not wish to use and intermediary. Duprey responded, "Yes, no, no. I don't, it's like I told him. One can never trust a middleman. One never knows where the other person is," believed to mean that Duprey preferred to avoid using an intermediary to arrange the payment that was due and coordinate the next shipment of drugs. Later in the conversation, UM0016 said, "How much are you going to give him . . . I hope that it can be the 5, 5 . . . I hope that it can get to the 5, 5, because they charge me the 5 so they can give me the 50 over here," believed to be a reference to $55,000, $50,000 of which would go directly to UM0016. Duprey said, "Oh, okay, okay," believed to mean Duprey would send a $55,000 payment as requested. UM0016 later said, "I would like to also be able to let you know anything directly through here, in the meantime, that Lolo appears. Uh, some normal equipment are going to arrive . . . of the normal ones, not, not of the bizcochos (cakes), but of the normal ones  . . . . do you need of those" believed to mean UM0016 wanted to be able to communicate directly with Duprey about a shipment of drugs, likely pure heroin ("normal equipment," "normal ones") and not heroin that had already been mixed with a diluent

88

("not bizcochas," i.e. cake) that would be sent to Duprey. Duprey responded, "Of the normal ones? How do those normal ones come? . . . Because you know the last time they sent me some things there, some bizcochitos there, some black ones. I don't know if you know about those, black?," believed to be a reference to a previous shipment of diluted or mixed heroin ("bizocochitos") that was so dark that it was, in part, black in appearance. UM0016 responded, "I didn't send that to you." Duprey added, "Lolo know about it, but he told me 'Let's see what can be done.' But I told Lolo's cousin, 'Listen, check and see how it can be. Because that is as if, as if it were a gum, you heard?' They're not yours, right," believed to mean Duprey informed UM0016 that he previously received a shipment of heroin that was very dark, black in color, which was not of good quality and consistency ("as if it were gum") and about which Duprey received complaints, and Duprey wanted to ensure that UM0016 had not sent that previous batch of heroin. UM0016 responded, "those are not mine," believed to mean that UM0016 had not sent the poor-quality shipment of heroin to Duprey. UM0016 later said, "I am going to send . . . whole ones," believed to be a reference to whole kilograms, "like that 15 that, that arrived?," believed to be a reference to a previous shipment of 15 kilograms of cocaine that had been sent to Duprey, per previous intercepts. Duprey responded, "Uh-huh, okay, the parceritas," believed to mean that Duprey confirmed that he understood UM0016 was referring to the previous shipment of 15 whole kilograms of cocaine that Duprey received. UM0016 said, "Like that, whole one, uh-huh?," believed to mean that UM0016 reiterated that the shipment would involve whole kilograms. Duprey responded, "Yes, those parceritas. Yes, yes," believed to mean that Duprey understood that UM0016 was referring to the 15 whole kilograms of cocaine ("parceritas") that were sent previously. UM0016 later said, "but they are not paisanas.

89

They are of the normal ones . . . they are not bizcochos or paisanas . . . they are of the . . . .," believed to meant that UM0016 was attempting to clarify that the current shipment would be of regular heroin, not be heroin that had been diluted ("bizcochos") or cocaine ("paisanas"). Duprey interrupted and said, "Yes, the normal ones. Regular ones. Uh-huh . . . of the little dark skin one," believed to be a reference to regular heroin, which is often brown or tan in color. UM0016 replied, "Right! Uh-huh," believed to mean that UM0016 would be sending Duprey a shipment of whole kilograms of heroin. Duprey responded, "Okay. So, I'll let you know about the little dark skinned one . . . we will, we will keep in contact," believed to mean Duprey would let UM0016 know about the quality of the heroin ("brownish") that UM0016 would be sending to Duprey.

208. On March 30, 2022, in session 1398 over Target telephone 3, Duprey spoke to Jonathan Santiago, who was using telephone number (203) 592-5107. During the call, Santiago informed Duprey that one of his customers had not yet paid him and, therefore, Santiago could not pay Duprey in full. The call, in pertinent part, proceeded as follows. Santiago said, "'Cause that's, nigga you ain't 'bout to just beat me for half a bird bro, like," believed to mean that Santiago informed Duprey that one of Santiago's customers had not yet paid Santiago ("ain't 'bout to just beat me") for half a kilogram of drugs ("half a bird"). Duprey responded, "Hell no, no on this time." Santiago said, "Nah, hell no. But um, but is like I was telling Meme man, for the time being, I'm a pay you little by little like," believed to mean that Santiago informed Duprey that although Santiago could not pay Duprey in full, he would make partial payments ("I'm a pay you little by little"). Duprey said, "Yeah," believed to mean that Duprey agreed with Santiago's plan to make partial payments. Santiago said, "Like um, each like, say I grab a 100 gram from you and I flip that and I

90

give you like two, like, you know what I'm saying?," believed to mean that if Santiago sold ("flip") 100 grams ("100 gram") of drugs provided to him by Duprey, Santiago would pay Duprey immediately, at least approximately $2,000 ("I give you like two"). Duprey said, "Yeah, yeah, you let me know," believed to mean Duprey again agreed to Santiago's partial-payment plan.

209.   On March 31, 2022, in session 1404 over Target Telephone 3, Duprey received a text message from UF5870, who was using telephone number (413) 883-5870, which read: "Hey do you have that blue tool," believed to be a reference to drugs packaged in blue packaging, or, possibly oxycodone pills, which are blue in color. Later the same day, Duprey texted UF5870, "Yes," believed to mean that Duprey had a supply of the drugs UF5870 was requesting.

210.   On April 1, 2022, in session 1407 over TT3, Duprey spoke with Jonathan Santiago was using telephone number (203) 592-5107. During the call, Santiago told Duprey, "A'ight. I'm 'bout to come pull up on you and bring you some bread." Santiago later said, "Alright. Listen! I was gonna ask you um... Cause I got some... I'm trying to grab some work too. Like at least 100. So, like I told you I could keep flipping and keep paying you for that. You don't know when your people gonna come?," believed to mean that Santiago wanted to obtain at least "100" grams of cocaine ("work") from Duprey, so Santiago could keep selling ("flipping") it and continue to pay Duprey. Duprey responded, "No, I'm waiting for that shit. Because they saying something. It got caught up, you know. Like, like they got caught up before they got here," believed to mean Duprey informed Santiago that Duprey's shipment of cocaine had not yet arrived, which is consistent with other communications intercepted during the time period session 1407 was intercepted. Duprey

91

later asked Santiago, "Yeah. What happen with the dog food? How we doing?," believed to be a reference to heroin ("dog food") that Duprey had previously provided to Santiago. Santiago responded, "The dog food? I still got some of that shit at house," believed to mean Santiago still had heroin stored within his residence. Duprey asked, "You still working on that this, huh?," believed to mean that Duprey inquired whether Santiago was still distributing the supply of heroin that Duprey previously provided to Santiago. Santiago responded, "Yeah. I still got some of that shit at the house."

211.   On April 2, 2022, in session 1415 over TT3, Duprey spoke to Jose Ramos, who was utilizing telephone number (516) 669-4881. Duprey said, "What's going on, Bebo? Listen, what you told me yesterday, of those 100? . . . How is it? It didn't come like powder right? Or did it?," believed to be an inquiry by Duprey as to the quality of cocaine that Ramos had obtained elsewhere, because Duprey supply had run dry. Ramos replied, "No. no," believed to mean that the cocaine had not been cut and did not appear to be powdery. Duprey then asked, "Its good?" to which Ramos responded, "Yes sir," believed to mean that the cocaine Ramos had was of good quality. Duprey said, "Alright, bring it to me and I have that for you there," believed to mean that Duprey wanted the cocaine and would have money ready for Ramos.

212.   On April 3, 2022, beginning in session 1434 over TT3, Duprey had a text message exchange with Thomas Santos, a.k.a. "White Boy," was using telephone number (475) 559-6199. (Santos has also utilized telephone number (475) 295-7948 during the course of this investigation.) In session 1434, Santos texted Duprey, "Pops this shot slow im stoll sitting on what u gave me if you want I can drop it back off," believed to mean that Santos was having trouble moving the cocaine Duprey previously provided to Santos and Santos

was willing to return the drugs to Duprey.  In session 1435, Santos texted Duprey, "And I've been giving u everything off top," believed to mean that Santos had been paying Duprey all profits Santos had made from selling the cocaine Duprey provided to him.  In session 1436, Santos texted Duprey, "I can only move as fast as I can," believed to mean that Santos was using his best efforts to distribute the drugs Duprey had provided to him. Duprey responded in session 1440 and texted Santos, "I knw is the my ppl calling like crazy so u having move nothing and u knw i do try get that tap to get lower," believed to mean that Duprey's suppliers were calling Duprey asking for payment.  In session 1444 and 1445, Santos replied, "Pops if you want you can take it back they ain't feeling ut . . . Ima.drop it off tom," believed to mean Santos' customers did not like the quality of the drugs Duprey had provided and therefore Santos was going to return the drugs to Duprey the following day.  In session 1447, Duprey texted Santos, "Oh ok see me at work tomorrow," believed to mean that Duprey wanted Santos to return the drugs to Duprey at Discount Car Rental (**Subject Premises 4**) the following day.  In session 1448, Santos texted Duprey, "ok."

213.    On April 4, 2022, in session 1452, Duprey texted Jonathan Santiago at telephone number (203) 592-5107:  "Im waiting caz the other shipment got caught," believed to mean that Duprey was still awaiting a shipment of drugs, which was consistent with what Duprey indicated in other communications intercepted during the time period session 1452 was intercepted.

214.    On April 4, 2022, at approximately 7:33 p.m., in session 1455, Duprey spoke to Thomas Santos.  Santos said, "You all set? . . . I'm leaving now . . . I'm just waiting for the green light, Pops.  I didn't wanna, you feel me," believed to mean that Santos was preparing to

drop off drugs to Duprey at Discount Car Rental as arranged for in the text message exchange between the two men on April 3, 2022, beginning in session 1434, but did not want to arrive at Discount Car Rental until Duprey had informed Santos that doing so was okay. Duprey responded, "No, no, no. Is alright. I see you over here," believed to mean Duprey informed Santos to come to Discount Car Rental (**Subject Premises 4**) to rental to return the drugs. Santos said, "Yeah. I wasn't taking off without calling you. A'ight."

215.   On April 4, 2022, at approximately 9:58 p.m., in session 1456 over TT3, Duprey texted Santos at telephone number (475) 559-6199, "Da new bill is 66660," believed to mean that Duprey informed Santos that Santos' current drug debt for cocaine was $66,660. Santos responded, "That's including what u gave me tonight," believed to mean that Santos confirmed that Santos' $66,660 drug debt to Duprey included the amount of cocaine that Duprey provided to Santos when they met earlier in the evening on April 4, 2022.

216.   On April 5, 2022, in session 1464 over Target Telephone 3, Duprey spoke to a female who was subsequently positively identified as Bianca Rodriguez-Cancel, who was using telephone number (718) 753-5096. Cancel told Duprey, "The thing is that the nephew tome me that it's to go to you to get something," believed to mean that Cancel had been instructed to pick up drug proceeds from Duprey. Duprey responded, "Uh-huh. Oh, so, so . . . It's about the 12, right? . . . That you are coming to get 12?," believed to meant that Duprey understood that Cancel would be picking up $12,000 in drug proceeds. Cancel responded, "Uh-huh. 12," believed to mean Cancel confirmed she would be picking up $12,000 in drug proceeds from Duprey. Duprey later said, "So come tomorrow then. Come up here tomorrow." Later, in session 1469, Cancel texted Duprey: "Send me the address," believed to mean the address where Cancel should meet with Duprey to pick up

94

the $12,000 in drug proceeds.  In session 1470, Duprey texted Cancel:  "767 wolcott st Waterbury ct," the address for Discount Car Rental (**Subject Premises 4**).

217.    On April 6, 2022, in session 1494 over TT3, Duprey spoke with Gebeau.  During the call, Gebeau asked Duprey, "What's up?  Did you get my text from the other phone or no?," believed to confirm that Gebeau utilizes more than one phone to contact Duprey for the purpose of arranging drug transactions.  Duprey responded, "Yeah.  I got a text from the other two numbers.  That same numbers first," confirming that Gebeau utilizes more than one telephone number.  Gebeau later asked Duprey, "Well... You got dark? Wait, wait, wait. You still got that dark or no?," believed to mean Gebeau inquired whether Duprey had a supply of heroin ("the dark") that was dark in color.  Duprey said, "All right.  Okay . . . Nah, I got the dark. Yeah, I got the dark. Yeah, I still got some of the dark. Yeah." Gebeau responded, "Oh shit. Okay, okay. I'll call you in a little while. I'll text you . . . See you tomorrow for sure."

218.    On April 7, 2022, beginning in session 1499 over TT3, Duprey communicated with Gebeau, who was using telephone number (475) 470-4553.  In session 1499, at 8:37 a.m., Gebeau texted Duprey, "just 7 dark for now," believed to mean Gebeau wanted to obtain seven grams of heroin from Duprey.  Approximately two-and-a-half hours later, at 11:10 a.m., Gebeau texted Duprey, "need 10 and," believed to mean Gebeau wanted 10 grams of heroin.  Duprey then called Gebeau, in session 1528, and asked, "Yea, um, so five, five?," believed to mean that Duprey inquired whether Gebeau wanted the 10 grams of heroin packaged in two separate bags, each containing five grams (i.e., "so five, five").  Gebeau later clarified, "What? [Pause] Yeah, but put them both... Listen! Same dark, two separate bags.  Cause I gotta see him right afterwards," believed to mean that Gebeau confirmed

95

that he wanted two separate bags of heroin, each containing five grams, because he intended to meet with his customer ("him") right after he met with Duprey. The two then discussed meeting at 12:30 for the transaction. Gebeau later once again confirmed his order, "five, five, dark, right?" Duprey responded "Alright, yeah." Gebeau said, "Nice! Okay, I'll be there at 12:30."

219. On April 8, 2022, in session 7 over Target Telephone 3, Duprey spoke to UM7796 who was using telephone number (862) 334-7796. UM7796 asked Duprey, "How much, how much for the um... The white?," believed to mean cocaine. Duprey responded, "For the white girl?," believed to mean cocaine, because the "white girl" is a coded term for cocaine frequently used in the drug trade. UM7796 said, "I got, yeah, yeah, yeah . . . the white." Duprey said, "The white. We could get some. How much they looking for," believed to mean Duprey confirmed he could supply UM7796 with cocaine and inquired about the quantity desired. UM7796 later indicated he had "Dominicans" who wanted to know "what's the comeback on it . . . Is it raw, like, It's a good comeback . . . You know what I mean? . . . .," believed to mean UM7796 wanted to know how much cocaine base the cocaine would yield if the cocaine were cooked or processed into cocaine base. Duprey responded, "Yeah, that shit is, that shit cook it and everything . . . They come back 100 for 100 . . . They come back 100 percent that shit . . . ." UM7796 said, "All right. Is there any way you can, uh, you could get like two grams? Or a gram? Anything. Just a sample so I could give this to this nigga," believed to mean UM7796 wanted to give his Dominican customer a sample of cocaine to be converted into cocaine base. Duprey responded, "Yeah, yeah, yeah."

220.    On April 10, 2022, Duprey engaged in a text message exchange over Target Telephone 3 with Jonathan Santiago, who was using telephone number (203) 592-5107.  In session 54, Duprey texted: "How much Money u got for me bro it been awhile now," believed to mean Duprey wanted to collect money for drugs previously provided to Santiago on consignment.  In session 55, Santiago responded:  "I know because I haven't gotten anymore from that bitch ass dude and I have some money from wat I had and I been trying to buy more stuff so I can get rid of and pay you with wat I make because if not there no way I can make money with out work," believed to mean that Santiago had not been able to collect money from one of his drug customers and need a new supply of drugs to sell so he could pay Duprey what he owed. In session 56, Santiago added: "That's why I been asking meme if u got anything yet so I can buy some off u and sale it and pay u as I get rid of it," believed to mean Santiago wanted to get a supply of drugs from Duprey so he could sell it and make a profit and pay Duprey what he owed. In session 57, Duprey responded: "No I have dog food but we got the bill is to high we need to get that paid first," believed to mean Duprey had a supply of heroin ("dog food"), but not cocaine, but that Duprey wanted Santiago to pay what he owed before Duprey would supply him with more drugs.

221.    On April 11, 2022, in session 71 over Target Telephone 3, Duprey spoke to UM8408, who was utilizing telephone number (347) 732-8408.  During the call, UM8408, I believed, arranged to send a female courier to pick up cash from Duprey for a drug debt Duprey owed.  UM8408 said, "You have abandoned us," believed to meant that UM8408 was disappointed that he had not recently heard from Duprey.  DUPREY said, "No, no, is bad up here. You heard. Up here is very bad."  UM8408 later said, "I'm calling you on behalf of the nephew," believed to be a reference to a high-ranking member of the distribution

97

organization of which Duprey is a part and through which Duprey is supplied with drugs-
-"the nephew" who—has been referenced in other intercepts in contexts that support this
belief.  Duprey said, "Yes on behalf of the nephew, when are you? Coming?," believed to
mean that Duprey understood that the high-ranking member of the organization--"the
nephew"--expected a payment of cash in connection with Duprey's drug debt.  UM8408
said, "If you can, today so I can send you the "comadre" ( lady)," believed to mean UM8408
intended to send a female courier to pick up the cash from Duprey.  Duprey responded,
"Send the lady already, that I'm leaving.  For her to get to the same spot that she came the
last time, that I'm leaving from here at 5:30 so she'll have time," believed to mean that
Duprey informed UM8408 to send the female courier to a location at which Duprey had
met with the courier previously.  The two later confirmed that the location was "Allstate,"
which is located in the same business plaza as Discount Car Rental, where Duprey is
employed.  Later the same day, in session 77, Duprey again spoke to UM8408, who said
"At 4:20 more or less the "comadre" (lady) will be there, for you to be on the look out . . .
She has the little back van/SUV . . . Uh-huh, the GMC. But I call you once she's there,
there in AllState."   Thereafter, surveillance observed the black GMC SUV arrive at
Discount Car Rental.  Duprey was observed exiting Discount Car Rental with a black bag
and meeting with the operator of the GMC SUV (who never exited the vehicle) through a
vehicle window during which the black bag was handed off.  The vehicle departed the area
and the operator was thereafter positively identified from a DMV photograph when she
stopped at a gas station, and she was followed to a residence located in New Jersey.

222.   On April 11, 2022, in session 75, Duprey texted Santiago at telephone number (203) 592-
5107:  "Let me knw u still making some Money we haue a bill bro 33360," believed to

mean that Duprey informed Santiago that Santiago's drug debt ("bill") was $33,360 ("33360).

223.   On April 13, 2022, in session 168, at approximately 12:48 p.m., Duprey spoke to Jose Ramos, who was using telephone number (516) 669-4881.  During the call, Duprey said, "The crazy one is there. I will call you back. That he is on his way, the crazy one. I don't know what for, the crazy one. Okay," believed to mean that Duprey informed Ramos that Javier Gonzalez was on his way to meet with Duprey at Discount Car Rental for a purpose that was unknown to Duprey.  Duprey has used the phrase "the crazy one" on several occasions in contexts that led investigators to believe this phrase was in reference to Javier Gonzalez.  At approximately 1:06 p.m. on April 13, 2022, footage from a pole camera installed in the vicinity of Discount Car Rental revealed an individual at this location consistent with Javier Gonzalez's appearance.  In session 169, at approximately 1:15 p.m. on April 13, 2022, Duprey again spoke to Jose Ramos, who was using telephone number (516) 669-4881.  During this call, Duprey indicated that "Jay" showed up, and that Duprey didn't know it was Jay because Jay arrived in a green, Acura and Jay usually drives a black truck.   Javier Gonzalez is known to use the alias "Jay," and has been observed by surveillance on several occasions during this investigation operating a black pick-up truck, which is registered in his name.  In fact, Javier Gonzalez and this vehicle have been observed at Discount Car Rental on several occasions.

224.   On April 18, 2022, in session 365 on Target Telephone 3, Duprey sent a text message to telephone number (516) 669-4881, utilized by Jose Ramos.  The text read:  "In the money that you gave me, how much was it that you gave me?  Because there were only 14,100

not 20,100," believed to mean that Ramos failed to pay Duprey the full amount of an existing drug debt, and paid $14,100 instead of $20,100.

225.  On April 19, 2022, in a series of text communications over Target Telephone 3, beginning at session 413, Duprey renewed his Target Telephone 3 account, and the text message response from the provider confirmed the telephone number currently assigned to Target Telephone 3.  In session 426, Duprey received a text from his service provider which read: "Welcome back to Total Wireless! Your phone number is 8604831069, your last day of service is 05/19/2022. Save time with SMS services. Reply HELP to learn more."

226.  On April 20, 2022, in session 477, Garry Gebeau texted Duprey, who was using Target Telephone 3:  "10h.. 7 in one 3 in other if u could plz. owe u 100 from last time," believed to mean that Gebeau wanted 10 grams of heroin, separated into two separate packages, one containing seven grams and the other containing three grams, likely because Gebeau had one drug customer who wanted to buy seven grams of heroin and another customer who wanted to purchase three grams of heroin.  It is also believed that Gebeau indicated that he was aware that he owed Duprey "100" dollars from a previous drug transaction.  Duprey responded in sessions 480 and 481:  "Yes plus the old bill" and "Ok see u at 12," believed to mean Duprey would meet with Gebeau to consummate the transaction at noon.  Later that day, in session 534, Gebeua texted Duprey at Target Telephone 3:  "The one that's supposed to weigh 7 only weighs 6.6 with the bag It should weigh at least 8 Point four with the back," believed to mean that Gebeau has weighed the bags of heroin Duprey previously distributed to him and the bag that was supposed to contain seven grams of heroin, and should weigh 8.4 grams including the weight of the bag, only weighed 6.6 grams. In session 536, Duprey texted Gebeau, "next time I get u," believed to mean Duprey would make up

100

for the missing quantity the next time he supplied heroin to Gebeau.  Later that day, in session 537, Gebeau spoke to Duprey.  During the call, Duprey told Gebeau, "Check the other one, in the three . . . to see if there is extra in there," believed to mean that Duprey informed Gebeau to weigh the bag that was supposed to contain three grams of heroin to see if the three-gram bag Duprey distributed to Gebeau contained an extra amount of heroin to account for the weight that was missing from the seven-gram bag of heroin.  Gebeau responded, "Yeah.  I'll check in one second."

227.   On April 21, 2022, in session 607, Jose Ramos spoke to Duprey, who was using Target Telephone 3.  During the call, the two are believed to have discussed a bulk quantity of cocaine contained in "bluish" packaging.  Ramos informed Duprey that one of his customers "grabbed the last 100, don't you remember?," believed to mean that Ramos has supplied 100 grams of cocaine to his customer.  Ramos later said, "He wants more .. he just called me and said... He called me this morning at 2:00 in the morning. I've got him waiting . . . Like 1, 1½ is what he gets," believed to mean that Ramos' customer usually receives 100 to 150 grams of cocaine from Ramos.  Duprey responded, "1, 1½ ? Okay. So that's fine. I will bring it for you tomorrow," believed to mean Duprey would distribute 100 to 150 grams of cocaine to Ramos the following day.

228.   On April 22, 2022, in session 611, Jonathan Santiago spoke to Duprey, who was using Target Telephone 3.  During the call, Santiago asked Duprey, "Listen, uh, nothing yet," believed to mean that Santiago inquired whether Duprey had received a shipment of cocaine.  Duprey later said, "Nah, nothing yet," Duprey had not received a large shipment of cocaine which he had been awaiting.  Duprey later added, "with that shit, though. Still the same dog food and shit like that. Then my boy got some, some of the whitey. But I

101

don't know how... [Pause] From the girl. Yeah. My boy got some whitey, but I don't know how much he got left . . . He got some. He said it cook and everything. It look good. Is just look the same one," believed to mean that Duprey had a supply of heroin ("dog food") and that Duprey could obtain cocaine ("some of the whitey") for Santiago from an alternate source of supply ("my boy"), and that the cocaine was of good quality and could be converted into cocaine base ("it cook and everything. It look good."). Santiago later asked, "Does it cook good," believed to mean Santiago wanted to confirm the cocaine Duprey could supply would be of good quality and capable of being converted into cocaine base. Duprey said, " Yeah, he said he don't got. It had no, you know, no problem or nothing. I sold for him though . . . 200 to somebody. Yeah, and they was alright nobody give 'em complaint . . . He said is good. So he still got some left. How much are looking to buy? So like that I could let him know," believed to mean that Duprey had sold 200 grams of the cocaine and received no complaints about its quality. Santiago said, "If it's good, find out how much he want... How much he want a gram . . . Find out how much he want. I'll prob, I'll buy 100," believed to mean Santiago wanted to buy 100 grams of cocaine from Duprey's alternate cocaine source-of-supply, provider the price-per-gram was acceptable to Santiago.

229.   On April 25, 2022, in session 742, Jonathan Santiago spoke to Duprey, who was using Target Telephone 3. During the conversation, Duprey said, "Yeah. He got some. He got some, yeah," believed to mean, based in part on session 611 intercepted on April 22, 2022, that Duprey confirmed that his alternate source of supply could provide cocaine to Santiago. Santiago responded, "And, and is it guaranteed to, to cook?," believed to mean Santiago wanted to confirm that the cocaine was of good quality and was capable of being

converted or "cook[ed]" into cocaine base.  Duprey responded, "Yeah. He's good. He, he's good, yeah. Because if anything, you could even call him.  Or you could even go with him and he, he cook it right there for you and everything. If you want.  He's straight," believed to mean that Duprey's alternate source of supply for cocaine would "cook" the cocaine into cocaine base for Santiago, if Santiago wanted him to do so.

230. On April 28, 2022, in session 894 over Target Telephone 3, Garry Gebeau spoke to Duprey. During the call, Gebeau told Duprey, "You gave me two bags.  One of them was good. The other one was off . . . You gotta remember, of course, if I get it from you I give it to other people for more money.  So it's like I lose out on a couple of hundred dollars on that shit," believed to mean that Duprey provided two bags of heroin to Gebeau, one of which did not contain the agreed-upon amount of heroin, and therefore, Gebeau lost money when he re-sold the drugs to his heroin customers.  Duprey responded, "No but it, it was two of them for what?  Uh, of the brown one, no?," believed to mean that Duprey confirmed that Gebeau had received two bags of heroin, i.e. "the brown one" from Duprey.  Gebeau responded, "The bigger one. Yeah. The brown. The bigger one," believed to mean Gebeau confirmed that the larger of the two bags of heroin Duprey had provided to Gebeau is the one that did not contain the agree-upon amount of heroin.

231. On April 28, 2022, in session 895 over Target Telephone 3, Duprey called (207) 881-3894 and left a voice message:  "Hey Lorenzo.  It's me, Colorado.  Jut give me a call, buddy," confirming that he (Duprey) uses the alias Colorado.

232. On April 28, 2022, in session 896 over Target Telephone 3, Garry Gebeau, using telephone number (413) 291-6166, texted Durey:  "5h and 7h separate. And 5 fish.  Text u in am," believed to mean Gebeau wanted 12 grams of heroin in two separate bags, one containing

103

5 grams and one containing 7 grams, and five grams of cocaine (i.e. "5 fish," a term Gebeau has used previously in context believed to pertain to cocaine, including on at least four occasions when Gebeau used the term "soft fish," soft being a term commonly in the drug trade to refer to cocaine powder.)  Later that day, is session 905, Durpey texted Gebeau: "Ok," believed to mean that Duprey agreed to Gebeau's order.

233.   On April 29, 2022, in session 925, at approximately 11:40 a.m., Garry Gebeau sent a text message to Duprey at Target Telephone 3, which read:  "We good for 1230," believed to mean that Gebeau inquired whether Duprey would be available to meet with Gebeau at 12:30 p.m. that day for the purpose of engaging in a narcotics transaction.  Moments later, at approximately 11:46 a.m., in session 927 on Target Telephone 3, Gebeau spoke to Duprey.  During the call, Gebeau said, "Yo.  Just wanted to make sure you'll be there 12:30," believed to mean Gebeau wanted to confirm that Duprey would be able to meet at 12:30 p.m. to consummate a drug transaction at Discount Car Rental (**Subject Premises 4**).  Duprey responded, "Yeah.  Yeah.  Yeah. . . ."  Surveillance covered the subsequent meet between Gebeau and Duprey at Discount Car Rental.   Moments later, at approximately 12:57 p.m. on April 29, 2022, in session 947 over Target Telephone 3, Duprey informed Gebeau that Duprey had observed what he believed was a law enforcement surveillance vehicle, "a black pick up," parked in "Arby's," which is a fast-food restaurant located behind Discount Car Rental.  Duprey added "They don't see nobody hand-to-hand or nothing like that.  You know," believed to mean that Duprey satisfied himself that surveillance units could not have observed a hand-to-hand drug transaction from that vantage point.  The vehicle Duprey observed on April 29, 2022, was, in fact, a law-enforcement surveillance vehicle.

104

234.    On May 3, 2022, in session 1147 over Target Telephone 3, Duprey received a text message

from telephone number (203) 592-5107, utilized by Jonathan Santiago. The text message

read: "Bro wats up with ur boy I need 200 I really need some fire so I can start paying you

off bro," believed to mean that Santiago wanted to obtain 200 grams of good quality

cocaine, i.e. "fire," so Santiago could sell the cocaine and pay off a drug debt that he owed

to Duprey.   Later that day, in session 1151, Duprey spoke to Santiago.   Duprey told

Santiago, "Goldo got that.  You heard?  . . . yeah.  He told me that in 10 minutes he will

have it in his hands," believed to mean that Duprey informed Santiago that a male known

only as Goldo, was going to supply Duprey with cocaine, which Duprey would distribute

to Santiago.  Santiago said, "Oh. Okay. Okay. Okay. Okay. Okay  . . . But now, question .

. . Is that guaranteed," believed to mean Santiago wanted to confirm that the cocaine

Duprey would be receiving from Goldo was of good quality.   Duprey responded, "Yeah .

. . and you buy 100 and you try 100 to see," believed to mean that Duprey suggested

Santiago buy 100 grams of cocaine to see if was of good quality.   Santiago responded,

"yeah.  'Cause I'll try, I'll grab 300.  But I grab, I don't wanna grab 300 if it's not

guaranteed . . . . ," believed to meant that Santiago wanted 300 grams of cocaine, but only

if it was of good "guaranteed" quality.  Santiago later indicated he would "take 100 for

now, to check if, if it is all," believed to mean Santiago wanted to be supplied with 100

grams of cocaine so he could test its quality.  Duprey said, "Yes. No.  I am going to tell

him, Uh-hu, to give me that half he told me about," believed to mean that Duprey would

be supplied with a half-kilogram, i.e. 500 grams, of cocaine.  Duprey later told Santiago,

"I will tell you 'This looks good,'" believed to mean that Duprey would inform Santiago

if the half-kilogram of cocaine he anticipated obtaining appeared to be of good quality.

Later that day, in session 1152, Duprey told Santiago, "Yo, I already did, I already picked it up . . . Yes, it looks nice. It's in a bag, but it looks nice," believed to mean Duprey had obtained the half-kilogram of cocaine and thought it looked to be of good quality. Santiago said, "Alright, go ahead . . . But . . . you know how to cook or no," believed to mean that Santiago confirmed he wanted to obtain at least 100 grams of the cocaine Duprey had been supplied with and inquired whether Duprey knew how to process or "cook" cocaine powder into cocaine base. Duprey responded, "I'm going to take to someone that ask me fofor, remember the other one that asking," believed to mean Duprey was going to take a portion of the cocaine to a third party who would attempt to cook it into cocaine base. Santiago later said, "So he cooks," believed to mean Santiago confirmed that the third party to whom Duprey was referring cooked cocaine powder into cocaine base. Duprey responded, "Yes, it seems like, he wants it for that also, too, uh-hu," believed to mean that the third party to whom Duprey was going to distribute cocaine powder wanted to cook it into cocaine base. Santiago later said, "I'm going to get the money and I'll be heading over there," believed to mean Santiago was going to meet with Duprey to consummate a cocaine transaction. Later that day, in session 1153, Santiago spoke to Duprey and said, "Yo, how much per gram?," believed to mean Duprey inquired about the per-gram price of the cocaine. Duprey responded, "He told me 28," believed to mean $28 per gram. Santiago responded, "Alright. That's good." Later that day, in session 1155, Santiago spoke to Duprey and said, "My chef . . . he, um, he ain't even around, you, you think your boy could cook my shit and I pay him . . . ask him if he could cook it for me and I'll pay him a hundred dollars, each hundred grams?," believed to mean Santiago wanted Duprey's acquaintance to "cook" Santiago's cocaine powder into cocaine base. Duprey said, "I'll find out right now and I'll

106

let you know." Later that day, in session 1163, Santiago again spoke to Duprey in a lengthy conversation and complained that the cocaine Duprey distributed to him was not cooking properly, saying, "it cooks to the oil . . . It came out, but I lost. I put 10 in and I got 4 back. But it came to the, I'm a show you how, I'm a show you how it came out in the pot . . . it boiled down to the oil. I had to freeze this shit so it could get hard like," believed to mean that Santiago cooked ten grams of cocaine and it only yielded four grams of cocaine base. Duprey indicated later in the call that another person to whom he had supplied a portion of the cocaine was satisfied with it and indicated he wanted "four birds," believed to mean four kilograms. Santiago again offered to "pay" one of Duprey's associates, saying "I'll pay him a hundred, each hundred grams, every hundred grams . . . if he cook up 300, I'll give him 300," believed to mean Santiago would pay Duprey's $100 for every hundred grams of cocaine powder he cooked into cocaine base for Santiago. Duprey later said, "Yeah, yeah, tomorrow he can do it." Santiago responded, "hold that other two for me, I'm a grab, I'm a grab 'em," believed to mean that Santiago wanted Duprey to hold another 200 grams of cocaine powder aside for Santiago, in addition to the 100 grams Duprey had already provided to Santiago. Santiago later said, "Yeah, I'll pay him 300 just to cook up 300," believed to mean Santiago was going to pay Duprey's associate $300 to cook 300 grams of cocaine powder into cocaine base for Santiago. Later that day, in session 1165, Santiago texted Duprey, "Ok I got that sold," believed to mean that Santiago had already arranged the sale of the 300 grams of cocaine base that he would be obtaining from Duprey.

235.    On May 4, 2022, in session 1166 on Target Telephone 3, Jonathan Santiago text Duprey: "Bro hold the other 200 for me I got the money for it," believed to mean that Santiago wanted to buy another 200 grams of cocaine from Duprey. Later that day, in session 1194,

Santiago spoke to Duprey and said, "Yo. Do you have the other 200," believed to mean Santiago asked Duprey if he had 200 grams of cocaine to distribute to Santiago." Duprey responded, "Yes. Yeah." Santiago responded, "Alright. Alright. I'm about to go. I'm about to come see you," believed to mean Santiago was going to meet with Duprey to consummate a transaction for 200 grams of cocaine.

236.    On May 4, 2022, in session 1196 on Target Telephone 3, Duprey spoke to Jose Ramos. Ramos said, "I'm going around there now. I'm going around there. I'm on my wat to where you are," believed to mean Ramos was going to meet with Duprey to obtain cocaine, which, based upon previous intercepts, Duprey had recently obtained a supply of. Duprey responded, "Oh. Okay. Alright, buddy. Okay," believed to mean that Duprey was prepared to meet with Ramos to consummate a cocaine transaction.

237.    On May 10, 2022, in session 1347 on TT3, Duprey spoke to Garry Gebeau. During the call, Gebeau ordered "seven and five on the H . . . seven H, five H . . . and , uh . . . . I gotta get the F for this kid . . . I gotta find out what it is," believed to mean Gebeau wanted a total of 12 grams of heroin, packaged in two separate bags, one containing seven grams, and one containing five grams, and that Gebeau needed to obtain fentanyl as well for one of his customer, but need to find out how much fentanyl his customer wanted.

238.    On May 22, 2022, in session 1413 on TT3, Duprey spoke to Gebeau. During the call, Gebeau said, "You still got that white stuff . . . the fish scale . . . I gotta get some of that, I forgot," believed to mean Gebeau wanted to obtain a supply of cocaine from Duprey.

**Target Telephone 4 ("TT4")**

239.    Several of Duprey's coconspirators were intercepted over Target Telephone 4 in communications that are believed to have pertained to drug trafficking, including Victor

Duran-Barrera, Wanda Lora (Duprey's paramour), Robert Amatruda, Garry Gebeau, Bianca Rodriguez-Cancel. Javier Gonzalez was also referenced in calls on Target Telephone 4 and was, himself, intercepted over Target Telephone 4, including in session 5249, in which Javier Gonzalez offered to supply Duprey's daughter with a bulk quantity of what is believed to have been oxycodone pills.

**A sampling of the communications is set forth below in chronological order.**

240.   On March 11, 2022, in session 36 over Target Telephone 4, Duprey spoke to Wanda Lora, who was using telephone number (203) 709-8326. During the call, Duprey said, "Yo, my black bookbag, is it there?," to which Lora said, "Which, black bookbag?" Duprey responded, "Where my money is at?," which is believed to be a reference to drug proceeds. Lora said, "I don't know. I didn't see if that was in the car. Did you throw it in the car?" Duprey said, "No, I took it last night no?" Wanda said, "I don't remember. I don't remember you having it last night. [Voices Overlap] . . . Cause we didn't do nothing. We just went straight. Unless, you left it at the salon," believed to be a reference to **Subject Premises 5**. Duprey said, "At the salon, at the salon, at the salon." Lora said, "I don't remember seeing that but, I mean, I could go check at lunch time." Duprey said, "Yeah because in there is . . . ."

241.   On March 12, 2022, in session 165 over Target Telephone 4, Duprey texted telephone number (347) 456-8272 and identified himself as "Red," confirming one of his known aliases. The text read: "Is me Red I need to ask you a question."

242.   On March 12, 2022, in session 228 over Target Telephone 4, Duprey spoke to UF1071 who was using telephone number (667) 900-1071 and said, "Hello, this is, uh, um, Derek,

um, wife?" UF1017 said, "Yes, it is. How are you today?" Duprey said, "Uh, how you

doing? This is Red, his friend," again confirming one of Duprey's known aliases.

243.    On March 13, 2022, in session 320 over Target Telephone 4, Duprey spoke to Victor

Duran-Barrera, who was using telephone number (475) 449-0830. Near the end of the call,

the parties agreed to meet the following day. Duprey said, "But I will see you tomorrow

for sure. Um, when do you, at what time do you get out work?" Duran-Barrera said, "Um,

I get out at around 12:30 from work. At like 3:00, I'm around there, by, in Bridgeport."

Duprey said, "Okay. Oh, so I will see you at my job before 5:30," believed to mean that

Duprey would meet Duran-Barrera for a transaction at Discount Car Rental (**Subject**

**Premises 4**), where Duprey works, before 5:30 p.m. the following day, March 14, 2022.

Duprey later asked, "Okay. What do you want the 100, um, 'tamalitos'?" Duran-Barrera

responded, "Yes, the 100 'tamalitos' for him and the 100 for me, to see," believed to be a

reference to a total of 200 grams of heroin, which was later confirmed by the arrest of

Duran-Barrera in possession of 200 grams of heroin. Duprey said, "Okay. That's fine."

On March 14, 2022, surveillance was established in the area of Discount Car Rental,

located at 767 Wolcott Street in Waterbury, in an effort to identify Duran-Barrera.

Surveillance observed a Hispanic male arrive operating a white BMW registered to Victor

Duran-Berrara. The Hispanic male entered Discount Car Rental (**Subject Premises 4**) at

approximately 4:05 p.m. carrying a black bodega type bag that was open and appeared to

be empty. Approximately ten minutes later, surveillance observed the same Hispanic male

exit the business carrying the same bodega bag, which appeared to be knotted and weighted

and to contain something, believed to be drugs, based upon session 320. The Hispanic

male was positively identified from a DMV photograph as Victor Duran-Barrera. Duran-

110

Barrera was subsequently stopped by police and found to be in possession of 200 grams of heroin and it is believed distributed the heroin to Duran-Barrera inside **Subject Premises 4**.

244.   On March 14, 2022, in session 486 over Target Telephone 4, Duprey spoke to UM1565, who was using telephone number (203) 600-1565.  The call lasted more than 30 minutes. During the call, the two appeared to discuss a shipment of money.  UM1565 said, "Damn, send me a couple of rolls [Laughs]."  Duprey said, "Yeah. [Laughs] I'll make one of those packages and send you a couple of those toilet papers down there," believed to be a reference to money.  UM1565 said, "Look, if you want to. Don't leave them flat. You can make them into rolls and tie them with rubber bands. Round rolls."  Duprey aid, "Mm-hum."  UM5165 said, "Divide them and put one of the little black things of, you already know what."  Duprey said, "Yes."  UM5165 said, "Uh-huh. So then, you know! You already know! But make them into rolls, if you want," believed to mean that UM5165 wanted Duprey to organize the money he would send in rolls.  Duprey said, "Alright then."

245.   On March 17, 2022, in session 815, Duprey spoke to Gary Gebeau.  During the call, Gebeau asked Duprey, "can you do 10 instead, of the 'F'?"  Duprey asked, "What you want? Um... 10," to which Gebeau replied, "10 of the "F". And then bring, um... I [Stammers] got... Listen, I went to my boys. . . .  And I'm telling you. That dark shit, when it's mixed in with the other. You can't put it in in the thing. It fucks up. In the water. [Audio Distortion] Dude, all pieces: perfect. I just gotta bring that back. It's 5 of the dark bla... I need the... I want dark stuff. But when you give it to me, it can't have that real dark black. Dark brown around the edges."  Duprey asked, "So you gonna need... What you gonna need," and Gebeau responded, "So. I want five (5) brown, the dark stuff. But... You know what I mean. Dark

without that around the edges. Just the, the regular brown. . . . Oh, yeah and 10 "F". 10 "F" Now if you give me 10... Let me call this kid. I want to see if he wants any of the um... Of the uh..., fish too. . . ." It is believed that in the foregoing conversation, Gebeau was asking whether Duprey could supply him with 5 grams of heroin ("the dark") and 10 grams of fentanyl (the "F") and informed Duprey he would check about the "fish," which, based upon previous intercepts in which the term "soft fish" was used by Gebeau, is believed to likely have been a reference to cocaine.  Later, on the same day, Gebeau texted Duprey, "10F and 5H nice dark for now. Mite comeback tomorrow for other, can't get hold of him," which is believed to have confirmed Gebeau's order for 10 grams of fentanyl and 5 grams of heroin from Duprey.  Later in the same day, in session 833, Gebeau texted Duprey, "Please make sure its nice strong F."  (The intercepts in which Gebeau has expressly used the term "soft fish," believed to be a reference to cocaine, are sessions 174, 523, 530, and 849 on Target telephone 3.  I know based on my training and experience that the term "soft" is a term commonly used in the drug trade to refer to cocaine.)[1]

246.    On March 19, 2022, in session 1261 over Target Telephone 4, Duprey spoke to UM9246, who was using telephone number (203) 953-9246.  During the call, the two discussed the "soft," believed to be a reference to cocaine, "the beige one," believed to be a reference to heroin, the "dark brown . . . and the dog food" also believed to be references to heroin, and "the blueish," believed to be a reference to the color of the wrapping on a package containing drugs.  Duprey also referenced product that was "white like baby powder . . . that's the C . . . no, no, that's the effie," believed to possibly be a reference to fentanyl

---

[1] Following a meeting with Duprey on March 17, 2021, Gebeau's vehicle was stopped by the Connecticut State Police.  Gebeau was positively identified.  During the stop, a narcotics canine alerted to the center console of the vehicle. Gebeau consented to a search.  A search was then conducted and yielded negative results.

("effie").   In session 1267, Duprey and UM9246 continued their conversation and referenced, "the black thing . . . a little piece so you could try it out," believed to be a reference to a heroin sample, "the blue one," and "the green one," believed to be references to the color of the packaging in which quantities of drugs were contained, "the brown one," and "the dark one," believed to be references to heroin, and the "powder" and "the Coca-cola," believed to be references to cocaine.

247.   On March 23, 2022, in session 1818 over Target Telephone 4, Duprey spoke to UM8680, aka Ezequiel (per session 1008) who was using telephone number (475) 313-8680.  During the conversation, UM8680 said, "Yes. There is something hard there that, I could get into, but it's that I don't want to risk it. It's just that, you can't trust anyone [Voices Overlap]," believed to meant that UM8680 had an opportunity to make money in the drug trade but didn't trust the people that presented him with the opportunity.  Duprey said, "Dude. Yes. Because this is fucked up here. Yo, I don't know. I don't understand these kids from here. They want to fuck around but they don't know how to move, they don't know how to fuck around. Nothing," believed to mean that they younger drug dealers with whom Duprey associates are not skilled in the narcotics trade.  UM8680 said, "What happens is that the kilos are going in here at 25, at 26. Meanwhile you go there, to Pennsylvania, Philadelphia, and you sell them for 38 or 40," believed to mean that kilograms of cocaine ("the kilos") are selling for $25,000 or $26,000 in Connecticut and $38,000 or $40,000 in Pennsylvania, which is consistent with prices for bulk quantities of cocaine.  Duprey responded, "Yes. No. Here, here you can't do anything. This is fucked up here."  UM8680 said, "No, you do something and you've already got the, the Feds behind you," believed to mean that UM8680 was concerned about law enforcement.  Duprey responded, "Yes. Uh-huh. Eating

you up [Laughs]," believed to mean that Duprey agreed that one must be cautious of law enforcement presence or risk being caught ("Eating you up").

248.     On March 26, 2022, in session 2080 over Target Telephone 4, Duprey spoke UM1565, who was using telephone number (203) 600-1565.  This telephone number is subscribed to by Andres Morales, and the user of the telephone, based upon the content of intercepts, is believed to be located in Puerto Rico.  In session 2080, Duprey and UM1565 discussed the whereabout of a package believed to contain drug proceeds that Duprey had mailed to UM1565.  During the call, UM1565 told Duprey, "Look, you know that hasn't arrived, bro."  Duprey said, "It hasn't arrived there yet?"  UM1565 said, "No, my brother.  It's supposedly in Catano, to arrive Monday.  And the shit is it delayed significantly."  Duprey said, "Uh-huh.  So, it was up here then, where it was really fucking delayed . . . in Springfield."  UM1565 said, "So question, you, did you do that good inside?  You know, stuffed it well," believed to mean that UM1565 inquired whether Duprey had packaged the money well in an effort to conceal it.  Duprey responded, "Yes. Yeah. Nah, they are all. They are all hundreds and I put them in little white envelopes . . . They are really stuffed there. In addition to the white little envelope. Right?" UM1565 said, "Yeah."  Duprey added, "That they're put inside of, the little white envelope. I put them inside of another one of those small white envelopes."  UM1565 said, "And, the black ones too, right?," believed to be a reference to black packaging material.  Duprey said, "Of, oh, yeah. Nah, the black ones, nah, you know those never fail," believed to mean the black packaging material used by Duprey is effective at concealing drug money.  UM1565 said, "Yes. Yes." Duprey added, "And then I put them inside of a magazine. And then I put in the magazine, you know the [Stammers] bubbles (wraps) used for when [things] break, like glass and

such? . . . Yeah, I put it all around the magazine," believed to mean that Duprey had wrapped the package in bubble wrap.

249.   On March 26, 2022, in session 2085 over Target Telephone 4, Duprey spoke to UM2247, who was using telephone number (203) 527-2247.  During the call, Duprey acknowledged that he had previous served time in federal prison.

250.   On March 27, 2022, in session 2159 over Target Telephone 4, Duprey sent a text message to UM1469, who was using telephone number (203) 519-1469.  The text message read: "It could be like 50 left for tomorrow," believed to mean Duprey expected to have 50 grams of drugs available for UM1469 the following day.  In session 2164 on March 27, 2022, Um1469 responded via text message:  "I'll hit you back Let you know for sure," believed to mean UM1469 would advise Duprey if he needed the 50 grams.

251.   On March 31, 2022, in session 2560 over Target Telephone 4, Cruz, who was utilizing telephone number (347) 361-2697, texted Duprey:  "I need 5," believed to be a reference to a quantity of drugs, likely 5 grams of cocaine or heroin.  Approximately 50 minutes later, in session 2576 over Target Telephone 4, Duprey spoke to Cruz.  During the call, Cruz said, "I'm getting out now but I wanna to see you before um," believed to mean UM2697 wanted to meet with Duprey to obtain drugs.  Duprey said, "Yes, come see me at work . . . Whenever you get here.  I ready for you," believed to mean Duprey instructed Cruz to meet Duprey at Discount Car Rental ("come see me at work") and he would supply her with drugs ("I'm ready for you") at **Subject Premises 4**.

252.   On April 1, 2022, in session 2762 over TT4, Duprey received a text from UM1469, who was using telephone number (203) 519-1469.  The text read: "You got soft?," believed to mean UM1469 was inquiring whether Duprey was in possession of a supply of powder

cocaine ("soft").  Approximately six minutes later, in session 2765, Duprey received a call from UM1469, in which Duprey said, "What's good? Yeah, I think we will be ready for tomorrow. You heard?," believed to mean that Duprey would be receiving a supply of cocaine the following day.

253.   On April 1, 2022, in session 2766, Duprey spoke to UM9662, who was using telephone number (413) 777-9662 (possibly James Majors).  During the call, UM9662 informed Duprey, "I found them parts for, for 17 for you. You know? 17,50," believed to mean that UM9266 located a supply of cocaine for a price of $17.50 per gram, or $17,500 per kilogram.  Duprey responded, "17, 50?"  UM9662 said, "Yeah."  Duprey said, "Damn!," believed to mean Duprey felt the price to be a good one.  UM9662 said, "That's literately half the price," believed to mean that UM9662's price was half the going price per kilogram of cocaine.  Duprey later said, "Yeah. Damn, 17, 50 huh? . . . That shit's cheap as fuck!," believed, once again, to mean Duprey felt $17,500 per kilogram of cocaine was a good price.  UM9662 later said, "Well, I don't know how he's getting it. But he is. But he says he really don't want to do that. Cause that's all he has left. But he said, 'Fuck it!' He'll take the money and get more," believed to mean that UM9662's cocaine source was willing to accept a price of $17.50 per gram.

254.   On April 1, 2022, in session 2807, Duprey spoke to Robert Amatruda, a.k.a. Bubba and Spanky, who was using telephone number (203) 850-9625.  During the call, Amatruda informed Duprey that he had "the 18" for Duprey, believed to be $18,000.  Duprey asked Amatruda if he had gone to see "that dude . . . Coupe."  Amatruda indicated that he had not seen the individual but had texted him and wanted to see this individual to "make a point. 'Cause I'ma tell him like this, 'Bro, if you got hard times or whatever. Bro, listen we could

116

sell stuff. We could do whatever we gotta do. But I'm not playing this game with you. You better come up with this fucking money and stop taking your sweet old time," believed to mean that the individual known as Coupe had failed to pay Amatruda a drug debt. Duprey later asked Amatruda, "And you called Major? [Voices Overlap]." Amatruda said, "Did I call who, Red?" Duprey said, "Major. Major said something about 17, five," believed to mean that UM9662, who is possibly James Major, had offered Duprey cocaine for $17.50 per gram in session 2766. Amatruda said, "Yeah right," believed to indicate that Amatruda felt the price of $17.50 per gram was an unrealistic price. Duprey said, "For real. He said, 'I got somebody. My boy, he wanna, he, he, he got a 17, five," believed to mean Duprey confirmed for Amatruda that UM9662, a.k.a. "Major" had offered cocaine at $17.50 per gram. Amatruda said, "Yeah, okay . . . You believe that dumb-ass?" Duprey said, "I don't know. I don't know what the fuck he got."

255.   On April 2, 2022, in session 2908, Duprey spoke to Amatruda, who was using telephone number (203) 850-9625. During the call, the two discussed the drug debt that an individual, believed to be known by the alias "Coop," owed to Amatruda. Duprey said, "Send me the number so I could call him and I'm going to tell him like [Voices Overlap]." Amatruda said, "Yeah just tell him the same thing too . . . ." Duprey said, "I'm gonna tell him, 'Yo, I need this, if not, you need to come up with something.'" Amatruda said, "Yeah, just say the same thing but, 'Yo, I'm going to see Bubba at about 6:00, yo, and you gotta come up with something,' That's what, I'm telling the same thing," believed to mean that Amatruda, also known as "Bubba" and "Spanky," had informed his customer that Duprey wanted the drug debt to be paid.

117

256.   On April 3, 2022, in session 3000, Duprey spoke to Javier Gonzalez who was using telephone number (860) 483-2274 (Target Telephone 2). During the call, the two discussed a male known by the alias "Gorilla," whom they suspected died recently from a cocaine overdose.  The two also discussed another male known by the alias "Magic," who was recently released to a halfway house and had come to visit Duprey.  Gonzalez instructed Duprey to inform Gonzalez next time "Magic" was around.

257.   On April 4, 2022, in session 3106 over TT4, Duprey spoke with Victor Duran-Barrera, a.k.a. "Mexico," who was calling from telephone number (475) 449-0830.  Barrera told Duprey, "I have, I have a bit of cash there. I wanted to bring them to you. To see if... I could see you tonight?"  Duprey then asked, "Yes. You let me know. Why not, of that. And the tamales, you ate them? To which Barrera responded "No, no. I have half of the tamales there. . . . But I have the other half of the other tamales there. If you could have [Stammers] half what I picked up last time?," believed to mean that Barrera had a supply of drugs ("tamales") but wanted to obtain more from Duprey, in an amount that was half of what Barrera received from Duprey "last time." Duprey answered, "Oh, no, well that's fine. You know it's a yes. . . With you it's anything, go ahead," believed to mean Duprey agreed to supply drugs to Barrera. It is believed that Duran-Barrera ordered 100 grams of heroin on this occasion, given his previous order of 200 grams of heroin.

258.   On April 6, 2022, in session 3408 over TT4, Duprey spoke with UM4144, a.k.a. "Victor," who was calling from telephone number (203) 885-4144. Duprey asks Victor, "Mm-hm. A good little number, right? To which Victor responds, "For you... Two, eight," believed to mean Victor would supply kilograms of cocaine to Duprey for a price of $28,000 per kilogram.  Duprey asks, "Damn. Really?"  Victor replies, "It's worth 3,0 but... Two (2)-

118

eight (8)...I give it to you at two (2)-eight (8) to you, to you.  Because, you are a serious person and I know that it's for the good . . . I am the exact same. The only thing is the BM(W) that I told you about, that you saw. Of the woman . . . I have it here. Humble. You know, that luxury stuff and shit . . . Yes. These people are in here, the... The DEA is, that DEA is in here. . . Ooh. In the last three (3) weeks they have taken like seven (7)," believed to mean that the DEA had arrested seven of UM4144's colleagues. Duprey responds, "Yes. No. And they hit New Haven hard. They are hitting hard, you heard?  Everywhere."

259.    On April 7, 2022, in session 3468 over TT4, Duprey spoke with Michele Cruz, who was calling from (347) 361-3697.  Cruz asked, "So I could grab something from you . . . Um. But you know I don't like separating it. . . wanna get five (5) and five (5). . . And then, um... I want uh... like two (2)."  Duprey asked, "Like two (2)?"  Cruz then replied, "Yeah. Like two (2) and two (2)."  Duprey then asked, "Two (2) and two (2). You want the five(5) and five (5) and two (2) and two (2)?," believed to mean Duprey confirmed that Cruz wanted 14 grams of heroin, packaged in four separate bags for her customers, two bags containing five grams each, and two bags containing two grams each.  Cruz responded, "Yeah. And then one (1) loose. Like."  Duprey responded, "Okay. I got you, ma."  Cruz then explained, "'Cause I got somebody else but they want... two (2) or three (3)," believed to mean that Cruz had one customer who was unsure whether they wanted two or three grams of heroin.

260.    On April 9, 2022, in session 3796 over Target Telephone 3, Duprey spoke to Robert Amatruda, a.k.a. "Spanky" and "Bubba," who was using telephone number (203) 519-3296.  During the conversation, which was lengthy and lasted approximately ten minutes, Amatruda said, "Any company come by or no?," believed to mean Amatruda inquired

whether Duprey had been able to arrange for a new supply of drugs, likely cocaine, which, based upon other intercepts, Duprey is believed to have been without at this time. Duprey said, "Who? The girl called me last night. If I want that. But you gotta be here," believed to mean Duprey had arranged to obtain drugs, some of which he would provide to Amatruda, but that Amatruda had to meet with Duprey that evening. Amatruda said, "Okay, um." Duprey said, "Yeah, I told her that you want like 200," believed to mean 200 grams of cocaine. Amatruda responded, "Yeah! For real. Please," believed to mean that Amatruda confirmed that he wanted 200 grams of cocaine. Duprey said, "Yeah, but you just gotta be here. I'm leaving at 3:00."

261.    On April 9, 2022, in session 3828 over Target Telephone 3, Duprey spoke to Robert Amatruda, a.k.a. "Spanky" and "Bubba," who was using telephone number (203) 519-3296. During the conversation, which was lengthy and lasted approximately 19 minutes, Amatruda expressed a reluctance to meet in person with, and obtain drugs from, the female who was scheduled to deliver drugs to Duprey, as discussed in session 3796. Amatruda said, "Yeah, but tell her to leave it, bro. What the fuck? And tell her [Stammers] she could come get the [Audio Skips] money," believed to mean that Amatruda would meet with the female to pay her what was owed for the drugs but did not want to be present to receive the drugs from the female, preferring that the female leave the drugs with Duprey. Amatruda later said, "Yo. No. Listen, Red. Be honest with you, I don't wanna meet the girl you know . . . Yo, Red. Tell her to leave it with you, right? And then you could [Voices Overlap]." Duprey said, "No, because I'm leaving in 15 minutes. That's what I'm saying. She don't gonna be here [Voices Overlap]." Amatruda said, "I know. But Red, you can hide it somewhere. Um, fucking." Duprey said, "No. I said I'm leaving in 15 minutes. By

the time she come over here, I'm already probably gone." Amatruda said, "Oh. Oh. I was 'bout to say. And then tell her that I'll bring her the money. Fuck!" believed to mean that Amatruda wanted Duprey to take delivery of the drugs from the female and hide them and that Amatruda would pay the female thereafter. Duprey said, "Yeah. Because her [UI] [Mumbles]. She's pretty cool though. She don't fuck with nobody, but... [Voices Overlap]," believed to mean that the female does not engage in drug transactions with many people. Amatruda said, "I know, Red. But you know how I am, bro . . . Damn, man! That girl, bro'. Fucking do, do, you could trust her?" believed to mean that Amatruda wanted to be careful and did not want to engage in a drug transaction with someone he did not know.

262.    On April 9, 2022, in session 3903, Robert Amatruda, a.k.a. "Spanky" and "Bubba," who was using telephone number (203) 519-3296, received a text message from Duprey who was using Target Telephone 4 containing a link regarding federal authorities and drug trafficking. The text read as follows: "Feds: Kilograms of cocaine, fentanyl, marijuana shipped                                    to                                    CT https://www.newsbreakapp.com/n/0eyhWyDk?pd=0AwpwJbz&lang=en_US&s=i4." The two men discussed the article pertaining to the arrest of "the 25 dudes they pick up" in session 4473 on April 13, 2022.

263.    On April 10, 2022, in session 3952, Duprey spoke to UM4095, who was using telephone number (718) 753-4095. During the call, UM4095 said, "So what do you have, vehicles from over there, that you rent over there?" Duprey said, " Yes. Uh-huh. What I do over here is, I'm working in, I run a business for a man that rents vehicles . . . At Seven (7), six (6), seven (7), Wolcott Street in Waterbury," which is the address for Discount Car Rental

in Waterbury, Connecticut.   In this call Duprey specifically identified the address of Discount Car Rental, his place of employ, which is **Subject Premises 4**.

264.   On April 14, 2022, in session 4625 on Target Telephone 4, Duprey spoke to Javier Gonzalez, who was using telephone number (860) 483-2274.   During the call, the two discussed the purchase of a property and Duprey's probation status.   Gonzalez indicated that he was just calling to check in on Duprey.

265.   On April 16, 2022, in session 4883 over Target Telephone 4, Duprey spoke to a female, subsequently identified as Bianca Rodriguez-Cancel, who was using telephone number (718) 753-5096.   During the call, Rodriguez-Cancel said, "What's up? What's good? Uh, well, I was told to give you a call on behalf of the Neph'. 15, something like that, they told me," believed to mean that Rodriguez-Cancel was going to pick up a $15,000 drug debt from Duprey.   Duprey said, "Of the Neph'. Okay. Yeah, I told him that I was going to let him know. Those people around. That nephew. That's Colombia's nephew."   Rodriguez-Cancel said, "Yes. My girl friend called me and told me, 'Look, to [Voices Overlap] . . . go meet with [Stammers] El Colorado (the Red one) [Voices Overlap],'" believed to be a reference to Duprey, who is known by the aliases "Red" and "Colorado."   Duprey said, "So when, uh-huh, for 15. For... [Voices Overlap] . . . When are you coming up, on Monday?," believed to mean Duprey inquired when Rodriguez-Cancel would pick up the $15,000 drug debt from Duprey.   Rodriguez-Cancel said, "Yeah, whenever you tell me to," believed to mean Rodriguez-Cancel would pick up the money on Monday.

266.   On April 17, in session 4880 over Target Telephone 4, Bianca Rodriguez-Cancel texted Duprey:  "I will go down there tomorrow," believed to mean that Rodriguez-Cancel would

pick up the $15,000 drug debt discussed in session 4883 on April 16, 2022, the following day.

267.    On April 18, 2022, in session 4937 over Target Telephone 4, at approximately 10:36 a.m., Bianca Rodriguez-Cancel, who was using telephone number (718) 753-5096, texted Duprey: "11 min," believed to mean Rodriguez-Cancel would arrive to pick up the $15,000 drug debt from Duprey in 11 minutes. In session 4939, Rodriguez-Cancel texted Duprey: "Send me the address." In session 4940, Rodriguez-Cancel, who was using telephone number (718) 753-5096, spoke to Duprey and asked him to text her his address. In session 4942, Duprey texted Rodriguez-Cancel: "767 wolcott street waterbury," which is the address for Discount Car Rental, where Duprey is employed. In session 4943, at approximately 10:49 a.m., Rodriguez-Cancel explained to Duprey that she had gotten lost, was in New York, and would arrive to meet with Duprey at approximately "12:00" p.m. In session 4946, at approximately 12:15 p.m., Rodriguez-Cancel texted Duprey: "I'm here." Surveillance covered the anticipated meet between Duprey and Rodriguez-Cancel and, thereafter, conducted a motor vehicle stop in which Rodriguez-Cancel was positively identified. In session 4954, Rodriguez-Cancel called Duprey an informed him "A fucking cop stopped me. But he didn't do anything to me. He let me go . . . This fucker is asking questions to like, you know . . . To see if I would say, make a mistake or something . . . And not me, dude. I am really smart, fucker. I am very smart. You are not going to catch me," believed to mean that Rodriguez-Cancel informed Duprey that she had been stopped but that the police did not arrest her or seize the $15,000 in cash she had received from Duprey. Later in the conversation, Rodriguez-Cancel informed Duprey, "My girlfriend called me . . . Yeah. I told her 'I am already around there. It's already secure, [he] needs to

123

calm down. That I am going there. I am not going to disappear with the cash,'" believed to mean that Rodriguez-Cancel informed the people who sent her to retrieve the $15,000 in cash from Duprey that she had picked up the money, it was "secure" and that she was on her way to deliver it.

268.    On April 18, 2022, in session 4988 over Target Telephone 4, Duprey spoke to Robert Amatruda, a.k.a. "Spanky" and "Bubba," who was using telephone number (203) 850-9625.  During the call, Duprey asked Amatruda, "Yo, what happened with, with, with, uh, uh, that banshee that you had?  The white banshee," believed to be a reference to the cocaine ("white banshee") Duprey had arranged to be delivered from a female, as discussed in sessions 3796 and 3828.  Amatruda said, "The quad?"  Duprey said, "Yeah, the Banshee that you bought from this girl," believed once again to be a reference to cocaine.  Amatruda later said, "I'll bring, I'll bring, I'll bring you the pictures and the paperwork [Voices Tomorrow. And the, the receipts for it... Ah. [Voices Overlap]," believed to mean Duprey would bring Duprey the money for the cocaine.  Duprey said, "Yeah, but that's, uh, uhm, the 200 CC?," believed to mean that Amatruda was paying for 200 grams of cocaine, as the two had discussed in session 3796.  Amatruda said, "Yeah."  Duprey said, "Alright."  A Google search revealed that Yamaha makes an off-road quad vehicle known as a Banshee.  But the Banshee does not come in a 200 CC model and this is believed to corroborate the conclusion that Duprey and Amatruda were speaking in code in session 4988 and making reference to 200 grams of cocaine.

269.    On April 21, 2022, in session 5248, Javier Gonzalez spoke to Duprey, who was using Target Telephone 4.  During the call, Duprey told Gonzalez, "Yo, my daughter says, 'Yo, I saw Uncle Jav just now," believed to meant Duprey's daughter had recently seen to Javier

Gonzalez.   Gonzalez said, "I'm pulling up behind her right now," believed to mean Gonzalez was parking behind Duprey's daughter's vehicle.   Later in the conversation, Javier Gonzalez told Duprey, "I'm a stop there real quick and kick it with you.  I'll be right there," believed to meant Javier Gonzalez was going to meet with Duprey and talk with him about something.  Moments later, in session 5249, Gonzalez again spoke to Duprey. Gonzalez said, "I'm gonna make that call for your daughter. [Stammers] Your daughter wants sweets," believed to mean that Gonzalez was going to put Duprey's daughter in touch with a supplier of oxycodone pills ("sweets").  Gonzalez added, "And I just showed it to her. So, [Stammers] So, [Stammers] she is paying 20. You know what I'm saying? I said, 'Fuck that shit.' So [Stammers], what I am going to, I am going to wait until she starts to get a lot, a lot. What I am going to do, I am going to put her on directly with that guy. Understand? So that, she already knows who the guy is, understand?," believed to mean that Gonzalez informed Duprey that Gonzalez was going to connect Duprey's daughter with an oxycodone supplier who would charge her less than $20 per pill, the price she was currently paying.  Duprey said, "Yeah. Because I told her. I said 'Yo. Jay get that shit, bro.' He can work with you on that," believed to mean that Duprey informed his daughter that Javier Gonzalez ("Jay") had a good source of supply for oxycodone and could connect his daughter with the source of supply.  Gonzalez later said, "I can't believe she's paying 20. So now she's gonna make, and she's doing good with that. So, imagine if she gets it for 10 dollars nigga? She gonna kill it . . . She gonna kill it. So, if she buys it, she sells it for 25, she's making 15. So for every 10, for every 10 she's making 150 dollars. And she sells 50, 60 a week in that motherfucker, nigga . . . She gon' make 6, 700 dollars a week," believed to mean that Gonzalez's oxycodone supplier would distribute oxycodone pills to Duprey's

125

daughter at a price of $10 per pill, and she could sell the oxycodone for $25 per pill, consistent with the going price for oxycodone pills.

270.    On April 24, 2022, in session 5524, Andres Morales, who is believed to reside in Puerto Rico, spoke to Duprey, who was using Target Telephone 4.   During the call, Duprey informed Morales that the "news" reported that "24 letters" had been intercepted coming in from Puerto Rico, where Morales resides," believed to be a reference to a news report about a large quantity of drugs, perhaps 24 kilograms of drugs, being interdicted by law enforcement.

271.    On April 25, 2022, in session 5631, Robert Amatruda, a.k.a. "Spanky" and "Bubba" spoke to Duprey who was using Target Telephone 4.   During the call, Duprey said, "Yo. How much of the white paint you got? For the car? [Voices Overlap]," believed to mean that Duprey inquired as to who much cocaine ("white paint") Amatruda had available for distribution.   Amatruda said, "Uh, I have, I don't know. Probably like, like, two. I don't know. Probably like two," believed to mean Amatruda indicated that he had approximately 200 grams of cocaine available to distribute.   Duprey said, "Like 200? All right, so. No, like I could let my.  Because his car is white. He's on white, you know what I'm saying?," believed to mean Duprey indicated that he had a customer who wanted cocaine (He's on white, you know what I'm saying?).   Amatruda said, "Yeah. No. whatever the hell, it don't matter [Voices Overlap]."   Duprey later said, "I gonna tell him that you got like a, like, like a hundred to see. [Voices Overlap]," believed to mean that Duprey would inform his cocaine customer that Amatruda had 100 grams of cocaine.   Amatruda responded, "Yeah, say one-fifty (150). Yeah. One-fifty (150). Yeah. Just to be safe," believed to mean Amatruda informed Duprey to tell his customer Amatruda had 150 grams of cocaine.

Duprey responded, "Yeah. One hundred fifty (150). Yeah, I gonna tell him," believed to mean Duprey agreed to tell his customer Amatruda had 150 grams of cocaine. Amatruda said, "Yeah. Just to be safe. But there might be more. I don't know. Just tell him that for now," believed to mean that Amatruda was unsure exactly how much cocaine he had available to distribute and that it might be more than 150 grams. Duprey said, "Yeah. I'll let him know [Voices Overlap]."

272.    On April 25, 2022, in session 5632, Michele Cruz, who was using telephone number (347) 361-2697, texted Duprey, who was using Target Telephone 4. The text read: "Need 5," believed to be a reference to five grams of heroin. In session 5633, Duprey responded via text message: "Tonight," believed to mean Duprey would supply Cruz with heroin that evening.

273.    On April 26, 2022, in session 5808, Robert Amatruda, a.k.a. "Spanky" and "Bubba" spoke to Duprey who was using Target Telephone 4. During the call, Amatruda complained to Duprey that an individual, believed to be a drug customer, "owes us 40,000, bro," believed to mean that a drug customer owes Amatruda and Duprey $40,000 for a drug debt for cocaine previously provided to the individual.

274.    On April 26, 2022, in session 5811 on TT4, Michele Cruz, who was using telephone number (347) 361-2697, spoke to Duprey, who was using Target Telephone 4. Duprey said, "So you gonna come out in a few or not?" Cruz said, "Yeah, I'm gonna come out in a few. Unless you want to bring it to me," believed to mean Cruz inquired whether Duprey would deliver drugs to her. Duprey said, "Alright. I'll pass by there real quick. I gotta go to the Elk's. But I'll pass by there real quick. Alright?," believed to mean Duprey agreed to deliver drugs to Cruz. Cruz later said, "Can I bring you the money later?," believed to

127

mean that Cruz wanted to pay Duprey for the drugs he would deliver at a later time. Duprey said, "Yeah. Or if you... You know um... I could leave it in [Stammers] here in [Stammers] the place and I'll just put it in the mailbox," believed to mean Duprey agreed to leave the drugs for Cruz in the mailbox at his residence at 87 Seymour Street. Pole camera footage suggests that, following this intercept, Duprey, rather than leaving the drugs in his mailbox, met with Cruz in front of 87 Seymour Street (**Subject Premises 3**) and engaged in a hand-to-hand transaction at the passenger window of Cruz's vehicle. (The pole camera footage, specifically, depicts a figure exiting 87 Seymour Street and approaching a vehicle parked at the curb in front of the residence, which is running with its lights on. The footage also depicts the figure remaining at the passenger side window of the curbed, running vehicle for a short period of time. The figure in the footage cannot be positively identified. But shortly after this interaction, in session 5845, Duprey texted Cruz: "You got 5 in the long one and in the short bag you got 6," believed to mean, Duprey distributed two separate packages of drugs to Cruz, one containing five grams and the other containing six grams, which he had stored within his residence.

275.    On April 27, 2022, in session 5951 over Target Telephone 4, Javier Gonzalez spoke to Jose Duprey. During the call, Gonzalez indicated that he was in Florida and inquired whether Duprey's brother, who resides in Orlando Florida, might deliver a supply of drugs to Gonzalez, because Gonzalez did not have his work phone with him, i.e. the phone containing telephone numbers for narcotics traffickers Gonzalez knows in Florida, specifically narcotics traffickers in the "Kissimmee" area of Florida. Later that day, in session 5986, Duprey again spoke to Gonzalez and informed him that Duprey had been in contact with a drug trafficker in Florida, but that the drug trafficker was located "three

hours away from . . . Davenport," Florida, where Gonzalez was staying. Gonzalez later said, "Geez. I don't wanna have him drive three hours. That's six total. Three and three." Duprey later indicated that he previously had been introduce to someone who had "weed" in Florida. Duprey also later said, "the dude said three hours is too far," believed to mean that Duprey's drug contact in Florida did not want to drive three hours to deliver drugs to Gonzalez. Gonzalez later said, "I wish I had my other phone. I would've made it happen. Because I have . . . [voices overlap] . . . full of numbers," believed to mean that Gonzalez, a high-level narcotics trafficker, owns and utilizes another cell phone that he did not have with him on his trip to Florida and that this "other phone" is "full of numbers" of drug traffickers, including some drug traffickers in Florida, who could have supplied Gonzalez with drugs while he was in Florida. Later that day, in session 5972, Gonzalez texted Duprey: "I got it don't sweat it bro I reached out to an old Friend and bingo SCORE GOOD NIGHT," believe to mean that Gonzalez had contacted a drug trafficker in Florida who was an "old friend," and this individual had agreed to supply Gonzalez with drugs, i.e. 'SCORE," while he was in Florida.

276. On April 28, 2022, in session 6024, Duprey was intercepted telling UM6650, that he had recently joined the "Elks lodge" because they "work with the community" and Duprey wanted to use his membership in the club to attempt to reduce his probation, saying "I got six years left but . . . she [probation officer] told me to submit for that, what is called, to get half the years taken of, you heard?," believed to mean Duprey wanted to have his term of probation reduced because he had joined the Elks lodge, which participates in community service.

277.    On May 3, 2022, in session 6440 over Target Telephone 4, Duprey spoke to his paramour, Wanda Lora.  During the call, Duprey informed Lora that authorities had arrested an individual named "Mo," saying to Lora, "You know they, they catch Mo, no?  . . . They caught him in Pennsylvania."  During the call, Duprey also said, "I am dreaming of with jails and this shit these days and I can't even go to sleep," believed to mean that Duprey is worried about being detected and arrested by law enforcement.  Later in the call, Lora said, "We have to talk about a game plan.  For just in case . . . What we will do.  You know? . . .You know, talk seriously about, about, what there is. What I don't have.  What you leave for me.  What, whatever," believed to mean that Lora wanted to have a serious and detailed conversation with Duprey about what she was to do if Duprey were arrested, including how much money Duprey was setting aside for her. Duprey later said, "I know what you are saying.  I have told you.  I gotta be careful . . . ," believed to mean Duprey understood Lora's concerns and need to be cautious about his narcotics trafficking so as to avoid detection.

278.    On May 5, 2022, in session 6819, Duprey spoke to Duran-Barrera, also known as "Mexico."  During the call, Duran-Barrera said, "I am going to pick up the man tonight. He's arriving today . . . we are going to speak with you Saturday to square off what's owed and such, and you already know not to make a comment about my stuff," believed to mean that Duran-Barrera and one of his associates will be meeting to determine precisely how much of a drug debt the associate owes to Duprey, and Duran-Barrera does not want Duprey to inform the associate that Duran-Barrera also owes Duprey a separate drug debt. Duprey responded, "No, no, no, no.  Yours is separate." Duran-Barrera said, " . . . Thank you, boss . . . I will call you separately.  You already know . . . I am almost finished with

that . . . I don't remember where I am at, boss," believed to mean that Duran-Barrera would call Duprey to order a new supply of heroin because he had distributed nearly all of his current supply but was unsure what his current debt to Duprey was.  Duprey responded, "Oh, I'll send you the text right now," believed to mean Duprey would text Duran-Barrera the amount of his drug debt.  Two days later, on May 7, 2022, in session 6935, Duran-Barrera spoke to Duprey and said, "You didn't send me the balance.  Send me the balance for both of us" believed to mean that Duran-Barrera informed Duprey that he forgot to text the total amount of Duran-Barrera's drug debt, and the amount of the drug debt owed by Duran-Barrera's associate (who, based on other intercepts, Duran-Barrera refers to as "the old man").  Duprey later said, "Okay.  So 'm going to send you, when it says "Mexico" and when it says "Toston," that's how I am going to tell you more or less. You already know that," believed to mean that Duprey would text Duran-Barrera two numbers, one for the drug debt owed by Duran-Barrera, a.k.a. "Mexico," and one for the drug debt owed by Duran-Barrera's associate, a UM known only as "Toston."  In the next session on May 7, 2022, session 6936, Duprey text Duran-Barrera:  "Mexico 9900 viejo 10.600," believed to mean that Duran-Barrera, a.k.a. "Mexico," owed Duprey $9,900 and Duran-Barrera's associate—Viejo translated means "old man"--owed Duprey $10,600.

279.   On May 5, 2022, in session 6830 over Target Telephone 4, at approximately 8:08 p.m., Duprey spoke to Andres Morales and the two made reference to Javier Gonzalez, a.k.a., "The Crazy One."  During the call, Morales said, "Look, send me the crazy one's number to see what I can come up with," believed to mean that Morales wanted Duprey to send him Javier Gonzalez's cell phone number, because Duprey and his conspirator's have used the alias "The Crazy One," to refer to Javier Gonzalez in other intercepts.  This belief was

131

confirmed by Duprey's response, when Duprey said, "Let me see.  Because he was in a mess, since they robbed Sisco," believed to be a reference to an earlier intercept in which Javier Gonzalez informed Duprey that his brother Francisco Gonzalez, a.k.a. "Sisco," had been burglarized and had multiple power tools stolen.  Duprey added, "I will send it to you now . . . I will send you his number now so you can call now," believed to mean that Duprey would text Javier Gonzalez's number to Morales.  The call ended at approximately 8:12 p.m.  Approximately two minutes later, at approximately 8:14 p.m., in session 6833 over Target Telephone 4, Duprey texted Morales the following:  "Loco +18604832274."  This telephone number--(860) 483-2274--is the telephone number known to be utilized by Javier Gonzalez, and the telephone number Javier Gonzalez used to participate in numerous, intercepted, pertinent communications in this case that pertained to drug trafficking.  As explained elsewhere herein, telephone number (860) 483-2274 in fact became Target Telephone 2 in this investigation and pertinent wiretap intercepts over Target Telephone 2 established probable cause to believe that this telephone number is utilized by Javier Gonzalez in furtherance of drug trafficking.

280.   On May 11, 2022, in session 7394 over TT4, Duprey spoke to Micelle Cruz.  During the call, Cruz said, "I was gonna ask you, do you have any fent," believed to mean that Cruz requested fentanyl from Duprey.  Duprey responded, "Yeah . . . What you need some of that? Soon?," believed to mean that Duprey confirmed he did in fact have a supply of fentanyl.  Cruz said, "Like, like one (1) or two (2). Like, just to put in there, 'cause they're telling me that is weak," believed to mean that Cruz's heroin customers had complained about the potency of the heroin Duprey had supplied to her.  Duprey said, "Oh, you wanna some, oh.  Nah, I'll give you something different. So, uhm, let me see, for next time I'm

gonna give you some, a big chunk (ph) of that, so you can save it in there," believed to mean Duprey was going to give Cruz heroin from a new batch he had received, or that Duprey was going to give Cruz a product other than fentanyl to use as cut to mix with heroin for her customers.  Cruz said, "That's good."  Duprey said, "Alright. I'll give you something different that came in, so you let me know."

X.   **ADDITIONAL INFORMATION REGARDING THE SUBJECT PREMISES**

281.   Numerous, pertinent facts and communications pertaining to the Subject Premises have been set forth above in various sections of this affidavit, including the subsections pertaining to Target Telephone 1, Target Telephone 2, Target Telephone 3, and Target Telephone 4.

282.   Additional information relating to the Subject Premises for which search warrants are sought is set forth below.

283.   The summaries of events and intercepted calls set forth below often include interpretive belief statements from your affiant, which is based upon the training, experience, and knowledge of the affiant and agents working on this case, including knowledge gained through this investigation.

**Additional Information Pertaining to Subject Premises 1 ("SP1")**

284.   **Subject Premises 1**, 119 Enoch Street in Waterbury, Connecticut, is the location where Javier GONZALEZ resides and at which there is probable cause to believe drug proceeds, records relating to drug trafficking and bulk cash smuggling, controlled substances and/or residue of controlled substances, as well as other evidence of the offenses set forth in this affidavit, including but not limited to Target Telephone 2, are located.

285.  Subject Premises 1, 119 Enoch Street in Waterbury, Connecticut, is more particularly described as a newly constructed, two-story, singly-family home that appears dark gray in color with gray brick in the area of the front entrance.  The front entrance has white double doors with oval shaped windows.  The residence has an attached two-car garage, with two, white garage doors.  The number "119" is mounted on a placard located to the left of the front double doors.  The specific location of Subject Premises 1 is known to agents, and a photograph/s of Subject Premises 1 is depicted on Attachment B to the warrant for this premises.

286.  Surveillance has confirmed Javier Gonzalez coming and going from Subject Premises 1 on multiple occasions throughout this investigation.  Additionally, one or more vehicles known to be owned by, registered to, and/or utilized by Javier Gonzalez have been seen at this location on multiple occasions throughout the investigation.

287.  An administrative subpoena sent to Eversource Legal Compliance Department was returned on April 27, 2022 and confirmed that the electric utility at 119 Enoch Street in Waterbury, Connecticut, 06705, is listed in Javier Gonzalez's name and lists (860) 483-2274 (Target Telephone 2) as the contact number for the account.

288.  The investigation in this case, as detailed throughout this affidavit, has established probable cause to believe that Javier Gonzalez is a large-scale narcotics trafficker who distributes heroin, cocaine, cocaine base, oxycodone, and marijuana.

289.  The investigation has also established probable cause to believe that Javier Gonzalez's drug trafficking has generated substantial cash proceeds, as evidenced by several, explicit wiretap intercepts set forth herein.

290.   For example, on December 28, 2022, Javier Gonzalez's brother, Francisco Gonzalez, informed another male that "Jay, he want to make more than a million . . . But I'm not in Jay's game like that," by which I believe Francisco Gonzalez indicated that his brother, Javier Gonzalez ("Jay"), is a higher-level narcotics trafficker that he is who generates substantial profits from drug trafficking.

291.   On or about February 14, 2022, in session 557, Javier Gonzalez boasted "I could grab 100,000, 200,000 like it ain't nothing."

292.   On February 17, 2022, Duprey informed his superior, Edwin Hernandez, in session 209 over Target Telephone 3, that "The Crazy One," an alias Duprey used on several occasions to refer to Javier Gonzalez, had met with Duprey at Discount Car Rental.  During the conversation, Duprey indicated that Javier Gonzalez had received "10 at 17," believed to mean 10 kilograms of cocaine at a price of $17,000 per kilogram, which is, based upon my training and experience, an exceedingly good, low price that would enable Javier Gonzalez to generate substantial profits from the resale of the cocaine.

293.   On or about February 24, 2022, Javier Gonzalez, with assistance from Francisco Gonzalez and Vanessa Battice, smuggled an estimated $26,000 into Mexico for the suspected purpose of making a cash payment to his (Javier Gonzalez's) Mexico-based drug supplier.

294.   As explained above in the section/s of this affidavit pertaining to my training and experience, I am familiar with the practices of drug traffickers.

295.   I know that drug traffickers, particularly those involved in drug trafficking at the level Javier Gonzalez is involved, often store cash drug proceeds and records relating to their drug trafficking and drug proceeds, including but not limited to records regarding the disposition, transportation, or transfer of drug proceeds, as well as records regarding drug

debts, within their residences, because they can exercise complete dominion and control over their residences and can undertake to secure these structures.  Subject Premises 1, in fact, appears to be equipped with at least two security cameras.

296.  There is probable cause to believe, and I do believe, Subject Premises 1 is a primary location utilized by Javier Gonzalez to secrete cash drug proceeds. And during the course of this investigation, including the wiretap phase, there has been no indication that Javier Gonzalez stores the cash proceeds generated by his drug trafficking at any location other than Subject Premises 1.

297.  There is also probable cause to believe Javier Gonzalez has records relating to his drug trafficking, including records regarding his travel to Mexico and bulk cash smuggling, stored within Subject Premises 1, and probable cause to believe that Target Telephone 2 will be found within Subject Premises 1.   (Investigators have confirmed that Javier Gonzalez traveled to Mexico at least seven times since October of 2020.)

298.  Although Subject Premises 1 is not believed to be the location where Javier Gonzalez routinely stores bulk quantities of his drugs, Javier Gonzalez is believed to regularly store smaller, redistribution quantities of drugs within Subject Premises 1 and to distribute drugs from Subject Premises 1.

299.  For example, Javier Gonzalez is believed to have possessed redistribution quantities of drugs within Subject Premises 1, which he distributed to his brother, Francisco Gonzalez, on at least two occasions during this investigation:  November 27, 2021 and December 11, 2021.

300. Also, on February 13, 2022, in session 403 on Target Telephone 2, Javier Gonzalez indicated that he would distribute marijuana to UF3177 which was stored at his "house," Subject Premises 1.

301. I believe that these examples demonstrate that Javier Gonzalez is comfortable storing smaller, redistribution quantities of drugs within Subject Premises 1 and has done so for several months throughout this investigation; and there is no indication that this pattern has ceased. Javier Gonzalez, based upon source information and other information developed in this investigation, including wiretap explicit intercepts set forth herein, has continued his involvement in drug trafficking for several years and through to the present, and I believe there is, therefore, probable cause to believe that smaller, redistribution quantities of controlled substances and/or residue of controlled substances, along with drug paraphernalia and packaging material will be found within Subject Premises 1.

302. I also know, based upon my training and experience, that drug proceeds and records which have come in contact with controlled substances, including but not limited to heroin, cocaine, and marijuana, can be detected by narcotics canines, even after the passage of time.

303. Service provider records, checked as recently as May 17, 2022, confirm that Target Telephone 2 remains active.

304. There is probable cause to believe, and I do believe, that the items listed on Attachment A for SP1, including drug proceeds, records relating to drug trafficking, including records regarding Javier Gonzalez's travel to Mexico and bulk cash smuggling, controlled substances and/or residue of controlled substances, and Target Telephone 2, all of which

are evidence of the offenses listed in this affidavit, will be found located within Subject Premises 1.

**Additional Information Pertaining to Subject Premises 2 ("SP2")**

305.    **Subject Premises 2,** 131 Geddes Terrace, Waterbury, Connecticut, is the location where Francisco GONZALEZ resides with his paramour, Vanessa Battice.

306.    As explained more fully below, there is probable cause to believe and I do believe that drug proceeds, drug records, and controlled substances and/or residue of controlled, as well as other evidence of the offenses set forth in this affidavit, including but not limited to Target Telephone 1, which is utilized by Francisco GONZALEZ, are located within Subject Premises 2.

307.    Subject Premises 2, 131 Geddes Terrace, Waterbury, Connecticut, is more particularly described as a two-story, single-family residence that is green and tan in color. The front door to the residence faces Geddes Terrace and the number "131" is clearly displayed to the left of the front door.

308.    On April 25, 2022 an administrative subpoena return for Subject Premises 2 was received from Eversource Energy which indicated that the electric utility account lists the current customer for 131 Geddes Terrace in Waterbury as Francisco GONZALEZ and the listed telephone number as (203) 509-1982, which is the telephone assigned to Target Telephone 1.

309.    An NCIC inquiry shows that Francisco GONZALEZ identifies Subject Premises 2 as his home address.

310.    During this investigation, Francisco GONZALEZ has been seen arriving at and departing from Subject Premises 2 numerous times and with a consistency that makes clear that

Subject Premises 2 is his home.  In addition, cars registered in Francisco GONZALEZ's name, including a black Chevrolet Silverado bearing CT registration 530-WSF, which law enforcement has observed Francisco GONZALEZ operating on numerous occasions, has been observed parked in the driveway of Subject Premises 2 with regularity.  Finally, during the period of time that communications were intercepted over Target Telephone 1, location data associated with Target Telephone 1 indicated that this device, utilized by Francisco GONZALEZ, was consistently in the coverage area that includes Subject Premises 2 on most evenings, indicating that Subject Premises 2 is, in fact, where Francisco GONZALEZ resides.

311.   CS3 confirmed that Francisco GONZALEZ resides at Subject Premises 2 and informed investigators that she/he purchased drugs from Francisco GONZALEZ for several years and had purchased drugs from Francisco GONZALEZ at Subject Premises 2.  During the course of this investigation, at the direction of and under the supervision of law enforcement, CS3 made four controlled purchases of heroin from Francisco GONZALEZ, three of which took place inside Subject Premises 2.  CS3 purchased five grams of heroin from Francisco GONZALEZ in connection with each of the four controlled purchases.  The three controlled purchases that took place inside Subject Premises 2 occurred on September 22, 2021, September 30, 2021, and October 7, 2021.

312.   Communications were intercepted over Target Telephone 1 from approximately November 17, 2021 through approximately January 13, 2022. During this time period, explicit intercepts, surveillance, and pole camera footage of Subject Premises 2 revealed that Francisco GONZALEZ distributes controlled substances (heroin, cocaine, cocaine base,

and/or oxycodone) with regularity, multiple times per week, and utilizes Subject Premises 2 as his principal point of distribution.

313.   I know that drug traffickers, particularly those who distribute drugs from a single location with the frequency that Francisco Gonzalez distributes drugs from Subject Premises 2, often store drugs, cash drug proceeds and records relating to their drug trafficking and drug proceeds, including but not limited to records regarding the disposition, transportation, or transfer of drug proceeds, as well as records regarding drug debts, within their residences, because they can exercise complete dominion and control over their residences and can undertake to secure these structures.   And Subject Premises 2, in fact, appears to be equipped with at least one security camera.

314.   During the period of time communications were intercepted over Target Telephone 1, Francisco Gonzalez distributed drugs with regularity from Subject Premises 2 to several customers who are believed to be drug users.   He also distributed drugs with regularity from Subject Premises 2 to at least two individuals who are believed to be redistributors: Christopher CAMMILLETTI and John STEFERAK, a.k.a. "Jack."

315.   Set forth below are summaries of Francisco Gonzalez's pertinent communications with Cammilletti and Steferak, all of which are believed to pertain to the distribution of controlled substances.   Footage from a pole camera in the area of 131 Geddes Terrance and/or physical surveillance by agents confirmed that the overwhelming majority of the transactions discussed in the following summaries took place at Subject Premises 2, which in the estimation of your affiant amply demonstrates Francisco Gonzalez's consistent pattern of distribution from Subject Premises 2.

## Francisco GONZALEZ's Pattern of Distribution to CAMMILLETTI

316.   Christopher Cammilletti is believed to be drug user and a redistributor who purchases cocaine, cocaine base, and heroin at Subject Premises 2 from Francisco GONZALEZ with regularity, portions of which he redistributes.

317.   November 17, 2021.  Session 18 over TT1.  GONZALEZ asks CAMMILLETTI, "What are we talking?"  CAMMILLETTI responded, "A half ball."

318.   November 18, 2021.  Session 86 over TT1.  CAMMILLETTI asks GONZALEZ, "I have a $15,000 deposit coming. I was wondering if you could spot me a ball, or a half a ball."  GONZALEZ responds, "So you want a gram and a half a ball?"  CAMMILLETTI responds, "Yeah."

319.   November 19, 2021.  Session 184 over TT1.  GONZALEZ asks CAMMILLETTI, "What are… what are we talking?"  CAMMILLETTI responds, "Half ball."

320.   November 20, 2021.   Session 257 over TT1.   GONZALEZ asks CAMMILLETTI, "Alright, what are we talking?"  CAMMILLETTI responds, "A gram."

321.   November 27, 2021. Session 791 over TT1. CAMMILLETTI tells GONZALEZ, "Alright, I need a half gram."

322.   November 27, 2021. Session 803 over TT1. CAMMILLETTI tells GONZALEZ, "Alright. My boy wants another one of those uh, half grams."  GONZALEZ responds, "Alright. Alright, man."

323.   November 29, 2021.  Session 995 over TT1.  CAMMILLETTI asks GONZALEZ, "Uh, you're not home uh?"  GONZALEZ responds, "Yeah I'm home."  CAMMILETTI tells GONZALEZ, "Alright. Uh, I'll need a 20."  GONZALEZ responds, "Okay."

324.    November 29, 2021.  Session 1000 over TT1.  CAMMILLETTI tells GONZALEZ, "Uh, I
        need a half gram if I can run you back with 10, I have 20 on me."  GONZALEZ responds,
        "Okay. Alright. Alright bye."

325.    December 2, 2021.  Session 1258 over TT1.  CAMMILLETTI texts GONZALEZ, "If you
        or your lady is available, I could go for another one of what I grabbed the other night."  On
        the same day, in Session 1263, over TT1, CAMMILLETTI tells GONZALEZ, "Same thing
        as the other night."  GONZALEZ responds, "14?"  CAMMILLETTI confirms, "14."

326.    December 11, 2021.  Session 2220 over TT1.  GONZALEZ asks CAMMILLETTI, "What
        are we talking anyways?"  CAMMILLETTI responds, "Uh, probably just a gram."
        CAMMILLETTI asks GONZALEZ, "Alright, you never, you never did uh, any of the soft
        huh?," believed to mean CAMMILLETTI inquired whether GONZALEZ had obtained a
        resupply of cocaine ("soft").  GONZALEZ responds, "Yeah, yeah," believed to men
        GONZALEZ had obtained a supply of cocaine.  CAMMILLETTI says, "You did. Okay,
        a'ight. Let me uh, let me talk to her and then that, that might, that gram might change."

327.    December 13, 2021.  Session 2429 over TT1.  CAMMILLETTI asks GONZALEZ, "Okay,
        can you leave me something outside?"  GONZALEZ responds, "What are we talking?"
        CAMMILLETTI responds, "Just a half a gram."

328.    December 15, 2021.  Session 2723 over TT1.  GONZALEZ asks CAMMILLETTI,
        "Alright. What are we talkin'?"  CAMMILLETTI responds, "A gram, hard."

329.    December 16, 2021.  Session 2846 over TT1.  CAMMILLETTI asks GONZALEZ, "Hey
        um, I just didn't want to text this, but Janet wants half a ball."

330.     December 17, 2021.  Session 2910 over TT1.  GONZALEZ asks CAMMILLETTI, "What are we talking?"  CAMMILLETTI responds, "Um, 14!  And then I need to drop . . . some of that off and then I'll come, we come back with some money for ya'."

331.     December 19, 2021.  Session 3009 over TT1.  CAMMILLETTI tells GONZALEZ, "Alright, she needs a gram."  GONZALEZ asks, "Gram of.   Gram of what?" CAMMILLETTI responds, "Hard."

332.     December 22, 2021.  Session 3288 over TT1.  GONZALEZ tells CAMMILLETTI, "I'm home."  CAMMILLETTI responds, "Um, Janet's got enough money for a gram though." GONZALEZ says, "Okay. I got you."  GONZALEZ confirms, "I'll be here."

333.     December 23, 2021.  Session 3431 over TT1.  CAMMILLETTI tells GONZALEZ, "It just be a half a ball."  GONZALEZ responds, "Okay."  CAMMILLETTI adds, "And she just gonna leave 100 bucks."  GONZALEZ confirms, "Okay."

334.     December 26, 2021.  Session 3583 over TT1.  CAMMILLETTI tells GONZALEZ, "Alright. I'm stopping by to grab hers. Drop you the cash, and she wants a half a ball." GONZALEZ responds, "Okay."

335.     December 26, 2021.  Session 3631 over TT1.  CAMMILLETTI tells GONZALEZ, "Definitively the last one. I need uh, either a gram or a half a ball.  I'll figure it out on the way."  GONZALEZ responds, "Alright, hurry up man."

336.     January 2, 2022.  Session 4228 over TT1.  CAMMILLETTI tells GONZALEZ, "She needs a gram and a 20 diesel."  GONZALEZ later said "Is it? Hold on, hold on . . . And a, and a D, and a diesel too?"  CAMMILLETTI confirms, "Yeah."

337.     January 2, 2022.  Session 4232 over TT1.  CAMMILLETTI tells GONZALEZ, "A'ight, uh, one of my boys wants a half gram."  GONZALEZ responds, "Okay, I got you."

338.    January 2, 2022.  Session 4244 over TT1.  CAMMILLETTI texts GONZALEZ, "Even or a half ball you can't put it outside."

339.    January 7, 2022.  Session 4553.  CAMMILLETTI asks GONZALEZ, "Uh, can I stop by real quick?"  GONZALEZ responds, "Yeah. What are you talking?"  CAMMILLETTI responds, "Uh, I believe a half of ball."  GONZALEZ confirms, "Okay. Alright."

340.    January 8, 2022.  Session 4598 over TT1.  GONZALEZ asks CAMMILLETTI, "Alright. What we talking?"  CAMMILLETTI responds, "Uh, a gram."

341.    January 8, 2022.  Session 4637 over TT1.  GONZALEZ asks CAMMILLETTI, "What you, what we're talking?"  CAMMILLETTI responds, "Uh.. Right now, half gram.  But that might, that might change to a full gram."  GONZALEZ responds, "Alright. Let me know."

342.    January 10, 2022.  Session 4687 over TT1.  CAMMILLETTI asks GONZALEZ, "You home?"  GONZALEZ responds, "Yep."  CAMMILLETTI tells GONZALEZ, "I need a half gram."  GONZALEZ confirms, "Okay."

343.    January 13, 2022.  Session 4942 over TT1.  CAMMILLETTI tells GONZALEZ, "Alright. Uh, I just gotta run to Watertown real quick and grab the money from Janet. It'll probably gonna be half a gram."  GONZALEZ confirms, "Okay. I got you."

### Francisco GONZALEZ's Pattern of Distribution to STEFERAK

344.    John Steferak is believed to be drug user and a redistributor who purchases heroin and oxycodone at Subject Premises 2 from Francisco GONZALEZ with regularity, portions of which he redistributes.  In the following summaries, Steferak's references to "blues" are believed to be references to 30mg oxycodone pills, which are blue in color.  Steferak's other references to combinations of numbers "Two and One and a half," for example, are

believed to be requests for heroin, packaged in separate quantities, in two separate bags. This belief was corroborated by Steferak's arrest on December 27, 2021, after he had requested "6 and 2," in an intercepted conversation, and was thereafter found in possession of two separate bags of heroin, one estimated to contain approximately six grams of heroin, the other estimated to contain approximately 2 grams of heroin.

345.    November 18, 2021.  Session 82 over TT1.  GONZALEZ asks STEFERAK, "What we talking?"  STEFERAK responds, "Um... It's gonna be two and one and a half and I figure how many of those blues, I won't know until I'm there. I gotta. . . .," believed to mean Steferak wanted Francisco Gonzalez to supply him with heroin in two separate packages, on containing two grams and another containing 1.5 grams, as well as an undetermined quantity of oxycodone ("blues")  On the same day, in Session 85 over TT1, Steferak texts GONZALEZ, "2+1.5+14 blue," confirming that he wanted one package of heroin containing two grams, another package containing 1.5 grams, and 14 30mg oxycodone pills, which are known to be blue in color.

346.    November 19, 2021.  Session 181 over TT1.  STEFRAK texts GONZALEZ, "12+9+1+40 blue," believed to mean Steferak wanted three bags of heroin, one containing 12 grams, another containing 9 grams, and a third containing 1 gram, and 40 oxycodone pills.

347.    November 26, 2021.  Session 695 over TT1.  STEFERAK tells GONZALEZ, "Yup. Alright, well um... If... Fucking, you want me to come up at that time, I will. I got everything and uh... I need uh... 12 and eight (8)."  GONZALEZ responds, "Uh! [Makes a babbling sound.] Okay! Alright, that. . . ."

348.    November 29, 2021.  Session 971 over TT1.  STEFERAK texts GONZALEZ, "I will leave my house in 15min. 3+ 0.5."

349.     December 1, 2021.  Session 1193 over TT1.  STEFRAK texts GONZALEZ, "I will head up now. 2+1.5."

350.     December 2, 2021.   Session 1270 over TT1.   GONZALEZ asks, "What we talkin' anyways? I'm home," believed to mean Francisco Gonzalez expressly informed Steferal that he was at **Subject Premises 2** ("home").  STEFERAK responds, "Uh... Two (2) and one (1)."   GONZALEZ responds, "Okay. I'm here," believed, once again, to mean Francisco Gonzalez expressly indicated that he was at Subject Premises 2, where he expected the drug transaction with Steferak would take place, as usual.

351.     December 3, 2021.  Session 1381 over TT1.  STEFERAK texts GONZALEZ, "I should be there in a hour or so. 10+7."

352.     December 8, 2021.  Session 1919 over TT1.  STEFERAK texts GONZALEZ, "2.5+2."

353.     December 9, 2021.  Session 2029 over TT1.  STEFERAK tells GONZALEZ, "It was... It was two (2) and then a half (½) gram."  GONZALAEZ responds, "Okay."

354.     December 10, 2021.  Session 2070 over TT1.  STEFERAK tells GONZALEZ, "Alright uh... ten (10) and nine (9)."  GONZALEZ responds, "Ten (10) and nine (9), okay. I got you."

355.     December 14, 2021.  Session 2615 over TT1.  STEFERAK tells GONZALEZ, "I'm just leaving my shop now. Uh... Four (4) and four (4)."  GONZALEZ responds, "Four (4) and four (4). Okay. Um. . . ."

356.     December 15, 2021.  Session 2707 over TT1.  STEFERAK texts GONZALEZ, "Can I stop by around 930pm tonight. 2+2."

357.     December 17, 2021.  Session 2909 over TT1.  STEFERAK texts GONZALEZ, "What time are you getting home. 11+10."

146

358.   December 21, 2021.  Session 3183 over TT1.  GONZALEZ asks STEFERAK, "What are we talking Jack?"  STEFERAK responds, "Uh four (4)," believed to mean four grams of heroin.

### December 27, 2021:  STEFERAKS' Arrest

359.   On or about December 27, 2021, in session 3736 over TT1, STEFERAK spoke to Francisco GONZALEZ and said, "I'm a get 6 and 2 . . . can you put all the six together and then the two," believed to be an indication that STEFERAK wanted heroin packaged in two separate bags, one containing six grams and another containing two grams.  GONZALEZ said, "Okay.  Six and two . . . Alright, man."  Surveillance was conducted of a subsequent meeting between STEFERAK and Francisco GONZALEZ at **Subject Premises 2**, during which Francisco Gonzalez is believed to have supplied Steferak with heroin, packaged in two separate quantities, in two separate bags, per Steferak's request.   Following the meeting at **Subject Premises 2**, the vehicle STEFERAK was operating was stopped and two packages of heroin were seized from STEFERAK, one estimated to contain approximately two grams of heroin and the second estimated to contain approximately six grams of heroin.

### STEFERAK's Continuing Pattern of Drug Transactions at Subject Premises 2

360.   Steferak and Francisco Gonzalez continued their consistent pattern of consummating drug transactions at Subject Premises 2 following Steferak's arrest.

361.   December 28, 2021.  Session 3802 over TT1.  STEFERAK asks GONZALEZ, "Is there any way that I could get, fucking, two (2) and two (2) on the arm? And I'll get you the money tomorrow?"  GONZALEZ responds, "Uh... I'll just give you, uh... some. You know

I'm saying?" STEFERAK confirms, "Yep." GONZALEZ responds, "Alright? So, I'm coming home right now," believed to mean Francisco Gonzalez expressly indicated that he would meet with Steferak at **Subject Premises 2** ("home") to consummate the drug transaction.

362. January 5, 2022.  Session 4403 over TT1.  STEFERAK tells GONZALEZ, "Two (2) and then a half."  GONZALEZ responds, "Okay."

363. January 10, 2022.  Session 4728 over TT1.  STEFERAK texts GONZALEZ, "2+1."

364. January 11, 2022.  Session 4785 over TT1.  STEFERAK texts GONZALEZ, "2+1."

365. January 13, 2022.  Session 4936 over TT1.  GONZALEZ asks STEFERAK, "What are we talking?"  STEFERAK responds, "Uh two and then a half."  GONZALEZ confirms, "Okay. I got you."

## Recent Surveillance at Subject Premises 2

366. Communications were intercepted over TT1 from approximately November 17, 2021 through January 13, 2022.  During this time period, explicit intercepts over TT1, many of which are set forth above, coupled with surveillance and/or pole camera footage, revealed Francisco Gonzalez's consistent pattern of distribution from Subject Premises 2, particularly his frequent distribution of drugs to Christopher Cammilletti and John Steferak.

367. On May 9, 2022, surveillance was established in the area of Subject Premises 2, the home of Francisco Gonzalez.

368. At approximately 6:00 p.m., surveillance observed Francisco Gonzalez arrive at and park in front of Subject Premises 2 in the vehicle he has been known to utilize throughout this

investigation, a black Chevrolet Silverado pick-up truck.  Gonzalez exited his vehicle and walked to the back of Subject Premises 2 out of sight.

369.   Moments later, surveillance observed Christopher Cammilletti arrive to the area and park across the street from Subject Premises 2.

370.   Cammilletti exited his vehicle and walked toward Subject Premises 2, where he was greeted briefly in the front yard area of Subject Premises 2 by Francisco Gonzalez, who had reappeared.

371.   Thereafter, both Gonzalez and Cammilletti walked together to the back of Subject Premises 2 and out view of surveillance, where they are believed to have entered Subject Premises 2 through a rear door.

372.   Moments later, at approximately 6:10 p.m., Cammilletti reappeared walking toward his vehicle from behind Subject Premises 2, entered his vehicle and departed the area.

373.   I believed based upon the consistent pattern of drug transactions between Cammilletti and Gonzalez at Subject Premises 2, and the nature of their meeting on May 9, 2022, including its brevity, that Francisco Gonzalez distributed drugs to Cammilletti at Subject Premises 2 on May 9, 2022.

374.   Following the meeting between Cammilletti and Gonzalez at Subject Premises 2 on May 9, 2022, surveillance followed Cammilletti's vehicle when it departed the area,

375.   Cammilletti was followed to the parking lot nearby store plaza, where a female exited from one of the stores in the plaza and entered Cammilletti's car.  The female remained inside Cammilletti's vehicle for several minutes and Cammilletti drove to the edge of the parking and parked, with the front to the vehicle facing an adjacent wooded area.  A short time later, the female departed from the vehicle and re-entered one of the stores in the plaza.

376.   I believe that, given the nature of this meeting, including its brevity and the suspicious nature of Cammilletti moving his vehicle to the edge of the parking lot, that Cammilletti distributed drugs to the female who had entered his car on this occasion.

377.   I believe the events of May 9, 2022 set forth above establish probable cause to believe, and I do believe, that Francisco Gonzalez's pattern of distributing drug to Cammilletti (and others) at Subject Premises 2 has continued.

378.   Service provider records, checked as recently as May 16, 2022, confirm that <u>Target Telephone 1</u> remains active.

379.   As explained above in the section/s of this affidavit pertaining to my training and experience, I am familiar, based upon my training and experience, with the practices of drug traffickers. I know that drug traffickers, particularly drug traffickers who distribute the volume of drugs that Francisco GONZALEZ distributes, with the frequency of Francisco GONZALEZ' distribution activities, often keep on their person and within their residences, drugs, drug proceeds, drug paraphernalia, including packaging, drug records, and cellular telephones utilized to facilitate drug trafficking.

380.   I also know, based upon my training and experience, that drug proceeds and records which have come in contact with controlled substances, including but not limited to heroin, cocaine, and marijuana, can be detected by narcotics canines, even after the passage of time.

381.   There is probable cause to believe, and I do believe, that the items listed on Attachment A, including but not limited to drug proceeds, records relating to drug trafficking, including records regarding bulk cash smuggling and Francisco Gonzalez's travel to Mexico on or about February 24, 2022, controlled substances and/or residue of controlled substances,

drug paraphernalia, including drug packaging, and <u>Target Telephone 1</u>, all of which are evidence of the offenses listed in this affidavit, will be found located within Subject Premises 2.

### Additional Information Pertaining to Subject Premises 3 ("SP3")

382.   This section provides details pertaining primarily to **Subject Premises 3**.  But it also provides pertinent information regarding other Subject Premises utilized by the conspirators in this case, including but not limited to **Subject Premises 4** (Discount Car Rental, located at 767 Wolcott Street in Waterbury), **Subject Premises 5** (Duprey's stash location, which is Blooming Eyes by Laura, located at 2030 Straits Turnpike, Suite 3, in Middlebury), **Subject Premises 7** (Victor DURAN-BARRERA's residence at 214 Denver Ave., Second Floor in Bridgeport), and **Subject Premises 9** (the service station at 345 Woodtick Road in Wolcott where Amatruda works), which are discusses more fully in subsequent subsections of this affidavit.  This subsection pertaining to **Subject Premises 3**, is, therefore, lengthier that subsections pertaining to other Subject Premises.

383.   **Subject Premises 3**, 87 Seymour Street, Floor 1, in Waterbury, Connecticut, is the location where Jose Duprey and Wanda Lora reside and at which there is probable cause to believe drug proceeds, drug records, and controlled substances and/or residue of controlled, including cocaine and heroin, as well as other evidence of the offenses set forth in this affidavit, and other items listed on Attachment A for this Subject Premises are located.

384.   Subject Premises 3, 87 Seymour Street, Floor 1, in Waterbury, Connecticut, is more particularly described as a two-level, two-family residence that is light blueish-gray in color with shutters that are light tan in color, and a front door that is maroon in color and covered by a small awning.  The front entrance of the residence faces Seymour Street.

385.   The number "87" is <u>NOT</u> displayed on the front door or the front of the structure, but the specific location of Subject Premises 3 is known to agents, and photograph/s of Subject Premises 3 are depicted on Attachment B to the warrant for this premises. In addition, the Waterbury Geographical Information System public website contains a photograph of Subject Premises 3 and confirms that this structure is listed as "87 Seymour Street."

386.   Surveillance, including footage from a pole camera installed in the vicinity of Subject Premises 3, has confirmed Jose Duprey and Wanda Lora coming and going from Subject Premises 3 on a regular basis during this investigation from at least February of 2022 through the time of this writing.   Additionally, vehicles known to be utilized by Jose Duprey and Wanda Lora have been observed parked at this location on a regular basis throughout the investigation during this time period.   Precise location information associated with Target Telephone 3 and Target Telephone 4, both utilized by Duprey, also indicate that these telephones are routinely in the coverage area that includes Subject Premises 3.

387.   An administrative subpoena was sent to Eversource Legal Compliance Department for 87 Seymour Street in Waterbury, Connecticut, 06708.   The subpoena response from Eversource on or about April 27, 2022, lists the electric utility for 87 Seymour Street, Floor 1, Waterbury Connecticut in the name Wanda Torres, with a contact telephone number of (203) 802-2948.   This telephone number is the telephone number for the business Blooming Eyes by Lora.  Blooming Eyes by Lora is the salon operated by Wanda Lora, located at 2030 Straits Turnpike, Suite 3, in Middlebury, Connecticut, which is utilized as a stash location for drugs by Duprey and which is identified herein as Subject Premises 5.

388.    On March 11, 2022, in session 978 over Target Telephone 3 ((203) 228-0565), Duprey

identified himself as "Jose Duprey," and stated that his telephone number was (347) 456-

8272, the telephone number for Target Telephone 4.  He also identified his address as "87

Seymour Street, Waterbury, Connecticut, 06708," the address of Subject Premises 3.

389.    Jose Duprey, as evidenced by numerous, explicit communications intercepted during the

wiretap phase of this investigation, distributes large quantities of heroin, fentanyl, and

cocaine on a regular basis.  The drug transactions in which he has so frequently engaged

have generated substantial cash proceeds, and this, too, has been evidenced by numerous

explicit intercepts, physical surveillance, and, in one instance, on February 23, 2022, the

seizure of $88,000 in cash from a money courier to whom Duprey had given the money.

390.    As explained above in the section/s of this affidavit pertaining to my training and

experience, I am familiar, based upon my training and experience, with the practices of

drug traffickers.

391.    I know that drug traffickers, particularly drug traffickers who distribute the volume of

drugs that Duprey distributes, with the frequency of Duprey's distribution activities, often

maintain and/or utilize multiple premises, each with a specific purpose, to facilitate the

drug trafficking organization's operational interests as well as to protect their interests from

their competition and elude law enforcement.

392.    I know that drug traffickers, particularly those involved in drug trafficking at the level

Duprey is involved, often store cash drug proceeds and records relating to their drug

trafficking and drug proceeds, including but not limited to records regarding the

disposition, transportation, or transfer of drug proceeds, as well as records regarding drug

debts, within their residences, because they can exercise complete dominion and control

153

over their residences and can undertake to secure these structures. Subject Premises 3, in fact, appears to be equipped with security cameras, and Duprey has indicated as much in at least one intercepted conversation he had with Edwin Hernandez after $88,000 was seized from Armando VAREAL-PLAZA on or about February 23, 2022.

393. There is probable cause to believe, and I do believe, Subject Premises 3 is a primary location utilized by Jose Duprey to secrete drug proceeds and that stored within Subject Premises 3 a large quantities of cash, representing drug proceeds, records pertaining to Duprey's drug trafficking, as well as cellular telephones utilized to facilitate drug trafficking, including Target Telephone 3, Target Telephone 4, both utilized by Duprey, and the cellular telephone assigned telephone number (203) 709-8326, utilized by Lora. During the course of this investigation, including the wiretap phase, there has been no indication that Duprey stores the cash drug proceeds generated by his drug trafficking at any location other than Subject Premises 3.

394. I know from my training and experience that items, including drug records and drug proceeds that have come in contact with controlled substances, including heroin and cocaine, can be detected by narcotics canines.

395. As explained below, and throughout this affidavit, explicit wiretap intercepts, coupled with surveillance, have plainly indicated occasions on which Duprey and/or Lora took large sums of cash stored within Subject Premises 3 and gave the cash to a money courier sent by Duprey's drug supplier to retrieve it from Duprey. Conversely, during the entire months-long wiretap phase of this investigation, there have been no intercepts indicating that Duprey stores large quantities of drug proceeds at any location other than Subject Premises 3.

396.   Some of the occasions on which large sums of cash drug proceeds stored within Subject Premises 3 were provided to drug couriers sent by Duprey's drug supplier to retrieve the money from Duprey are set forth in detail below.

397.   Also set forth below in detail are some examples of instances when Duprey possessed drugs within Subject Premises 3.  (Duprey, as explained more fully elsewhere herein, is believed to use Subject Premises 5 as his primary stash location for bulk quantities of drugs.)

398.   Although Subject Premises 3 is not believed to be the location where Jose Duprey routinely stores bulk quantities of his drugs, Duprey is believed to regularly store smaller, redistribution quantities of drugs within Subject Premises 3 and to distribute drugs from Subject Premises 3.

399.   I believe that the examples detailed below regarding instances when Duprey possessed drugs within Subject Premises 3 demonstrate that Duprey is comfortable storing smaller, redistribution quantities of drugs within Subject Premises 3 and has done so for several months throughout this investigation.  Duprey, based upon source information and other information developed in this investigation, including wiretap explicit intercepts set forth herein, has continued his involvement in drug trafficking for several years and through to the present, and I believe there is, therefore, probable cause to believe that smaller, redistribution quantities of controlled substances and/or residue of controlled substances, along with drug paraphernalia and packaging material will be found within Subject Premises 3.

**February 15, 2022:  Drugs Within Subject Premises 3 (Including a Video)**

400.   On February 15, 2022, Duprey is believed to have traveled from his place of employ, Discount Car Rental (**Subject Premises 4**), to his stash location, Blooming Eyes by Lora, located at 2030 Straits Turnpike (**Subject Premises 5**), to retrieved drugs, which he brought to his residence (**Subject Premises 3**) and processed.

401.   On February 15, 2022, at approximately 1:41 p.m., in session 121 on TT3, Duprey made on outgoing intercepted telephone call to Edwin Hernandez, who was using telephone number (470) 838-5167.  During the call, which lasted approximately nine minutes, Duprey and Hernandez are believed to have discussed the quality of heroin that Hernandez recently had his people send to Duprey.  Hernandez said, "Alright and how are you doing with the parceras, bro," believed to mean Hernandez inquired about kilograms of heroin that had been sent to Duprey.  Duprey said, "That parseras are going up . . . Listen that black . . . That black on one side came out good and on the other it came out bad . . . The little cousin did a mix right . . . Yes but people said it didn't do anything to them, some people was good for some people bad for others . . . Yeah I don't know about that combination, we'll have to open another one to see what's up with different of that . . . because if not the pizza guy will have to change the purples," believed to mean that one of the batches of heroin ("the black") Duprey previously received from Hernandez's people was of poor quality and some customers disliked it, and, therefore, Duprey was going to open another batch of kilograms of heroin to check its quality and if the new  was also of poor quality, Hernandez would have to have his delivery person ("the pizza guy") replace the new batch, which was contained in purple packaging.   Duprey later said, "So I will do the mix of the white

parseritas with the black and see how it comes out," believed to mean Duprey was going to process and mix different batches of heroin on February 15, 2022 or soon thereafter.

402. Based on the context of this conversation in session 121 on TT3, investigators also believed that Duprey retrieve a quantity of heroin for this purpose from **Subject Premises 5**, 2020 Straits Turnpike in Middlebury, Connecticut, the location of "Blooming Eyes by Lora," a business operated by his paramour and coconspirator, Wanda Lora.

403. At approximately 6:25 p.m. on February 15, 2022, pole camera footage depicted Duprey exiting from his place of employ, Discount Car Rental (**Subject Premises 4**) and departing this location in a black Lexus SUV and heading South on Wolcott St.[2] A few minutes later, mobile surveillance observed a black Lexus bearing CT registration BF19094, which is registered to Jose Duprey, driving South on Meriden Rd. from Manor Ave. in Waterbury and was able to positively identify Jose Duprey as the operator and sole occupant of the Lexus at this time.

404. Mobile surveillance was able to follow Duprey as he drove directly to **Subject Premises 5**, 2030 Straits Turnpike in Middlebury, Connecticut, the location of Blooming Eyes by Lora, where Duprey arrived at approximately 6:40 p.m. This location, Subject Premises 5, is, as discussed elsewhere herein, the location where Duprey is believed to secrete large quantities of drugs.

405. At approximately 6:50 p.m., pole camera footage from Subject Premises 5 depicted Duprey exiting Subject Premises 5, re-entering his black, Lexus, and departing the area. The

---

[2] The DEA surveillance report corresponding to this incident indicates that, "[b]ased on pole camera surveillance DUPREY was observed leaving Discount Car Rental at approximately 6:10 P.M. for a period of only about two minutes." On February 15, 2022, from approximately 4:05 p.m. until approximately 6:24 p.m. the recording function of the pole camera at Discount Car Rental appears to have sporadically malfunctioned, but the video feed was believed to have been operational and viewed by the monitoring agent.

surveillance unit in the area was unable to reacquire mobile surveillance of Duprey's black Lexus at that time, and, therefore travelled directly to Duprey's residence at 87 Seymour Street (**Subject Premises 3**), where, at 7:05 p.m., Duprey's black Lexus was observed parked in front of Subject Premises 3. At this time, surveillance was also able to observe Duprey enter Subject Premises 3, after he spoke briefly with his daughter, Edmeyln Duprey, in front of the residence. Mobile surveillance was then terminated.

406. A short time later that evening, at 7:43 p.m., in session 128 over TT3, DUPREY made an outgoing intercepted call to Edwin Hernandez. During the call, which lasted approximately ten minutes, Duprey, in sum and substance, informed Hernandez that he had processed a quantity of heroin inside Subject Premises 3 and was dissatisfied with the result. Duprey said "I was here doing the mix . . . and that gets like gum you heard . . . sticky and all . . . And I put a little of Mr. Freddy with both, you understand . . . I almost couldn't take it out of the Osterizer (blender) . . . so let him know, because as much as you mill it . . . it goes back to sticking . . .. I cannot put it in a strainer because it is going to stay all stuck there," which, again, is believed to mean Duprey was inside Subject Premises 3 processing drugs, likely heroin, which is often processed in a blender, and could not get the heroin to mix properly, even after mixing in a quantity of "Mr. Freddy," perhaps a reference to fentanyl, which is often mixed with heroin. At the end of session 128, Edwin Hernandez said, "send me a little video," believed to mean Hernandez asked Duprey to send a video of the heroin that Duprey was unable to process successfully. Session 128 ended at approximately 7:54 p.m.

407. At approximately 7:59 p.m., Duprey sent and outgoing intercepted video message to Hernandez in data session 22 over Target Telephone 3. The video Duprey sent depicts a

158

person's hand, believed to be Duprey's, holding and manipulating a small amount of a black substance, which based upon training and experience appeared to have the same consistency as black tar heroin.

408. Based upon the foregoing, there is probable cause to believe that Duprey processed a quantity of heroin inside Subject Premises 3 on February 15, 2022, and took a video of the result of those efforts, inside Subject Premises 3, which was captured in intercepted data session 22 over Target Telephone 3.

## February 23, 2022:  Cash Drug Proceeds at Subject Premises 3 (Seizure of $88,000)

409. On February 23, 2022, Duprey gave Armando Varela-Plaza, a money courier for Duprey's drug supplier, $88,000 in suspected drug proceeds that had been stored within Subject Premises 3.  Law enforcement seized the $88,000 from Varela-Plaza in connection with a subsequent motor-vehicle stop.

410. The follow intercepted calls over Target Telephone 3 ("TT3"), observations, and actions occurred on February 23, 2023.

411.  In session 382, intercepted at approximately 11:30 a.m., Duprey spoke to UM7097, who was utilizing telephone number (917) 862-7097, and who is believed to be Edwin Hernandez's superior within the drug trafficking organization of which Duprey is a part. During the call, in sum and substance, UM7097 informed Duprey that UM7097's money courier would meet with Duprey later that evening to collect drug proceeds.

412. During session 382, Duprey said, "Uh-huh! No, no. Uh-huh. So, they can come up…I leave work at 6:00, today. So…." UM7097 said, "Look. Look. They want it for today. My question is, if you can, so my guy can leave work at 5:00 and be on his way there," believed

159

to mean that UM7097's superiors wanted UM7097 to collect drug proceeds from Duprey that day and UM7097's "guy" would travel to meet with Duprey for that purpose. Duprey replied "Yes. No, no, no. Go ahead, go ahead. Uh-huh, have him leave at 5:00, because I leave work at 6:00. So, what I'll do is go get them and I'll see him right then," believed to mean that Duprey agreed to "go get" the drug proceeds after he got out of work and would then meet with UM7097's drug courier. UM7079 said, "Okay. Look, he will call your numb, uh, will call you at 5:00. For sure, now. Okay?" DUPREY then agreed, saying "Ok?" Later in the session, UM7079 asked Duprey, "You get out at 6:00? He'll be arriving there like around 6:30. He'll be there before 7:00." DUPREY replies "Yes, uh-huh. Uh-huh. I'll go get them. I'll pick them up quick and we'll see each other quick". UM7079 confirms "He will... send you a message or he will call you 15 minutes before he arrives over there. Perfect?" DUPREY replies "Okay not a problem, cousin. Go ahead."

413.   In session 384, intercepted at approximately 1:06 p.m., Duprey spoke to Edwin Hernandez, who was using telephone number (470) 838-5167. During the brief call, Duprey told Hernandez, "Listen, all set . . . they called me already," believed to me that Duprey informed Hernandez that Hernandez's superior, UM7097, had contacted Duprey and arranged to send a courier to pick up drug proceeds from Dupery. Hernandez said, "Yeah, but only pass . . . Just the 80. You heard?," believed to mean that Hernandez instructed Duprey to give the money courier only $80,000 in drug proceeds. Duprey said, "Yes. Yes, for the evening. Okay? So, I'll call you later. Because I'm busy," believed to mean Duprey agreed to give UM7097's money courier $80,000, as he was instructed to do by Hernandez.

414.   Based on the above referenced wire intercepts, surveillance was established in the vicinity of Discount Car Rental (Subject Premises 5) located 767 Wolcott Street, Waterbury at

approximately 1:30 p.m., in anticipation of a meeting between Duprey and UM7097's money courier, later identified as Armando Varela-Plaza, who was expected to pick up $80,000 from Duprey.

415.  Later that evening, at approximately 6:16 p.m., in session 391 over TT3, Duprey received another call from Hernandez.  During the call, Hernandez said, "I know I bother more than the little old man. Listen, the thing is that I didn't understand him well, because the old man was on the road. Buts it's eight (8) eight (8)," believed to meant that Hernandez informed Duprey that he had to give UM7097's money courier $88,000 instead of $80,000. Duprey said, "Oh, so let me check... Hold on, because I have to get to that place. I haven't even gone over there to get it yet," believed to mean that Duprey needed to go to his residence, Subject Premises 3, to "check" to see if he had $88,000 in cash drug proceeds stored within Subject Premises 3 to deliver to UM7097's money courier.  Hernandez said, "Alright, buddy. Alright."

416.  At approximately 6:35 p.m., in session 392 on TT3, DUPREY received a call from Varela-Plaza, the money courier, was using telephone number (347) 556-6369.  During the call, the two arranged to meet at Subject Premises 3.  Varela-Plaza said, "I will be there in about... I will be there in 10, 15 minutes." Duprey asked, "Oh, okay. Cousin, where will you be, more or less?"  Varela-Plaza asked, "Where you saw me last time, right?," believed to mean that Varela-Plaza had picked up drug proceeds from Duprey on at least one prior occasion.  Duprey replied, "Uh huh, where did I tell you last time more or less . . . I sent you to the little house, that other time?," believed to mean Duprey met previously with Varela-Plaza at Subject Premises 3.  Varela-Plaza said, "Yeah, Yeah, Yeah."  Duprey later said, "Uh huh. The little house. You remember the little house. Right?"  Varela-Plaza said,

161

"Yeah. Yeah. There, there. I'm going there," believed to mean that Varela-Plaza was on his way to meet with Duprey at Subject Premises 3 to pick up the $88,000 in drug proceeds. Duprey said, "Fuck! Perfect! Yes, because there, I'm on my way over there already, as I am leaving work late," believed to mean Duprey was leaving Discount Car Rental ("work") and was on his way to Subject Premises 3 to meet with Varela-Plaza and give him $88,000 that was stored within Subject Premises 3.

417.    Almost immediately after session 392 ended, at approximately 6:36 p.m., surveillance observed the interior lights of the Discount Car Rental store shut off.  Duprey was then seen walking to the rear parking lot of Discount Car Rental.  Duprey entered a gold-colored Ford Fusion station wagon (Bearing CT registration BD24431), drove out of the parking lot, and drove southbound on Wolcott Street. The mobile surveillance team then followed Duprey.  Surveillance briefly lost sight of Duprey but reacquired his vehicle and thereafter followed DUPREY to his residence at 87 Seymour Street in Waterbury, Subject Premises 3.

418.    At approximately 6:56 p.m., in session 393, Duprey received a text message on TT3 from Varela-Plaza, which read:  "Cousin, I'm here already," believed to mean that Varela-Plaza had arrived to the vicinity of Subject Premises 3. At 7:02 p.m., in session 394, Duprey texted Varela-Plaza: "OK."  At that time, surveillance observed a white Ford F-150 pickup truck, bearing New York license plates GPJ6155, idling on Russell Street, which intersects with Seymour Street in close proximity to Subject Premises 3.

419.    At approximately 7:07 p.m., in session 396 on TT3, Duprey called Varela-Plaza.  During the call, Duprey said, "where are you, on the little hill where… towards the little house?," believed to mean that Duprey asked if Varela-Plaza was parked on the hill near Subject

Premises 3 ("the little house").   Varela-Plaza replied "Yeah, yeah. I'm over here already."
Duprey then asked "Ok, at the house right?" and UM6369 confirmed "Yeah, yeah, yeah,"
believed to mean that Varela-Plaza had arrived and was parked nearby Subject Premises 3.
Duprey said, "Oh, okay. So, I'm going to see you there, outside, soon. Let me see. Okay?,"
believed to mean that Duprey was going to assemble the $88,000 in drug proceeds inside
Subject Premises 3 and bring the money out to Varela-Plaza.   Varela-Plaza responded,
"Yeah."

420.   Following session 396, surveillance observed Duprey exit from Subject Premises 3 and
walk to the white Ford F-150 pickup truck, with New York registration plates, which had
repositioned from Russell Street and parked on Seymour Street.   Duprey appeared to
engage in a brief conversation with the operator of the white Ford F-150 pickup truck, after
which the vehicle departed the area.

421.   Thereafter, the white Ford F-150 pickup truck, bearing New York license plates GPJ6155,
was stopped, Varela-Plaza was identified as the operator and sole occupant of the vehicle,
and $88,000 in cash was seized from within the vehicle.

422.   Later that evening, in session 404 on TT3, Duprey spoke to Hernandez. During the call,
Duprey said, "We are all set. All good. 88," believed to mean that Duprey informed
Hernandez that he had given Varela-Plaza $88,000. Hernandez asked, "Have you passed
it?" to which Duprey replied, "Yes."

423.   But in the very next session, session 405 over Target Telephone 3, Edwin Hernandez spoke
to Duprey again and told him, "Police grabbed him on the way back . . . they took the cash,"
believed to mean that Hernandez had learned that Varela-Plaza had been stopped by police,
who seized the $88.000.  Varela-Plaza was not arrested and was given a written warning

163

for a traffic violation.  He did not cooperate with authorities and when questioned about the $88,000, indicated that the money was associated with a construction job he was working on.

424.    The seizure gave rise to several, other lengthy calls between Hernandez and Duprey, including one, session 409 on Target Telephone 3, in which Hernandez initiated a three-way conversation with a male, believed to Mexican, who is also believed to be Hernandez's superior in the targeted drug trafficking organization.  In these calls, Duprey appeared to be under suspicion in connection with the seizure.  But after several hours and several calls, which focused in part on where the transfer of money occurred, what precautions Duprey had taken to ensure no law enforcement were in the area at the time of the transfer, how far away from Duprey's residence the stop was made, whether federal authorities had made the stop, and whether authorities had arrested the courier and/or searched the courier's cellular telephone (neither of which occurred), the parties appeared to have satisfied themselves that Duprey was not responsible for the seizure.

425.    Based on the foregoing, there is probable cause to believe, and I do believe, that the $88,000 seized from Varela-Plaza on February 23, 2022, had been previously secreted within Subject Premises 3 by Duprey on February 23, 2022.

### March 7, 2022:  Cash Drug Proceeds at Subject Premises 3

426.    Intercepted calls, coupled with surveillance, including pole camera footage from Subject Premises 3 and Discount Car Rental, indicate that on March 7, 2022, Wanda Lora took cash drug proceeds from within **Subject Premises 3** and delivered them to Duprey at Discount Car Rental (**Subject Premises 4**), where Duprey transferred the proceeds to a money courier for his drug supplier.  Details of the incident are set forth below.

164

427.    At approximately 3:43 p.m., in session 813 on TT3, Duprey spoke to Edwin Hernandez, who was using telephone number (470) 838-5167.  During the call, the two are believed to have discussed two events planned for March 7, 2022:  1) a deliver of drugs to Duprey, and 2) a money-pickup from Duprey.  Most of the details set forth below pertain to the money-pick up.

428.    In session 813, the conversation between Duprey and Hernandez indicated that one individual would be making a "delivery" of "Ferraris," believed to be a reference to kilograms of heroin (possibly fentanyl), and that this individual "has to get five dollars," believed to mean that the person who would deliver the drugs to Duprey needed to be paid $5000.  Duprey later said "the other one hasn't called me," believed to mean that Duprey has not yet spoken to the person who would be arranging the money pick-up.  Hernandez said "No, I already talked with the other one because you were busy there . . . So I talked with him and gave him the serial number," believed to men that Hernandez spoke to the person coordinating the money pick-up from Duprey and informed him how much money ("the serial number") Duprey would be giving him.  Hernandez later indicated that the money courier was "like two hours away" and Duprey needed to give the money courier "55," believed to mean $55,000.  Hernandez later reiterated "55 and 5," believed to mean Duprey had to give $55,000 to the money courier who would be picking up money from Duprey and Duprey had to pay the drug transporter $5000 in cash for delivering the drugs to Duprey.  Duprey said, "Okay, okay," believed to mean that Duprey understood this arrangement.

429.    In session 815 on TT3, at approximately 4:05 p.m., Duprey received a call from UM6861, who was using telephone number (503) 704-6861. During the call, UM6861 said, "Hi I am

165

the guy that is going to pick up a bill today . . . I want to know if you have the address that I have to go . . . .," believed to mean that UM6861 informed Duprey that he was the money courier who would be picking up the $55,000  ("the bill") from Duprey.  Duprey said, "Okay I will send it to you now," believed to mean Duprey would send UM6861 the address at which the money pick-up would take place.  UM6861 said "Oh good, I'll let you know around what time I'm going," believed to mean that UM6861 would inform Duprey of his anticipated arrival time.

430.   In session 816 on TT3, Duprey texted UM8681 "767 Wolcott st Waterbury ct," which is the address of Discount Car Rental (**Subject Premises 4**).  In session 818 on TT3, UM6861 texted Duprey "5:40," believed to mean that UM6861 expected her would arrive at Discount Car Rental at approximately 5:40 p.m.

431.   On March 7, 2022, at 5:28 p.m., toll records for telephone number (475) 775-0308--which, according to CS5 is Duprey's person cell phone--sent an outgoing text message to (203) 802-2948, Lora's telephone number.  It is believed Duprey used his personal phone, which was not being tapped, to communicate to with Lora and instruct her to bring the drug proceeds to Discount Car Rental.

432.   At approximately 5:35 p.m. surveillance observed a White Honda Accord bearing Connecticut registration BD66036 arrive in the lot and park near the front of Discount Car Rental.

433.   At approximately 5:38 p.m., in session 820 on TT3, Duprey received a call from UM6861.  During the call, UM6861 said, "I'm here already," believed to mean that UM6861 had arrived at Discount Car Rental and was the operator of the white Honda Accord bearing Connecticut registration BD66036.  Duprey said, "Okay.  Okay. Wait for me there, that

166

they are bringing it, okay," believed to mean that Duprey informed UM6861 that the money was on its way and, more specifically that Lora would be arriving with the money, which was stored at **Subject Premises 3**. UM6861 said "Alright, fine."

434.    In session 821 on TT3 at 5:51, Duprey spoke to Edwin Hernandez.  Hernandez said, "How you doing bro?" Duprey said, ". . . . the old lady is coming up with the money to give it to the guy, one already arrived," believed to mean that Duprey indicated that Wanda Lora, his "old lady" would be arriving with the "money" because that "one," the money courier, had "already arrived."  Hernandez said, "Oh you took care of one?" Duprey said, "Uh huh I imagine that, yes that one is of the coin," believed to be a reference to the money courier ("the coin").  Hernandez said, "But did you took care of the one of the Ferrari?," believed to mean Hernandez inquired whether the drug transporter has yet arrived.  Duprey said, "No the Ferrari haven't arrived," believed to mean the drugs had not yet arrived. Duprey later said, "Yes. That's 55 for him, for the one of the coin," believed to mean Duprey confirmed that he would be giving the money courier $55,000 in dur proceeds.

435.    In session 826 on TT3, at approximately 6:01 p.m., Duprey called UM6861. Duprey said, "Hello my brother, no, I'm a little late but we are good with that you heard?," believed to mean that Duprey was still waiting for Lora to arrive with the $55,000.  "UM6861 said, "Oh how is that, you guys are ready?"  Duprey said, "Well yes, yes."  UM6861 said, "Oh okay oh."  Duprey said, "You are here already I saw you in the white Honda right?" UM6861 said, "Yes in the white Honda do you want me to come in?," believed to mean that UM6861 was in fact the person surveillance observed arriving at Discount Car Rental in the white Honda earlier that evening.  Duprey said, "Well yes you can come in I have seen you before, yes come in so you can have a seat there while they bring that okay,"

167

believed to mean Duprey was comfortable having UM6861 wait inside Discount Car Rental while the two waited for Wanda Lora to arrive from Subject Premises 3 with the $55,000.  UM6861 said "Okay okay I'll come in now bye."

436.    At approximately 6:03 p.m., UM6861 was observed on pole camera footage entering Discount Car Rental (**Subject Premises 4**).  UM6861 was not carrying anything when he entered Discount Car Rental.

437.    Approximately two hours earlier that evening, at approximately 4:11 p.m., footage from a pole camera located at the home of Duprey and Lora, **Subject Premises 3**, depicts Wanda Lora arriving at Subject Premises 3 in a black, Mitsubishi Outlander, exiting the vehicle, and entering the front door of Subject Premises 3.  At approximately 5:51 p.m., pole camera footage at Subject Premises 3 indicates that Wanda Lora--wearing the same clothes she had been wearing when she arrived at Subject Premises 3 at approximately 4:11 p.m.-- exited Subject Premises 3, carrying a bag, entered the black Mitsubishi Outlander, and departed from the area.  The color of the bag could not be determined given the lighting at this time of day.

438.    At approximately 6:05 p.m., pole camera footage from Discount Car Rental (**Subject Premises 4**), depicts the black Mitsubishi Outlander arrive at and park in front of Discount Car Rental.  Footage also reveals Wanda Lora exit the driver's door of the black, Mitsubishi Outlander and walk into Discount Car Rental carrying what appeared to be a yellow, plastic, shopping bag.  The color of the bag was able to be seen more clearly at this time given the lighting at Discount Car Rental.

439.    At 6:07 p.m., pole camera footage at Discount Car Rental revealed, through the blinds of the storefront window of the business, that Duprey was in possession of the yellow plastic

bag that Lora had delivered to Duprey.  Duprey appeared to carry the yellow bag to a desk and set it down out of view of the pole camera.  Lora, Duprey and UM6861 who had arrived in the Honda, can be seen in the area of the desk on which Duprey had appeared to place the yellow bag.  There appeared to be an object on the desk, determined from subsequent footage, to be a light-colored box.  Duprey can be seen in the pole camera footage rummaging around and at one point bending over in the area of the desk where the bag and the box were located.  Thereafter, Duprey picked up the light-colored box and handed it to UM6861.  Duprey was then observed discarding the now empty yellow plastic bag.

440.   UM6861 walked out of Discount Car Rental carrying the light-colored box, put the box into the trunk of the Honda he had arrived in, got the enter the driver's seat of the Honda, and departed from the area.

## March 21, 2022:  Cash Drug Proceeds at Subject Premises 3 ($30,000)

441.    On March 21, 2022, at approximately 11:15 a.m., in session 1192, Target Telephone 3 received an in-bound telephone call from UM5856, who was calling from telephone number 347-754-5856.  During the call, in part and in substance, UM5856 informed DUPREY that he, UM5856, was instructed to meet with DUPREY to pick something up that day. DUPREY informed UM5856 that he works until 6:00 p.m. or 6:30 p.m. and UM5856 agreed to meet with Duprey around 9:00 p.m. UM5856 asked DUPREY if he would be going to the same address as last time or around the same area, and DUPREY attempted to confirm an address with UM5856. DUPREY then informed UM5856 he would send UM5856 an address to go to for the meet. UM5856 then stated "Okay. They told me it's 3-0 right?," believed to mean that UM5956 informed Duprey that UM5856 was supposed to collect $30,000 in drug proceeds from Duprey.  Duprey responded, "Uh-huh.

I will send you one. So that you arrive, be comfortable," believed to meant that Duprey understood that he owed $30,000 and that he would send UM5856 an address where they would meet for the exchange.

442.   At approximately 6:51 p.m., Duprey was observed leaving the place where he works, Discount Car Rental (**Subject Premises 4**).  Duprey was operating a silver Nissan Altima.

443.   Surveillance followed Duprey to an automotive garage located at 345 Woodtick Road in Wolcott (**Subject Premises 9**).  It is believed Duprey picked up money from Robert Amatruda at this address, which Amatruda owed to Duprey in connection with drug Duprey previously provided to Amatruda, and that Duprey did this so he would have a sufficient amount of money to pay UM5856.  (Robert Amatruda is coconspirator to whom Duprey supplies redistribution quantities of heroin.  Amatruda is believed to operate the garage/business located at 345 Woodtick Rd. in Wolcott (Subject Premises 9) and to use this location to store drugs and drug proceeds.  The United Illuminating utility for structure at 345 Woodtick Road is listed in Robert Amatruda's name.)

444.   At approximately 7:01 p.m. Duprey received a text message from Telephone Number 374-754-5856 (UM5856) in Spanish (Session 1203). In translation, the message stated "Send me the address, buddy. So I can head over there, please".

445.   At approximately 7:02 p.m., in session 1204, Duprey sent an outbound text from Target Telephone 3 to UM5856 which read, "CVS west main st Waterbury ct".  There is, in fact, a CVS Pharmacy is located at 1279 West Main Street Waterbury, and it is believed that in session 1204 Duprey was instructing UM5856 that this location is where Duprey wanted to meet to give UM5856 the $30,000 in drug proceeds.

446.   At approximately 7:19 p.m., DUPREY was observed leaving Amatruda's garage on Woodtick Road (**Subject Premises 9**).   Surveillance units followed Duprey from this location back to Duprey's house, located 87 Seymour Street in Waterbury (**Subject Premises 3**).

447.   At approximately 7:36 p.m., Duprey arrived at his residence 87 Seymour Avenue Waterbury, Connecticut.

448.   At approximately 7:37 p.m., Telephone Number 347-754-5856 (UM5856) responds via text message stating "Ok. I'm on my way". (Session 1207).

449.   At approximately 9:44 p.m., in session 1253, Duprey spoke to UM5856.  During the call, which lasted approximately two minutes, UM5856 informed Duprey that he had arrived "at the CVS" and was operating a "Jeep" that was "black."  UM5856 also indicated that there was a "T-Mobile" store and a "wine" store there.  Duprey indicated he would be there in "two minutes."

450.   At approximately 9:46 p.m., surveillance units observed Duprey exit his residence, Subject Premises 3, and enter back into the Nissan Altima he had been operating earlier in the evening.  Surveillance units then followed Duprey from his residence, Subject premises 3, to the meet location at CVS on West Main Street in Waterbury.

451.   At approximately 9:49 p.m. Duprey was observed arriving at TD Bank across the street from CVS Pharmacy on West Main Street in Waterbury..

452.   At approximately 9:50 p.m., surveillance units observed a black Jeep Wrangler with aftermarket rims arrive at CVS Pharmacy. At this same time, surveillance units also observed DUPREY arrive at the CVS.

171

453.    At approximately, 9:52 p.m., in session 1257, Duprey spoke to UM5856, who informed Duprey again that he was in "a Wrangler" (Jeep) and that the vehicle had "North Carolina" plates.

454.    At approximately 9:54 p.m., Duprey was observed exiting his vehicle and reaching into the passenger side of his vehicle and retrieving a satchel from his vehicle. DUPREY was then observed meeting with UM5856 at the black Jeep Wrangler and conducting a hand-to-hand exchange in which Duprey is believed to have given UM5956 $30,000 in drug proceeds that was previously stored within his residence, Subject Premises 3.

455.    At approximately 9:55 p.m., the black Jeep Wrangler bearing North Carolina Registration HJR8238 departed from the parking lot.

456.    Duprey departed the area in his vehicle.

### March 28, 2022:  Cash Drugs Proceeds at Subject Premises 3 ($55,000)

457.    On March 28, 2022, Wanda Lora is believed to have taken $55,000 in cash drug proceeds stored within Subject Premises 3 and delivered them to Duprey at Discount Car Rental.

458.    The transaction is believed to have first been discussed a day earlier, on March 27, 2022.

459.    On March 27, 2022, at approximately 6:42 p.m., in session 1375 on Target Telephone 3, Jose DUPREY received a call from a Mexican telephone number, 52-7775390016, utilized by an unidentified male (UM0016).  During the course of this approximately seven- minute conversation, UM0016 asked DUPREY "How much are you going to give him?," believed to mean UM0016 wanted to know how much money Duprey was going to hand over to UM0016's money courier.  Duprey said, "there is 50," believed to mean Duprey had $50,000 to give to the courier.   The conversation continued with UM0016 saying "doesn't

172

it have the 5,5?" and later UM0016 said "I hope that it can be the 5,5," believed to mean UM0016 wanted $55,000 from Duprey.  UM0016 also said "I hope it's the 5,5 because they charge me the 5 so that they can give me the 50 here," believed to mean that UM0016 had to pay the money courier $5,000 to pick up the cash drug proceeds from Duprey, so UM0016 wanted $55,000 from Duprey.  During the lengthy call, which was explicit in many respects, it became clear the UM0016 was the individual directing kilograms of heroin to Duprey.  UM0016 indicated that he was going to send "whole ones . . . like the 15 that arrived . . . the normal ones . . . regulars" which Duprey confirmed was heroin, "It's of the brownish," to which UM0016 responded, 'Yeah.  Uh-huh."

460.   Investigators anticipated, based on session 1375, that a money pick-up would occur later in the evening on March 27,2022 or the following day.  But there were no subsequent calls between Duprey and UM0016 on March 27, 2022 or March 28, 2022.  Nor were there any intercepted calls between Duprey and any of the other individuals who are believed to money couriers for the organization and who have picked up cash drug proceeds from Duprey in this case (UM6861 and UM5856, for example).

461.   On March 28, 2022, however, in session 2238, intercepted at approximately 3:07 p.m. on Target Telephone 4, Duprey spoke to Wanda Lora.  The conversation lasted approximately three minutes and was cryptic and confusing.  In session 2238, Duprey appeared to indicate that someone had directed him to a location with which he was unfamiliar for a meeting at approximately 6:30.  Duprey then appeared to inform Lora that he needed to obtain drug proceeds that were stored within Subject Premises 3.  Lora asked, "What do mean?"  Duprey said, "To bring that I had [have] on [in] the house," believed to mean that Duprey informed Lora that he needed cash drug proceeds that were stored within Subject Premises

173

3 ("the house").  Lora said, "On what?  Duprey said, "[Sucks Teeth] In the house."  Lora asked, "At what house?"  Duprey responded, "[Chuckles] Yours."  Lora said, "My house at 6:30?," believed to mean that Lora inquired whether there would be an exchange at Subject Premises 3 at 6:30 p.m.  Duprey responded, "No, I don't.  I gotta find out where is that . . . I gotta find out what is in there. I don't know what I do in there," believed to mean Duprey needed to determine exactly how much cash drug proceeds were stored within Subject Premises 3.

462.    On March 28, 2022, at approximately 5:30 p.m., footage from the pole camera installed in the vicinity of 87 Seymour Street in Waterbury (**Subject Premises 3) shows** Wanda Lora exit from the front door of 87 Seymour Street, carrying a black bag, walk to and enter a black Mitsubishi Outlander, and depart the area in this vehicle.

463.    On this same date, at approximately 5:31 p.m., footage from the pole camera at Discount Car Rental (**Subject Premises 4**) showed a white Honda Accord bearing Connecticut license plate BD66309 arrive at Discount Car Rental.  Moments later, a male exited the white Honda and entered Discount Car Rental empty handed. This male was UM6861, the same male who had had conducted the suspected money pick up from Duprey at Discount Car Rental on March 7, 2022, using this same white Honda Accord.

464.    At approximately 5:42 p.m., the pole camera footage shows Lora's black Mitsubishi arrive at Discount Car Rental, exit the vehicle carrying the black bag she carried out of her house (**Subject Premises** 3), and entered Discount Car Rental.  Approximately two minutes later, Lora exited Discount Car Rental empty handed and entered her Mitsubishi.

465.    At approximately 5:46 p.m., UM6861 exited Discount Car Rental carrying a grey weighted plastic bag, entered his white Honda, and departed the area.

466.    Based on the foregoing, there is probable cause to believe that, on this occasion, Wanda
Lora took $55,000 in cash drug proceeds out of Subject Premises 3 and delivered the money
to Duprey, and that Duprey paid this money to UM6861, a money courier for Duprey's
Mexican drug supplier, UM0016.

**April 26, 2022:  Drugs Within Subject Premises 3**

467.    On April 26, 2022, in session 5811 on TT4, Michele Cruz, who was using telephone
number (347) 361-2697, spoke to Duprey, who was using Target Telephone 4.  Duprey
said, "So you gonna come out in a few or not?"  Cruz said, "Yeah, I'm gonna come out in
a few. Unless you want to bring it to me," believed to mean Cruz inquired whether Duprey
would deliver drugs to her. Duprey said, "Alright. I'll pass by there real quick. I gotta go
to the Elk's. But I'll pass by there real quick. Alright?," believed to mean Duprey agreed to
deliver drugs to Cruz.  Cruz later said, "Can I bring you the money later?," believed to
mean that Cruz wanted to pay Duprey for the drugs he would deliver at a later time. Duprey
said, "Yeah.  Or if you... You know um... I could leave it in [Stammers] here in [Stammers]
the place and I'll just put it in the mailbox," believed to mean Duprey agreed to leave the
drugs for Cruz in the mailbox at his residence at 87 Seymour Street.

468.    Subsequent intercepts and pole camera footage suggest that, following session 5811
intercepted on TT4, Duprey, rather than leaving the drugs in his mailbox, met with Cruz in
front of 87 Seymour Street and engaged in a hand-to-hand transaction at the passenger
window of Cruz's vehicle.

469.    More specifically, the pole camera footage depicts a car arriving on the street in front of
Subject Premises 3 at approximately 9:31 p.m., parking at the curb, and remaining running
with its lights on.  At approximately 9:33 p.m., the pole camera footage depicts a figure

exiting Subject Premises 3 and approaching the passenger side window of the running vehicle parked at the curb in front of Subject Premises 3. The footage also depicts the figure that had exited Subject Premises 3 remaining at the passenger side window of the running vehicle for a short period of time and then returning to Subject Premises 3 at approximately 9:34 p.m. The figure in the footage cannot be positively identified. But shortly after this interaction, in session 5845, intercepted at approximately 9:36 p.m., Duprey texted Cruz: "You got 5 in the long one and in the short bag you got 6," believed to mean that the figure depicted in the pole camera footage was, in fact, Duprey, and that he had distributed two separate packages of drugs to Cruz, one containing five grams and the other containing six grams, which he had stored within his residence prior to the transaction.

470.     Moments later, in session 5848 on TT4, intercepted at approximately 9:37, Duprey again spoke to Cruz. During this call, Duprey reiterated that he had distributed to Cruz two packages, one containing "five" which "is not cut," and one containing "six," that "is cut," believed to mean that Duprey distributed to Cruz one bag containing five grams of heroin that had not been mixed or "cut" with diluents and one bag containing six grams of heroin that had been cut with diluents, and would therefore likely be less expensive. Cruz asked, "the one that is six is gonna be how much," and Duprey informed Cruz, "like 240," believed to mean that Cruz owed Duprey $240 for the six grams of heroin that was diluted with cut that he distributed to her from within Subject Premises 3 on April 26, 2022. This intercept and the content and context of Cruz's previous intercepts with Duprey, including intercepts in which she has indicated the product Duprey provided to her was weak, indicate that she

obtains heroin from Duprey, and I believe the $240 price Duprey quoted Cruz in session 5848 was consistent with the per-gram price for heroin of diluted quality.

471.    Based upon the foregoing, there is probable cause to believe that on April 26, 2022, Duprey distribute heroin to Cruz that he had stored within Subject Premises 3 on this date.

### May 12, 2022:  Drugs Within Subject Premises 3

472.    On May 12, 2022, Duprey is believed to have distributed 50 grams of heroin stored within Subject Premises 3 to Victor Duran-Barrera.  He is also believed to have received a shipment of cocaine at **Subject Premises 3** on May 12, 2022, and to have delivered 300 grams of the cocaine to Jonathan Santiago that same day.  The transactions with Duran-Barrera and Santiago are addressed separately below.

### The Duran-Barrera 50 Gram Heroin Transaction on May 12, 2022

473.    At approximately 8:49 p.m. on May 12, 2022, in session 7463 over Target Telephone 4, Victor Duran-Barrera, using telephone number (475) 449-0830, spoke to Duprey.  During the call, Duran-Barrera, in sum and substance, indicated that he and "the old man" would be traveling to Subject Premises 3 in "about 40 minutes" because they wanted to be supplied with heroin.  Specifically, Duprey asked Duran-Barrera "how may tamales" Duran-Barrera and the old man need.  Duran-Barrera responded, "It seems bout 50 tamalitos," believed to mean 50 grams of heroin.  Duprey said, "Oh, 50 tamalitos . . . alright then, so come up then."  Duran-Barrera later said, "Okay, we're going over there right now," believed to mean that Duran-Barrera and a UM, "the old man" would be traveling to Subject Premises 3 to obtain 50 grams of heroin and would arrive in approximately 40 minutes or so.

474.     Approximately 10 minutes later, at approximately 8:59 p.m., footage from the pole camera in the vicinity of 87 Seymour Street in Waterbury (**Subject Premises 3)** depicted a figure exiting the residence at 87 Seymour and entering a small, dark colored SUV.  The SUV is believed to have been the black Mitsubishi, known to be operated by Duprey numerous times during this investigation.  Footage also revealed that the dark colored SUV departed from the area.

475.     At approximately 9:09 p.m., footage from the pole camera at **Subject Premises 5** (Duprey's stash location at 2030 Straits Turnpike) depicted what appeared to be the same small, black SUV arrive in the parking lot of 2030 Straits Turnpike at park.  The footage also depicted a male, who resembled Duprey, exit from the SUV and enter the building located at 2030 Straits Turnpike. (Footage from the pole camera at this location is of better quality that the footage from the pole camera at Subject Premises 3.)

476.     At approximately 9:26 p.m., the footage from this pole camera depicted the same male resembling Duprey exit from the building at 2030 Straits Turnpike, get back into the SUV, and depart from the area.

477.     Location information associated with Target Telephone 4, utilized by Duprey throughout this investigation, indicated that Duprey was at Subject Premises 3 and Subject Premises 5 consistent with the times set forth above.

478.     At approximately 9:30, p.m., footage from the pole camera in the vicinity of **Subject Premises 3** indicated that a light-colored sedan, which appeared to be similar to the vehicle Duran-Barrera was operating when he was stopped by authorities in possession of 220 grams of heroin on March 31, 2022, arrived at and parked in the street in front of **Subject Premises 3,** with its lights remaining on.

479.   At approximately 9:35 p.m., in session 7466 over TT4, Duran-Barrera spoke to Duprey and said, "We arrived already."  Duprey responded, "Okay, I'm on my way already," believed to mean that Duprey had retrieved a supply of heroin for Duran-Barrera at **Subject Premises 5** (the stash location) and was on his way back to **Subject Premises 3** (87 Seymour Street) to meet with Duran-Barrera and distribute the heroin to him.

480.   At approximately 9:37 p.m., pole camera footage shows that the lights on the light-colored sedan parked in the street in front of Subject Premises 3 went off.

481.   At approximately, 9:42 p.m., the pole camera footage revealed what appeared to be the same dark colored SUV observed earlier in the evening and believed to be the black Mitsubishi known to be operated by Duprey, arrive at and park in the driveway of Subject Premises 3.

482.   The quality of the footage from the pole camera at Subject Premises 3 is such that it is relatively hard to make out precise details in the dark evening hours.  But the footage shows that the occupants of both vehicles exited their respective vehicles, lingered for a short time, and at approximately 9:47 p.m., walked to the front door of Subject Premises 3, and entered.  The figures depicted in the footage could not be positively identified, but it is believed there were three figures—Duprey, Duran-Barrera, and the unknown male to whom Duran-Barrera referred as "the old man."

483.   At approximately 10:04 p.m. the footage from the pole camera shows what is believed to be two figures, Duran-Barrera, and the unknown male to whom Duran-Barrera referred as "the old man," exiting from the front door of Subject Premises 3, and shortly thereafter, the lights of the light-colored sedan parked in front of Subject Premises 3 turned on and the vehicle departed the area,

484.    It is believed the Duprey, on this occasion, supplied Duran-Barrera and "the old man" with 50 grams of heroin inside Subject Premises 3.

### The Santiago 300-Gram Cocaine Transaction on May 12, 2022

485.    In the early afternoon on May 12, 2022, Santiago and Duprey began making arrangements for a cocaine transaction, which, as described below is believed to have been consummated later that evening.

486.    On May 12, 2022, at approximately 1:05 p.m. in session 1439 over Target Telephone 3, Santiago, using telephone number (203) 592-5107, texted Duprey: "Ok ima come see u .. need more did u get urs yet ?," believed to mean that Duprey wanted to obtain drugs from Duprey and inquired whether Duprey had received a shipment of cocaine.

487.    In session 1444 at approximately 1:08 p.m. on TT3, Santiago texted Duprey: "Can u call goldo see if he got some good stuff," believed to mean that Santiago wanted Duprey to see if Duprey could obtain good quality cocaine from "goldo," who is an unknown male, who, based upon previous intercepts and the investigation in this case, is believed to supply cocaine to Duprey.

488.    In session 1445 on TT3, Duprey texted Santiago: "Yes how much," believed to mean that Duprey would obtain cocaine for Santiago and wanted to know how many grams of cocaine Santiago wanted.  In session 1447, Santiago texted Duprey: "like 300," believed to mean Santiago wanted 300 grams of cocaine.

489.    In several subsequent communications between Duprey and Santiago over Target Telephone 3 on May 12, 2022, the two discuss, in rather explicit language, the anticipated transaction.

490.   Duprey, in session 1453 on TT3 at 3:52 p.m., texted Santiago: "He going to call me caz he want like 30," believed to mean that Duprey's cocaine supplier wanted $30 per gram. Santiago, in session 1454, texted Duprey: "Damn he went up from 28 to 30 that's crazy, believed to be a reference to an increased per-gram price for cocaine to $30 per gram.

491.   At approximately 8:53 p.m. on May 12, 2022, in session 1474, Santiago spoke to Duprey. Duprey in sum and substance informed Santiago that he could obtain a bulk quantity of cocaine that was "the same thing" Duprey had previously provided to Santiago.  Santiago said, "I'm a need two . . . [m]y boy needs 100.  So 300," believed to mean Santiago wanted to be supplied with 300 grams of cocaine by Duprey.  Duprey later said, "it gonna be today," believed to mean the transaction would occur that evening.

492.   At approximately 10:02 p.m., footage from the pole camera in the vicinity of Subject Premises 3 showed a dark colored SUV arrive at and park in the street in front of Subject Premises 3 (behind Duran-Barrera's light-colored sedan, which was still parked in front of Subject Premises 3).  The lights of the dark colored sedan turned off, but no one was observed exiting the SUV.

493.   Immediately after the figure believed to be Duran-Barrera exited Subject Premises 3 at 10:04 p.m., a figure believed to be Duprey exited from the front door of Subject Premises 3 and walked toward the dark colored SUV parked behind Duran-Barrera's sedan and stood at the driver's side window of the dark SUV for approximately 10 minutes (after Duran-Barrera had departed from the area).  The figure believed to be Duprey can be observed in the pole camera footage returning to and entering the front door of Subject Premises 3 at approximately 10:16 p.m.  The operator of the dark colored SUV is believed to have been the male known only as "Goldo" (or a runner for Goldo) and is further believed to have

181

delivered a bulk quantity of cocaine to Duprey on this occasion, which Duprey secured within **Subject Premises 3**.

494.   In session 1479 on TT3, intercepted at 10:39 p.m., Duprey spoke to Santiago.  During the call, Santiago said, "And you sure it's the same thing . . . because there is shit, there is shot going around . . . that when you cook it, that shit taste like shit . . . whenever you cook the coke, whenever you cook that shit up, that taste like garbage," believed to mean Santiago had received a supply of cocaine that was of poor quality and could not be processed or "cooked" into cocaine base.  Santiago later said, "Alright, I'll be right there."

495.   At approximately 10:57 p.m.in session 1480 over Target Telephone 3, Duprey spoke to Santiago.  The two directed one another to the meet location. Santiago said, "you about to see me in two minutes. I'm right here at the light, next to Walmart.  Duprey said, "Next to Walmart, that where I'm at.  What you, what you driving?" Santiago said, "In the Benz." The two then agreed to pull into the "Gulf" station near "Walmart."  Duprey indicated he was in "Wanda's truck . . . the black one."

496.   It is believed that thereafter Duprey met with Santiago and supplied him with 300 grams of cocaine that Duprey brought with him from **Subject Premises 3**.  The meeting was confirmed by a subsequent intercept, session 1481 on TT3 intercepted at 11:40 p.m. in which Duprey informed Santiago that Santiago's money was "short 600 dollars" and that Santiago had paid "84," believed to be $8,400, which would be consistent with a price of $28 per gram (300 grams x $28 per grams = $84,000), prompting Santiago to say "He really went up on the price?  He went up to 30?," to which Duprey responded, "Yeah, he really went up on the 30," believed to mean the price per gram for the cocaine was $30.

497. There is probable cause to believe, and I do believe, that the items listed on Attachment A to the warrant for Subject Premises 3, including drug proceeds, drug records, residue of controlled substances, Target Telephone 3, Target Telephone 4, and the cellular telephone assigned telephone number (203) 709-8326, utilized by Lora, all of which are evidence of the target offenses, will be found located within Subject Premises 3.

### Additional Information Pertaining to Subject Premises 4 ("SP4")

498. **Subject Premises 4** is Discount Car Rental, located at 767 Wolcott Street in Waterbury. A search warrant for this location is not being sought, for the reasons articulated elsewhere in this affidavit.

### Additional Information Pertaining to Subject Premises 5 ("SP5")

499. **Subject Premises 5** ("**SP 5**") is located at 2030 Straits Turnpike, Suite 3 in Middlebury, Connecticut. There is probable cause to believe, and I do believe, that this premises is the principal location at which Jose Duprey stores bulk quantities of drugs, including heroin and cocaine.

500. Subject Premises 5 is more particularly described as Suite 3, one of several small business suites inside in a small business park structure located at 2030 Straits Turnpike in Middlebury, Connecticut. The door to Suite 3 is clearly marked with a sign that reads "Suite 3." The sign also reads "Skintique," "All About Tranquility Massage Therapy," "Blooming Eyes by Laura," and "by appointments only 203-802-2948." The business park structure is circular in shape and white and blue in color, with a large sign on its front lawn which clearly displays the number "2030."

501.    The telephone number displayed on the door to Suite 3, (203) 802-2948, is a cellular telephone number associated with Wanda Lora, a.k.a. Wanda Lopez, Duprey's paramour. It is the contact number listed for the Eversource electric utility service account for the residence at 87 Seymour Street in Waterbury (Subject Premises 3), where Lora and Duprey reside.  And Lora has been intercepted using telephone number (203) 802-2948 to contact Duprey during the wiretap phase of this investigation.

502.    The salon, Subject Premises 5, is not believed to be currently in operation.  Its website was last updated with posts in 2020.  Lora is believed to work at a medical facility in Middlebury, and she has been observed very few times at this location on pole camera footage during this investigation.  Duprey, conversely, comes and goes from this location frequently, as described more fully below, for the suspected purpose of retrieving redistribution quantities of drugs from the bulk supply of drugs believed to be secreted within Subject Premises 5.

503.    The pole camera that has provided footage for Subject Premises 5 was installed on or about January 19, 2022, in the vicinity of 2030 Straits Turnpike, Middlebury, Connecticut, which is located on the corner of Straits Turnpike and Turnpike Drive.

504.    My belief that Duprey secretes bulk quantities of drugs in Subject Premises 5 is based in part on my training, experience, and knowledge gained through this investigation, including knowledge gained through the debriefing of one or more cooperating sources, and numerous, explicit wiretap intercepts over Target Telephone 3 and Target Telephone 4, at times in conjunction with coordinated surveillance and/or pole camera footage and location information associated with Target Telephone 3 and Target Telephone 4, all of which support this belief.

184

505.   My belief about the purpose for which Duprey uses Subject Premises 5 is also based, in part, on a February 23, 2022 trash pull conducted at Subject Premises 5 moments after Duprey was observed on pole camera footage depositing a bag in a particular trash receptacle at Subject Premises 5.  The trash pull yielded kilogram wrappers with white residue, which field tested positive for the presumptive presence of cocaine.

506.   In or about October of 2021, CS5 provided information about Jose Duprey to law enforcement.  More specifically, CS5 indicated that Duprey is involved in the distribution of kilograms quantities of drugs, works with a partner known only as "Spanky" and "Baba" (later determined to be Robert AMATRUDA, a.k.a. "Bubba"), and secretes drugs and drug proceeds at an eyelash salon in Middlebury, Connecticut operated by his girlfriend, Wanda Lopez.  Investigators later identified Subject Premises 5, a salon located at 2030 Straits Turnpike, Suite 3, in Middlebury, Connecticut.

507.   CS5's information has been, in large part, borne out by the investigation conducted in this case.

508.   Numerous explicit intercepts, at times coupled with surveillance and/or pole camera footage, have indicated that Duprey travels to Subject Premises 5 to obtain redistribution quantities of drugs that are secreted at Subject Premises 5.  A sampling of some of the surveillances involving Duprey at Subject Premises 5, spanning from February of 2022 through May of 2022, is set forth below.

**February 11, 2022:  Jose Duprey Retrieves Drugs from SP5**

509.    On February 11, 2022, it is believed that Jose Duprey traveled from Discount Car Rental to Subject Premises 5 to retrieve drugs for the purpose of supplying drugs to Jonathan Santiago, one of his redistributors.  Details of the event are set forth below.

510.    On February 11, 2022, at approximately 5:53 P.M., the pole camera located at Discount Car Rental (Subject Premises 4) located at 767 Wolcott Street in Waterbury, revealed that Jose DUPREY was closing Discount Car Rental for the evening and shutting off the lights.

511.    At approximately 5:55 P.M., footage from this pole camera at SP4 revealed a black SUV with a roof rack depart from the backside of the Discount Car Rental building and then exit the parking lot of 767 Wolcott Street.  It was believed that the vehicle was being operated by DUPREY, given the short amount of time between the lights at the business being shut off and the black SUV departing from the back of the business, but Duprey himself was not observed at this time.

512.    At approximately 6:08 P.M., footage from another pole camera, the pole camera located at **Subject Premises 5**, 2030 Straits Turnpike in Middlebury, depicted the same black SUV that had departed moments earlier from the Discount Car Rental parking lot arriving in the parking lot at Subject Premises 5.  Footage from the pole camera at Subject Premises 5 at this time depicted DUPREY exiting the vehicle empty handed and walking into the office park building located at 2030 Straits Turnpike.

513.    At approximately 6:10 P.M., footage showed DUPREY exiting the building carrying what appeared to be multiple bags, which appeared to be heavy, based on the manner in which DUPREY was carrying them.  DUPREY walked directly to the SUV in which he had arrived moments earlier, opened the hatchback, and placed all of the bags into the vehicle.

186

514.   At approximately 6:11 P.M., DUPREY entered the vehicle and exited the parking lot of 2030 Straits Turnpike.

515.   At approximately 6:42 P.M., DUPREY, utilizing TT3, made an outgoing call (Session 29) to Jonathan SANTIAGO, one of the distributors to whom Duprey has distributed drugs during this investigation. Santiago was using telephone number (475) 559-9691. In sum and substance, DUPREY and SANTIAGO made arrangements to meet and DUPREY said, "I'll let you know when I get there, so like that you... you pull up," and SANTIAGO replied, "Alright," by which it is believed Santiago agreed to be ready for Duprey's arrival at an agreed upon location, where the two would consummate a drug transaction, with Duprey distributing to Santiago the drugs Duprey had moments earlier retrieved from inside **Subject Premises 5**.

516.   At approximately 7:20 P.M., DUPREY, utilizing TT3, made a second outgoing call (Session 30) to SANTIAGO. In sum and substance, DUPREY informed SANTIAGO that he had arrived at the designated meet location.  Santiago informed Duprey that he was "about to leave right now then," indicating that Santiago had not even begun traveling to the meet location.  Duprey said, "Oh. Alright. Alright. Alright . . . Let me put this.  Alright," which I believe meant that Duprey, given Santiago's tardiness, was going to put the drugs ("put this") he was planning to distribute to Santiago in a safer location within his vehicle while he waited for Santiago for arrive.

517.   I further believe that at some point thereafter on February 11, 2022, Duprey met with Santiago and distributed to Santiago the drugs Duprey had earlier retrieved from inside **Subject Premises 5**.

**February 23, 2022:  Kilogram Wrappers Pulled from the Trash Outside SP5**

518.    On or about February 23, 2022, footage from the pole camera in the vicinity of **Subject Premises 5** depicted Jose Duprey exiting the circular office park building located at 2030 Straits Turnpike, depositing a plastic bag in a particular trash receptacle at this location, and departing the area.   Moments later, law enforcement responded to the area and recovered packaging consistent with kilogram packaging in the trash receptacle.   The packaging contained a white residue consistent with the appearance of cocaine.   The residue was field tested and yielded a positive result for the presumptive presence of cocaine.  Details of the incident are set forth below.

519.    On February 23, 2022 at approximately 11:15 A.M., case agents were conducting surveillance at multiple locations utilized by Jose DUPREY in and around Waterbury.  At or about this time, on footage from the pole camera positioned at 2030 Straits Turnpike, Jose DUPREY was observed arriving at 2030 Straits Turnpike operating a gold 2001 Ford Focus station wagon bearing Connecticut Registration BD24431. The vehicle is registered to Discount Car Rental, which is where DUPREY is employed.

520.    DUPREY was also observed in the footage exiting the vehicle.   He was wearing dark colored pants, a white and black jacket, baseball hat, and carrying a satchel bag slung across his shoulder. DUPREY then entered the front door of the business park building located at 2030 Straits Turnpike.

521.    At approximately 11:27 A.M., DUPREY was observed on the pole camera footage exiting the front door of the business structure at 2030 Straits Turnpike carrying a small white

plastic bag. DUPREY was observed walking towards the rear of the parking lot in the direction of five metal trash cans.

522.     DUPREY was also observed on the pole camera footage discarding the white plastic bag into one of the metal trash cans.  As DUPREY discarded the bag, he was observed manipulating and pushing the bag into one of the trash cans and then securing the lid of this trash can with a bungee cord. DUPREY then walked back to his vehicle and departed the area.

523.     Shortly after DUPREY left the parking lot at 2030 Straits Turnpike, one or more surveillance team members were directed to this location and arrived at approximately 11:44 A.M.  A surveillance team member was directed by the agent monitoring the pole camera at this address to the particular trash can into which Duprey had deposited the white plastic bag.

524.     The surveillance team member removed all the trash (five bags) from the particular trash can into which Duprey had deposited the white plastic bag, secured the trash bags in the rear of his vehicle and relocated to another area to examine the trash.

525.     The first garbage bag, the one that was located at the top of the trash can into which Duprey had deposited the small white bag, was a large white kitchen-style plastic garbage bag that contained a smaller white plastic bag. The smaller white plastic bag resembled the size of the white plastic bag that DUPREY was observed on the pole camera carrying and placing in the metal trash can.

526.     The smaller white plastic bag contained numerous plastic cellophane wrappings along with vacuum sealed bags. These vacuum sealed bags were consistent with the size and shape that a kilogram of narcotics would be packaged in.   One of the vacuum sealed bags

189

contained cellophane that was covered in a dark oily substance with a purple/bluish tint which was wrapped with black electrical tape. Inside the cellophane packaging were remnants of a white powdery residue, which based on my training and experience was consistent with the appearance of cocaine.  The smaller white bag also contained numerous black carbon papers and cardboard packaging.

527.   The other trash bags, those located below the trash bag that was at the top of the trash can into which Duprey has been observed depositing the small white plastic bag did not contain any narcotics, drug paraphernalia, or evidence commonly associated with the packaging and distribution of narcotics.

528.   The suspected drug packaging material was processed as evidence and photographed.  A representative sampling of the white powdery residue found on the suspect kilogram wrappers was field tested and yielded a positive result for the presumptive presence of cocaine.

529.   Color photographs of the items seized are set forth below.  They are believed to depict wrappings for kilograms of drugs, which are, in part, blue or purple and black in color.

530. 



531.

532.    The color of the packing that was seized on February 23, 2023—the black portion and the portion that was blue or purple—was of significance in the investigation, because in previous intercepted communications, Duprey and or his conspirators have referenced these colors in conversation that are believed to have pertained to drugs.

533.    For example, on February 15, 2022, in session 123 on Target Telephone 3, Duprey called UM8432, who was using telephone number (203) 594-8432.   The intercept was approximately five minutes and twenty-two seconds in length.  During the call, in pertinent part, Duprey said, "Yes, but as much as he says 'No that that one is like the purple one,'

no the purple one you break it and it would turn, your heard?," believed to mean that Duprey informed UM8432 that the drugs contained in purple packaging were of good quality, as revealed by the fact that it was cocaine in its original chunk form, pieces of which could be broken off ("the purple one you could break it").  UM8432 said, "Yes," believed to mean he agreed with Duprey's assessment of the quality of the drugs. Duprey later said, "Uh-huh, the purple one, even the last black one that he brought . . . No its was like purple clear like this, no like this, no I don't know but he is the one that have it that motherfucker said half and half of compress back home that motherfucker kill it no but when I gave it to him that shit was the shit I gave him the purple one . . . .," believed to mean that Duprey had given another redistributor the cocaine that came in the purple wrapping and was of good quality ("when I gave it to him that shit was the shit . . . the purple one"), but that the  redistributor had cut the cocaine heavily ("half and half of compress") and "kill[ed]" its quality.

534.    There have also been numerous, other intercepted communications in which Duprey and/or his coconspirators referenced the color blue in contexts that appeared to pertain to the color of the packaging of drugs.  One good example occurred on April 2, 2022, in session 607.  Duprey spoke to Jose Ramos said, "And, yo, um, the bluish? the kid called me this morning for the blue. The one that didn't want it. The new one. [Voices Overlap]," believed to be a reference to cocaine wrapped in blue packaging. Duprey said, "The one who didn't want it? . . . Now he wants it."  Ramos said, "Well, he did grabbed the last 100, don't you remember? . . . He wants more.  He just called me and said.  He called me this morning at 2:00 in the morning. I've got him waiting," believed to mean that one of Ramos' cocaine customers purchase 100 grams of cocaine from Ramos and initially did not want

more of the cocaine wrapped in blue packaging, but subsequently changed his mind and ordered more and was "waiting" on Ramos to supply more cocaine.

535.   Based on the above intercepted calls, my training and experience, and knowledge gained from this investigation, I believe DUPREY and UM8432 and DUPREY and RAMOS were talking about kilograms of cocaine with black and purple or black and blue packaging, consistent with the items seized from 2030 Straits Turnpike on February 23, 2022.

### March 15, 2022:  Duprey's Daughter Retrieves Drugs from SP5

536.   On March 15, 2022, in a series of communications intercepted over Target Telephone 4, including sessions 522, 559, 586, 604, 608, 611, Duprey spoke with Robert Amatruda.  In the conversations that spanned these session, Duprey made arrangements to do two things: 1) get a part for a car that Duprey wanted repaired, and 2) pick up drugs, believed to be heroin and/or cocaine, from **Subject Premises 5** for Amatruda, who had a customer that was waiting on the drugs.  Ultimately, Duprey arranged for his daughter, Edmelyn Duprey, to pick up the drugs from **Subject Premises 5** and deliver it to Duprey at Discount Car Rental, and for his paramour, Wanda Lora, to pick up the part needed to repair the car. Excerpts from the above-referenced sessions are set forth below.

537.   On March 15, 2022, in session 522 at approximately 9:16 A.M., over Target Telephone 4, Duprey received a call from Amatruda, who was using telephone number (203) 850-9625. During the call, Amatruda said, "When you wanna meet over there by 10:30, 10:40?," believed, based in part on subsequent intercepts, to be an inquiry by Amatruda regarding when Duprey wanted to meet at Discount Car Rental to replace a part on a car there. Duprey said, "Yeah. Something like that . . . ."  Amatruda said, "Okay, I'll meet you over

194

there. I'll call you when I'm leaving here so.  I'll be right there. I'll be over there like 10:40."
Duprey responded, "Yeah, what I do is I'll drive to the shop. You call me, I'll be over there,"
believed to mean that Duprey confirmed he would meet Amatruda at Discount Car Rental.
Amatruda responded, "Okay um, don't forget to do that thing, too," believed, based in part
on other intercepts, including those set forth below, that Amatruda wanted Duprey to pick
up drugs from Subject Premises 5 for Amatruda, because Amatruda had a customer who
wanted to be supplied with drugs later that day.  Duprey responded, "Alright."

538.    On March 15, 2022, in session 559 at approximately 12:55 P.M. over Target Telephone 4,
Amatruda called Duprey again.  During the initial portion of the call, the two discussed a
small auto part (determined to be a sensor in a subsequent intercept).  The conversation
then turned to Amatruda's desire to get drugs from Duprey for his (Amatruda's) customer.
Duprey said "I'm at work."  Amatruda replied, "Yeah, but you got that thing on you, too,
right," believed to mean that Amatruda wanted to confirm that Duprey had retrieved from
within **Subject Premises 5** the drugs Amatruda earlier requested.  Duprey said, "Nah, I'll
go get it but you just [Voices Overlap]."  Amatruda said, "Fuck. Go get it, because I told
the guy about 4:30 he'll, I'll have it [Voices Overlap]," believed to mean that Amatruda
wanted Duprey to pick up drugs from Subject Premises 5 soon ("Fuck.  Go get it."),
because Amatruda had informed his customer ("the guy")  that Amatruda would have the
drugs by "4:30."  Duprey said, "Yeah, yeah, yeah."

539.    On March 15, 202, in session 586 at approximately 3:34 P.M. over Target Telephone 4,
Duprey called Amatruda.  During the initial part of the call, the parties discussed the fact
that Duprey was going to send his daughter pick up the auto part he needed because the
store that had the part in stock was going to charge a delivery fee to deliver it.  The

conversation then turned criminal in nature, and Amatruda said, "Did you go do that for me?," believed to mean that Amatruda inquired whether Duprey had picked up drugs from **Subject Premises 5** for Amatruda. Duprey said, "Nah, I gotta do it . . . ." Amatruda said, "Go it! . . . Oh, my god. You son of a gun . . . You was suppose to do that this morning, motherfucker. He's gonna be here in half hour. Duprey later explained, it is believed, that the car he was going to drive to Subject Premises 5 was not running properly, it was running to slow. Duprey said, "I know. But you know what happened? That the car was like staying in that, in that thing. No? . . . And I said, 'Damn, I don't wanna go over there and then the fucking police be like, 'Damn, why you running too, too slow?' You know? . . . You know how it is this motherfucker. If you run to fast they stop you. If you run to slow, they stop you. [Chuckles]," believed to meant Duprey was concerned that he would be stopped by police for police driving to slow, because the car he was going to drive to Subject Premises 5 to pick up drugs for Amatruda was not running properly. Near the end of the conversation, Duprey said, "So my daughter said that she gonna pick that up. I'm gonna see if she could come by over here and bring me that at the same time," believed to mean that Duprey explained that he was going to have his daughter pick up an auto part for him (which he indicated elsewhere was a sensor) and that Duprey informed Amatruda that he was going to ask his daughter to pick up drugs from Subject Premises 5 and bring it to Duprey at Discount Car Rental ("I'm gonna see if she could come by over here and bring me that at the same time"). Amatruda later said, "I'm coming there right now. I'll be right there. Bye," believed to mean Amatruda was on his way to Discount Car Rental. Duprey said, "Alright, I'll see you over here."

196

540.    On March 15, 2022, in session 604 at approximately 5:19 P.M. over Target telephone 4 Amatruda called Duprey.  During the conversation, Duprey said, "Yeah, I'm sending my daughter now," believed to mean Duprey was sending his daughter to pick up drugs at Subject Premises 5.  Amatruda said, "Oh, yeah! Because the guy just called me. So that means he's driving. Fucking, he's probably getting close," believed to mean that Amatruda's drug customer was on his way and was close. Duprey said, "Alright, so just uh. I'm sending my daughter right now." Amatruda said, "Okay. Uh, fucking, and did she get your sensor?," believed to mean Amatruda inquired whether Duprey's daughter had already picked up the auto part the two needed, the "sensor." Duprey responded, "Yeah, my girl getting the sensor," believed to mean that Duprey's paramour, Wanda Lora, instead of Duprey's daughter, was going to pick up the auto part. Amatruda said, "Okay."

541.    At approximately 5:45 P.M., footage from the pole camera at Subject Premises 5 depicted a black Lexus SUV bearing Connecticut registration BF19094 arrive at 2030 Straits Turnpike in Middlebury.  The footage also depicted Edmelyn DUPREY exit the vehicle and enter the building at 2030 Straits Turnpike.  (The black Lexus bearing Connecticut registration BF19094 is currently registered to Jose DUPREY of 87 Seymour Street in Waterbury, CT.)

542.    At approximately 5:55 P.M., footage from the pole camera at Subject Premises 5 depicted Edmelyn Duprey exit the building, get back into the aforementioned Lexus and leave the area.

543.    On March 15, 2022, in session 608, at approximately 6:10 P.M., over Target Telephone 4, Duprey made an outgoing call to Amatruda.  During the call, Duprey told Amatruda, "My daughter is about to come, on her way," believed to mean that Duprey informed

197

Amatruda that his daughter would soon be arriving at Discount Car Rental with a supply of drugs for Amatruda's customer, which she had retrieved from within **Subject Premises 5**.

544.   At approximately 6:15 P.M., mobile surveillance in the area of Discount Car Rental, located at 767 Wolcott Street in Waterbury, observed the above-referenced back Lexus that had moments earlier been observed at Subject Premises 5, arrive at Discount Car Rental. Edmelyn Duprey was observed exiting the vehicle and entering the business.  (The pole camera at Discount Car Rental appears to have lost service and/or was not functioning and recording properly at this time.)

545.   On March 15, 2022, in session 611, at approximately 6:37 P.M. over Target Telephone 4, Duprey spoke to Amatruda.  Toward the end of the conversation, Duprey said, "Yo, so where your boy at?," believed to mean Duprey inquired as to the whereabouts of Amatruda's drug customer.  Amatruda said, "He's... [Mumbles], I got the money. I'll [U/I] for you asshole. He fucking, I don't know. I'm probably gonna be fucking stuck. Let me call 'em. Because, you know what, I ain't even call him back. Bro', he probably think I'm fucking," believed to mean that Amatruda had not yet communicated with his drug customer to consummate the transaction, but already had in hand money for the drugs that Duprey was going to supply to Amatruda for Amatruda's customer.  Duprey said, "No! My daughter came here like 20 minutes ago," believed to mean that Duprey informed Amatruda that his daughter had retrieved the drugs from within **Subject Premises 5** and delivered the drugs to Duprey at Discount Car Rental.  Amtruda later said, " . . . . Yeah, well hurry up. Come on over."  Duprey said, "Alright," which is believed to have meant that Duprey would bring the drugs to Amatruda.

198

546.    At approximately 6:45 P.M., mobile surveillance followed DUPREY as he left Discount Car Rental and traveled directly to **Subject Premises 9**, the service station where Amatruda works, located at 345 Woodtick Road in Wolcott.

547.    At approximately 7:03 P.M. footage from the pole camera installed in the vicinity of **Subject Premises 9**, the service station located at 345 Woodtick Road in Wolcott, depicted Duprey arrive at Subject Premises 9, exit his vehicle (a Mercedes, bearing Connecticut registration AV91168) with a satchel slung across his chest, and walk towards the front door of the service station (which was situated out of view of the pole camera), at which time I believe Duprey entered the service station and delivered to Amatruda the drugs that Duprey's daughter had retrieved from within **Subject Premises 5** earlier that evening. Also parked in front of the service station on Woodtick Road at this time was a tan Chevrolet Tahoe bearing Connecticut registration AV89771, which is currently registered to Robert AMATRUDA and which Amatruda has been observed operating during this investigation.

### April 13, 2022:  Robert AMATRUDA and Jose DUPREY Retrieve Drugs from SP5

548.    On April 13, 2022, Jose DUPREY and Robert AMATRUDA traveled together in Amatruda's tan Chevrolet Tahoe to **Subject Premises 5** and retrieved heroin and/or cocaine from within Subject Premises 5.  This was evidenced by explicit intercepts, pole camera footage from Discount Car Rental and **Subject Premises 5**, and location information associated with Target Telephone 4.  Details of this event are set forth below.

549.    On April 13, 2022 at approximately 6:20 P.M., Jose DUPREY, utilizing phone number 347-456-8272, which is Target Telephone 4 (TT4), received two incoming text messages

from Robert AMATRUDA, who was utilizing telephone number 203-850-9625. The text messages are as follows:  In Session 4470, Amatruda texted: "Wya," believed to be an abbreviation for "Where You At," and to have been an inquiry by Amatruda as to Duprey's location.  In session 4471, Amatruda texted: "I want that part asap," believed to mean that Amatruda wanted to obtain drugs from Duprey, based upon subsequent intercepts, pole camera footage, and location information from TT4 on April 13, 2022, as well as numerous other communications on other dates between Duprey and Amatruda evidencing their involvement in drug trafficking,

550.   On the same date, at approximately 7:53 P.M, DUPREY utilizing TT4, engages in a text message conversation with Robert AMATRUDA. The text message conversation was as follows:  In session 4485 AMATRUDA texted: "Yo."   In Session 4487 Duprey texted: "On my way." In session 4490, Amatruda texted: "K."  In session 4492 Amatruda texted: "I'm here," believed to mean that Amatruda had arrived at Discount Car Rental (Subject Premises 4).

551.   Live pole camera footage of Discount Car Rental, located at 767 Wolcott Street, Waterbury, CT, is believed to have confirmed Amatruda's arrival at Discount Car Rental, consistent with the foregoing text message exchange.  The footage depicted a tan Chevrolet Tahoe, consistent with the tan, Chevrolet Tahoe known to be utilized by Amatruda during this investigation, and which is registered to Amatruda, arriving at Discount Car Rental at this time and pulling around the back of the business out of view of the pole camera. Amatruda himself was not observed on the pole camera at this time.

552.   On the same date at approximately 8:25 P.M. in session 4493 over TT4, Duprey spoke to Amatruda.  During the conversation, Duprey indicated that he was delayed because of

traffic, saying he was "fucking stuck behind these trucks."  Amatruda later asked, "You gotta go get it still?  Or you got it?," believed to mean Amatruda inquired whether Duprey had already retrieved drugs for Amatruda from within Subject Premises 5.  Duprey indicated that he had not yet retrieved the drugs and later said, "[d]on't leave, bro . . . because I gotta go pick up the car either way right there" believed to mean that Duprey wanted Amatruda to wait for him at Discount Car Rental.  (Based upon other intercepts on this date, Duprey is believed to have been traveling with Wanda Lora at this time, and as explained below, she is believed to have dropped Duprey off at Discount Car Rental moments later.)  Amatruda said, "Oh, okay. So, I'll wait for you. Alright. Bye," believed to mean that Amatruda intended to wait for Wanda Lora to drop Duprey off at Discount Car Rental.

553.    On the same date at approximately 8:50 P.M., in session 4498 over TT4, Duprey again spoke to Amatruda.  During the conversation, Amatruda said, "How far you get?," and informed Duprey that he was at the "shop," believed to mean that Amatruda was still waiting for Duprey at Discount Car Rental.  Duprey later said, "wait for me in the shop, so I could go with you over there real quick . . . We'll go over there real quick," believed to mean that Duprey wanted Amatruda to wait for him at Discount Car Rental so the two men could travel together to **Subject Premises 5** ("We'll go over there real quick"), where Duprey would retrieve a supply of drugs for Amatruda.  Amatruda later said, "Okay. Bye," believed to mean that Amatruda understood and agreed to Duprey's proposed plan.

554.    On the same date at approximately 8:54 P.M., the pole camera at Discount Car Rental depicted a black Mitsubishi Outlander pull into the parking lot of the Discount Car Rental and drive around the back of the building out of view.  It is believed, based upon this

footage and other intercepts on this date, that at this time, Wanda Lora dropped of Jose Duprey at Discount Car Rental so Duprey could travel with Amatruda to Subject Premises 5 to retrieve a supply of drugs secreted at Subject Premises 5.  To further corroborate DUPREY's location at this time on this date, location information associated with Duprey's cellphone, TT4, indicated that Duprey was in the area of Discount Car Rental at this time on this date.

555.   At approximately 8:56 P.M., the black Mitsubishi Outlander was observed exiting the parking lot of the Discount Car Rental and departing the area.  It is believed, as explained above, that the Mitsubishi was at this time being operated by Wanda Lora, who had dropped Duprey off at Discount Car Rental so he could travel with Amatruda to Subject Premises 5.

556.   Almost immediately thereafter, the tan Chevrolet Tahoe was also observed exiting the parking lot of Discount Car Rental and departing the area.  Based on the above documented intercepts, and other information learned through the course of this investigation, I believe that Amatruda was operating the tan, Chevrolet Tahoe, that Duprey was a passenger in the vehicle, and that the two were headed to Subject Premises 5 to retrieve a supply of drugs for Amatruda.

557.   Roughly 12 minutes later, at approximately 9:08 P.M., footage from the pole camera in the vicinity of **Subject Premises 5** depicted the tan Chevrolet Tahoe arrive at 2030 Straits Turnpike and park in the parking lot at this location. The footage also depicted a male, appearing to have the features of DUPREY, exit the passenger side of the Tahoe, and a male, appearing to have the features of AMATRUDA, exit the driver side of the Tahoe. Both males can be seen on the footage entering the building at 2030 Straits Turnpike.

202

558.   At approximately 9:31 P.M, the footage from the pole camera in the vicinity of Subject Premises 5 depicts what appears to be the same two males exiting the building at 2030 Straits Turnpike and re-entering the Chevrolet Tahoe.  In addition, the location information associated with Duprey's TT4 indicates that TT4 was in the area of 2030 Straits Turnpike, Middlebury, CT on this date and at this time.

559.   At approximately 9:32 P.M, the pole camera footage depicts the tan Chevrolet Tahoe exit the parking lot at 2030 Straits Turnpike.

560.   Thereafter, at approximately 9: 49 P.M., footage from the pole camera at Discount Car Rental depicted what appeared to be the same tan, Chevrolet Tahoe arriving at Discount Car Rental and pull behind the building out of view of the camera.

561.   At approximately 10:02 P.M., the pole camera at Discount Car Rental, which benefits from better lighting than the pole camera at Subject Premises 5, depicted DUPREY and AMATRUDA exit Discount Car Rental through the front door of the building.  The pings from DUPREY's cellphone, TT-4, also indicated that Duprey was at this location on this date and at this time.

562.   Based upon the foregoing, I believe that on this date, Duprey and Amatruda traveled together to Subject Premises 5 and that Duprey obtained a supply of drugs for Amatruda from within Subject Premises 5.

### May 12, 2022:  DUPREY Retrieved Heroin from within SP5 for DURAN-BARRERA

563.   On May 12, 2022, there is probable cause to believe, and I do believe, that Jose DUPREY retrieved a supply of heroin from within **Subject Premises 5** for Victor DURAN-BARRERA.   After receiving a call from Victor DURAN-BARRERA indicating that

DURAN-BARRERA wanted to be supplied with "50 tomalitos," believed to be 50 grams of heroin, a male believed to be DUPREY was observed on the pole camera at Subject Premises 3 (his residence) departing in a vehicle from Subject Premises 3. A short time later, a male believed to be Duprey was observed on the pole camera at Subject Premises 5 (Duprey's stash location) arriving at, entering, then later exiting Subject Premises 5, where he is believed to have obtained a supply of heroin to distribute to Duran-Barrera later that evening. Minutes later, a figure believed to be Duprey was observed on the pole camera at Subject Premises 3 returning to Subject Premises 3 and meeting with a male believed to be Duran-Barrera and one of Duran-Barrera's associates, known only as "the Old Man."

564. Details of this suspected transaction, including specific times and excerpts from corresponding intercepted communications, are set forth in a previous subsection of this affidavit captioned "Additional Information Pertaining to Subject Premises 3."

565. The examples set forth above of Duprey's use of Subject Premises 5 establish probable cause to believe that he has used Subject Premises 5 as a stash location to secrete drugs during February, March, April, and May of 2022.

566. In addition to the examples from February, March, April, and May of 2022 detailed above, showing Duprey's pattern of use of Subject Premises 5 as a stash location for drugs, your affiant also queried the location data for Target Telephone 4 during these months.

567. The query revealed that there were 19 instances from February 15, 2022, through May 11, 2022, when location data associated with Target Telephone 4 indicated Duprey was at Subject Premises 5 between approximately the hours of 10:30 a.m. and 12:30 p.m. Moreover, an examination of the intercepts on these dates indicated that on 16 of these 19

204

occasions, Duprey participated in communications that were believed to indicate he would be distributing drugs on these dates, which your affiant believes supports the inference that Duprey traveled to Subject Premises 5 in the morning on these days to obtain a supply of drugs for the day's distribution activities.  Finally, the above-refenced 19 instances is likely an exceedingly conservative indication of how many times Duprey was actually at Subject Premises 5 during this time period, because it only represents occasions when Duprey *initiated or received* a communications on Target Telephone 4 while in the vicinity of Subject Premises 5.  In other words, if Duprey did not initiate or receive a call (or text) while in the vicinity of Subject Premises 5, Target Telephone 4's presence (i.e., Duprey's presence) at Subject Premises 5 on such occasions could not be, and was not, captured by my query of the location data.

568.   Based upon the foregoing, there is probable cause to believe, and I do believe, that Subject Premises 5 is the principal location at which Jose Duprey stores bulk quantities of drugs, including heroin and cocaine, and that quantities of these drugs, and residue of these drugs, as well as other items listed on Attachment A for Subject Premises 5 will be found within this Subject Premises.

**Additional Information Pertaining to Subject Premises 6 ("SP6")**

569.   Subject Premises 6 ("SP6"), 163 Fanning Street, Waterbury, CT, is believed to be the residence of Jose RAMOS and the location at which there is probable cause to believe drug proceeds and drug records, as well as other evidence of the offenses set forth in this affidavit and listed on Attachment A for this Subject Premises are located.

570.   SP6 is more particularly described as a single-family residence that is white in color and has black shutters.  The residence has the number "163" clearly displayed on the residence to the right of the front door.

571.   Based on information developed during the investigation, RAMOS has been identified as redistributor who is supplied with bulk quantities of drugs, including cocaine, from DUPREY.

572.   RAMOS has participated in numerous intercepted communications during this investigation, which, in your affiant's judgment, plainly pertained to narcotics trafficking. Many of these communication have been set forth in other sections of this affidavit.  Some such communications, for the Court's ease of reference, are also set forth below.

573.   RAMOS, as evidenced by numerous, explicit communications intercepted with Jose Duprey during the wiretap phase of this investigation, re-distributes large quantities of drugs, including cocaine, on a regular basis.  The drug transactions in which RAMOS has so frequently engaged are believed to have generated substantial cash proceeds, and this, too, has been evidenced by explicit intercepts.

574.   RAMOS is the user of telephone (516) 669-4881.  Telephone number (516) 669-4881 is currently subscribed to Jose RAMOS of 541 Piedmont Street, Waterbury, CT.  Your affiant submitted an administrative subpoena to Eversource requesting the billing history at 163 Fanning Street, Waterbury, CT.  The results showed Desire TORRES has the electric bill for SP6 listed in her name.  During previous surveillances of RAMOS at Discount Car Rental, agents have observed RAMOS operating vehicles registered to TORRES, including a 2008 Toyota Scion bearing Connecticut registration BE00252 and 2011 white Chevrolet

Traverse bearing Connecticut registration BA21377.  Agents, therefore, believe TORRES to be RAMOS' paramour.

### March 12, 2022:  RAMOS requesting 200 Grams of Cocaine

575.    On March 12, 2022, Jose Ramos calling from telephone number (516) 669-4881, spoke to DUPREY.  During the call, DUPREY asked RAMOS, "Are we still on for the, on the 200 blue ones," believed to be a reference to 200 grams of cocaine, based upon the coloring of the kilogram wrappers seized during the trash pull at Subject Premises 5 on February 23, 2022. RAMOS later responded, "Yes.  Well, tomorrow [UI] I can take them all for you," believed to mean that Ramos would take delivery of 200 grams of cocaine from DUPREY.

### April 13, 2022:  DUPREY and RAMOS exchange $3,000

576.    On April 13, 2022, at approximately 1:17 P.M., TT-3 received an incoming telephone call from RAMOS, session 171. During the course of the intercepted call, in sum and substance, RAMOS tells DUPREY that he will give DUPREY "three pesos of mine," and that he wanted DUPREY to give him the "same" of what DUPREY gave him last time. As the call continues, in sum and substance RAMOS tells DUPREY they will meet "later on or tomorrow." Based on the content of this call, investigators believe RAMOS was going to bring DUPREY $3,000 from his profits from selling drugs Duprey previously supplied to him, and, in exchange for the $3,000 payment wanted to be supplied with the same quantity of drugs Duprey previously supplied to RAMOS.

### April 14, 2022:  Surveillance of Jose RAMOS at SP6

577.    On April 14, 2022 at approximately 12:39 P.M., TT-3 made an outgoing telephone call to RAMOS, session #179. During the course of the intercepted call, in sum and substance

RAMOS tells DUPREY that he is on his way to see DUPREY, to which DUPREY responded, "I'm here."

578. Based upon this conversation, surveillance units established surveillance near Discount Car Rental located at 767 Wolcott Street in Waterbury, CT. At approximately 12:50 P.M., surveillance observed a silver lifted Chevrolet Silverado truck (with black rims and Tonneau cover) bearing Florida license plate PH969M enter the parking lot and park in front of Discount Car Rental.

579. Two unidentified males exited the silver truck and entered the front door of Discount Car Rental. The driver of the truck was a shorter male wearing a baseball hat. At approximately 1:03 P.M., both unidentified males exited Discount Car Rental and entered the silver truck. The driver of the truck had a beard and appeared to be Jose RAMOS, based upon a DMV photo.

580. The silver truck then departed the parking lot of Discount Car Rental and headed North on Wolcott Street. Surveillance units followed the silver truck to Subject Premises 6, 163 Fanning Street in Waterbury, CT.

581.  At approximately 1:13 P.M., surveillance observed the silver truck turn off of Fanning Street onto Smithwick Street and reverse into the driveway of 163 Fanning Street. Surveillance at tis time was able to positively identify Jose RAMOS as the driver of the truck.

582. A check of the silver pickup truck's Florida registration PH969M showed it to be currently registered to Seabreeze Auto LLC out of Delray Beach, Florida.

**April 18, 2022:  RAMOS' $20,100 Drug Debt**

583.     On April 18, 2022, at approximately 1:03 P.M., Target Telephone 3 sent an outgoing text message to (516) 669-4881, the telephone utilized by RAMOS.  The message was in Spanish language and translated to English by a contracted DEA linguist.  The text read: "In the money that you gave me... How much was it that you gave me?  Because there were only 14,100 not 20,100."  Based on this text message along with previous intercepts, your affiant believes RAMOS paid DUPREY for a drug debt but shorted DUPREY six-thousand dollars, which your affiant believes evidences the quantities of drugs with which RAMOS is involved.

**April 21, 2022:  RAMOS Orders 150 Grams of Cocaine**

584.     On April 21, 2022 at approximately 1:30 P.M., Target Telephone 3 received an incoming phone call from phone number (516) 666-4881 (session 607), which is utilized by Jose RAMOS. During the call, in part and in substance, RAMOS indicated that he was calling on behalf of a UM in Meriden, Connecticut.  RAMOS asked DUPREY about the "bluish one" and indicated that the UM from Meriden called RAMOS asking for the "blue one." RAMOS explains that the UM wants more and that RAMOS has the UM waiting on the drugs.  DUPREY asks RAMOS what the UM wants and RAMOS explained "Like one and half," believed to mean that RAMOS Meriden customer wanted 150 grams of the cocaine that had been wrapped or packaged in blue packaging.  Duprey indicated that he would supply the drugs the next day.

**April 22, 2022:  Drug Proceeds and Drugs at SP6**

585.    The next day, on April 22, 2022, at approximately 12:17 P.M. Target Telephone 3 received an incoming phone call from phone number 516-666-4881 (session 609), which is utilized

by Jose RAMOS.  During the call DUPREY explains to RAMOS that he is waiting on him.  RAMOS indicated that he would be sending someone with the "tickets and such," believed to mean that RAMOS was going to send a runner to DUPREY with the money for a supply of drugs, including it is believed, the 150 grams of cocaine discussed on the previous day.  DUPREY agrees and the call ends.

586.    On April 22, 2022, at approximately 12:30 P.M. surveillance was established at SP6, 163 Fanning Street, Waterbury CT.  Surveillance confirmed that RAMOS was at the residence by observing him walking in the backyard of the residence.

587.    At approximately 1:05 P.M., surveillance observed a blue Hyundai vehicle, park in front of the driveway at 163 Fanning Street, SP6.  Surveillance observed a Hispanic male exit the driver seat of the vehicle and approach SP6.  The unidentified male was wearing a baseball hat, a black hooded sweatshirt with a design on the back, and blue jeans.

588.    The UM and RAMOS spoke briefly and walked to the front of the residence.  A short time later, RAMOS and UM return to the rear of the house and were observed by surveillance, and the UM walked to and entered the blue Hyundai.  While the UM was walking to the Hyundai, surveillance observed that the front pouch of the UM's sweatshirt appeared to be weighted down.  At approximately 1:11 P.M., the Hyundai departed from SP6.  It is believed, based upon the observations made at SP6 at this time, and subsequent observations made later that day, that RAMOS provided the UM in the blue Hyundai with money for DUPREY and, possibly, with a quantity of drugs to distribute to another one of RAMOS' customers, as explained below.

589.    At approximately 1:36 P.M., surveillance observed the blue Hyundai pull into 767 Wolcott Street, Discount Car Rental.  The unidentified male with the same clothing that

was observed at Subject Premises 6 moments earlier was observed exiting the driver seat of Hyundai and entering Discount Car Rental.  The registration plate for the Hyundai was CT registration BF63454.

590.    At approximately 1:45 P.M., surveillance observed the Hyundai the unidentified male operating the vehicle exit from Discount Car Rental.  Surveillance was then conducted on the vehicle as it traveled throughout Waterbury.

591.    At approximately 1:52 P.M. the blue Hyundai was observed arriving at a brick building on Phoenix Avenue and pulled into the parking lot on Phoenix Avenue, at which point surveillance lost sight of the Hyundai, because the lot was small and closed off to the street. Shortly thereafter, however, surveillance observed the Hyundai depart from the parking lot.

592.    At approximately 1:59 P.M., surveillance observed the Hyundai arrive back at **Subject Premises 6** and park in front of the driveway.  RAMOS was observed approaching the Hyundai and entering the front passenger side of the vehicle.  At approximately 2:03 P.M. RAMOS was observed exiting the Hyundai, and the vehicle departed from **Subject Premises 6**.

593.    Based upon my training and experience, and knowledge gained during this investigation DUPREY and his coconspirators, including RAMOS, I believe that on April 22, 2022, RAMOS provided the operator of the blue Hyundai with drug proceeds and drugs that RAMOS had stored within Subject Premises 6.  I further believe that, consistent with session 609 above in which RAMOS informed DUPREY that RAMOS would be sending someone with the "tickets and such," RAMOS directed the operator of the blue Hyundai to transport money to DUPREY at Discount Car Rental, which I believe the operator of the

Hyundai, in fact, did, based upon the surveillance observations set out above at Discount Car Rental I further believe that DUPREY gave the operator of the Hyundai the supply of drugs to be delivered to RAMOS. I believe the operator of the Hyundai, thereafter, distributed a quantity of drugs to one of RAMOS' customers on Phoenix Avenue in Waterbury, before returning to Subject Premises 6. Finally, I believe that when the operator of the Hyundai returned to **Subject Premises 6** and met with RAMOS in the front seat of the vehicle, he delivered to RAMOS the drugs that DUPREY had given to him for RAMOS and/or proceeds from the suspected drug transaction conducted on Phoenix Avenue, which RAMOS secured within **Subject Premises 6**.

594.   RAMOS has been intercepted participating in communications during the wiretap phase of this investigation that I believe pertained to his involvement with Jose Duprey in drug trafficking; and many of these intercepted communications have been set forth throughout this affidavit. And RAMOS' involvement in drug trafficking is believed to have continued through the time of the drafting of this affidavit.

595.   This was evidenced, in part, by session 1503 on TT3, intercepted on May 13, 2022, in which DUPREY, who based on other intercepts was planning to leave for vacation, called RAMOS and said, "you told me you were going to pass by," to which RAMOS replied "I am, I'm going, I'm going to you. I am on my way," believed to mean that RAMOS was going to meet with DUPREY and obtain a supply of drugs from DUPREY before DUPREY left for vacation.

596.   As I have indicated in the section of this affidavit pertaining to my training and experience, I know that drug traffickers, particularly those involved in distributing hundreds of grams of cocaine, as RAMOS is believed to do, with the frequency that RAMOS is believed to

distribute drugs, often store drugs and cash drug proceeds and records relating to their drug trafficking and drug proceeds, including but not limited to records regarding the disposition, transportation, or transfer of drug proceeds, as well as records regarding drug debts, within their residences, because they can exercise complete dominion and control over their residences and can undertake to secure these structures.

597.   I also know that when drugs are stored in a location, residue of the drugs often remains in the storage location even after the drugs themselves are removed.

598.   I also know, based upon my training and experience, that drug proceeds and records which have come in contact with controlled substances, including but not limited to heroin, can be detected by narcotics canines, even after the passage of time.

599.   Accordingly, I believe there is probable cause to believe that RAMOS continues to be involved in drug distribution, and that there is probable cause to believe drug proceeds, records relating to drug trafficking, cocaine and/or residue of cocaine, as well as other evidence of the offenses set forth in this affidavit, including but not limited to the cellular telephone assigned telephone number (516) 669-4881, utilized by RAMOS, and as listed on Attachment A to the warrant for Subject Premises 6, will be found within Subject Premises 6.

**Additional Information Pertaining to Subject Premises 7 ("SP7")**

600.   **Subject Premises 7 ("SP7")**, 214 Denver Avenue, Floor 2, Bridgeport, Connecticut, is the residence where Victor DURAN-BARRERA, a.k.a. "Mexico," resides and at which there is probable cause to believe drug proceeds, records relating to drug trafficking, heroin and/or residue of heroin, as well as other evidence of the offenses set forth in this affidavit,

including but not limited to the cellular telephone assigned telephone number <u>(475) 449-0830</u>, are located.

601. 214 Denver Avenue, Floor 2, Bridgeport, Connecticut is more particularly described as a multi-family residence with a green-and-white painted exterior, white-trimmed windows, and black shingles. There are two separate doors on the front of the structure, both of which are white. The two doors are immediately adjacent to each other. The right door is labeled "214" and is believed to be a common door used to access a first-floor unit and the second-floor unit, which is the Subject Premises. (The left door is labeled "212" and is believed to access the first and second floor units of 212 Denver Avenue, a separate premises.)

602. Based on information developed during the investigation to date, DURAN-BARRERA is believed to be a heroin distributor who is supplied with heroin by Jose Duprey. DURAN-BARRERA utilizes a cellular telephone assigned telephone number (475) 449-0830 and has been intercepted communicating with Jose DUPREY on numerous occasions in conversations that were explicit and plainly appeared to pertain to drug trafficking.

603. On March 31, 2022, following one such intercepted communication in which DURAN-BARRERA ordered 200 grams of heroin from DUPREY, law enforcement followed DURAN-BARRERA after he met with DUPREY, stopped DURAN-BARRERA's vehicle, and seized 200 grams of heroin from DURAN-BARRERA.

604. The police report corresponding to this incident lists DURAN-BARRERA's address as "214 Denver Ave Fl2 Bridgeport CT 06605," which is SP7, and notes that his telephone number is "(475) 449-0830."

605.    The vehicle DURAN-BARRERA was operating on March 31, 2022, at the time of his arrest, is registered in the name "Victor Duran-Barrera" at "214 Denver Ave., FL2, Bridgeport, CT, 06605."

606.    There have been surveillances at **SP7** on occasions during the investigation.  DURAN-BARRERA and his vehicle, for example, were observed at **SP7** on March 14, 2022, and on April 20, 2022.  Details pertaining to these surveillances, and other incidents involving DURAN-BARRERA, including excerpts of corresponding pertinent, intercepted communications, are set forth below.

### March 14, 2022:  DURAN-BARRERA Surveilled to SP7

607.    On March 13, 2022, at approximately 7:54 p.m., DURAN-BARRERA was intercepted over Target Telephone 4 making a call to DUPREY (session 320).  During the call, in relevant part, DURAN-BARRERA said, "Calling to see if I could see you tomorrow," and DUPREY replied, "That's fine."  DUPREY said, "Oh, so I will see you at my job before 5:30," and DURAN-BARRERA replied, "Oh, okay. Well all right, boss. The, the same thing."  DUPREY asked, "Okay. Yeah. For the same thing," and DURAN-BARRERA confirmed, "Yes. Yes."   DUPREY asked, "Okay. What do you want the 100 um, tamalitos?" and DURAN-BARERRA responded, "Yes, the 100 tamalitos for him and the 100 for me, to see."   DUPREY agreed and said he would see DURAN-BARRERA the following day.  In the call set forth above, based on my training and experience as well as information gathered to date regarding this drug trafficking organization, I believe that DURAN-BARRERA and DUPREY agreed to meet on March 14th ("tomorrow") at Discount Car Rental ("I will see you at my job") before 5:30 p.m.  I also believe that

DURAN-BARRERA asked DUPREY to supply him with a total of 200 grams of heroin ("100 tamalitos for him and the 100 for me").

608.   On March 14, 2022, agents conducted surveillance of Discount Car Rental and, at approximately 4:05 p.m., observed DURAN-BARRERA arrive at Discount Car Rental in a white BMW.  The BMW, a indicated above, was registered in DURAN-BARRERA's name and listed **SP7** as his mailing address.

609.   Surveillance observed DURAN-BARRERA enter the front door of Discount Car Rental carrying an open, black bag, which did not appear to be filled with anything.

610.   At approximately 4:15 p.m., surveillance observed DURAN-BARRERA exit the front door of Discount Car Rental carrying a black bag which appeared to be knotted and weighted.

611.   Surveillance units followed DURAN-BARRERA as he traveled in the BMW from Discount Car Rental to the area of **SP7**.  At approximately 4:55 p.m., surveillance observed DURAN-BARRERA park the BMW across the street from **SP7**.

612.    DURAN-BARRERA exited the BMW and carried a black, weighted bag to the front porch of **SP7**.

613.   While on the front porch of **SP7**, DURAN-BARRERA appeared to look through a mailbox affixed to its exterior and then enter one of its front doors.  Surveillance was not, at this time, able to confirm which of the two front doors DURAN-BARRERA entered through, and surveillance was terminated a short time later.

**March 31, 2022:  DURAN-BARRERA Arrested in Possession of 200 Grams of Heroin**

614.    On Tuesday, March 29, 2022, at approximately 6:47 p.m., Target Telephone 4 received an incoming text message from telephone number 475-449-0830 (session 2328), which read: "All good boss I'll go down on Thursday."

615.    On the same date, at approximately 6:50 p.m., DUPREY, who was using Target Telephone 4, called DURAN-BARRERA at telephone number (475) 449-0830 (session 2329). During the call, in relevant part, DURAN-BARRERA explained, "Yes, I have all of yours there but I'm going to wait to see this kid tomorrow so I can have everything and bring it to you," and DUPREY replied, "Alright then, I will see you, when did you said, for Thursday right?"  DURAN-BARRERA confirmed, "Thursday I can come down because I still have a bit there and I want to go with nothing," and said, in relevant part, "the same." DUPREY asked, "The 100 tamales?" and DURAN-BARRERA responded, "Yes, the 100 tamalitos and 100 of pineapple."  DUPREY agreed and said, "I'll see you on Thursday then."

616.    In the text message and call set forth above, based on my training and experience, as well as information gathered to date regarding this drug trafficking organization, I believe that DURAN-BARRERA asked DUPREY to supply him with a total of 200 grams of heroin ("100 tamalitos and 100 of pineapple") on March 31st ("Thursday").  I also believe that DURAN-BARRERA had gathered money for a drug debt owed to DUPREY ("I have all of yours there"), but was waiting to see one of his customers ("I'm going to wait to see this kid tomorrow") to gather additional money for the anticipated 200-gram heroin transaction with DUPREY ("so I can have everything and bring it to you").  DURAN-BARRERA

further indicated that he had a quantity of heroin remaining ("I still have a bit there") which he wanted to sell before being re-supplied ("I want to go with nothing").

617.   Accordingly, on Thursday, March 31, 2022, agents conducted surveillance of Discount Car Rental and, at approximately 4:14 p.m., observed DURAN-BARRERA's white BMW arrive at Discount Car Rental.  Surveillance observed DURAN-BARRERA exit the BMW and go into the front door of Discount Car Rental.

618.   At approximately 4:26 p.m., DURAN-BARRERA exited Discount Car Rental, empty-handed.  DURAN-BARRERA was wearing a hooded sweatshirt.

619.   Surveillance units followed DURAN-BARRERA as he traveled in his BMW to Interstate 84 and then Route 8 South.

620.   Agents coordinated with the Connecticut State Police to conduct a walled-off traffic stop of DURAN-BARRERA in the area of Bridgeport, while he was still being surveilled by agents.

621.   During the traffic stop, DURAN-BARRERA told the investigating trooper that he was traveling from Waterbury to his home in Bridgeport.  Following a positive K-9 alert, troopers searched the BMW and located and seized two items wrapped in paper towel and plastic wrapping, each weighing approximately 100 grams, inside the driver side front door pocket.  DURAN-BARRERA told troopers that the items were heroin.

622.   This seizure is consistent with DURAN-BARRERA's request to obtain the "100 tamalitos and 100 of pineapple" from DUPREY in the call set forth above.  Troopers also located a small bag (approximately 5 gross grams) of suspected heroin and a straw.

623.   DURAN-BARRERA advised troopers that he is a heroin user.  Troopers also seized approximately $1,400 in U.S. currency from the BMW and DURAN-BARRERA's person.

218

DURAN-BARRERA was arrested on state drug and motor vehicle charges.  As indicated above, according to the arrest report, DURAN-BARRERA's address is the same as the address for **SP7** and his telephone number is (475) 449-0830, the same number DURAN-BARRERA utilized to contact DUPREY on Target Telephone 4.

### April 20, 2022:  Surveillance of DURAN-BARRERA at SP7

624.  On April 20, 2022, surveillance of **SP7** was conducted.  During the surveillance, at approximately 4:46 p.m., DURAN-BARRERA was observed entering the right, front door of 212-214 Denver Avenue, which is believed to access **SP7**, with another, unidentified male.

625.  DURAN-BARRERA appeared to unlock the right, front door with a key before entering.

626.  Prior to this observation, surveillance observed DURAN-BARRERA and the unidentified male appearing to perform a repair to DURAN-BARRERA's BMW, which was parked across the street from **SP7**.

### DURAN-BARRERA's Continued Involvement in Drug Trafficking

627.  Following his arrest on March 31, 2022, DURAN-BARRERA has continued to be in contact with Duprey, and the intercepted conversations in which he has participated appear to pertain to drug trafficking.  Several of these communications are set forth throughout this affidavit, including but not limited to the section pertaining to communications intercepted over Target Telephone 4.

628.  One such recent example of DURAN-BARRERA's continued involvement in heroin trafficking occurred on May 12, 2022, when DURAN-BARRERA, in session 7463 over TT4, ordered "50 tomalitos," believed to mean 50 grams of heroin, from Duprey and was thereafter believed to have been surveilled meeting with Duprey at Duprey's residence at

87 Seymour Street in Waterbury to consummate the transaction.  Details pertaining to this event, including excerpts of intercepted calls and times of related surveillance observations, are set forth in the previous subsection of this affidavit captioned "Additional Details Pertaining to Subject Premises 3."

629.    As I have indicated in the section of this affidavit pertaining to my training and experience, I know that drug traffickers, particularly those who distribute the quantities of heroin that DURAN-BARRERA is believed to distribute, often store drugs and cash drug proceeds and records relating to their drug trafficking and drug proceeds, including but not limited to records regarding the disposition, transportation, or transfer of drug proceeds, as well as records regarding drug debts, within their residences, because they can exercise complete dominion and control over their residences and can undertake to secure these structures.

630.    I also know, based upon my training and experience, that drug proceeds and records which have come in contact with controlled substances, including but not limited to heroin, can be detected by narcotics canines, even after the passage of time.

631.    Accordingly, I believe there is probable cause to believe that DURAN-BARRERA continues to be involve in heroin distribution, and that there is probable cause to believe drug proceeds, records relating to drug trafficking, heroin and/or residue of heroin, as well as other evidence of the offenses set forth in this affidavit, including but not limited to the cellular telephone assigned telephone number (475) 449-0830, and as listed on Attachment A to the warrant for Subject Premises 7, will be found within Subject Premises 7.

**Additional Information Pertaining to Subject Premises 8 ("SP8")**

632. **Subject Premises 8 ("SP8")** is 4 Chester Street, Ansonia, Connecticut.  It is believed to be the residence of Garry GEBEAU and the location at which there is probable cause to believe drugs, drug proceeds and drug records, as well as other evidence of the offenses set forth in this affidavit and listed on Attachment A for this Subject Premises are located, including but not limited to cellular telephone assigned telephone numbers <u>475-470-4553</u> and <u>413-291-6116.</u>

633. SP8, 4 Chester Street, Ansonia, Connecticut is more particularly described as a single-family residence that is white in color with a black iron railing.  The residence has the number "4" clearly displayed on the left side of the front door.

634. Based on information developed during the investigation to date, GEBEAU is believed to redistribute heroin, fentanyl, and cocaine, which is supplied to him by DUPREY. GEBEAU is also believed to be the user of telephone numbers <u>475-470-4553</u> and <u>413-291-6116.</u>

635. An administrative subpoena was sent to United Illuminating (UI) Electric company Legal Compliance Department for **Subject Premises 8**.  The results showed the electric bill is currently active and is in Gary GEBEAU's name.  The phone number associated with the UI bill is telephone number (475) 470-4553 which your affiant knows to have been utilized by GEBEAU in furtherance of drug trafficking during this investigation.

636. GEBEAU has been intercepted participating in communications during the wiretap phase of this investigation that I believe plainly pertained to his involvement with Jose Duprey in drug trafficking; and many of these intercepted communications have been set forth throughout this affidavit.

637.    GEBEAU's intercepts are, in fact, among the most explicit recorded during this investigation.  The following excerpts, some of which appear in other sections of this affidavit, are set forth below again for the Court's ease of reference and are offered as examples of Gebeau's consistent drug trafficking throughout the wiretap phase of this investigation.

638.    On February 28, 2022, between 7:56 A.M., and 12:36 P.M., Jose DUPREY, utilizing TT3, engaged in a text message exchange with Garry GEBEAU, who was utilizing telephone number 475-470-4553. In Session 523, GEBEAU texted Duprey, "Good morning 7F, 4 soft fish."  In Session 524, GEBEAU texted Duprey, "I meant 7H and 4 Swaft fish."  In Session 526, Duprey responded, "K 1230."   Based on my training and experience, when GEBEAU references a number, your affiant believes he is referring to the number of grams he wants to purchase.  Furthermore, based on my training and experience and familiarity with this investigation, when GEBEAU is referencing the letter "F," the letter "H," and the phrase "soft fish," I believe he is referring to the narcotic he wants to purchase. Your affiant believes more specifically, "soft fish," is in reference to powder cocaine, the letter "F" is in reference to fentanyl, and the letter "H" is in reference to heroin.  In Session 530, GEBEAU texts Duprey, "7h, 5 soft fish," and Duprey responds in Session 531, "Ok." Based on this information, it is believed GEBEAU is ordering 7 grams of heroin and 5 grams of cocaine from DUPREY. When DUPREY responds, "K 1230," I believe he is informing GEBEAU that he will have the product ready for GEBEAU by 12:30 p.m.

639.    On March 2, 2022, in Session 619, Gary GEBEAU, texted Duprey, "5 fish shiny and5 f." and "change this 6 left for dark," which is believed to be an order for five grams of cocaine, "fish shiny," five grams of fentanyl, "f," and six grams of heroin, "dark," which GEBEAU

wanted in exchange for the six grams of heroin previously provided to him.  On the same day, in Session 640, GEBEAU texted Duprey, "u gave me 5 fish (175$) and 5 f (235$)...$ 410 total, i gave u 350 so owe u 60 from today rite," which is believed to be a message from GEBEAU confirming how much his debt is to Duprey.  On the same day, in Session 652, GEBEAU texted Duprey, "That dark is nice it's all nice but that dark is real nice," which is believed to be GEBEAU providing feedback to Duprey that the heroin is of particularly good quality.

640.    On March 9, 2022, in session 927, GEBEAU texted Duprey "Good morning. Let's do 10 h dark and 15 of fish. I have some extra $ for u. Thx," which is believed to mean that GEBEAU wanted to purchase a quantity of heroin, likely 10 grams, ("10 h dark") and a quantity of cocaine, likely 15 grams ("15 of fish"), because GEBEAU has referenced in other intercepts the term "soft fish," and soft is a coded term commonly used in the drug trade to refer to cocaine.  Later that day, in session 941, GEBEAU spoke to Duprey and said, "You got the dark too, right?" Duprey said, "Yeah, the dark one . . . They like the dark one, huh?  For some reason." GEBEAU said, "Oh yeah, man.  They fucking love it." It is believed that in session 941, GEBEAU confirmed he wanted to purchase heroin ("the dark one") because his customers wanted the dark colored heroin ("They fucking love it").

641.    On April 7, 2022, beginning in session 1499 over TT3, Duprey communicated with GEBEAU, who was using telephone number (475) 470-4553.  In session 1499, at 8:37 a.m., GEBEAU texted Duprey, "just 7 dark for now," believed to mean GEBEAU wanted to obtain seven grams of heroin from Duprey.  Approximately two-and-a-half hours later, at 11:10 a.m., GEBEAU texted Duprey, "need 10 and," believed to mean GEBEAU wanted 10 grams of heroin.  Duprey then called GEBEAU, in session 1528, and asked, "Yea, um,

so five, five?," believed to mean that Duprey inquired whether GEBEAU wanted the 10 grams of heroin packaged in two separate bags, each containing five grams (i.e., "so five, five"). GEBEAU later clarified, "What? [Pause] Yeah, but put them both... Listen! Same dark, two separate bags. Cause I gotta see him right afterwards," believed to mean that GEBEAU confirmed that he wanted two separate bags of heroin, each containing five grams, because he intended to meet with his customer ("him") right after he met with Duprey. The two then discussed meeting at 12:30 for the transaction. GEBEAU later once again confirmed his order, "five, five, dark, right?" Duprey responded "Alright, yeah." GEBEAU said, "Nice! Okay, I'll be there at 12:30."

642. On April 20, 2022, in session 477, Garry GEBEAU texted Duprey, who was using Target Telephone 3: "10h.. 7 in one 3 in other if u could plz. owe u 100 from last time," believed to mean that GEBEAU wanted 10 grams of heroin, separated into two separate packages, one containing seven grams and the other containing three grams, likely because GEBEAU had one drug customer who wanted to buy seven grams of heroin and another customer who wanted to purchase three grams of heroin. I know from training and experience that 10 grams is a redistributable quantity of heroin. It is also believed that GEBEAU indicated that he was aware that he owed Duprey "100" dollars from a previous drug transaction. Duprey responded in sessions 480 and 481: "Yes plus the old bill" and "Ok see u at 12," believed to mean Duprey would meet with GEBEAU to consummate the transaction at noon. Later that day, in session 534, GEBEAU texted Duprey at Target Telephone 3: "The one that's supposed to weigh 7 only weighs 6.6 with the bag It should weigh at least 8 Point four with the back," believed to mean that GEBEAU has weighed the bags of heroin Duprey previously distributed to him and the bag that was supposed to contain seven grams

224

of heroin, and should weigh 8.4 grams including the weight of the bag, only weighed 6.6 grams. In session 536, Duprey texted GEBEAU, "next time I get u," believed to mean Duprey would make up for the missing quantity the next time he supplied heroin to GEBEAU. Later that day, in session 537, GEBEAU spoke to Duprey. During the call, Duprey told GEBEAU, "Check the other one, in the three . . . to see if there is extra in there," believed to mean that Duprey informed GEBEAU to weigh the bag that was supposed to contain three grams of heroin to see if the three-gram bag Duprey distributed to GEBEAU contained an extra amount of heroin to account for the weight that was missing from the seven-gram bag of heroin. GEBEAU responded, "Yeah. I'll check in one second."

643.   On May 10, 2022, in session 1347 over TT3, Duprey communicated with GEBEAU, who was using telephone number (475) 470-4553. GEBEAU told Duprey, "I think tomorrow, either early or a little bit after 12:00 um . . . seven (7) and five (5) on the H. You know what's H? Seven (7) H, H five (5)." This is believed to mean that GEBEAU wanted 12 grams of heroin, separated into two separate packages, one containing seven grams and the other containing five grams, likely because GEBEAU had one drug customer who wanted to buy seven grams of heroin and another customer who wanted to purchase five grams of heroin. I know from training and experience that 12 grams is a redistributable quantity of heroin. Duprey responded, "Yeah," which I believe indicates that he could provide the quantities of narcotics that GEBEAU requested. GEBEAU then told Duprey, "And um . . . I gotta get the F for this kid. But fucking. . . Damn, I gotta find out what it is. Are you gonna to be answering in the morning or no?" This is believed to mean that GEBEAU was informing Duprey that he also needed to purchase a quantity of fentanyl from Duprey, ("I

225

gotta get the F for this kid") but that he didn't know the quantity that his customer ("this kid") wanted to be supplied ("But fucking. . . Damn, I gotta find out what it is"), and that GEBEAU was going to provide Duprey with the information in the morning ("Are you gonna to be answering in the morning or no"). Duprey responded, "Yeah, yeah," which I believe means that he was acknowledging that GEBEAU could provide the information in the morning and they would complete the narcotics purchase order at that time.

644. In addition to explicit intercepts throughout the wiretap phase in which Gebeau has participated, Gebeau has also been surveilled at **Subject Premises 8**, as explained below.

### April 28, 2022 and April 29, 2022:  Surveillance of GEBEAU at SP8

645. On April 29, 2022, surveillance observed GEBEAU at Subject Premises 8 in the morning. Following several intercepts on April 29, 2022, indicating that GEBEAU was going to meet with DUPREY to be supplied with drugs, surveillance observed such a meeting, and thereafter intercepted a call indicating that GEBEAU had returned to his house, with, your affiant believes, the drugs that DUPREY supplied to GEBEAU.

646. On April 28, 2022, at approximately 11:39 A.M., GEBEAU, using telephone number 413-291-6116, called Target Telephone 3 (session 894). In sum and substance, GEBEAU indicated that one of the two bags of narcotics provided by DUPREY on a previous occasion, one was good quality and the other was not. GEBEAU and DUPREY agreed to meet the following morning. GEBEAU indicated that he would advise DUPREY of the quantity of narcotics that he wanted to acquire the following day. During this call, GEBEAU also told DUPREY that he registered the black Lexus the previous day.

647. On the same date, at approximately 2:52 P.M., Target Telephone 3 received an incoming text message (session 896) from telephone number 413-291-6116 which read: "5h and 7h

226

seaparate.and 5 fish. Text u in am," believed to mean GEBEAU wanted to obtain five grams of heroin in one package and seven grams of heroin in another package and five grams of cocaine. At approximately 11:04 P.M., a text message from Target Telephone 3 was sent to telephone number 413-291-6116, Gebeau's phone, which read: "Ok".

648.    On April 29, 2022, surveillance was established in the area of **Subject Premises 8.**

649.    On April 29, 2022, beginning at 9:21 A.M., Gebeau sent several text messages to TT3 attempting to confirm a time to meet with DUPREY and requesting that DUPREY meet at "12:30"

650.    the same date, at approximately 11:46 A.M., GEBEAU, using telephone number 413-291-6116 called Target Telephone 3 (session 927). In sum and substance, DUPREY told GEBEAU he could leave now to meet him and GEBEAU said he would be there in about twenty minutes.

651.    At approximately 11:54 A.M., surveillance observed GEBEAU outside **Subject Premises 8** wearing a red baseball cap. Surveillance also observed GEBEAU get into a black Lexus SUV, later determined to have Connecticut registration AU68413 ("the Lexus"), and then get back out. Surveillance also observed GEBEAU in the garage, which is attached to SP6. A law enforcement database query determined that CT AU68413 is a black 2007 Lexus RX400 registered to Wendy Fildes at **Subject Premises 6**.

652.    At approximately 11:58 A.M., surveillance observed GEBEAU get back into the Lexus and depart the area.  GEBEAU was not followed by surveillance at this time.

653.    At approximately 12:27 P.M., Target Telephone 3 received an incoming text message (session 929) from telephone number 413-291-6116, which read: "5 min", believed to mean Gebeau would be arriving to conduct a drug transaction in five minutes.

654.   At approximately 12:30 P.M., surveillance observed the Lexus driving past Valero gas station on Wolcott St.   At approximately 12:31 P.M., surveillance observed a black Lexus SUV arrive at 767 Wolcott Street and pull to the back of the business.

655.   Another surveillance unit, operating a black pickup truck, was parked in the parking lot of Arby's restaurant which is located adjacent to 767 Wolcott St.

656.   At approximately 12:31 P.M., Target Telephone 3 received an incoming text message (session 930) from telephone number 413-291-6116, which read: "Here". Also, at 12:31 P.M., GEBEAU, using telephone number 413-291-6116 called Target Telephone 3 (session 931) and told DUPREY he had arrived.

657.   At approximately 12:32 P.M., surveillance observed a male with a red baseball cap exit the Lexus.   Surveillance observed the front hood and trunk of the Lexus open, and the male with the red baseball cap moving in and around the Lexus.

658.   At approximately 12:45 P.M., surveillance observed DUPREY and the male with the red baseball cap near the trunk of the Lexus together.

659.   At approximately 12:49 P.M., surveillance observed the Lexus depart the rear parking area of Discount Car Rental. Surveillance units followed the Lexus as it departed the location to Interstate 84 where sight of it was lost due to heavy traffic.

660.   At approximately 12:57 P.M., GEBEAU, who was using telephone number 413-291-6116 called Target Telephone 3 (session 947). During the call, in sum and substance, DUPREY said he had tried calling GEBEAU about ten times because he saw a black pickup truck, possibly a Ford Ranger, pull out of the Arby's restaurant after GEBEAU left. GEBEAU told DUPREY that he had not been pulled over by law enforcement and that he had not answered because the ringer to his phone was off. GEBEAU assured DUPREY that if he

228

were to be pulled over by law enforcement he would alert him quickly. GEBEAU advised DUPREY that he was traveling on the connector near Route 8 where there was a car accident.

661.   As indicated above, one of the surveillance units on this occasion was in fact operating a black Ford pickup truck, and departed Arby's restaurant to conduct surveillance of GEBEAU after he left Discount Car Rental. Surveillance units also observed a traffic accident on Interstate 84 near the Route 8 on-ramps, consistent with GEBEAU's comment to DUPREY.

662.   Based on the call set forth above (session 947), and DUPREY's and GEBEUA perceived heightened suspicion, surveillance of GEBEAU and **Subject Premises** 8 were terminated at approximately 1:01 P.M.

663.   On the same date, at approximately 1:33 p.m., DUPREY, using Target Telephone 3, called GEBEAU at telephone number 475-470-4553 (session 955). In sum and substance, DUPREY asked if GEBEAU had arrived home and GEBEAU indicated he had just walked into the house, believed to mean that GEBEAU had returned to **Subject Premises** 8 with the drugs DUPREY provided to him earlier at Discount Car Rental.

664.   As I have indicated in the section of this affidavit pertaining to my training and experience, I know that drug traffickers, particularly those involved in distributing the quantities of heroin, fentanyl and cocaine, as GEBEAU is believed to distribute, with the frequency that GEBEAU distributes thee drugs, based on surveillance and intercepted communications, often store drugs and cash drug proceeds and records relating to their drug trafficking and drug proceeds, including but not limited to records regarding the disposition, transportation, or transfer of drug proceeds, as well as records regarding drug debts, within

their residences, because they can exercise complete dominion and control over their residences and can undertake to secure these structures.

665.   I also know that when drugs are stored in a location, residue of the drugs often remains in the storage location even after the drugs themselves are removed.

666.   I also know, based upon my training and experience, that drug proceeds and records which have come in contact with controlled substances, including but not limited to heroin, can be detected by narcotics canines, even after the passage of time.

667.   Accordingly, I believe there is probable cause to believe that GEBEAU continues to be involved in drug distribution, and that there is probable cause to believe drug proceeds, records relating to drug trafficking, heroin, fentanyl and cocaine, and//or residue of these controlled substances, as well as other evidence of the offenses set forth in this affidavit, including but not limited to the cellular telephone assigned telephone number 475-470-4553 and the cellular telephone assigned telephone number 413-291-6116, both utilized by GEBEAU, and as listed on Attachment A to the warrant for Subject Premises 8, will be found within **Subject Premises 8**.

**<u>Additional Information Pertaining to Subject Premises 9 ("SP9")</u>**

668.   Based on my training, experience, knowledge of the investigation, and Title III intercepts in conjunction with coordinated surveillance I have probable cause to believe and do believe Subject Premises 9 to be the location at which Robert AMATRUDA, a.k.a. "Bubba," a.k.a. "Spanky," stores narcotics.

669.   **Subject Premises 9 ("SP9")** 345 Woodtick Road, Wolcott, Connecticut, is more particularly described as a two-bay garage with a small office attached on the right side. The garage is light gray in color with maroon bay doors and the office is also light gray in

color with maroon trim on the windows and doors.  Currently, there are no numbers affixed to the garage.   Your affiant believes Robert AMATRUDA, a.k.a. "Bubba," a.k.a. "Spanky," uses this garage/office as a stash location for bulk quantities of narcotics, including cocaine.

670.  An administrative subpoena was sent to Eversource Legal Compliance Department for Subject Premises 9.  The results showed the electric bill is currently active and is in Amatruda's name.

671.  Details pertaining to Amatruda and the use of SP in connection with his drug trafficking activities are set forth in other sections of this affidavit.  Additional details connected to two specific events involving SP9 are set forth below.

### March 15, 2022: Drugs Transported to Subject Premises 9

672.  Details pertaining to this even on March 15, 2022, are set forth in full in the section of this Affidavit pertaining to Subject Premises 5.  Some details are restated below for the Court's es of reference.

673.  On March 15, 2022, at approximately 9:16 a.m., Target Telephone 4 received an incoming telephone call from (203) 850-9625, which is believed to be utilized by Amatruda.  During the call, in relevant part, Amatruda asked, "When you wanna meet over there by 10:30, 10:40?" and Duprey replied, "Yeah. Something like that…"  Amatruda said, "Okay, I'll meet you over there. I'll call you when I'm leaving here so…  I'll be over there like 10:40," and Duprey said, "Yeah, what I do is I'll drive to the shop."  Amatruda continued, "Okay um, don't forget to do that thing, too," and Duprey said, "Alright."  In the call set forth above, I believe that Amatruda requested that Duprey bring a quantity of narcotics

previously discussed ("um, don't forget to do that thing") to Subject Premises 4 ("I'll drive to the shop").

674.    At approximately 12:55 p.m., Target Telephone 4 received an incoming call from Amatruda (session 559).  During the call, in relevant part, Amatruda asked, "Are you at work?" and Duprey said, "Alright, yeah, yeah, I'm at work."  Amatruda said, "Yeah, but you got that thing on you too, right?" and Duprey replied, "Nah, I'll go get it but you just."  Amatruda interrupted, "Fuck. Go get it, because I told the guy about 4:30 he'll, I'll have it," and Duprey said, "Yeah, yeah, yeah. Um, I'm here with Henry right now…"  Here, I believe that Duprey confirmed he was at Discount Car Rental ("I'm at work"), but had not yet obtained the requested narcotics for Amatruda ("nah, I'll go get ").  Amatruda encouraged Duprey to obtain the narcotics because he had made arrangements to provide them to a third party at a certain time ("I told the guy about 4:30").  Duprey agreed ("yeah"), but advised Amatruda that the business owner ("Henry") was present at Discount Car Rental.

675.    At approximately 3:34 p.m., Duprey, using Target Telephone 4 called Amatruda (session 586).  During the call, Amatruda asked, "Did you go do that for me?" and Duprey said, "Nah, I gotta do it. But I got somebody cleaning the car."  Amatruda demanded, "Go do it. Oh, my god. You son of a gun," and Duprey said, "But I wanna see Henry coming. Yeah, tell him to relax."  Here, I believe that Duprey still had not yet obtained the requested narcotics ("Nah, I gotta do it").  Later during the same call, Duprey said that he would task his daughter, who I believe to be Edmeyln Duprey, to pick up a motor vehicle part and "that" at the same time for him.  I believe "that" is a reference to the requested narcotics.

676.    At approximately 5:19 p.m., Target Telephone 4 received an incoming call from Amatruda (session 604).   During the call, Duprey said, "I'm sending my daughter now," and Amatruda replied, "Oh, yeah! Because the guy just called me." Here, I believe that Duprey said Emelyn Duprey was on her way to pick up the narcotics ("sending my daughter now"). At approximately 5:45 p.m., a pole camera positioned in the vicinity of Subject Premises 5, the business, Blooming Eyes by Laura, showed a black Lexus SUV bearing Connecticut registration BFF19094, which is registered to Jose Duprey, arrive in the parking lot. TFO Vitelli observed Edmelyn Duprey exit the vehicle and go inside the building where Subject Premises 5 is located. At approximately 5:55 P.M., TFO Vitelli observed Edmelyn Duprey exit the building, get back inside the Lexus and leave the area.

677.     At approximately 6:15 p.m., surveillance units at the observed the same back Lexus arrive at Discount Car Rental.  Edmelyn Duprey got out of the Lexus and went inside Discount Car Rental.

678.    On March 15, 2022, at approximately 6:37 p.m., Duprey called AMATRUDA from Target Telephone 4 (session 611) and said, "Yeah. Alright, so I'm gonna go see you over there now. What you doing?" and AMATRUDA indicated he was working on a vehicle.  Duprey asked, "Yo, so where your boy at?" and AMATRUDA said, "I got the money. I'll [unintelligible] for you asshole…I'm probably gonna be fucking stuck." Duprey said, "No! My daughter came here like twenty minutes ago," and AMATRUDA said, "I wanted to know what you was doing. I though you was, yeah, well hurry up. Come on over." In call set forth above, I believe that Duprey said he could meet AMATRUDA at Subject Premises 9 ("go you see you over there now") and asked if AMATRUDA had met yet with the third party for whom he was "middling" the narcotics transaction ("so where your boy at?").

AMATRUDA said he had the money for the transaction ("I got the money"), but assumed Duprey did not have the requested narcotics ("probably gonna be fucking stuck"). Duprey told him that he was now in possession of the narcotics ("my daughter came here") and AMATRUDA requested that he bring them to Subject Premises 9 ("come on over").

679. Several minutes later, at approximately 6:45 p.m., mobile surveillance followed Duprey as he left Discount Car Rental and traveled directly to Subject Premises 9. TFO Vitelli observed Duprey arrive at Subject Premises 9 at approximately 7:03 p.m., exit his vehicle and walk towards the front door of Subject Premises 9. Also parked in front of Subject Premises 9 was a tan Chevrolet Tahoe bearing Connecticut registration AV89771 ("the Tahoe") which is registered to AMATRUDA. Based on the above intercepts and physical surveillance, I believe that Duprey transported a quantity of narcotics to AMATRUDA at Subject Premises 9, where AMATRUDA had the requisite cash to complete the transaction.

### April 25, 2022:  Cocaine Obtained from Subject Premises 9

680. On April 25, 2022, at approximately 5:54 p.m., Duprey, using Target Telephone 4, called AMATRUDA at telephone number 203-519-3296 (session 5631). During the call, in relevant part, Duprey asked, "Yo. How much of the white paint you got? For the car?" and AMATRUDA replied, "Probably like, like, two (2)? I don't know. Probably like two (2)." Duprey said, "Like two-hundred (200)? All right, so…because his car is white. He's on white, you know what I'm saying?" and AMATRUDA said, "Yeah. No. Whatever the hell, it don't matter." Duprey said, "I gonna tell him that you got like a, like, like a hundred (100) to see," and AMATRUDA interrupted, "Yeah, say one-fifty (150). Yeah. Just to be

234

safe." Based on the call set forth above, I believe that Duprey inquired how much cocaine AMATRUDA had on-hand ("how much of the white paint you got") and AMATRUDA said about 200 grams ("like 200"). Duprey indicated that he was calling on behalf of a third party ("his car is white" and "I gonna tell him") who wanted to be supplied with cocaine. Based on intercepts over Target Telephone 3, I believe the third party to be Jonathan Santiago.

681.    At approximately 7:53 p.m., agents observed a male believed to be AMATRUDA arrive at Subject Premises 9 in the Tahoe and go inside. At approximately 7:57 P.M., the same male was observed exiting Subject Premises 9 and departing the area in the Tahoe. At approximately 8:17 p.m., AMATRUDA sent Target Telephone 4 a text message (session 5669) which read," Don't do this to me brother com on need to get up," which went unanswered by Duprey. Shortly after the above text message, AMATRUDA called Target Telephone 4 seven times, all of which went unanswered. At approximately 9.08 p.m., AMATRUDA sent Target Telephone 4 a text message (session 5675) which read," yo why you forgot about me." After this text message, AMATRUDA called Target Telephone 4 several more times, all of which went unanswered. At approximately 9:19 p.m., AMATRUDA texted Target Telephone 4 (session 5680): "Blue cheese on ur salad tomorrow bro at work no bs I'll be by the house an car trailer we co get before it hits makers." On April 26, 2022, at approximately 12:14 a.m., Target Telephone 4 sent an outgoing text message (session 5686) to AMATRUDA which read, "Injust came out from the elks at 11 I got you tomorrow." Based on the intercepts and surveillance described above, I believe that AMATRUDA traveled to Subject Premises 9 where he obtained a quantity of cocaine at approximately 7:53 p.m., which he intended to provide to Duprey.

235

Shortly thereafter, AMATRUDA began calling Duprey at Target Telephone 4 and sending him text messages which went unanswered.   The tenor of the AMATRUDA's text messages and frequency of calls following his short stop at Subject Premises 9, leads me to believe that AMATRUDA was upset that Duprey was not answering his phone ("don't do this to me" and "why you forgot about me") and wanted to offload the cocaine he was transporting in the Tahoe.   At the time of these unanswered calls and text messages, surveillance observed Duprey to be inside a local establishment ("the elks").   I believe Duprey may have left Target Telephone 4 in his car or did not have cellular service while inside the establishment.   I also believe that AMATRUDA eventually gave up hopes of conducting the transaction on this date and said he would bring the cocaine ("blue cheese") to Discount Car Rental the following day ("tomorrow bro at work").   When Duprey responded early the following morning, he indicated that they would conduct the transaction later in that day ("I got you tomorrow").

682.   As explained above in the section/s of this affidavit pertaining to my training and experience, I am familiar, based upon my training and experience, with the practices of drug traffickers. I know that drug traffickers, particularly drug traffickers who distribute the volume of drugs that AMATRUDA distributes, with the frequency of AMATRUDA'S distribution activities, in addition to storing drugs and drug proceeds and records within their residences, also often keep separate locations, "stash locations," over which they can exercise control, as locations in which to store narcotics, in the belief that doing so insulates them from the contraband at such locations.

683.   I also know that when drugs are stored in a location, residue of the drugs often remains in the storage location even after the drugs themselves are removed.

236

684. I also know controlled substances and drug records or drug proceeds that have come in contact with controlled substances like heroin, cocaine, and cocaine base can be detected by narcotics canines, even after the passage of time.

685. I believe that the calls in which AMATRUDA has participated, set out throughout this affidavit, and the examples set forth above in this section, demonstrate that AMATRUDA consistently distributes large quantities of drugs and that he stores redistribution quantities of drugs within Subject Premises 9 and has done so for several months throughout this investigation; and there is no indication that this pattern has ceased. I believe the events set forth above establish probable cause to believe, and I do believe, that AMATRUDA's pattern of storing narcotics at Subject Premises 9 has continued.

686. There is probable cause to believe, and I do believe, that the items listed on Attachment A, including drug paraphernalia, including drug packaging, controlled substances, controlled substances residue, drug proceeds and drug records all of which are evidence of the target offenses, are located within Subject Premises 9.

**Additional Information Pertaining to Subject Premises 10**

687. **Subject Premises 10** ("SP10") is located at 30 Hart Circle, Unit 12, in Waterbury, Connecticut. SP10 is the location where Thomas SANTOS and his girlfriend, Celia Santiago, reside and at which there is probable cause to believe drug proceeds and drug records, as well as other evidence of the offenses set forth in this affidavit and listed on Attachment A for this Subject Premises are located.

688. Subject Premises 10, 30 Hart Circle, Unit 12, in Waterbury, Connecticut, is more particularly described as a three level, apartment/condominium building with numerous

237

individual units within.  The ground floor of the building consists of 10 garages on the east side of the building.  The second floor of the building is the main floor that contains entrances to individual units within.  The third floor of the building appears to only be accessible by going through the main entrances to the building on the second floor.  The exterior of the building primarily contains yellowish colored siding and reddish-brown colored brick with brown trim.  Unit 12 is accessed via a stairwell attached to the wall closest to Hart Circle, which leads to the second floor.  At the top of the stairwell, a door is located on the left-hand side, and it is the only door the stairwell leads to.  To the left-hand side of that door is a series of four doorbells labeled 9, 10, 11, and 12.  Once that door is opened, Units 9 and 10 are located straight ahead.  Unit 11 is located up a stairwell to the left-hand side of the main door and Unit 12 is located up a stairwell to the right-hand side of the main door.

689.   The number "30" is displayed on the outside wall of the stairwell closest to Hart Circle, which leads to Units 9-12.  Photographs of Subject Premises 10 are depicted on Attachment B to the warrant for this Subject Premises.  In addition, the Waterbury Geographical Information System public Web site contains a photograph of the building located at Subject Premises 10 and confirms that this structure is listed as "30 Hart Circle."

690.   Santos is currently a supervised person on Special Parole from the Connecticut Department of Corrections.  He is being supervised by Parole Officer Jennifer Desena.  Santos is currently required to wear a GPS monitoring device at all times per the stipulations of his parole.  The GPS monitoring device is securely attached to Santos's ankle and cannot be removed without triggering an alert to the Parole office.  Unless an alert has been triggered showing the GPS monitoring device was removed, the location data reported by the GPS

238

monitoring device indicates where Santos is located at any given time.  Santos also has a curfew from 9:00PM to 6:00AM and is required to remain at the residence approved by his Parole Officer during that time frame.  From 6:00AM to 9:00PM, Santos is free to leave the residence.

691.   Parole Officer Desena and Parole Officer Leigh Caruso made a home visit to SP10 on May 4, 2022 and obtained written consent from Celia Santiago for Santos to live there.  As a result, Parole Officer Desena approved Santos's request to live at SP10 on that day.  Parole Officer Caruso reviewed the GPS monitoring data for Santos and reported that the device puts Santos at SP10 every night since being approved to live there.  Santos has no other approved living locations.

692.   Surveillance has confirmed Santos departing 30 Hart Circle during May of 2022. Additionally, at least one vehicle known to be utilized by Santos has been observed parked at this location.

693.   An administrative subpoena was sent to Eversource Legal Compliance Department for 30 Hart Circle, Unit 12, in Waterbury, Connecticut, 06705.  The subpoena response from Eversource lists the electric utility for 30 Hart Circle, Unit 12, Waterbury Connecticut in the name Celia Santiago, SANTOS's girlfriend.

694.   Thomas Santos, as evidenced by numerous, explicit communications intercepted with Jose Duprey during the wiretap phase of this investigation, re-distributes large quantities of cocaine and heroin on a regular basis.  The drug transactions in which SANTOS has so frequently engaged are believed to have generated substantial cash proceeds, and this, too, has been evidenced by numerous explicit intercepts.  For example, on February 19, 2022, Santos received a text message from Jose Duprey (TT3 Session #261) on telephone number

(475) 295-7948 stating, "New bill 96240 ok." I suspect this text message meant Santos owed Jose Duprey $96,240 for cocaine that he had previously received from Duprey. Then on February 28, 2022, Santos received another text message from Jose Duprey (TT3 Session #572) on telephone number (475) 295-7948 stating, "So now we have to work to bring this balance 109500." I suspect this text message meant Santos now owed Jose Duprey $109,500 for cocaine and heroin that he received from Duprey.

695.   Furthermore, on March 27, 2022, Santos sent two text messages to Duprey (TT3 Sessions #1364-1365) from telephone number (475) 559-6199 stating, "Send me the new bill," and "of sale." I suspect Santos sent these text messages to Duprey asking how much he owed him for the fronting of illegal narcotics. On April 4, 2022, Santos received a text message from Jose Duprey (TT3 Session #1456) stating, "Da new bill is 66660." I suspect this text message meant Santos had a new outstanding balance owed to Jose Duprey of $66,660. These text messages appear to imply that Santos had collected enough cash from the sale of illegal narcotics to pay down approximately $42,840 in drug debts owed to Duprey in a little over a month time frame.

696.   As explained above in the section/s of this affidavit pertaining to my training and experience, I am familiar, based upon my training and experience, with the practices of drug traffickers. I know that drug traffickers, particularly drug traffickers who distribute the volume of drugs that Santos distributes, with the frequency of Santos's distribution activities, often maintain and/or utilize multiple premises, each with a specific purpose, to facilitate the drug trafficking organization's operational interests as well as to protect their interests from their competition and elude law enforcement. However, given that Santos is on a GPS monitoring device and his movements are restricted by a curfew, I believe

240

Santos is using SP10 as the primary storage location for cash drug proceeds and drug records. I also know that items, including drug records and drug proceeds that have come in contact with controlled substances, including cocaine and heroin, can be detected by narcotics canines.

697.    In this case, there is probable cause to believe that SANTOS secretes cash drug proceeds within Subject Premises 10 as well as other items listed on Attachment A for this Subject Premises, and, also, keeps within Subject Premises 10 records pertaining to Santos' drug trafficking, as well as cellular telephones utilized to facilitate drug trafficking, including the cellular telephones assigned telephone number (475) 295-7948 and telephone number (475) 559-6199, which were both utilized by Santos to contact Duprey on Target Telephone 3.

### Additional Information Pertaining to Subject Premises 11

698.    **Subject Premises 11**,169 Stonefield Drive, Apartment 7, in Waterbury, Connecticut, is the residence where Jonathan SANTIAGO resides and at which there is probable cause to believe drug proceeds, records relating to drug trafficking, controlled substances, including cocaine and/or residue of cocaine, as well as other evidence of the offenses set forth in this affidavit, and listed on Attachment A for SP11, including but not limited to the cellular telephone assigned telephone number (203) 592-5107, currently utilized by SANTIAGO, and the cellular telephone assigned telephone number (475) 559-9691, previously utilized by SANTIAGO, will be found.

699.    Subject Premises 11 ("**SP11**"), 169 Stonefield Drive, Apartment 7, in Waterbury, Connecticut, is more particularly described as a multi-unit apartment building with the front doors at ground level. The building's bottom portion is constructed of brick and the

241

top portion has tan siding.  The exterior front door to SP11 is maroon in color and is clearly marked "169 7" on the right side of the door, above the black mailbox mounted to the brick.

700.    An administrative subpoena was sent to Eversource Legal Compliance Department for Subject Premises 11.  The results showed the electric bill is currently active and is listed in the name Norma Echevarria, who, as explained below, is believed to be the mother of SANTIAGO.

701.    An administrative subpoena was sent to AT&T wireless for account information regarding telephone (203) 592-5107, the telephone currently utilized by SANTIAGO.  The subpoena response indicated service for this cellular telephone is currently active, and has been active since December 8, 2017, and is subscribed to in the name Norma Echevarria of 169 Stonefield Drive, Apartment 7, Waterbury, Connecticut, which is **SP11**.

702.    Jonathan SANTIAGO's driver's license lists 169 Stonefield Drive, Apartment 7, Waterbury, Connecticut as his address.  Additionally, a check of an open-source law enforcement database showed SANTIAGO's top known address to be 169 Stonefield Drive, Apartment 7, Waterbury, Connecticut.  The check also associated telephone number (203) 592-5107 with SANTIAGO.

### 2019 Arrest of Jonathan SANTIAGO by the Waterbury Police Department

703.    On August 3, 2019, members of the Waterbury Police Department Street Crimes Unit conducted a motor vehicle stop of a vehicle being operated by Jonathan SANTIAGO, who was arrested in connection with the stop.

704.    The arrest report indicates that SANTIAGO was in possession of a redistribution quantity of pre-packaged heroin and a redistribution quantity of suspected oxycodone, and, as indicated, was arrested.

242

705.    There were two small children in the vehicle SANTIAGO was operating at the time of his arrest. So, SANTIAGO's mother, Norma ECHEVARRIA was called to take custody of the children and transport them to her home at 169-7 Stonefield Drive, Waterbury Connecticut.

706.    Following his arrest, SANTIAGO provided the following booking information to the Waterbury Police Department as his booking information:   Address: 169-7 Stonefield Drive, Waterbury CT, which is **SP11**; Telephone number: (203) 592-5107, which is the telephone number SANTIAGO has been intercepted using to contact Duprey during the wiretap phase of the DEA's current investigation of DUPREY.

### May 4, 2022:  200 Grams of Suspected Cocaine Within SP11

707.    On May 4, 2022, Jose DUPREY and Jonathan SANTIAGO engaged in a series of calls and text messages intercepted over Target Telephone 3. In sum and substance, these conversations indicated that DUPREY was going to supply SANTIAGO with 200 grams on this date.

708.    Specifically, in session 1166, SANTIAGO sent a text message to Target Telephone 3 which read: "Bro hold the other 200 for me I got the money for it." And in session 1193, at 11:18 a.m. over Target Telephone 3, Santiago texted Duprey: "Ok I need the other 200," believed to mean SANTIAGO wanted to purchase 200 grams of cocaine from Duprey.

709.    In call session 1194 over TT-3, intercepted at approximately 12:01 p.m., SANTIAGO and DUPREY had the following conversation:

DUPREY: Yo!
SANTIAGO: Yo. Do you have the 200?
DUPREY: Uh, yeah.
SANTIAGO: A'ight. Bet. Um... Do you have it with you?

DUPREY: Yeah. I just bring it in case. Yeah. I said, let me bring it in case. So like I don't have to run. [Voices Overlap]
SANTIAGO: A'right. A'right, I'm 'bout to go... I'm 'bout to come see you.
DUPREY: All right, bro. All right.
SANTIAGO: All right, bye.

710.   In the foregoing conversation, I believe Duprey informed Santiago that he was already in possession of the 200 grams of cocaine that Santiago had earlier requested, and Santiago indicated that he would travel to Discount Car Rental, where Duprey works, to pick up the cocaine.

711.   On May 4, 2022, at approximately 1:27 P.M., SANTIAGO sent an intercepted text (Session 1199) to TT-3 which read "Just calling to let u know I'm on my wat to u bro."

712.   Shortly after the above text (session 1199) was intercepted, surveillance units observed a white Mercedes Sedan arrive at Discount Car Rental, where DUPREY works and was believed to be at that time, based upon the above intercepted sessions and on location information associated with Target Telephone 4.   SANTIAGO had been previously observed by investigators operating a white Mercedes sedan bearing Connecticut registration BD35621, and this vehicle is believed to be the one observed arriving at Discount Car Rental on May 4, 2022.

713.    Shortly after the Mercedes arrived, a surveillance team member, with the aid of binoculars, observed SANTIAGO exit the Mercedes and enter Discount Car Rental.

714.   A short time later, SANTIAGO exited the store and got back into the driver's seat of the Mercedes and departed the parking lot.

715.   At this time mobile surveillance began to followed SANTIAGO's vehicle. SANTIAGO drove under constant surveillance to the Eastridge apartments at 16 Meriline Avenue in

244

Waterbury. SANTIAGO backed his vehicle into a parking space in the lot but never got out of the vehicle. A short time later, a white female emerged from the courtyard area of the complex and walked to the front driver side area of the Mercedes. Due to cars being in the line of sight, surveillance was able to see a majority of the Mercedes but could not see exactly what the white female was doing. Moments later the female walked back to the area from which she had come.   I believe based on my training and experience, and knowledge gained in this investigation regarding SANTIAGO and his drug trafficking activities, that SANTIAGO engaged in a hand-to-hand drug transaction with the white female who was observed at the driver's side window of his vehicle, likely involving a small portion of the cocaine SANTIAGO had moments earlier received form DURPEY.

716.   After the suspect hand-to-hand transaction with the white female, SANTIAGO's white Mercedes pulled off out of the lot and mobile surveillance continued.  SANTIAGO was again followed under constant surveillance as he drove straight from Meriline Avenue to 169 Stonefield Drive in Waterbury.

717.   There, at the parking lot for **SP11**, surveillance observed SANTIAGO park his vehicle in a parking lot below the apartment building. Surveillance then observed SANTIAGO walk up the rear staircase leading to Apartment 7, which is **SP11**.

718.   There is probable cause to believe, and I do believe, that on May 4, 2022, SANTIAGO brought a bulk quantity of cocaine that he had received earlier that day from Jose DUPREY into SP11 and stored it there for future redistribution.

**May 17, 2022:  Surveillance of SANTIAGO and Drugs Within SP11**

719.   On May 17, 2022, at approximately 1:40 A.M., surveillance observed SANTAIGO's white Mercedes Benz, bearing Connecticut registration BD35621, parked at the end of the parking lot for 169 Stonefield Drive in Waterbury.

720.   Surveillance observed that SANTIAGO's vehicle was running with the lights on but could not confirm whether anyone was in the vehicle.

721.   A surveillance unit parked in the lot several parking spots away from where SANTAGO's Mercedes was parked, in a position from which surveillance was able to maintain a clear view of the Mercedes.

722.   After approximately ten minutes, surveillance observed a male, positively identified as Jonathan SANTIAGO, exit from the Mercedes.

723.   Surveillance then observed SANTIAGO run toward the rear door of 169 Stonefield Drive, Unit 7 (**SP11**) and enter.

724.   Shortly after SANTIAGO entered SP11, a light in a room on the second floor of the apartment was illuminated. After approximately two minutes, the light went off. SANTIAGO was then observed hastily exiting the rear door of 169 Stonefield Drive, Unit 7 (**SP11**) and returning to and entering his white Mercedes. SANTIAGO the drove quickly out of the parking lot.

725.   Thereafter, just two blocks from SP11, surveillance observed SANTIAGO's Mercedes parked window-to-window next to a dark colored sports utility vehicle, consistent with the manner in which persons park their vehicles when engaged in hand-to-hand drug transactions.  Based upon training and experience, it is believed that, on May 17, 2022,

SANTIAGO retrieved a quantity of drugs from within SP11, which he distributed to the operator of the SUV just two blocks away from SP11.

726.    SANTIAGO has been intercepted participating in communications during the wiretap phase of this investigation that I believe pertained to his involvement with Jose Duprey in drug trafficking; and many of these intercepted communications have been set forth throughout this affidavit.  And SANTIAGO's involvement in drug trafficking is believed to have continued through the time of the drafting of this affidavit, as evidenced, in part, by the events of May 17, 2022 detailed above.

727.    As I have indicated in the section of this affidavit pertaining to my training and experience, I know that drug traffickers, particularly those involved in distributing hundreds of grams of cocaine, as SANTIAGO is believed to do, with the frequency that SANTIAGO, based on surveillance and intercepted communications, is believed to distribute drugs, often store drugs and cash drug proceeds and records relating to their drug trafficking and drug proceeds, including but not limited to records regarding the disposition, transportation, or transfer of drug proceeds, as well as records regarding drug debts, within their residences, because they can exercise complete dominion and control over their residences and can undertake to secure these structures.

728.    I also know that when drugs are stored in a location, residue of the drugs often remains in the storage location even after the drugs themselves are removed.

729.    I also know, based upon my training and experience, that drug proceeds and records which have come in contact with controlled substances, including but not limited to heroin, can be detected by narcotics canines, even after the passage of time.

730.    Accordingly, I believe there is probable cause to believe that SANTIAGO continues to be involved in drug distribution, and that there is probable cause to believe drug proceeds, records relating to drug trafficking, cocaine and/or residue of cocaine, as well as other evidence of the offenses set forth in this affidavit, including but not limited to the cellular telephone assigned telephone number (203) 5107, currently utilized by SANTIAGO, and the cellular telephone assigned telephone number (475) 559-9691, previously utilized by SANTIAGO, and as listed on Attachment A to the warrant for Subject Premises 11, will be found within Subject Premises 11.

**Additional Information Pertaining to Subject Premises 12**

731.    **Subject Premises 12 ("SP12")** is located at 96 North Pond Street, in Bristol, CT 06010. It is believed to be the location where Robert AMATRUDA resides, with his girlfriend, Tikyra Harrison, at there is probable cause to believe that AMATRUDA stores drugs, drug proceeds, and drug records and that these and the other items and evidence listed on Attachment A for Subject Premises 12 will be found within Subject Premises 12, including the cellular telephones assigned telephone numbers 203-850-9625 and 203-519-3296, both of which are believed to have been utilized by AMATRUDA during this investigation in connection with drug trafficking.  (AMATRUDA is also believed to store drugs within Subject Premises 9, the service station where he works, which is located at 345 Woodtick Road in Wolcott, Connecticut, as explained in the section of this affidavit pertaining to that Subject Premises.)

732.    Subject Premises 12, 96 North Pond Street, in Bristol, Connecticut is more particularly described as a two-story, two-family residence that is white in color with dark-colored shutters. The residence is located on the corner of North Pond Street and Cypress Street.

248

The front door to the residence faces North Pond Street and the number "96" is clearly displayed on the left side of the front door as you look at the house from the street.

733.   Your affiant submitted an administrative subpoena to Eversource requesting the subscriber information and billing history at 96 North Pond Street, Bristol, Connecticut. The results showed the electric bill is currently active and is subscribed to in the name of Tikyra HARRISON, who is believed to be AMATRUDA's paramour, based on multiple intercepts between AMATRUDA and DUPREY in which "Tikyra" was referenced.

734.   AMATRUDA, moreover, has been seen coming and going many times from Subject Premises 12 during this investigation. Furthermore, cars registered in his name, including a white Subaru and a tan Chevrolet Tahoe, bearing CT registration AV89771, have been observed parked in the driveway of Subject Premises 12.   Investigators have observed Amatruda operating the tan Chevrolet Tahoe on several occasions during this investigation in connection with what were believed to be drug trafficking activities.

735.   AMATRUDA has utilized two cellular telephones during this investigation. They are assigned telephone numbers (203) 850-9625 and (203) 519-3296.

736.   As evidenced by numerous, explicit communications intercepted during the wiretap phase of this investigation in which AMATRUDA participated or was referenced, AMATRUDA is believed to distribute large quantities of heroin and cocaine on a regular basis.

737.   At times, when intercepts suggested to investigators DUPREY was without a supply of cocaine, DUPREY is believed to have continued to supply Amatruda with drugs, which, in this context, led investigators to believe Duprey was supplying heroin to Amatruda.  In addition, on one occasion when Duprey appeared to be without a supply of cocaine,

Amatruda is believed to have obtained "four" kilograms of cocaine from an alternate source of supply and to have provided, or offered to provide, cocaine to Duprey for redistribution.

738.   Several of the explicit communications in which Amatruda participated or was referenced have been set forth in detail in other sections of the affidavit.

739.   Set forth below are selected examples and intercepts, which in your affiant's estimation augment the other explicit intercepts detailed elsewhere in this affidavit and further illustrate the quantities of drugs Amatruda distributes and one instance where he is believed to have expressly indicated that drugs were stored in his house, **Subject Premises 12**.

### April 2, 2022:  AMATRUDA in Possession of Four Kilograms of Cocaine

740.   On April 2, 2022, in session 2898 at approximately 2:11 p.m., Jose DUPREY, utilizing phone number 347-456-8272 ("TT4"), received an incoming phone call (session 2898) from an individual who has been positively identified but who is referred to herein as UM9662, a.k.a. "James," who was utilizing telephone number 413-777-9662.

741.   UM9662 is believed to be a drug user and, perhaps, a street-level distributor.  And on one occasion, intercepts indicated that UM9662 attempted to broker a deal for a bulk quantity of cocaine for Duprey.

742.   In session 2898, UM9662 said, "Okay so, do you want any or no?," believed to mean UM9662 asked Duprey if he wanted UM9662 to make further efforts at brokering a deal for a bulk quantity of cocaine.  Duprey said, "I don't know because Bubba, said he got some," believed to mean Duprey indicated that Amatruda ("Bubba") had acquired a supply of cocaine.  UM9662 said, "Yeah, but Bubba, don't pick up his phone."  Duprey said, "He got like four (4) of them," believed to mean that Duprey informed UM9662 that Amatruda

250

had acquired four kilograms of cocaine.  UM9662 said, "Oh really."  Duprey said, "Yeah [Chuckles]."  UM9662 said, "Have him call this number for me. Have him call me," believed to mean that UM9662 wanted to obtain cocaine from Amatruda and instructed Duprey to have Amatruda call UM9662.

743.   At the time session 2898 on TT4 was intercepted, other intercepts indicated that DUPREY was out of cocaine and looking for an alternate supplier.

744.   I believe the foregoing intercept is one example of the quantities of drugs Amatruda is involved in distributing.  As indicted, numerous other explicit intercepts pertaining to Amatruda's drug trafficking activities are set forth elsewhere in this affidavit.

### May 9, 2022, and May 10, 2022:  Cocaine Stored within Subject Premises 12

745.   On May 9, 2022, and May 10, 2022, explicit intercepts indicated that Amatruda has a bulk quantity of cocaine stored within Subject Premises 12.

746.   Intercepts over the course of these two days (and other intercepts) indicate that Duprey and Amatruda find UM9662, a.k.a. James to be a nuisance and prefer not to deal with him, likely because James is a drug user.

747.   Intercepts on May 9, 2022, and May 10, 2022, suggested that UM9662 a.k.a. James had been persistently calling Duprey and Amatruda and that Amatruda ultimately, and reluctantly, agreed to provide UM9662, a.k.a. James with a small quantity of cocaine.

748.   Intercepts coupled with surveillance indicated that On May 10, 2022, Amatruda took a quantity of cocaine out of **Subject Premises 12** and traveled with it to a location where he met with UM9662, a.k.a. James, but that the anticipated transaction with UM9662,

a.k.a. James was not consummated because UM9662, a.k.a. James did not have the correct amount of money for the transaction, which angered Amatruda.

749.    Some of the pertinent excerpts associated with the events of May 9, 2022 and May 10, 2022 are set forth below.

750.    At approximately 6:22 p.m., in session 7058 on TT4, Duprey spoke to Amatruda, who was utilizing telephone number (203) 519-3296.  UM9662, a.k.a. James was present with Duprey during the call and can be heard in the background. During the call, Duprey indicated that he was "with James."  Amatruda said, "So, what you guys want? . . . What James want?  Duprey was heard talking to James in the background, and, thereafter, informed Amatruda that James wanted "the ball . . . at least," believed to mean James wanted at least an eight-ball of cocaine from Amatruda.  Amatruda responded angrily, saying "I told him, I wasn't doing it 'til tomorrow!  He knows that! . . . I'm not opening that thing up for him . . . I'm not doing it. [Voices Overlap]," believed to mean that Amatruda would supply James with cocaine the following day (May 10, 2022), because he was not going to open a kilogram of cocaine on the evening of May 9, 2022. Amatruda later said, "I'm about to go home right now.  I was gonna do that for you real quick . . . I really don't wanna do it right now," believed to mean that Amatruda was going to process and/or package a quantity of cocaine for Duprey inside **Subject Premises 12** for Duprey but preferred to not do so on the evening of May 9, 2022. Duprey later said, "so just call me when you done in there," believed to mean Duprey instructed Amatruda to call Duprey whenever he finished processing or packaging cocaine for Duprey inside Subject Premises 12.  Later in the conversation, Amatruda said, "I'll see him tomorrow . . . . James," believed to mean Amatruda would supply

252

James with at least an eight-ball of cocaine the following day, May 10, 2022.  Duprey

said, "Alright, alright.  I'll call you then."  Amatruda said, "I'll bring one tomorrow with

me," believed to mean either that Amatruda would bring "one" eight-ball for James when

Amatruda delivered cocaine to Duprey the following day, or that Amatruda was going to

bring "one" kilogram of cocaine to Duprey the following day.

751.    On May 9, 2021, in session 7071 on TT4 at approximately 7:29 p.m., Amatruda called

Duprey.  During the call, Amatruda said, Yo, your boy James, man, just called me again.

. . . Yo! Is he paying me tomorrow?," believed to mean Amatruda wanted Duprey to

confirm that James would pay Amatruda for the cocaine.  Duprey said, "Ah! He better

pay."  Amatruda said, "Yo, he's just thinking he pay for half and take the other half,"

believed to mean that Amatruda had a conversation with James in which James wanted to

pay for a quantity of cocaine and receive an equal quantity on consignment. Duprey said,

"No, bro! No."  Amatruda said, "I'm not doing that bro," believed to mean that Amatruda

made clear to Duprey that Amatruda would not provide a quantity of cocaine to James on

consignment.  Investigators anticipated that the contemplated drug transaction would

occur at Discount Car Rental on May 10, 2022.

752.    On May 10, 2022, in anticipation of a drug transaction between Amatruda and James,

surveillance was established at Amatruda's residence at 96 North Pond Street, Bristol,

Connecticut (Subject Premises 12)..

753.    At approximately 3:15 p.m., AMATRUDA was observed exiting his house and entering

his tan 2008 Chevrolet Tahoe bearing CT registration AV89771, which was parked in the

driveway.  Amatruda then departed from Subject Premises 12, followed by surveillance.

754.   Amatruda's vehicle was followed directly to Bristol Central High School, located at 480 Wolcott Street, Bristol, Connecticut, where, based upon other intercepts, Amatruda's child is believed to attend, and Amatruda had previously picked up his child from school at this location.  Amatruda's vehicle traveled out of view of surveillance units at the school.  It was apparent that school was being dismissed for the day and there was a high volume of vehicles and school buses entering and exiting the school property

755.   At approximately 3:25 p.m., surveillance units observed AMATRUDA's vehicle exiting the school and proceeding South on Wolcott Street. Surveillance units followed the vehicle as it traveled from Bristol Central High School to Discount Car Rental located at 767 Wolcott Street, Waterbury.

756.   Surveillance units observed the vehicle pull into the Discount Car Rental parking lot at approximately 3:46 p.m. and immediately drive around the back of the building out of view of surveillance units.

757.   At approximately 3:53 p.m. surveillance observed an older model tan Cadillac STS bearing CT registration 351-YZZ pull into the Discount Car Rental parking lot and park directly in front of the business. The registration plate has been confirmed as misuse. During the course of this investigation, this Cadillac STS has been observed on a regular basis at the Discount Car Rental.  Surveillance observed a black male exit from the Cadillac and was able to positively identify the black male as UM9662, a.k.a. James, utilizing a recent DMV photograph of James, whose true identify is known to your affiant.

758. At approximately 4:03 p.m., surveillance observed AMATRUDA's tan Chevrolet Tahoe driving out from the back of the building toward the street and exit the parking lot onto Wolcott Street.

759. Shortly thereafter, at approximately 4:04 p.m., surveillance observed UM9662, a.k.a. "James" walking from around the back of the Discount Car rental building, from the same direction as AMATRUDA's vehicle had appeared, and approach the Cadillac STS parked in the front parking lot.

760. UM9662, a.k.a. "James entered the Cadillac STS.  At that time, DUPREY was observed pulling into the parking area in the front of the building operating a tan Mercedes. And UM9662, a.k.a. James was observed entering the front passenger seat of DUPREY's vehicle, which exited the parking lot.

761. On May 10, 2022, in session 7282 on TT4, at approximately 10:37 p.m., Jose DUPREY, called AMATRUDA, who was utilizing telephone number (203) 519-3296. During the call, it was revealed that Amatruda did not supply UM9662 with the cocaine that Amatruda had brought with him from Subject Premises 12, because UM9662, a.k.a. James did not have money for the drugs.  During the call, Duprey, referring to UM9662 specifically by name, said," This nigga was calling me all day. Like what the fuck! . . . I hate that shit, bro'."  Amatruda said, "Bro, listen! You see how I told him. I was like, 'Yo, give me the money.' I said, 'Listen, you give him the money, I'll tell you where it is,'" believed to mean that Amatruda insisted that UM9662, a.k.a. James pay in full for the drugs that Amatruda had brought to the anticipated transaction from within **Subject Premises 12**.  Duprey said, "I had to turn the phone off and everything. I was like, "Yo, what the fuck?," believed to mean that UM9662 had been calling Duprey looking for

drugs because Amatruda had refused to supply drugs to UM9662, a.k.a. James when they met at Discount Car Rental earlier in the day.  Amatruda then said "Yeah. I'm not giving him that shit tomorrow either. Fuck that!," believed to meant that Amatruda was disgusted with UM9662, a.k.a. James and did not want to deal with him.

762.   I believe the foregoing illustrates a specific example of an instance in which AMATRUDA expressly indicated that he had drugs stored within Subject Premises 12 and, in fact, brought a quantity of drugs from Subject Premises 12 to a meeting with UM9662, a.k.a. James at Discount Car Rental, but that no transaction was consummated because UM9662, a.k.a. James did not have money for the deal.

763.   As I have indicated in the section of this affidavit pertaining to my training and experience, I know that drug traffickers, particularly those involved in distributing hundreds of grams of cocaine and heroin, as AMATRUDA is believed to do with some regularity, based on surveillance and intercepted communications, often store drugs and cash drug proceeds and records relating to their drug trafficking and drug proceeds, including but not limited to records regarding the disposition, transportation, or transfer of drug proceeds, as well as records regarding drug debts, within their residences, because they can exercise complete dominion and control over their residences and can undertake to secure these structures.

764.   I also know that when drugs are stored in a location, residue of the drugs often remains in the storage location even after the drugs themselves are removed.

765.   I also know, based upon my training and experience, that drug proceeds and records which have come in contact with controlled substances, including but not limited to heroin, can be detected by narcotics canines, even after the passage of time.

766.    There is probable cause to believe, and I do believe, that the items listed on Attachment A for Subject Premises 12, including drug paraphernalia, including drug packaging, controlled substances, controlled substances residue, drug proceeds and drug records all of which are evidence of the target offenses, as well as the cellular telephones assigned telephone numbers 203-850-9625 and 203-519-3296, both of which are believed to have been utilized by AMATRUDA during this investigation in connection with drug trafficking, are located within Subject Premises 12.

## XIII.   EXECUTION OF THE WARRANTS

767.    The undersigned anticipates executing the warrants between the hours of 6:00 a.m. and 10:00 p.m. and therefore does not request express authorization to execute the warrants sought herein at any time of the day or night, although it is believed, based upon the information contained herein, such authorization is supported by good cause.

768.    Separate and distinct Attachments A documents, describing the items believed to be contained within the Subject Premises to which the attachment pertains, are attached to the applications and search warrants.   Separate and distinct Attachments B documents, describing the Subject Premises to be searched (and including one or more photographs of the premises) are also attached to the applications and search warrants.

## XIV.   SEALING

769.   It is further requested that this affidavit be filed under seal until further order of the Court as the investigation is continuing, and, it is my belief that, based upon the details of the investigation set forth herein, disclosure at this time could compromise the safety of law enforcement authorities conducting the investigation and those who will effect the anticipated arrests and searches, and the ongoing investigation itself, by, including but not limited to, causing Violators to flee or destroy evidence if they were to be alerted to the contents of this affidavit.


_____
Scott Vitelli
DEA Task Force Officer

SUBSCRIBED and SWORN to before me this 24th day of May 2022, at Bridgeport, Connecticut.

/s/
_____
HONORABLE ROBERT M. SPECTOR
UNITED STATES MAGISTRATE JUDGE